UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

------------------------------------------------------------x
                                            :

CIT COMMUNICATIONS FINANCE
CORPORATION,
                                            :

                Plaintiff,            :

              - against -         :       No. 06 Civ. 121 (SLR)

LEVEL 3 COMMUNICATIONS, LLC and     :
LEVEL 3 COMMUNICATIONS, INC.,

                                            :

              Defendants.           

                                            :
------------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION TO REMAND

**BLANK ROME LLP**
Steven L. Caponi (DE ID #3484)
1201 Market Street,
Suite 800
Wilmington, Delaware 19801
Phone: 302-425-6400

Attorneys for Defendants Level 3 Communications,
LLC and Level 3 Communications, Inc.

Dated: Wilmington, Delaware
       June 19, 2006

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ......................................................................................................1

STATEMENT OF FACTS ............................................................................................................3

ARGUMENT.................................................................................................................................5

I.     THE REMOVED ACTION IS RELATED TO A CASE UNDER TITLE 11 OVER
       WHICH THIS COURT AND THE BANKRUPTCY COURT HAVE ORIGINAL
       JURISDICTION. ................................................................................................................5

II.    EQUITABLE CONSIDERATIONS REQUIRE THAT THIS COURT RETAIN
       JURISDICTION AND NOT REMAND THE ACTION TO STATE COURT .................8

       A.     The Court Should Not Abstain From Hearing the Removed Action
              Pursuant to 28 U.S.C. § 1334(c)(2).......................................................................8

       B.     This Court Should Not Abstain From Hearing the Removed Action
              Pursuant to 28 U.S.C. § 1334(c)(1).....................................................................10

III.   IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THE REMOVED
       ACTION TO THE BANKRUPTCY COURT AND ALLOW IT TO DECIDE THE
       REMAND MOTION .........................................................................................................14

CONCLUSION............................................................................................................................16

i

## TABLE OF AUTHORITIES

### REPORTED DECISIONS

*Aaron Gleich, Inc. v. Housing Authority*,
    200 B.R. 464 (Bankr. D. Me. 1996)..................................................................................13

*Binder v. Price Waterhouse & Co.*,
    372 F.3d 154 (3d Cir. 2004)......................................................................................6, 7, 8

*First Fidelity Bank, N.A. v. Hooker Investment, Inc.*,
    937 F.2d 833 (2d Cir. 1991)..............................................................................................13

*Great America Insurance Co. v. Mobile Tool International*,
    320 B.R. 552 (Bankr. D. Del 2005) ...................................................................................9

*Grimes v. Graue*,
    158 B.R. 965 (Bankr. S.D. Tex. 1993) ..............................................................................9

*Hohl v. Bastian*,
    279 B.R. 165 (W.D. Pa. 2002).........................................................................................15

*LaRoche Industrial, Inc. v. Orica Nitrogen LLC*,
    312 B.R. 249 (Bankr. D. Del. 2004) ................................................................................11

*Langenkamp v. Culp*,
    498 U.S. 42 (1990)............................................................................................................13

*Lone Star Industrial, Inc. v. Liberty Mutual Insurance Co.*,
    131 B.R. 269 (D. Del. 1991).............................................................................................15

*NDEP Corp. v. Handl-It, Inc.*,
    203 B.R. 905 (Bankr. D. Del. 1996) ................................................................................13

*NYLife Distributings, Inc. v. Adherence Group, Inc.*,
    72 F.3d 371 (3d Cir. 1995)...............................................................................................10

*Pacor, Inc. v. Higgins*,
    743 F.2d 984 (3d Cir. 1984)...............................................................................................6

*Republic Reader's Serv., Inc. v. Magazine Serv. Bureau, Inc.*,
    81 B.R. 422 (Bankr. S.D. Tex. 1987) ..............................................................................10

*In re Resorts International*,
    199 B.R. 113 (Bankr. D.N.J. 1996) ...................................................................................8

*Stratton v. Mariner Health Care, Inc.*,
    303 B.R. 42 (Bankr. D. Del. 2003) ...................................................................................11

*Travellers International v. Robinson*,
    982 F.2d 96 (3d Cir. 1992)...............................................................................................13

*Traylor v. First Family Finance Services, Inc.*,
    183 B.R. 286 (M.D. Ala. Apr. 17, 1995) ..........................................................................15

## UNREPORTED CASES

*In re Allegheny Health, Education & Research Foundation*,
    No. 98-25773, 1999 WL. 1033566 (Bankr. E.D. Pa. Nov. 10, 1999) ...............................15

*Bienvenu v. Vaughan*,
    No. 93-3486, 1994 WL. 71292 (E.D. La. Feb. 28, 1994)..................................................15

*Nemsa Establishment, S.A.*,
    1995 WL. 489711 ...............................................................................................................14

*Nemsa Establishment, S.A. v. Viral Testing System Corp.*,
    No. 95 Civ. 0277, 1995 WL. 489711 (S.D.N.Y. Aug. 15, 1995) ......................................12

*RGC International Investors, LDC, v. Tricord System, Inc.*,
    No. 02-82361, 2003 WL. 1565945 (Bankr. D. Del. Mar. 24, 2003) ................................15

*Resolution Trust Corp. v. Chemical Bank*,
    94 Civ. 1564, 1996 WL. 19030 (S.D.N.Y. Jan. 18, 1996).................................................14

## DOCKETED CASES

*In re Genuity Inc.*, Case No. 02-43558 (Bankr. S.D.N.Y.)...........................................................1, 4

## OTHER

28 U.S.C. § 1334(b) ...............................................................................................................1, 2, 3, 6

28 U.S.C. § 1334(c)(1)...................................................................................................................10

28 U.S.C. § 1334(c)(2).....................................................................................................................9

28 U.S.C. § 1452(b) .......................................................................................................................11

28 U.S.C. § 157(a) .........................................................................................................................15

Fed. R. Bankr. P. 2002, 6004 ..........................................................................................................4

Federal Rule of Bankruptcy Procedure 9014 ....................................................................................5

## PRELIMINARY STATEMENT

The Remand Motion should be denied for several reasons. First, this Court has jurisdiction over the Removed Action pursuant to 28 U.S.C. § 1334(b). The Removed Action relates to In re Genuity Inc. et al., Case No. 02-43558, filed on November 27, 2002 (the "Petition Date"), by Genuity Solutions, Inc. and related entities ("Genuity" or "Debtors") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") pending in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (the "Bankruptcy Case").[1] Plaintiff filed Administrative Claim Nos. 5937 and 6180 and Claim No. 2954, as amended by Claim No. 6176 in the Bankruptcy Case (collectively, the "Bankruptcy Claims"), which have been objected to by the liquidating trust which succeeded the Debtors, and these objections are currently pending before the Bankruptcy Court as contested matters. The Bankruptcy Claims seek to recover damages for unpaid lease payments and for the value of equipment that was not returned to CIT that had been leased to the Debtors pursuant to certain schedules under a Master Equipment Lease No. E212580 (the "Master Equipment Lease").

The Master Equipment Lease schedules were rejected by the Debtors in the Bankruptcy Case. The Bankruptcy Claims seek damages in the aggregate amount of $6,281,639.60. The Complaint in the Removed Action seeks damages from Level 3 in an unliquidated amount for unpaid lease payments and for the value of unreturned equipment under the Master Equipment Lease schedules. In short, CIT seeks to recover twice for the same alleged injury: once from the Debtors in the Bankruptcy Court and a second time from Level 3 in the Removed Action. Any recovery CIT were to obtain from Level 3 in the Removed Action would by definition reduce its

---

[1]    If the Remand Motion is denied, Level 3 intends to file a prompt motion to transfer venue of the Removed Action to the Bankruptcy Court.

potential recovery against the Debtors in the Bankruptcy Court. Moreover, if the Removed Action is remanded, Level 3 will have to implead the Debtors as third-party defendants, inasmuch as Level 3 believes that, to the extent CIT is entitled to any recovery under the Master Equipment Lease, it is against the Debtors. As a result, the Removed Action is indisputably "related to" the Bankruptcy Case, and this Court (and the Bankruptcy Court) has jurisdiction over it pursuant to 28 U.S.C. § 1334(b). The Removed Action is simply an attempt to make an "end run" around the claims resolution process in the Bankruptcy Court, and to avoid the reality that any recovery against the Debtors' estates may be payable to CIT only in "bankruptcy dollars."

Equitable factors such as the avoidance of uneconomical use of judicial resources, and avoidance of inconsistent determinations, all weigh heavily in favor of denying Plaintiff's Remand Motion, inasmuch as the Removed Action and the Bankruptcy Claims will require the adjudication of identical issues: CIT's alleged entitlement to unpaid lease payments and the value of unreturned equipment under the Master Equipment Lease schedules.

Finally, in the alternative, Level 3 respectfully requests that this Court transfer venue of the Removed Action to the Southern District of New York and let the Bankruptcy Court determine the Remand Motion. The Bankruptcy Court is uniquely positioned to determine whether Plaintiff's claims asserted in the Removed Action are duplicative of the Bankruptcy Claims, whether the claims in the Removed Action relate to the Bankruptcy Case, and whether Plaintiff's prosecution of this action outside the Bankruptcy Court is merely an attempt to forum shop.

2

## STATEMENT OF FACTS

According to Plaintiff, on or about December 28, 1995, Plaintiff entered into the Master Equipment Lease and corresponding schedules with Genuity. (Compl. ¶ 6.)[2] Pursuant to the Master Equipment Lease, Genuity was to make "monthly installment lease payments" to Plaintiff in exchange for continued use and retention of the equipment that was the subject of the Master Equipment Lease schedules. (Id. ¶ 7.)

On the Petition Date, Genuity filed a Motion for Order Under 11 U.S.C. 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (I) (A) Approving Notice and Bidding Procedures, (B) Approving Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, In Connection With the Proposed Sale of Substantially All of the Debtors' Assets and (C) Scheduling Hearing and Setting Bidding and Objection Deadlines In Connection With Such Sale; and (II) Authorizing and Approving (A) Asset Purchase Agreement With Level 3 Communications, Inc. and Level 3 Communications, LLC, (B) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances, (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (D) Certain Related Relief  (the "Sale Motion") [In re Genuity Inc., Case No. 02-43558 (Bankr. S.D.N.Y.), D.I. 24, annexed hereto as Exhibit A].[3]  On January 15, 2003, Plaintiff filed its objection to the Sale Motion [In re Genuity, D.I. 337, annexed hereto as Exhibit B].

On January 24, 2003, the Bankruptcy Court entered an Order Under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 Authorizing and Approving (I)

---

[2]     The facts alleged in the Complaint are accepted as true solely for purposes of the Remand Motion.  Level 3 reserves the right to dispute these facts at the appropriate time.

[3]     Docket entries filed in In re Genuity Inc., Case No. 02-43558 (Bankr. S.D.N.Y.) are cited as In re Genuity, followed by the docket index number.

Asset Purchase Agreement With Level 3 Communications, Inc. and Level 3 Communications, LLC; (II) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances; (III) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Certain Related Relief (the "Sale Order") [In re Genuity, D.I. 438, annexed hereto as Exhibit C].

On January 24, 2003, the Bankruptcy Court entered a Stipulation and Order (the "Stipulation") [In re Genuity, D.I. 459, annexed hereto as Exhibit D] between Plaintiff, Level 3, and the Debtors, regarding Plaintiff's objections to the Sale Motion and providing for Genuity to pay certain sums and set aside certain sums of money to compensate Plaintiff.

Genuity rejected all schedules related to the Master Equipment Lease prior to December 2, 2003, the effective date of the Debtors' Joint Consolidated Plan of Liquidation, as Modified, dated October 1, 2003 (the "Plan") [In re Genuity, D.I. 1673, annexed hereto as Exhibit E], which was confirmed by the Order Confirming Debtors' Joint Consolidated Plan of Liquidation, as Modified (the "Confirmation Order") [In re Genuity, D.I. 1830, annexed hereto as Exhibit F].

On or about October 14, 2003, Plaintiff filed Administrative Claim No. 5937 [annexed hereto as Exhibit G], and on January 4, 2004, Plaintiff filed Administrative Claim No. 6180 [annexed hereto as Exhibit H]. Administrative Claim No. 5937 seeks damages arising under the Master Equipment Lease schedules through July 31, 2003 ($759,476.68), and Administrative Claim No. 6180 seeks damages arising under the Master Equipment Lease schedules arising on or after August 1, 2003 (S788,490.77). On or about April 1, 2003, Plaintiff filed Claim No. 2954 [annexed hereto as Exhibit I], as amended by Claim No. 6176 [annexed hereto as Exhibit J]. Claim No. 2954, as amended by Claim No. 6176 seeks damages in unpaid amounts due under the Master Equipment Lease as of the Petition Date and a counterpart claim for rejection

4

damages in the event the Debtors rejected the Master Equipment Lease and related schedules ($4,733,672.21). On September 22, 2004, the liquidating trust appointed pursuant to the Plan filed the Tenth Omnibus Objection of GLT Liquidating Trust to Proofs of Claim (the "Tenth Omnibus Objection") [In re Genuity, D.I. 2394, annexed hereto as Exhibit K], objecting to, among others, Plaintiff's Bankruptcy Claims, thus initiating contested matters pursuant to Federal Rule of Bankruptcy Procedure 9014. Plaintiff filed its response to the Tenth Omnibus Objection on January 21, 2005 ("Plaintiff's Response to the Tenth Omnibus Objection") [In re Genuity, D.I. 2579, annexed hereto as Exhibit L]. The contested matters are currently pending in the Bankruptcy Court.

On January 23, 2006, Plaintiff filed the Complaint in the Removed Action, asserting claims for breach of contract, unjust enrichment, and conversion, contending that pursuant to the Sale Order "Level 3 was required to make Monthly Payment to [Plaintiff] for the Equipment," that Level 3 "has failed to make the required Monthly Payments," and that "Level 3 has failed to return all the Equipment to [Plaintiff]." (Compl. ¶¶ 13-15.) On February 24, 2006, Level 3 removed this action to this Court. On March 23, 2006, Plaintiff filed the Remand Motion.

## ARGUMENT

I.   THE REMOVED ACTION IS RELATED TO A CASE
     UNDER TITLE 11 OVER WHICH THIS COURT AND THE
     BANKRUPTCY COURT HAVE ORIGINAL JURISDICTION.

Section 1334(b) of title 28 of the United States Code vests in the district courts jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Plaintiff argues that this Court does not have jurisdiction over the Removed Action because the Removed Action is not related to a case under title 11. (See Mem. of Law in Supp. of Pl.'s Mot. to Remand, dated Mar. 23, 2006 ("Pl. Mem."), at 5.)

Plaintiff is incorrect. "The usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether **the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy**." Pacor, Inc. v. Higgins (In re Pacor, Inc.), 743 F.2d 984, 994 (3d Cir. 1984), overruled on other grounds by Things Remembered, Inc. v. Petrarca, 516 U.S. 124 (1995); Binder v. Price Waterhouse & Co. (In re Resorts Int'l), 372 F.3d 154, 174 (3d Cir. 2004).

If Plaintiff has any claim against Level 3, it clearly arises out of the Master Equipment Lease, and related schedules, with the Debtors. Those schedules were rejected by the Debtors and Plaintiff has filed the Bankruptcy Claims to recover unpaid lease payments and the value of unreturned equipment against the Debtors in the Bankruptcy Court. The Confirmation Order entered in the Bankruptcy Court provides, in pertinent part that:

> Retention of Jurisdiction. Notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, **the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases after the Effective Date to the extent that it is legally permissible**, including, without limitation, for the following purposes: . . .
>
> (e) Leases and Executory Contracts. To determine any and all motions for the rejection, assumption, or assignment of executory contracts or unexpired leases and **to determine the allowance of any Claims resulting from the rejection of executory contracts and unexpired leases**;
>
> (f) Actions. To determine all applications, motions, adversary proceedings, contested matters, actions, Causes of Action and any other litigated matters instituted in the Chapter 11 Cases, including any remands.

(Confirmation Order ¶ 25(e)-(f) (emphasis added).) To the extent that Plaintiff is claiming damages resulting from a rejection of the Master Equipment Lease schedules, that claim falls within the jurisdiction expressly retained by the Bankruptcy Court. (See id. ¶ 25(f).)

6

The Complaint in the Removed Action alleges that, pursuant to the Debtors' sale of
assets to Level 3, Level 3 acquired "some or all of the Equipment as well as [the Debtors']
obligations under the [Master Equipment Lease and schedules]." (Compl. ¶ 11.) The question
of whether Level 3 acquired any of the equipment leased to the Debtors under the Master
Equipment Lease cannot be determined without reference to the terms of the Purchase
Agreement and Sale Order. The construction of the Purchase Agreement, however, remains
within the jurisdiction of the Bankruptcy Court pursuant to the Confirmation Order. (See
Confirmation Order ¶ 25.) The Sale Order, under which many of the leases related to the Master
Equipment Lease were rejected and which approved the Purchase Agreement, also explicitly
provides that the Bankruptcy Court retains jurisdiction stating:

> **This Court retains jurisdiction to enforce and implement the
> terms and provisions of the Purchase Agreement,** all
> amendments thereto, any waivers and consents thereunder, and of
> each of the agreements executed in connection therewith
> (including, but not limited to, the Ancillary Agreements (including
> the Transition Services Agreement)) in all respects, including, but
> not limited to, retaining jurisdiction to (a) compel delivery of the
> Purchased Assets to the Purchaser, (b) compel assumption of the
> Assumed Liabilities by the Purchaser, (c) resolve any disputes
> arising under or related to the Purchase Agreement, except as
> otherwise provided therein, and (d) interpret, implement and
> enforce the provisions of this Sale Order.

(Sale Order ¶ 32 (emphasis added).) Thus, any determination of whether Level 3 is liable to CIT

for damages arising under the Master Equipment Lease should be made by the Bankruptcy

Court.

Plaintiff has been litigating its claims arising under the Master Equipment Lease
schedules with the Debtors in the Bankruptcy Court since September 2004. The subject matter
of the Bankruptcy Claims is identical to the claims asserted in the Removed Action filed almost a
year and a half later. If the Removed Action is remanded, the Superior Court will be required "to

construe and enforce provisions of the Plan to resolve a post-confirmation dispute." Binder, 372

F.3d at 167 (citing with approval to the bankruptcy court's retention of jurisdiction to decide In

re Resorts Int'l, 199 B.R. 113 (Bankr. D.N.J. 1996)). It will be required to determine whether

the Debtors, Level 3, or indeed any party, is liable to Plaintiff for damages arising from the

Master Equipment Lease schedules. In the event the Removed Action is remanded, Level 3 will

have to implead the Debtors as third-party defendants, inasmuch as Level 3 believes that, to the

extent CIT is entitled to any recovery under the Master Equipment Lease, it is from the Debtors.

Thus, the Removed Action clearly falls within the related to jurisdiction of the Bankruptcy

Court.

Finally, Plaintiff's reliance on Grimes v. Graue (In re Haws), 158 B.R. 965 (Bankr. S.D.

Tex. 1993) for the proposition that the Removed Action is not "related to" the Bankruptcy Case,

is misplaced. Grimes involved an adversary proceeding brought by a former chapter 11

bankruptcy trustee two years after the bankruptcy case was closed. There was no ongoing

contested matter pending before the bankruptcy court involving either of the two parties in

Grimes. Moreover, unlike in Grimes, analysis of the Removed Action will require review of

numerous filings in the Bankruptcy Case because the claims arise out of the Debtors' rejection of

the leases in the Bankruptcy Case.

## II.    EQUITABLE CONSIDERATIONS REQUIRE THAT THIS COURT RETAIN JURISDICTION AND NOT REMAND THE ACTION TO STATE COURT.

### A.    **The Court Should Not Abstain From Hearing the Removed Action Pursuant to 28 U.S.C. § 1334(c)(2).**

There are six requirements for mandatory abstention under section
1334(c)(2) of title 28: (1) the motion to abstain is timely; (2) the action is
based upon a state law claim or cause of action; (3) an action has been
commenced in state court; (4) the action can be timely adjudicated; (5)
there is no independent basis for federal jurisdiction which would have

8

permitted the action to be commenced in federal court absent bankruptcy; and (6) the matter is non-core.

Great Am. Ins. Co. v. Mobile Tool Int'l (In re Mobile Tool Int'l), 320 B.R. 552, 556 (Bankr. D. Del. 2005) (citations omitted).

Level 3 submits that mandatory abstention is inapplicable here. Although Plaintiff argues that each of the criteria for mandatory abstention is satisfied, it ignores the obvious and fundamental impediment to the applicability of mandatory abstention. Plaintiff chose the forum in which to seek damages arising out of the Master Equipment Lease, and related schedules, almost a year and a half before it commenced the Removed Action. The forum it chose was the Bankruptcy Court, in which it asserted that the Debtors, not Level 3, were liable for unpaid lease payments and for the value of unreturned equipment under the Master Equipment Lease. Apparently dissatisfied with its progress in the Bankruptcy Court, Plaintiff now seeks to hold Level 3 liable for the same damages it seeks from the Debtors. Rather than assert that claim in the Bankruptcy Court, which has jurisdiction over Level 3 as a purchaser of assets of the Debtors, it instead engaged in rank forum shopping, commencing the Removed Action in the Superior Court and asserting duplicative claims against Level 3 for the same damages sought from the Debtors in the Bankruptcy Case. When faced with parallel state and federal claims, a court should "evaluate the conduct of the parties in litigating both the federal and state actions to ensure that procedural fencing, forum shopping or gamesmanship is not rewarded." NYLife Distribs., Inc. v. Adherence Group, Inc., 72 F.3d 371, 383 (3d Cir. 1995); see also Republic Reader's Serv., Inc. v. Magazine Serv. Bureau, Inc. (In re Republic Reader's Serv., Inc.), 81 B.R. 422, 428 (Bankr. S.D. Tex. 1987) ("All courts should attempt to protect both the state and federal court systems from the illegitimate gamesmanship involved in forum shopping"). Plaintiff chose its forum for determination of its claims under the Master Equipment Lease and related

9

schedules -- the Bankruptcy Court -- and it should not be permitted to evade the Bankruptcy

Court's jurisdiction by changing the identity of the defendant and asserting the same claims in a

different court.

B.    **This Court Should Not Abstain From Hearing the Removed Action Pursuant to 28 U.S.C. § 1334(c)(1).**

A district court may remand an action arising under title 11 or arising in, or related to, a

case under title 11 to state court if it would further the interests of justice, the interest of comity

or respect for state law.  28 U.S.C. § 1452(b).  A district court should consider the following

factors in determining whether to divest itself of jurisdiction and remand to state court:

> 1. the effect or lack thereof on the efficient administration of the estate; 2. the
> extent to which state law issues predominate over bankruptcy issues; 3. the
> difficulty or unsettled nature of applicable state law; 4. the presence of a related
> proceeding commenced in state court or other non-bankruptcy court; 5. the
> jurisdictional basis, if any, other than section 1334; 6. the degree of relatedness or
> remoteness of the proceeding to the main bankruptcy case; 7. the substance rather
> than the form of an asserted "core" proceeding; 8. the feasibility of severing state
> law claims from core bankruptcy matters to allow judgments to be entered in state
> court with enforcement left to the bankruptcy court; 9. the burden of the court's
> docket; 10. the likelihood that the commencement of the proceeding in
> bankruptcy court involves forum shopping by one of the parties; 11. the existence
> of a right to a jury trial and; 12. the presence of non-debtor parties.

LaRoche Indus., Inc. v. Orica Nitrogen LLC (In re LaRoche Indus., Inc.), 312 B.R. 249, 253-54

(Bankr. D. Del. 2004).  These factors weigh heavily in favor of retention of this action.

Each of the Bankruptcy Claims explicitly references the Master Equipment Lease, and

the purported breaches and damages asserted in the Bankruptcy Court include the purported

breaches of contract and damages asserted here in the Removed Action.  A transfer of the

Removed Action to the Bankruptcy Court, rather than a remand to state court, would ensure the

efficient reorganization of the Debtors' bankruptcy estates, in that it would enable the

Bankruptcy Court to address the claims asserted by Plaintiff against Level 3 together with the

claims filed in the Bankruptcy Case against the Debtors. On the other hand, remand would result in duplicative and uneconomical use of judicial resources. If the Removed Action is remanded, two different courts will be adjudicating whether Plaintiff is entitled to damages arising under the Master Equipment Lease and related schedules and the amount of any such damages. Denial of Plaintiff's Remand Motion will greatly reduce the possibility that the Superior Court and the Bankruptcy Court will arrive at inconsistent determinations concerning the rights and obligations of Level 3 and the Debtors. See Stratton v. Mariner Health Care, Inc. (In re Mariner Post-Acute Network, Inc.), 303 B.R. 42, 47-48 (Bankr. D. Del. 2003) (refusing to remand to Delaware state court where the two actions were "substantially identical" and "[r]emanding the Delaware Action would cause the parties and the Courts to expend unnecessary resources in trying the same issues twice and risks inconsistent results") Because Plaintiff's claims in the Removed Action are identical to Bankruptcy Claims asserted against the Debtors, only recast against Level 3, a distinct possibility of inconsistent and conflicting determinations exists.

Moreover, the Bankruptcy Claims were pending in the Bankruptcy Court when Plaintiff commenced this action. The Bankruptcy Court is already familiar with the Sale Order, the Confirmation Order, the Debtors' rejection of the Master Equipment Lease and related schedules, and the Bankruptcy Claims. Of course, the Superior Court has no such familiarity with the parties and the subject matter of the Removed Action. It would be a substantial waste of scarce judicial resources to have two courts adjudicating the same issues.

That this action presents questions of general state law is not particularly relevant in determining whether this Court should voluntarily abstain, inasmuch as the state law issues are basic contract issues that do not involve any complex interpretation or analysis. See Nemsa Establishment, S.A. v. Viral Testing Sys. Corp., No. 95 Civ. 0277, 1995 WL 489711, at *7

11

(S.D.N.Y. Aug. 15, 1995) (lack of complexity of state law issues reduces importance of this factor in deciding abstention).[4]

Plaintiff's assertion that its right to a jury trial will be denied if this action is transferred to the Bankruptcy Court, (see Pl.'s Mem. at 11), is not persuasive either. By filing the Bankruptcy Claims in the Bankruptcy Court, Plaintiff voluntarily submitted itself to the equitable jurisdiction of the Bankruptcy Court and thereby waived the right to a jury. See Langenkamp v. Culp, 498 U.S. 42, 45 (1990) (holding that by filing claims against the bankruptcy estate, the respondents brought themselves within the equitable jurisdiction of the bankruptcy court and, therefore, were not entitled to a jury trial in a separate action on the same claims brought by the trustee against the respondents); Travellers Int'l v. Robinson, 982 F.2d 96, 99 (3d Cir. 1992) (stating that Travellers "waived its right to a jury trial [in an adversary proceeding] and has constructively submitted to the equitable jurisdiction of the bankruptcy court by filing a claim with the [bankruptcy] court"); NDEP Corp. v. Handl-It, Inc. (In re NDEP Corp.), 203 B.R. 905, 910-11 (Bankr. D. Del. 1996); Aaron Gleich, Inc. v. Hous. Auth. (In re Aaron Gleich, Inc.), 200 B.R. 464, 466 (Bankr. D. Me. 1996) (finding that because the debtor's claims against the creditor in the adversary proceeding "involve the same contentions and issues as are central to the process of allowing or disallowing the [creditor's] claim, a jury trial is not available"). Given the complete overlap of the claims asserted in the Removed Action with the Bankruptcy Claims, the claims asserted in the Removed Action should have been asserted, if at all, in the Bankruptcy Court. Had they been asserted there, Plaintiff's claims against Level 3 would not require a jury

---

[4]    Moreover, the issues involved in the Removed Action likely do not even involve Delaware state law issues, given that Plaintiff identifies New Jersey state law as controlling the Master Equipment Lease, (see Plaintiff's Response to Tenth Omnibus Objection ¶ 18, n.3), and Plaintiff utterly fails in the Complaint to allege where the alleged conversion occurred, which presumably is not Delaware.

12

trial.  See First Fid. Bank, N.A. v. Hooker Inv., Inc. (In re Hooker Inv., Inc.), 937 F.2d 833, 838

(2d Cir. 1991) (stating that "by seeking to preserve both its ability to file a proof of claim and its

right to a jury trial, the Bank wants to invoke the bankruptcy court's equitable jurisdiction so that

it may share in the distribution of Debtors' bankruptcy estate, but avoid the bankruptcy court's

equitable jurisdiction so that the Bank can obtain a jury trial in the adversary proceeding" and

holding that the Bank cannot have it both ways).

        Thus, the efficient administration of the Bankruptcy Case, the avoidance of duplicative

and uneconomical use of judicial resources, and the avoidance of the possibility of inconsistent

results all weigh heavily in favor of denying Plaintiff's Remand Motion.    See Nemsa

Establishment, S.A., 1995 WL 489711, at *8 (holding that while "certain factors favor

remanding th[e] action, remand is, on balance, inappropriate, and [the] motion for remand

accordingly is denied").  Plaintiff's belated attempt to hold Level 3 liable for the same damages

as the Debtors in the Superior Court smacks of forum shopping and should not be condoned.  A

plaintiff should not be able to use procedural manipulation "as a means of seeking a forum which

might be more receptive to its claims than the Bankruptcy Court was at the time the plan was

confirmed."  Resolution Trust Corp. v. Chem. Bank (In re Best Prods. Co.), 94 Civ. 1564, 1996

WL 19030, at *3 (S.D.N.Y. Jan. 18, 1996) (refusing to withdraw reference to the bankruptcy

court).

        Here, Plaintiff consented to the Bankruptcy Court's jurisdiction by filing the Bankruptcy

Claims and, thereafter, consented again to the Bankruptcy Court's jurisdiction to determine the

Bankruptcy Claims when it filed Plaintiff's Response to the Tenth Omnibus Objection, long after

the Plan's confirmation date of November 21, 2003.  No principled reason exists, based on law

13

or equity, to permit Plaintiff to prosecute the Bankruptcy Claims in the Bankruptcy Court and simultaneously prosecute the Removed Action against Level 3 in the Superior Court.

III.    IN THE ALTERNATIVE, THE COURT SHOULD
        TRANSFER THE REMOVED ACTION TO THE BANKRUPTCY
        COURT AND ALLOW IT TO DECIDE THE REMAND MOTION.

Whether this action is related to the Bankruptcy Case determines whether this Court and the Bankruptcy Court have jurisdiction to adjudicate it. The Bankruptcy Court is uniquely positioned to determine whether Plaintiff's claims asserted in the Removed Action are duplicative of the Bankruptcy Claims and related to the Bankruptcy Case, and whether Plaintiff's prosecution of this action outside the Bankruptcy Court is enjoined by the Sale Order, the Debtors' Plan, the Confirmation Order, and the Bankruptcy Code. See Hohl v. Bastian, 279 B.R. 165, 176-77 (W.D. Pa. 2002) (quoting from In re Allegheny Health, Educ. & Research Found., No. 98-25773, 1999 WL 1033566, at *1 (Bankr. E.D. Pa. Nov. 10, 1999) that "the action should be transferred to the 'home' court of the bankruptcy to decide the issue of whether to remand or abstain from hearing the action"); but cf. RGC Int'l Investors, LDC, v. Tricord Sys., Inc. (In re Tricord Sys., Inc.), No. 02-82361, 2003 WL 1565945, at *1 (Bankr. D. Del. Mar. 24, 2003) (remanding prior to considering a venue transfer motion where the state action was filed **several months prior** to the chapter 11 filing); Lone Star Indus., Inc. v. Liberty Mut. Ins. Co., 131 B.R. 269, 273 (D. Del. 1991) (remanding where the plaintiff had chosen to commence the action in state court, and subsequently filed for bankruptcy protection in another jurisdiction).

Accordingly, in the alternative, Level 3 submits that this Court should defer decision on the Remand Motion and transfer venue of the Removed Action to the Southern District of New York. Level 3 will then seek referral of the Removed Action to the Bankruptcy Court in accordance with 28 U.S.C. § 157(a) and the "Standing Order of Referral of Cases to Bankruptcy

Judges of the United States District Court for the Southern District of New York" (Ward, Acting C.J.), dated July 10, 1984. The Bankruptcy Court can then determine whether Plaintiff's Remand Motion should be granted. See Traylor v. First Family Fin. Servs., Inc., 183 B.R. 286, 287-88 (M.D. Ala. Apr. 17, 1995) ("The court finds that the [bankruptcy judge], who is exceedingly learned in the laws of bankruptcy, is in the best position to make this determination and rule on the motion for reconsideration of the ruling denying the motion to remand. Accordingly, the court will defer to the expertise and specialized knowledge of the bankruptcy judge"); Bienvenu v. Vaughan, No. 93-3486, 1994 WL 71292, at *1 (E.D. La. Feb. 28, 1994).

15

## CONCLUSION

For the reasons stated herein, Level 3 respectfully requests that the Court deny

Plaintiff's motion to remand and award such other and further relief as this Court deems just and

proper.

Dated:   Wilmington, Delaware
         June 19, 2006

BLANK ROME LLP

_____
Steven L. Caponi (DE ID #3484)
1201 Market Street,
Suite 800
Wilmington, Delaware 19801
Phone: 302-425-6400

OF COUNSEL:

Brian E. O'Connor
John C. Longmire
Kira Antell
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue New York, New York 10019
Phone: 212-728-8000

Attorneys for Defendants
Level 3 Communications, LLC and
Level 3 Communications, Inc.

16

statute is concerned with economic regulation rather than with protecting the public health and safety").

69.     Here, Bankruptcy Code section 363, which is intended to facilitate debtors' operations of their businesses to maximize recoveries for all constituencies, would be undermined if the Court does not find that the state and local statutes and regulations establishing bulk sale restrictions do not apply to the Sale. The Debtors do not seek a general waiver of all state and local requirements that would apply to the Sale. Rather, the relief requested is restricted to the follow-ing: bulk sales laws, to the extent applicable, would be waived, as creditors are protected by the notice of this Motion and the jurisdiction of this Court.

### NOTICE, WAIVER OF MEMORANDUM REQUIREMENT AND PREVIOUS REQUEST FOR RELIEF

70.     Notice of the Motion has been and will be given in accordance with the notice procedures set forth herein. The Debtors respectfully submit that such notice is sufficient, and request that this Court find that no further notice of the relief requested herein is required.

71.     The Debtors submit that no new or novel issue of law is presented with respect to the matters contained herein, and respectfully request that the requirement of a memorandum of law, pursuant to Local Bankruptcy Rule 9013-1(b), be waived.

72.    No previous request for the relief requested herein has been made to this Court or to any other court.

WHEREFORE the Debtors respectfully request that this Court (i) enter an order in the form attached hereto as Exhibit B approving the Bidding Procedures, the Breakup Fee and Expense Reimbursement, and the form and manner of notice with respect to the Sale; (ii) enter an order in the form attached hereto as Exhibit C authorizing and approving the Purchase Agreement and the Debtors' assumption of the Purchase Agreement on the Closing Date, the Sale to the Purchaser or, if applicable, the Successful Bidder, and the assumption and assignment of

the Assumed Contracts and Assumed Leases; and (iii) grant such other and further

relief as is just and proper.

Dated: New York, New York
       November 27, 2002

<div align="center">

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

</div>

/s/ J. Gregory Milmoe
J. Gregory Milmoe (JM 0919)
Sally McDonald Henry (SH 0839)
Cheri L. Hoff (CH 5193)
Four Times Square
New York, New York  10036
(212) 735-3000

<div align="center">- and -</div>

Eric M. Davis
David R. Hurst
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899
(302) 651-3000

Attorneys for Debtors and
 Debtors-in-Possession

<div align="center">53</div>

**EXHIBIT A**

**Asset Purchase Agreement**

Execution Copy

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**LEVEL 3 COMMUNICATIONS, INC.,**

**LEVEL 3 COMMUNICATIONS, LLC,**

**GENUITY INC.,**

**AND**

**THE SUBSIDIARIES OF GENUITY INC.**
**LISTED ON THE SIGNATURE PAGE HERETO**

**DATED AS OF NOVEMBER 27, 2002**

# TABLE OF CONTENTS

**Page**

ARTICLE I.      DEFINITIONS ...................................................................................... 1

    Section 1.1.      Definitions ........................................................................... 1
    Section 1.2.      Accounting Terms and Determinations .................................... 1

ARTICLE II.     PURCHASE AND SALE OF PURCHASED ASSETS AND
               ASSUMPTION OF ASSUMED LIABILITIES ..................................... 2

    Section 2.1.      Purchase and Sale of Purchased Assets .................................... 2
    Section 2.2.      Assumption of Liabilities ....................................................... 2
    Section 2.3.      Purchase Price ....................................................................... 2
    Section 2.4.      Adjustments to Base Price ...................................................... 2
    Section 2.5.      Payment of the Purchase Price. ............................................... 3
    Section 2.6.      Post-Closing Purchase Price Adjustment. ................................ 4
    Section 2.7.      Payment of the Post-Closing Purchase Price Adjustment. ......... 5
    Section 2.8.      Selection of Customer Contracts for Assignment. .................... 6
    Section 2.9.      Selection of Other Contracts and Leases for Assignment. ......... 7
    Section 2.10.     Assumption of Assumed Contracts and Assumed Leases on the
               Closing Date .......................................................................... 8
    Section 2.11.     Certain Matters Relating to Sellers' Ability to Reject Contracts
               and Leases in the Bankruptcy Case. ........................................ 9
    Section 2.12.     Allocation of Purchase Price. .................................................. 10

ARTICLE III.    REPRESENTATIONS AND WARRANTIES OF SELLERS ............................ 11

    Section 3.1.      Authority of Seller ................................................................. 11
    Section 3.2.      No Conflict or Violation; Consents ......................................... 11
    Section 3.3.      Subsidiaries and Investments .................................................. 12
    Section 3.4.      Certificate and By-Laws ........................................................ 12
    Section 3.5.      SEC Reports; Financial Statements and Information. ............... 12
    Section 3.6.      [Intentionally omitted.] .......................................................... 13
    Section 3.7.      [Intentionally omitted.] .......................................................... 13
    Section 3.8.      [Intentionally omitted.] .......................................................... 13
    Section 3.9.      Inventory .............................................................................. 13
    Section 3.10.     Real Property. ....................................................................... 13
    Section 3.11.     Personal Property. ................................................................. 16
    Section 3.12.     Compliance with Legal Requirements; Permits. ...................... 16
    Section 3.13.     Affiliate Agreements ............................................................. 17
    Section 3.14.     Contracts. .............................................................................. 17
    Section 3.15.     Intellectual Property. ............................................................. 19
    Section 3.16.     Software ................................................................................ 21
    Section 3.17.     Labor Relations ..................................................................... 21
    Section 3.18.     ERISA .................................................................................. 21
    Section 3.19.     Insurance .............................................................................. 21
    Section 3.20.     Litigation .............................................................................. 22
    Section 3.21.     Environmental Matters ........................................................... 22
    Section 3.22.     Tax Matters. .......................................................................... 24
    Section 3.23.     Interim Operations ................................................................. 24
    Section 3.24.     [Intentionally omitted.] .......................................................... 24

# TABLE OF CONTENTS

**Page**

Section 3.25.    Customers and Suppliers..................................................24
Section 3.26.    [Intentionally omitted.]...................................................24
Section 3.27.    [Intentionally omitted.]...................................................24
Section 3.28.    Certain Payments ............................................................24
Section 3.29.    Network Operations.........................................................25
Section 3.30.    Schedule Updates.............................................................25

ARTICLE IV.    REPRESENTATIONS AND WARRANTIES OF PURCHASER ....................25

Section 4.1.    Authority of Purchaser .....................................................25
Section 4.2.    No Conflict or Violation ..................................................26
Section 4.3.    Litigation .........................................................................26
Section 4.4.    Brokers .............................................................................27
Section 4.5.    Certificate and By-Laws ...................................................27
Section 4.6.    Financing ..........................................................................27
Section 4.7.    Solvency ............................................................................27
Section 4.8.    Implementation Agreement ...............................................27

ARTICLE V.    CERTAIN COVENANTS OF SELLERS ...........................................27

Section 5.1.    Conduct of Business..........................................................27
Section 5.2.    Information and Access .....................................................32
Section 5.3.    Confidentiality Agreements ..............................................32
Section 5.4.    Notices of Certain Events..................................................33
Section 5.5.    Schedule Updates...............................................................33
Section 5.6.    Purchaser Schedule Updates .............................................33
Section 5.7.    Title Insurance ..................................................................34

ARTICLE VI.    CERTAIN COVENANTS AND AGREEMENTS ...............................34

Section 6.1.    Hart-Scott-Rodino and Other Filings.................................34
Section 6.2.    Bankruptcy Matters; Bidding Process. ..............................34
Section 6.3.    Transfer Taxes...................................................................35
Section 6.4.    Property Taxes....................................................................36
Section 6.5.    Certain Provisions Relating to Consents, Cooperation and
                 Adequate Assurance..........................................................37
Section 6.6.    Certain Actions With Respect to Customer Contracts ............38
Section 6.7.    Best Efforts.......................................................................38
Section 6.8.    Takeover Proposals; Confidential Information.....................38
Section 6.9.    Obligations of Parent and Purchaser; Joint and Several Liability ..........39
Section 6.10.   FCC Applications and State PUCs Applications......................39
Section 6.11.   Sales/Use Taxes.................................................................40

ARTICLE VII.    CONDITIONS TO CLOSING ....................................................40

Section 7.1.    Conditions to Sellers' Obligations .....................................40
Section 7.2.    Conditions to Purchaser's Obligations................................41

ARTICLE VIII.    POST-CLOSING AGREEMENTS................................................43

Section 8.1.    Assistance in Collection of Receivables...............................43
Section 8.2.    Mail .................................................................................43

(ii)

## TABLE OF CONTENTS

**Page**

Section 8.3.      Sums Received in Respect of Business ...................................................43
Section 8.4.      Further Assurances........................................................................43
Section 8.5.      Intellectual Property .....................................................................43
Section 8.6.      Transition Services Agreement..................................................43

ARTICLE IX.    THE CLOSING ............................................................................43

Section 9.1.      The Closing ...................................................................................43
Section 9.2.      Deliveries by Sellers at the Closing............................................44
Section 9.3.      Deliveries by Parent and Purchaser at the Closing...................44

ARTICLE X.    INDEMNIFICATION ......................................................................45

Section 10.1.    Survival ..........................................................................................45
Section 10.2.    Indemnification Provisions for Benefit of Purchaser. ..............45
Section 10.3.    Indemnification Provisions for Benefit of Sellers. ...................46
Section 10.4.    Matters Involving Third Parties ..................................................46
Section 10.5.    Certain Additional Provisions Relating to Indemnification. ...................48

ARTICLE XI.    EMPLOYEES AND EMPLOYEE BENEFIT PLANS......................................49

Section 11.1.    Employment. ..................................................................................49
Section 11.2.    Health and Welfare Benefits for Transferred Employees ......................50
Section 11.3.    Certain Additional Provisions Relating to Severance and
                 Retention Bonuses for Transferred Employees. ...................50
Section 11.4.    Terms of Offer Letters .................................................................52
Section 11.5.    WARN Act Compliance ...............................................................52
Section 11.6.    Plan Liabilities..............................................................................52
Section 11.7.    No Employee Rights .....................................................................53

ARTICLE XII.    TERMINATION...........................................................................53

Section 12.1.    Termination ...................................................................................53
Section 12.2.    Effect of Termination; Expense Reimbursement; Breakup Fee.............55

ARTICLE XIII.    MISCELLANEOUS PROVISIONS ...................................................56

Section 13.1.    Notices...........................................................................................56
Section 13.2.    Amendments .................................................................................57
Section 13.3.    Assignment and Parties in Interest..............................................57
Section 13.4.    Announcements.............................................................................57
Section 13.5.    Expenses........................................................................................58
Section 13.6.    Entire Agreement .........................................................................58
Section 13.7.    Descriptive Headings ...................................................................58
Section 13.8.    Counterparts..................................................................................58
Section 13.9.    Governing Law; Venue.................................................................58
Section 13.10.   Construction ..................................................................................59
Section 13.11.   Severability....................................................................................59
Section 13.12.   Specific Performance ...................................................................59
Section 13.13.   Ancillary Agreements ..................................................................59
Section 13.14.   Genuity Acting on Behalf of Sellers............................................59

1093038.30

# SCHEDULES AND EXHIBITS

| SCHEDULE NUMBER | SCHEDULE NAME |
|---|---|
| 1.1 | Assumed Contracts |
| 1.2 | Assumed Leases |
| 1.3 | Excluded Assets |
| 1.4 | Permitted Liens |
| 1.5 | Knowledge Parties |
| 1.6 | Excluded Agreements |
| 1.7 | Certain Assessment Dates |
| 1.8 | Underlying Service Agreements |
| 1.9 | Rejection Claim Caps |
| 2.4(b) | Certain Prepayments |
| 3.1 | Foreign Qualifications |
| 3.2 | Conflicts and Consents |
| 3.5(d) | Other Financial Information |
| 3.9 | Inventory |
| 3.10(a) | Owned Real Property |
| 3.10(b) | Leases |
| 3.10(c) | Certain Real Estate Matters |
| 3.10(g) | Property Taxes |
| 3.11(a) | Personal Property; Liens |
| 3.11(b) | Leased Personal Property |
| 3.11(c) | Certain Maintenance Matters |
| 3.12(a) | Compliance with Laws |
| 3.12(b) | Permits |
| 3.13 | Affiliate Agreements |
| 3.14(a) | Contracts |
| 3.14(b) | Contract Obligations |
| 3.14(c) | Certain Contract Matters |
| 3.14(d) | Non-Seller Subsidiaries' Customer Contracts |
| 3.15(a) | Owned Intellectual Property |
| 3.15(b) | Patents and Registrations |
| 3.15(c) | Licensed Intellectual Property |
| 3.16 | Software |
| 3.17 | Labor Disputes |
| 3.19 | Insurance |
| 3.20 | Litigation |
| 3.21 | Environmental Matters |
| 3.23 | Interim Operations |
| 3.25 | Major Customers and Suppliers |
| 3.29(a) | Network Compliance |
| 3.29(b) | Network Operations Metrics |
| 3.29(d) | Network Capacity |
| 4.2 | No Conflict or Violation |

(iv)

1093038.30

| | |
|---|---|
| 4.8 | Implementation Agreement |
| 5.1 | Conduct of Business |
| 6.6 | Certain Customer Contracts |
| 6.10(a) | FCC Applications |
| 6.10(b) | State PUC Applications |
| 7.1(f) | Certain Governmental Approvals |
| 7.2(g) | Certain Required Consents |
| 7.2(h) | Certain Contracts and Counterparties |
| 11.3 | Genuity Severance Plan |

| **EXHIBIT** | **EXHIBIT NAME** |
|---|---|
| A | Definitions |
| B | Assumption Agreement |
| C | Bill of Sale |
| D | Escrow Agreement |
| E | Transition Services Agreement |
| F | Form of Bidding Procedures Order |
| G | Form of Sale Order |

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*"), dated as of November 27, 2002, is entered into by and among Genuity Inc., a Delaware corporation (including any successor, "*Genuity*"), and the subsidiaries of Genuity listed on the signature pages hereto, (including their respective successors, each a "*Seller*" and together with Genuity, the "*Sellers*"); Level 3 Communications, Inc., a Delaware corporation ("*Parent*"), and Level 3 Communications, LLC, a Delaware limited liability company and an indirect wholly owned subsidiary of Parent ("*Purchaser*").

## PRELIMINARY STATEMENT

WHEREAS, Genuity is engaged directly and through the other Sellers and their corporate Affiliates, in the Business; and

WHEREAS, Genuity and the other Sellers intend to file voluntary petitions for relief pursuant to Section 301 of Title 11 of the United States Code, 11 U.S.C. §§101 *et seq.* (as amended, the "*Bankruptcy Code*"), in the United States Bankruptcy Court (the "*Bankruptcy Court*") for the Southern District of New York (the "*Bankruptcy Cases*"); and

WHEREAS, Genuity owns, directly or indirectly, all of the issued and outstanding shares of capital stock of each other Seller; and

WHEREAS, Sellers desire to sell and transfer to Purchaser, and Purchaser desires to purchase and assume from Sellers, the Purchased Assets and Purchaser is willing to assume, and Sellers desire that Purchaser assume, the Assumed Liabilities; and

WHEREAS, upon the terms and subject to the conditions set forth herein, and as authorized under Sections 105, 363, 365 and 1146 of the Bankruptcy Code, Purchaser will purchase from Sellers the Purchased Assets and Purchaser will assume from Sellers the Assumed Liabilities;

NOW, THEREFORE, in consideration of the foregoing premises, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I.

## DEFINITIONS

**Section 1.1.** **Definitions.** Capitalized terms used herein and not otherwise defined shall have the meanings specified in *Exhibit A* to this Agreement.

**Section 1.2.** **Accounting Terms and Determinations.** Unless otherwise specified herein, all accounting terms used herein shall be interpreted, all determinations with respect to accounting matters hereunder shall be made, and all financial statements and certificates and reports as to financial matters required to be furnished hereunder shall be prepared, in accordance with GAAP Consistency.

1093038.30

## ARTICLE II.

## PURCHASE AND SALE OF
## PURCHASED ASSETS AND
## ASSUMPTION OF ASSUMED LIABILITIES

**Section 2.1.    Purchase and Sale of Purchased Assets.**  On the terms and subject to the conditions set forth in this Agreement, at the Closing (and on the applicable Assumption Date with respect to Purchased Assets consisting of rights under any Assumed Contract or Assumed Lease assumed by a Seller and assigned to Purchaser after the Closing Date as provided herein) Purchaser shall purchase from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Purchaser, all of the Purchased Assets, free and clear of all Liens (other than Permitted Liens) and free and clear of all Liabilities (other than Assumed Liabilities).

**Section 2.2.    Assumption of Liabilities.**  On the terms and subject to the conditions set forth in this Agreement, at the Closing (and on the applicable Assumption Date with respect to Assumed Liabilities under any Assumed Contract or Assumed Lease assumed by a Seller and assigned to Purchaser after the Closing Date as provided herein), Purchaser shall assume and become responsible for all of the Assumed Liabilities.

**Section 2.3.    Purchase Price.**  On the terms and subject to the conditions set forth in this Agreement, the purchase price for the Purchased Assets shall be $242,156,160 less the Delay Cost (the "*Base Price*"), less the Severance Amount, subject to adjustment as provided in this *Article II* (as so adjusted, the "*Purchase Price*").

**Section 2.4.    Adjustments to Base Price.**  The Base Price shall be adjusted in the manner provided in this *Section 2.4* (collectively, the "*Adjustments*").

(a)    Adjustment for Certain Variations in Annualized Recurring Revenue.

(i)    The Base Price shall be decreased by the product of (x) $0.833, and (y) the amount, if any, that the Sellers' Annualized Recurring Revenue is less than $780 million.

(ii)    The Base Price shall be increased by the product of (x) $0.833, and (y) the amount, if any, that the Sellers' Annualized Recurring Revenue is greater than $1,068 million.

(b)    Reconciliation of Prepaid Items.  The Base Price shall be (i) decreased by the sum of (x) the amount of any customer cash deposits outstanding as of the Assumption Date with respect to each Assumed Contract or Assumed Lease and (y) cash advances, which cash advances will not be recognized as revenue in accordance with GAAP Consistency until after the Closing Date other than as set forth on *Schedule 2.4(b)-1*, outstanding as of the Assumption Date with respect to each Assumed Contract or Assumed Lease, and (z) the amount of any service credits pursuant to service level agreements (to the extent such agreements constitute Assumed Customer Contracts) that are not satisfied by Sellers on or prior to ninety (90) days after the Closing Date and (ii) increased by the sum of (x) the amount of prepaid expenses under Assumed Contracts

2

and Assumed Leases for which Purchaser will receive goods or services after the respective Assumption Date, *provided*, that only those prepayments (A) listed on *Schedule 2.4(b)-2* to the extent outstanding on the Closing Date in accordance with GAAP Consistency, (B) required to be made subsequent to the date hereof pursuant to Contracts listed on *Schedule 3.14(a)* as in effect on the date hereof (except as set forth on *Schedule 2.4(b)-3)*, or (C) permitted to be made subsequent to the date hereof pursuant to *Section 5.1(d)(ii)(B)* and in an amount not to exceed the expenses for goods and services to be received within 30 days after the Assumption Date, shall be included in such calculation and (y) the amount of any security deposits made by Sellers with respect to Assumed Contracts or Assumed Leases as of the Assumption Date; provided, however, that with respect to each security deposit, the increase in the purchase price shall not exceed the amount of such security deposit set forth on *Schedule 2.4(b)-4*.

(c)     Adjustment for Property Taxes.  The Base Price shall be increased or decreased as provided in *Section 6.4(a)(iii)*.

(d)     Adjustment for Variations in Severance Amount from Estimated Severance Amount.  The Base Price shall be decreased by the amount, if any, by which the Severance Amount exceeds the Estimated Severance Amount.  The Base Price shall be increased by the amount, if any, by which the Estimated Severance Amount exceeds the Severance Amount.

### Section 2.5.     Payment of the Purchase Price.

(a)     Not less than two (2) Business Days prior to the Closing Date:

(i)     Purchaser shall deliver to Sellers its estimate of the Severance Amount as of the Closing Date based on the Business Employee Offeree Schedule (the "*Estimated Severance Amount*"); and

(ii)     Sellers shall deliver to Purchaser a certificate as to the portion of the Allegiance Payment and the Verizon Payment that has been paid.

(b)     On the terms and subject to the conditions set forth in this Agreement, at the Closing,

(i)     Sellers shall pay $20 million (the "*Escrow Amount*") in immediately available funds by wire transfer to the Escrow Agent for deposit pursuant to the Escrow Agreement.

(ii)     Purchaser shall pay an amount equal to the Base Price less the sum of (x) $64.8 million, (y) the Estimated Severance Amount, and (z) the portion of the Allegiance Payment and the Verizon Payment that has not been paid by Sellers as of the Closing Date, by wire transfer of immediately available funds to Sellers to an account designated in writing by Sellers not less than two (2) Business Days prior to Closing.

1093038.30

    (c)    Sellers or Purchaser, as the case may be, shall pay the Adjustments as provided in *Section 2.6* and *2.7*.

    (d)    Within five (5) Business Days after Purchaser receives written notice from Sellers certifying the amount of rejection claims finally determined by the Bankruptcy Court in the preceding calendar quarter and the portion thereof constituting Rejection Claims and receipt of evidence reasonably satisfactory to Purchaser verifying such certification, Purchaser shall pay to Sellers by wire transfer of immediately available funds to an account designated in writing by Sellers an amount, to the extent not previously paid, equal to the product of (i) $0.27 and (ii) the amount by which such rejection claims as finally determined by the Bankruptcy Court, to the extent constituting Rejection Claims, exceed $360 million; *provided, however*, that the aggregate payment pursuant to this clause *(d)* shall not exceed $64.8 million.

### Section 2.6.    Post-Closing Purchase Price Adjustment.

    (a)    As soon as reasonably practical after the Closing, but in no event more than one hundred twenty (120) days after the Closing Date, Purchaser shall prepare and deliver to Sellers a report setting forth the calculation of each of the Adjustments and the amount payable in accordance with *Section 2.7* (the "*Adjustment Report*"). The Adjustment Report shall be prepared in accordance with the terms of this Agreement and GAAP Consistency, and in the event of an inconsistency between the two, the terms of this Agreement shall govern. Sellers shall provide Purchaser with reasonable access to their books, records and facilities in connection with Purchaser's preparation of the Adjustment Report.

    (b)    Within twenty (20) days after receipt of the Adjustment Report, Sellers may, by written notice to Purchaser, object to the Adjustment Report. Upon reasonable prior notice, Purchaser shall provide Sellers with reasonable access during normal business hours during such twenty (20) day period to the books and records used in connection with Purchaser's preparation of the Adjustment Report. If Sellers object to the Adjustment Report, they shall within such twenty (20) day period deliver written notice of their objection (the "*Objection Notice*") to Purchaser: (i) objecting to the Adjustment Report and the calculation of the Adjustments, (ii) setting forth the items being disputed and the reasons therefor, and (iii) specifying Sellers' calculation of each of the Adjustments and the amount payable in accordance with *Section 2.7*.

    (c)    For fifteen (15) days after delivery of the Objection Notice, Purchaser and Sellers shall attempt to resolve all disputes between them regarding the Adjustment Report. If Purchaser and Sellers cannot resolve all such disputes within such fifteen (15) day period, Genuity or Purchaser may submit the matters in dispute for determination by Deloitte & Touche LLP or another nationally recognized independent public accounting firm mutually satisfactory to Purchaser and Sellers (the "*Arbiter*"). Promptly, but not later than thirty (30) days after the acceptance of its appointment, the Arbiter shall determine (based solely on presentations to the Arbiter by or on behalf of Sellers and Purchaser and not by independent review) only those items in dispute and shall render a report as to the calculation of each of the Adjustments and the resulting

payment pursuant to *Section 2.7*. For purposes of the Arbiter's calculation of the Purchase Price, the amounts to be included shall be the appropriate amounts from the Adjustment Report as to items that are not in dispute and for those items in dispute the amounts determined by the Arbiter. In resolving any disputed item, the Arbiter may not assign a value to such item greater than the greatest value for such item claimed by either party or less than the lowest value for such item claimed by either party. Purchaser and Sellers shall cooperate with the Arbiter in making its determination and such determination shall be conclusive and binding upon Purchaser and Sellers.

(d)     Purchaser and Genuity shall each bear one-half of the fees and expenses of the Arbiter.

### Section 2.7.     Payment of the Post-Closing Purchase Price Adjustment.

(a)     Payment due as a result of any Adjustment shall be made as provided in this *Section 2.7*. Any payment due to Purchaser shall be paid directly by Sellers and shall not reduce the Escrowed Funds.

(b)     If the Adjustment provided for in this *Article II* results (i) in an increase to the Base Price, Purchaser shall pay the Adjustment to Sellers, or (ii) in a decrease to the Base Price, Sellers shall pay the Adjustment to Purchaser, in each case together with interest at the rate of 5% per annum from the Closing Date through the date such payment is made.

(c)     Any payment pursuant to this *Section 2.7* shall be paid within twenty (20) days after delivery of the Adjustment Report; provided that if an Objection Notice shall have been timely delivered but the Objection Notice, if resolved in favor of the party required to make payment pursuant to this *Section 2.7*, would result only in a reduction in the amount owed to the other party pursuant to this *Section 2.7*, then, pending resolution of such Objection Notice, the party required to make payment pursuant to this *Section 2.7* shall pay the lower of the two amounts calculated by Purchaser and Sellers within ten (10) days after the delivery of such Objection Notice, together with interest at the rate of 5% per annum from the Closing Date through the date such payment is made. Any amounts owed after resolution of all disputes by the Arbiter shall be paid to the party entitled to receipt thereof within ten (10) days of the Arbiter's final determination, together with interest at the rate of 5% per annum from the Closing Date through the date such payment is made.

(d)     Pursuant to Bankruptcy Code Section 364(c)(1), the obligation of Sellers to pay the Adjustments, including interest with respect thereto, shall receive superpriority administrative claim status. Pursuant to Bankruptcy Code Section 364(c)(1), the administrative claims in respect of the Adjustments, including interest with respect thereto, shall have priority over any and all administrative expenses of the kinds specified in Bankruptcy Code Sections 503(b), 506(c), 507(a) or 507(b).

1093038.30

**Section 2.8.    Selection of Customer Contracts for Assignment.**

(a)    Not more than two (2) Business Days after the date of this Agreement, Sellers shall deliver to Purchaser a schedule (the "*Customer Contract Schedule*") setting forth a list of all of Sellers' Contracts with their customers as of the date of this Agreement (the "*Customer Contracts*"), and a description of the name of the customer, the relevant Seller and the date of the Contract, which Customer Contract Schedule shall designate which of the Customer Contracts is a Foreign Customer Contract. Customer Contracts shall also include any Contract of a Seller with a customer entered into during the period from the date hereof through the commencement of the Bankruptcy Case. Sellers shall identify such Contracts to Purchaser in writing within five (5) days after the commencement of the Bankruptcy Case and the Customer Contract Schedule shall be deemed thereby amended without any further action required by any party hereto. Sellers shall either promptly deliver a copy of each Customer Contract to Purchaser, or provide Purchaser with access to Sellers' electronic database containing the full and complete text of such Customer Contract.

(b)    With respect to each Customer Contract, Purchaser may, by written notice to Genuity, delivered no later than the later of (i) five (5) Business Days prior to the Closing Date, and (ii) twenty (20) Business Days subsequent to the date that such Customer Contract is included, added or deemed added to the Customer Contract Schedule and a copy of the Customer Contract is delivered or made available to Purchaser (such later date being referred to as the "*Customer Contract Election Date*") instruct Sellers whether or not to assume and assign to Purchaser such Customer Contract (each Foreign Customer Contract other than those that Purchaser has timely instructed Sellers to assume, and each North American Customer Contract that Purchaser has timely instructed Sellers not to assume, is referred to as an "*Excluded Customer Contract*"). After each Customer Contract Election Date, the corresponding Customer Contracts other than the Excluded Customer Contracts are referred to as the "*Assumed Customer Contracts.*"

(c)    On the Customer Contract Election Date (or with respect to those Customer Contracts which have a Customer Contract Election Date prior to the Closing Date, on the Closing Date), Sellers shall (i) cure any and all defaults existing under each Assumed Customer Contract to the extent required for Sellers to assume such Assumed Customer Contract in the Bankruptcy Case, (ii) pay, or to the extent permitted by the Sale Order segregate funds sufficient to pay, any and all Cure Amounts due with respect to such Assumed Customer Contract, (iii) assume such Assumed Customer Contract in the Bankruptcy Case, and (iv) subject to Purchaser providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assign such Assumed Customer Contract to Purchaser pursuant to an Order of the Bankruptcy Court (which may be the Sale Order). Effective upon and concurrently with such assignment, Purchaser shall assume each Assumed Customer Contract assigned to it pursuant to this *Section 2.8*.

(d)    Sellers shall promptly notify Purchaser in writing of any new Contract with a customer entered into after the commencement of the Bankruptcy Case. No later

1093038.30

than the later of (i) five (5) Business Days prior to the Closing Date, and (ii) five (5) Business Days subsequent to the date that a copy of such Contract is delivered or made available to Purchaser, Purchaser shall notify Sellers in writing whether it will assume such Contract. With respect to those Customer Contracts that Purchaser expressly elects to assume, Sellers shall assign such Contracts to Purchaser by the later of (x) the Closing Date, and (y) two (2) Business Days after notice from Purchaser, and effective upon such assignment Purchaser shall assume such Contract. If Purchaser has issued a *Section 5.1* Consent to a Seller entering into a new Contract with a customer, Purchaser shall be deemed to have expressly elected to, and Purchaser shall assume such new Contract pursuant to this *Section 2.8(d)*.

(e)    With respect to each Non-Seller Subsidiary Customer Contract, Purchaser may, by written notice to Genuity, delivered no later than the later of (i) five (5) Business Days prior to the Closing Date, and (ii) twenty (20) Business Days subsequent to the date that a copy of the Non-Seller Subsidiary Customer Contract is delivered or made available to Purchaser request that Sellers cause the Non-Seller Subsidiary party to such Non-Seller Subsidiary Customer Contract to assign such Non-Seller Subsidiary Customer Contract to a Seller. Upon receipt of such a request, Sellers shall use their commercially reasonable efforts to cause the Non-Seller Subsidiary that is a party to the Non-Seller Subsidiary Customer Contract to assign such Non-Seller Subsidiary Customer Contract to a Seller (but only if and to the extent such assignment is permitted under the terms of such Non-Seller Subsidiary Customer Contract and all applicable Legal Requirements and only if such assignment would not, in Sellers' good faith judgment, present any significant risk to any Seller, the Non-Seller Subsidiary or any of their respective Affiliates, including directors or officers, of any legal or financial liability), provided, however, that Sellers shall not be obligated to offer or pay any consideration or grant any financial accommodation in connection therewith to the counterparty to such Non-Seller Subsidiary Customer Contract. If and to the extent permitted under the terms of the Non-Seller Subsidiary Customer Contract and all applicable Legal Requirements, if the Non-Seller Subsidiary Customer Contract has been assigned to a Seller pursuant to this *Section 2.8(c)*, such Seller will assign the Non-Seller Subsidiary Customer Contract to Purchaser by the later of (x) five (5) Business Days after the assignment of the Non-Seller Subsidiary Customer Contract to such Seller and (y) the Closing Date, provided, however, that Sellers shall not be obligated to offer or pay any consideration or grant any financial accommodation in connection therewith to the counterparty to such Non-Seller Subsidiary Customer Contract. Effective upon the later of such assignment and Closing, Purchaser shall assume the Non-Seller Subsidiary Customer Contract.

**Section 2.9.    Selection of Other Contracts and Leases for Assignment.**

(a)    At any time and from time to time on or prior to the Election Date, Purchaser may, in the exercise of its sole and absolute discretion by written notice to Genuity on or before the Election Date, elect to have Sellers assume and assign to it (i) one or more Undesignated Agreements and (ii) one or more Underlying Service Agreements. Sellers shall (x) within two (2) Business Days of any such notice, provide written notice to the counterparties to the Undesignated Agreements or Underlying Service Agreements specified in Purchaser's notice, and (y) take such action, in each case

7

as is necessary pursuant to the procedures set forth in the Sale Order to assume such Undesignated Agreements and Underlying Service Agreements.

(b)     On the date an assumption and assignment of any Undesignated Agreement or Underlying Service Agreement pursuant to *Section 2.9(a)* is scheduled to become effective pursuant to the terms of the Sale Order (provided that if such date is prior to the Closing Date, then on the Closing Date), Sellers shall (i) cure any and all defaults existing under each such Assumed Contract or Assumed Lease to the extent required for Sellers to assume such Assumed Contract or Assumed Lease in the Bankruptcy Case, (ii) pay, or, to the extent required by the Sale Order, segregate funds sufficient to pay, any and all Cure Amounts due with respect to such Assumed Contract or Assumed Lease, (iii) assume such Assumed Contract or Assumed Lease in the Bankruptcy Case, and (iv) subject to Purchaser providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assign such Assumed Contract or Assumed Lease to Purchaser pursuant to an Order of the Bankruptcy Court (which may be the Sale Order).  Effective upon such assignment, Purchaser shall assume each Assumed Contract or Assumed Lease assigned to it pursuant to this *Section 2.9*, and concurrently with such assumption, Purchaser shall reimburse Sellers for any Purchaser Cure Amount due in connection with the assumption by Sellers of such Assumed Contract or Assumed Lease (or to the extent the Purchaser Cure Amount is in dispute, Purchaser shall segregate funds in escrow on terms reasonably acceptable to Sellers sufficient to reimburse Sellers for the amount claimed by them and Purchaser shall so reimburse Sellers promptly upon settlement or determination by the Bankruptcy Court of such dispute).

(c)     Purchaser shall make sufficient elections to permit Sellers to assume in the Bankruptcy Case and assign to it pursuant to an Order of the Bankruptcy Court (which may be the Sale Order), and Purchaser shall accept such assignments to it, of such Contracts and Leases so that the total Rejection Claims shall not exceed $600 million.

(d)     Sellers shall promptly notify Purchaser in writing of any new Contract (other than a Contract with a customer) or Lease entered into after the commencement of the Bankruptcy Case.  No later than the later of (i) five (5) Business Days prior to the Closing Date, and (ii) five (5) Business Days subsequent to the date that a copy of such Contract or Lease is delivered or made available to Purchaser, Purchaser shall notify Sellers in writing whether it will assume such Contract or Lease.  With respect to such new Contract or Leases that Purchaser expressly elects to assume, Sellers shall assign such Contract or Leases to Purchaser, and concurrently with such assignment Purchaser shall assume such Contract or Lease.

**Section 2.10.     Assumption of Assumed Contracts and Assumed Leases on the Closing Date**.  With respect to each Assumed Contract listed on *Schedule 1.1* and each Assumed Lease listed on *Schedule 1.2*, on the Closing Date, Sellers shall (i) cure any and all defaults existing under each such Assumed Contract or Assumed Lease to the extent required for Sellers to assume such Assumed Contract or Assumed Lease in the Bankruptcy Case, (ii) pay, or, to the extent permitted by the Sale Order, segregate funds sufficient to pay, any and all Cure Amounts due with respect to such Assumed Contract or Assumed Lease, (iii) assume such

8

1093038.30

Assumed Contract or Assumed Lease in the Bankruptcy Case, and (iv) subject to Purchaser providing adequate assurance of performance to the counterparty thereto to the extent required by the Bankruptcy Court, assign such Assumed Contract or Assumed Lease to Purchaser pursuant to an Order of the Bankruptcy Court (which may be the Sale Order). Effective on the Closing Date, Purchaser shall assume each such Assumed Contract or Assumed Lease.

**Section 2.11.    Certain Matters Relating to Sellers' Ability to Reject Contracts and Leases in the Bankruptcy Case.**

(a)    At any time at least fifteen (15) Business Days prior to the Closing Date, Purchaser may, by written notice to Genuity designate any Undesignated Agreement or Underlying Service Agreement as an Excluded Agreement; and upon such notice, such Undesignated Agreement or Underlying Service Agreement shall automatically be deemed to be an Excluded Agreement. At any time after fifteen (15) Business Days prior to the Closing Date and on or prior to the Election Date, Purchaser may, by written notice to Genuity, elect to direct Sellers not to reject any (i) Undesignated Agreement, or (ii) Underlying Service Agreement, effective on or prior to any date so long as such date is (A) no later than the later of (x) three (3) months following the Election Date, or (y) the effective date of confirmation of a Chapter 11 plan in the Bankruptcy Case and (B) no earlier than fifteen (15) Business Days subsequent to the date of such notice. Purchaser may give one or more subsequent notices accelerating the date in a notice given pursuant to the prior sentence to a date no earlier than fifteen (15) Business Days subsequent to the date of such subsequent notice.

(b)    Sellers shall not reject in the Bankruptcy Cases: (x) any Assumed Contract listed on *Schedule 1.1* or Assumed Lease listed on *Schedule 1.2*, (y) any Customer Contract prior to the Customer Contract Election Date or any Assumed Customer Contract prior to its Assumption Date, or (z) any Undesignated Agreement or Underlying Service Agreement, in the case of this clause (z) on or prior to:

(i)    in respect of Undesignated Agreements and Underlying Service Agreements for which an election has been made pursuant to *Section 2.9*, the Assumption Date;

(ii)    in respect of Undesignated Agreements and Underlying Service Agreements for which an election has been made pursuant to *Section 2.11(a)*, the date set forth in such election (as such date may be accelerated in accordance with *Section 2.11(a)*); and

(iii)    in respect of Undesignated Agreements and Underlying Service Agreements for which no election has been made pursuant to *Section 2.9* or *Section 2.11(a)*, the Election Date.

(c)    Purchaser shall have the right to reasonably direct Sellers in the defense of, and in the settlement and compromise of, any claim in the Bankruptcy Case arising out of an Excluded Agreement if such claim could give rise to Rejection Claims, or at Sellers' expense, to initiate and/or prosecute any objection to any claim arising from any

Excluded Agreement if such claim could give rise to Rejection Claims. Sellers shall not settle any claim in the Bankruptcy Case arising out of any Excluded Agreement if such claim could give rise to Rejection Claims without Purchaser's prior written consent, which consent shall not be unreasonably withheld.

(d)     On the Election Date, or if later the date specified in a notice delivered pursuant to *Section 2.11(a)*, Sellers shall reject in the Bankruptcy Cases all Contracts listed on *Schedule 3.15(c)* that do not constitute Assumed Contracts.

**Section 2.12.    Allocation of Purchase Price.**

(a)     As soon as reasonably practicable, but not later than one hundred twenty (120) days following the Closing, Purchaser shall prepare and deliver to Sellers a schedule which shall set forth the allocation of the Purchase Price among the Purchased Assets and the Assumed Liabilities (the *"Purchaser's Allocation"*). Sellers shall accept and agree to the Purchaser's Allocation unless such allocation is manifestly unreasonable, in which case Sellers shall deliver written notice to Purchaser within thirty (30) days after receipt of the Purchaser's Allocation. Any payments pursuant to *Section 2.7* resulting from a change in the Purchased Assets and Assumed Liabilities shall be allocated to the portion of the Purchase Price paid with respect to the Purchased Assets. Any payment pursuant to *Section 2.5(d)* shall be allocated to the Purchased Assets. Subject to the requirements of any applicable Tax law, all Tax Returns filed by Purchaser and Sellers shall be prepared consistently with such allocation.

(b)     In the event of any Purchase Price adjustment pursuant to *Section 2.7* hereof after the delivery of the Adjustment Report by Purchaser, Purchaser and Sellers agree to adjust the allocation of the Purchase Price and Assumed Liabilities to reflect such Purchase Price adjustment and, subject to the requirements of any applicable Tax laws, to file consistently any Tax Returns required as a result of such Purchase Price adjustment. In the event of any payment pursuant to *Section 2.5(d)* hereof after the delivery of the Adjustment Report, Purchaser and Sellers agree to adjust the allocation of the Purchase Price and Assumed Liabilities to reflect such payment, and, subject to the requirements of any applicable Tax law, to file consistently any Tax Returns required as a result of such payment.

(c)     If Purchaser and Sellers are unable to agree upon any of the matters set forth in *Section 2.12(a)* or *(b)*, within thirty (30) days (or such later date as is mutually agreed upon by both parties), the matter or matters in dispute shall be submitted to the Arbiter or, if none was retained, to independent accountants of nationally recognized standing reasonably satisfactory to Purchaser and Sellers.

(d)     After the Closing Date, Sellers shall prepare, in consultation with the Purchaser and Purchaser's accountants, those statements or forms (including Form 8594) required by Section 1060 of the Code and the regulations promulgated thereunder. Such statements or forms shall be prepared consistently with the allocation under this *Section 2.12*, as adjusted to reflect any adjustment pursuant to *Section 2.7* and any payment pursuant to *Section 2.5(d)*. Such statements or forms shall be filed by the parties with

1093038.30

their respective federal income Tax Returns as required by Section 1060 of the Code and the regulations promulgated thereunder and each party shall provide the other party with a copy of such statement or form as filed.

## ARTICLE III.

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Each Seller jointly and severally represents and warrants to Purchaser and Parent as follows (provided, however, that except as expressly stated, no representation or warranty is made with respect to the Excluded Matters):

Section 3.1.    Authority of Seller.  Each Seller is a corporation or limited liability company duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation.  Each Seller is duly qualified to do business and is in good standing in each of the jurisdictions set forth on *Schedule 3.1* opposite such Seller's name, which are all of the jurisdictions in which the ownership of the Purchased Assets or the conduct of the Business requires such qualification, except where the failure to so qualify would not reasonably be expected to result in a Material Adverse Effect.  Each Seller has the corporate power or limited liability company power, as the case may be, and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it is a party.  The execution and delivery by each Seller of this Agreement and the Ancillary Agreements and performance by each Seller of its obligations under this Agreement and the Ancillary Agreements to which it is a party and the consummation by such Seller of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action or limited liability company action on the part of such Seller, and this Agreement constitutes, and each of the Ancillary Agreements to which it is a party upon its execution will constitute (in each instance, assuming such agreements constitute valid and binding obligations of the other parties thereto), the legal, valid and binding obligation of such Seller enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium or similar Legal Requirements which affect creditors' rights generally and by legal and equitable limitations on the enforceability of equitable remedies.  Each Seller has the corporate power or limited liability company power, as the case may be, and authority to own its properties and to carry on the Business as currently conducted.

Section 3.2.    No Conflict or Violation; Consents.  Except with respect to the Business other than the North American Business and except as set forth on *Schedule 3.2*, after giving effect to the Sale Order, neither the execution and delivery of this Agreement and the Ancillary Agreements by Sellers, the consummation by Sellers of the transactions contemplated hereby or thereby, nor the fulfillment by Sellers of the terms and compliance with the provisions hereof or thereof, will (with or without notice or lapse of time):

(a)    contravene, conflict with, or result in a violation of (i) any provision of the certificate or articles of incorporation, by-laws, articles of organization or limited liability company agreement of any Seller, or (ii) any resolution adopted by the board of directors or the stockholders of any Seller;

11

1093038.30

(b)     assuming receipt of the Governmental Approvals set forth on *Schedule 3.2*, contravene, conflict with, or result in a violation of, in any material respect, any Legal Requirement to which any Seller, the Business or any of the Purchased Assets is subject;

(c)     assuming receipt of the Governmental Approvals set forth on *Schedule 3.2*, contravene, conflict with, or result in a violation of, in any material respect, any of the terms or requirements of, or give any Governmental Agency the right to revoke, withdraw, suspend, cancel, terminate, or modify, any material Permit that is held by any Seller;

(d)     contravene, conflict with, or result in a violation or breach in any material respect of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Contract or Lease;

(e)     result in the imposition or creation of any Lien (except for a Permitted Lien) upon or with respect to any of the Purchased Assets;

(f)     result in Purchaser being subject to a Contract or Lease whereby Purchaser's breach or performance of any non-competition, exclusivity, employee non-solicitation, "most-favored-nation," reciprocal purchase provision or other provision materially restricting business conduct or operation is determined based on the acts or omissions of Purchaser's Affiliates (other than its officers or directors); or

(g)     require the consent, approval, or authorization of, or registration or filing with, any Governmental Agency ("*Governmental Approvals*") except for (i) the filing of the Sale Order and the Bidding Procedures Order with, and the approval thereof by, the Bankruptcy Court, and (ii) the filing of a notification and report form under the HSR Act, and the rules and regulations promulgated thereunder, and the expiration or earlier termination of the applicable waiting period thereunder.

Section 3.3.    **Subsidiaries and Investments.**  The Purchased Assets do not include the stock of, or any equity participation in, any Person.

Section 3.4.    **Certificate and By-Laws.**  True and correct copies of the certificate or articles of incorporation and by-laws of each Seller were provided to Purchaser prior to the date of this Agreement.

Section 3.5.    **SEC Reports; Financial Statements and Information.**

(a)     Genuity has filed all Reports on Form 10-K, Form 10-Q and Form 8-K (including all exhibits thereto) required to be filed with the U.S. Securities and Exchange Commission (the "*Commission*") since June 27, 2000, and has heretofore made available to Purchaser, in the form filed with the Commission, its (i) Annual Report on Form 10-K for the fiscal year ended December 31, 2001, (ii) Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2002, June 30, 2002 and September 30, 2002, and (iii) all Reports on Form 8-K filed by Genuity with the Commission since January 1, 2002

1093038.30

(collectively, the "*SEC Reports*").  The SEC Reports (x) at the time filed complied as to form in all material respects with the requirements of the Exchange Act, and (y) did not at the time they were filed contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. None of the subsidiaries of Genuity is required to file any statements or reports with the Commission pursuant to Sections 13(a) or 15(d) of the Exchange Act.

(b)     The audited consolidated balance sheet of Genuity at December 31, 2001, 2000 and 1999 and related consolidated statements of income, retained earnings and cash flow for the periods then ended and the notes thereto included in the applicable SEC Report (collectively, the "*Financial Statements*"), (i) were, except as otherwise noted therein, prepared in accordance with GAAP Consistency, and (ii) present fairly, in all material respects, the financial condition, the results of operations and the retained earnings and cash flow of Genuity as of the dates and for the periods indicated thereon.

(c)     The unaudited consolidated balance sheet of Genuity as of the Interim Balance Sheet Date (the "*Interim Balance Sheet*"), and the related consolidated statements of income and cash flow for the period then ended included in the applicable SEC Report, (i) were, except as otherwise noted therein, prepared in accordance with GAAP Consistency, and (ii) present fairly, in all material respects, the financial condition, results of operations and cash flows of the Genuity as of the dates and for the periods indicated thereon, subject to normal year-end adjustments.

(d)     The supplemental information of Genuity described on *Schedule 3.5(d)*: (i) was prepared in good faith in the Ordinary Course of Business for the internal use of Sellers, and (ii) to Sellers' Knowledge presented fairly in all material respects the information purported to be presented therein as of the respective dates thereof.

**Section 3.6.**     [Intentionally omitted.]

**Section 3.7.**     [Intentionally omitted.]

**Section 3.8.**     [Intentionally omitted.]

**Section 3.9.**     **Inventory.**  Except as set forth on *Schedule 3.9*, the inventories, including spare parts, replacement and component parts, of Sellers relating to the Network, to the extent directly or indirectly maintained by any Seller (the "*Inventory*"), are, taken as a whole, reasonably sufficient in quantity and suitable for the maintenance and operation of the Network, to the extent directly or indirectly maintained by any Seller, in the Ordinary Course of Business. Since September 1, 2002, Sellers have not sold Inventory or other Personal Property for gross proceeds of more than $1.2 million or having undepreciated book value of more than $17.5 million.

**Section 3.10.**     **Real Property.**

(a)     *Schedule 3.10(a)-1* lists all real property (including a list of each specific Seller entity name) owned by any Seller as of the date hereof and used in connection with

13

1093038.30

the North American Business (together with all building improvements therein, the "*Owned Real Property*"). Except as set forth on *Schedule 3.10(a)-2*, each Seller has good, marketable and indefeasible title to the Owned Real Property listed as owned by it on *Schedule 3.10(a)-1* in fee simple, free and clear of any Liens other than Permitted Liens. Except as set forth on *Schedule 3.10(a)-2*, and except for Permitted Liens, there are no Contracts or Leases or other agreements to which Sellers' interest in Owned Real Property is subject granting any Third Party the right to purchase, lease, use or occupy any of the Owned Real Property and, to Sellers' Knowledge, there are no Persons (other than any Seller or any Person under Permitted Liens) in possession or control of any part of the Owned Real Property.

(b)     *Schedule 3.10(b)-1* contains a list of all leases and subleases, including names of the parties thereto and the location of the applicable premises, with respect to all real property leased or subleased by Sellers as of the date hereof and used in connection with the North American Business, and lists all material licenses, occupancy agreements, rights of way, easement or any similar agreement necessary for the operations of the North American Business as presently conducted (such leases, subleases and other agreements, together with all amendments thereto, collectively, the "*Leases*", and such real property the "*Leased Property*"). Each Lease is valid, binding and enforceable against Sellers and, to Sellers' Knowledge, except as set forth on *Schedule 3.10(b)-2*, the other parties thereto in accordance with its terms, and in full force and effect, subject in the case of enforceability against the other parties thereto, to applicable bankruptcy, reorganization, insolvency, moratorium or similar Legal Requirements which affect creditors' rights generally and by legal and equitable limitations on the enforceability of equitable remedies. Except as set forth on *Schedule 3.10(b)-3*, Sellers have performed all material obligations required to be performed by them under each of the Leases with Major Customers or Major Suppliers, other than monetary defaults that would not reasonably be expected to result in a termination of the Lease prior to the commencement of the Bankruptcy Case and that would be cured by Sellers by payment of the Cure Amount. Except as set forth on *Schedule 3.10(b)-3*, neither Sellers nor, to Sellers' Knowledge, any other party thereto is in material default under any Lease (and no event has occurred which, with due notice or lapse of time or both, would constitute such a lapse or default by Sellers or, to Sellers' Knowledge, any other party thereto) other than in the case of Sellers defaults that would not reasonably be expected to result in a termination of the Lease prior to the commencement of the Bankruptcy Case and that would be cured by Sellers by payment of the Cure Amount. Except as set forth on *Schedule 3.10(b)-3*, no material controversy, claim, dispute or disagreement exists between the parties to any of the Leases. Sellers have previously made available to Purchaser a copy of each Lease or other written evidence of the obligations, listed on *Schedule 3.10(b)-1*. Since the Interim Balance Sheet Date, no option has been exercised by Sellers or, to Sellers' Knowledge, any other party under any of the Leases, except options whose exercise has been evidenced by a written document, a true, complete and accurate copy of which has been or, with respect to any such option exercised after the date hereof, will prior to the Closing be, made available to Purchaser with the corresponding Lease.

1093038.30

(c)      Except as set forth on *Schedule 3.10(c)*, Sellers have not received any written notice of: (i) any violation of any material applicable building, zoning, land use or other similar Legal Requirement (including, without limitation, the Americans With Disabilities Act) in respect of Owned Real Property or Leased Property, which has not been heretofore remedied, which violations, individually or in combination with any others, would materially and adversely affect the ability of Sellers to use the affected parcel of material Owned Real Property or material Leased Property in the manner and scope in which it is now being used or operated by Sellers; (ii) any operations on or uses of any material Owned Real Property and material Leased Property which constitute material non-conforming uses under any applicable building, zoning, land use or other Legal Requirement; and (iii) other than published notice not actually received, any pending or contemplated rezoning proceeding materially affecting any material Owned Real Property or any material Leased Property.

(d)      Sellers have no Knowledge of and have not received any written notice that there is existing, pending or threatened: (i) condemnation of any part of material Owned Real Property or material Leased Property by any Governmental Agency; (ii) special assessments against any part of material Owned Real Property or material Leased Property; or (iii) litigation against any Seller for breach of any restrictive covenant affecting any part of material Owned Real Property or material Leased Property.

(e)      The covenants, easements, rights-of-way and other Liens affecting any material Owned Real Property or any material Leased Property do not with respect to each such Owned Real Property or Leased Property materially impair the ability to use any such Owned Real Property or Leased Property in the operation of the Business as presently conducted. The Purchased Assets include all utilities and services and rights of access to public roads, streets or the like or valid easements over private streets, roads or other private property for such ingress to and egress from material Owned Real Property (and to Sellers' Knowledge, material Leased Property), except as would not materially impair the ability to use any such Owned Real Property or Leased Property in the operation of the Business as presently conducted.

(f)      No Seller is a "foreign person" within the meaning of Section 1445 of the Code or is subject to withholding under the Foreign Investment and Real Property Tax Act of 1980.

(g)      Except as set forth on *Schedule 3.10(g)-1*, to the extent required by Legal Requirement, Sellers have paid in full all material *ad valorem* property Taxes and other assessments levied on the Owned Real Property and the Leased Property (if required under the Lease) that Sellers are obligated to pay and that have heretofore become due and payable, except in the case of the representation being made as of the date hereof as is being contested in good faith by appropriate proceedings and for which a reserve in accordance with GAAP Consistency has been set forth on the Business's books. Except as set forth on *Schedule 3.10(g)-2*, Sellers have no Knowledge of any tax abatements or exemptions specifically affecting the Owned Real Property or any proposed increase in

15

1093038.30

the assessed valuation of the Owned Real Property or of any proposed public improvement assessments.

Section 3.11.    **Personal Property.**

(a)    *Schedule 3.11(a)-1* contains a list of Personal Property of the Business owned by any Seller with an original cost of $25,000 or more as of the Interim Balance Sheet Date (the "*Material Personal Property*").  As of the Interim Balance Sheet Date, Sellers owned outright and had valid title to all Material Personal Property and all other Personal Property reflected as owned on the Interim Balance Sheet subject to no Lien except Permitted Liens and except as set forth on *Schedule 3.11(a)-2*.

(b)    *Schedule 3.11(b)* sets forth the name, parties and date of all leases with respect to Personal Property to which any Seller is a party as of the date hereof under which the annual rent and other charges are, in the aggregate, $100,000 or more.  Except as set forth on *Schedule 3.11(b)*, Sellers hold a valid leasehold interest in all of the Personal Property shown or required to be shown on *Schedule 3.11(b)* as leased by any Seller, in each case under valid and enforceable leases.

(c)    Since December 31, 2001, except as set forth on *Schedule 3.11(c)*, the Personal Property has been maintained in accordance with Sellers' historical practices.  The Personal Property, taken as a whole, is reasonably suitable for the conduct of the North American Business as currently conducted.

Section 3.12.    **Compliance with Legal Requirements; Permits.**

(a)    Except as set forth on *Schedule 3.12(a)-1*, Sellers are in compliance in all material respects with all Legal Requirements applicable to the Business or any of the Purchased Assets.  Since December 31, 2001, except as set forth on *Schedule 3.12(a)-2*, Sellers have not received any written (or, to their Knowledge, oral) notice or other communication from any Governmental Agency regarding any actual, alleged, possible, or potential violation of, or failure to comply, in any material respect, with, any Legal Requirement.

(b)    *Schedule 3.12(b)-1* sets forth a list of each Permit held by Sellers as of the date of this Agreement, including the expiration date of such Permits.  The Permits listed on *Schedule 3.12(b)-1* constitute all of the Permits that are necessary for the conduct of the North American Business or the ownership or use of the Purchased Assets in connection therewith as currently conducted, owned and used by Sellers.  All such Permits, except as noted on *Schedule 3.12(b)-2* are in full force and effect and no proceeding is pending or, to the Knowledge of any Seller, threatened, to revoke or limit any such Permit.  Except as set forth on *Schedule 3.12(b)-3*:

(i)    Sellers are, and at all times since December 31, 2001 have been, in compliance in all material respects with all of the terms and requirements of each Permit held by Sellers necessary for the conduct of the North American Business or the ownership or use of the Purchased Assets in connection therewith, as currently conducted, owned and used by Sellers;

16

1093038.30

(ii)    Since December 31, 2001, Sellers have not received any written (or, to their Knowledge, oral) notice or other communication from any Governmental Agency regarding (A) any actual, alleged, possible, or potential violation of or failure to comply with, in any material respect, any term or requirement of any Permit held by Sellers and necessary for the conduct of the North American Business or the ownership or use of the Purchased Assets in connection therewith, as currently conducted, owned and used by Sellers, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Permit held by Sellers and necessary for the conduct of the North American Business or the ownership or use of the Purchased Assets in connection therewith, as currently conducted, owned and used by Sellers; and

(iii)    Since the Interim Balance Sheet Date, all applications required to have been filed for the renewal of the Permits held by Sellers and necessary for the conduct of the North American Business or the ownership or use of the Purchased Assets in connection therewith, as currently conducted, owned and used by Sellers have been duly filed on a timely basis with the appropriate Governmental Agencies, and all other filings required to have been made by Sellers with respect to such Permits have been duly made on a timely basis with the appropriate Governmental Agencies.

Section 3.13.    **Affiliate Agreements.**  Except (a) as set forth on *Schedule 3.13*, (b) for any Contracts and Leases solely among the Sellers, and (c) for Contracts between any Seller on the one hand and any subsidiary of any Seller on the other hand that is not a Contract for provision of goods, facilities or services (other than administrative services), there are no written Contracts or Leases or to the Knowledge of Sellers material oral Contracts or Leases, between any Seller, on the one hand, and any Affiliate or Related Person of any Affiliate of any Seller, on the other hand, in connection with the Business.

Section 3.14.    **Contracts.**

(a)    *Schedule 3.14(a)* hereto lists all written Contracts (including Excluded Agreements, but excluding Customer Contracts and agreements to purchase services under tariff) and to the Knowledge of Sellers describes all oral Contracts (including Excluded Agreements, but excluding Customer Contracts and agreements to purchase services under tariff) in effect as of the date of this Agreement which relate to the conduct or operation of the Business and which provide for annual payments or the exchange of value of $100,000 or more.

17

1093038.30

(b)    Except as set forth on *Schedule 3.14(b)* and for agreements to purchase services under tariff, as of the date hereof the Contracts do not include any Contracts described in the following clauses; Sellers have used their good faith efforts to classify the Contracts on *Schedule 3.14(b)* so as to correspond with the clauses of this *Section 3.14(b)*; however, a Contract listed under one clause of *Schedule 3.14(b)* will be deemed to be listed under all other applicable clauses of *Schedule 3.14(b)*:

(i)    mortgage, indenture, note or other instrument for or relating to Indebtedness other than capitalized leases;

(ii)    guaranty of any obligation for borrowings or performance, or guaranty or warranty of products or services, excluding endorsements or guaranties of instruments made in the Ordinary Course of Business and statutory warranties;

(iii)    Contract under which there remains any Liability of any Seller pursuant to the terms thereof for the sale or lease of any of Sellers' assets other than in the Ordinary Course of Business;

(iv)    Contract under which there remains any Liability of any Seller pursuant to the terms thereof for the purchase of any real estate;

(v)    Contract for the future purchase by Sellers of services or Personal Property with an outstanding balance or remaining commitment in excess of $200,000;

(vi)    Contract under which there remains any Liability of any Seller pursuant to the terms thereof pursuant to which a Seller is obligated to make payments, contingent or otherwise, on account of or arising out of prior acquisitions or sales of businesses, assets, or stock of other companies;

(vii)    distribution, dealership, representative, broker, sales agency, advertising or consulting Contract excepting any such contract that is terminable at will, or by giving notice of thirty (30) days or less, without Liability;

(viii)    agreement imposing non-competition, exclusive dealing, "most-favored-nation" or employee non-solicitation obligations on any Seller;

(ix)    agreement providing for payments to any Person based on sales, purchases, or profits, other than (x) direct payments for goods or services and (y) payments to salesmen in the Ordinary Course of Business;

(x)    Contract relating to cleanup, abatement or other actions in connection with environmental liabilities; or

(xi)    other material Contract not required to be listed above which was entered into outside of the Ordinary Course of Business other than any Contract relating to retention of professionals in connection with the Bankruptcy Cases.

1093038.30

(c)     Each Contract is valid, binding and enforceable against Sellers and, to Sellers' Knowledge, except as set forth on *Schedule 3.14(c)*, the other parties thereto in accordance with its terms, and in full force and effect, subject in the case of enforceability against the other parties thereto to applicable bankruptcy, reorganization, insolvency, moratorium or similar Legal Requirements which affect creditors' rights generally and by legal and equitable limitations on the enforceability of equitable remedies.  Except as set forth on *Schedule 3.14(c)*, Sellers have performed all material obligations required to be performed by them under each Contract with Major Customers and Major Suppliers, other than monetary defaults that would not reasonably be expected to result in a termination of the Contract prior to the commencement of the Bankruptcy Case and that would be cured by Sellers by payment of the Cure Amount.  Except as set forth on *Schedule 3.14(c)*, neither Sellers nor, to Sellers' Knowledge, any other party thereto is in material default under any Contract (and no event has occurred which, with due notice or lapse of time or both, would constitute such a lapse or default by Sellers, or to Sellers' Knowledge, any other party thereto), other than in the case of Sellers defaults that would not reasonably be expected to result in a termination of the Contract prior to the commencement of the Bankruptcy Case and that would be cured by Sellers by payment of the Cure Amount.  Sellers have delivered to Purchaser a copy of each Contract or other written evidence of the obligations, and all amendments thereto, listed on *Schedules  3.14(a)* or *(b)*.

(d)     *Schedule 3.14(d)* sets forth a list of all of the Non-Seller Subsidiaries' Customer Contracts as of the date of this Agreement.

(e)     All circuits purchased from Verizon and its Affiliates, under the Memorandum of Understanding, dated as of January 3, 2002, between Verizon Services Corp. (on behalf of various Verizon entities), Teleselector Resources Group (on behalf of various Verizon entities), GTE Consolidated Services Group (on behalf of various GTE/Verizon entities) and Genuity Solutions, Inc. have been purchased under tariff.

**Section 3.15.    Intellectual Property.**

(a)     Except as set forth on *Schedule 3.15(a)*, Sellers own or have the valid right to use all material Intellectual Property.  To the Knowledge of any Seller, there are no infringements of any Intellectual Property by any third party.  To Sellers' Knowledge, the conduct of the Business as currently conducted does not infringe any proprietary right of a third party.  Except as set forth in *Schedule 3.15(a)*, there is no claim, suit, action or proceeding pending or, to the Knowledge of any Seller, threatened against any Seller:  (i) alleging any such material conflict or infringement with any third party's proprietary rights; or (ii) challenging any Seller's ownership or use, or the validity or enforceability of any material Intellectual Property.  Except as set forth in *Schedule 3.15(a)*, the consummation of the transactions contemplated by this Agreement will not materially limit the use or ownership of any, or any right to, Intellectual Property.

(b)     *Schedule 3.15(b)-1* sets forth a complete list of registrations/patents or applications therefor pertaining to the Seller Intellectual Property, and to Sellers' Knowledge the Jointly Owned Intellectual Property, as of the date hereof and the owner

19

1093038.30

of record (and in the case of Jointly Owned Intellectual Property the nature of Sellers' interest), date of application or issuance and relevant jurisdiction as to each. Except as described on *Schedule 3.15(b)-2*, all Seller Intellectual Property listed therein is owned by Sellers, free and clear of all Liens, except for Permitted Liens and Liens that will be extinguished by the Sale Order. To Sellers' Knowledge and except as described on Schedule 3.15(b)-2, Sellers' interest in all Jointly Owned Intellectual Property listed therein is owned by Sellers, free and clear of all Liens, except for Permitted Liens and Liens that will be extinguished by the Sale Order. All Seller Intellectual Property, and to Sellers' Knowledge all Jointly Owned Intellectual Property, listed, or required to be listed, on *Schedule 3.15(b)-1* is valid, subsisting, unexpired and enforceable and the registrations thereof are in proper form and all renewal fees and other maintenance fees that have fallen due have been paid. Except as set forth on *Schedule 3.15(b)-2*, as of the date hereof, no listed application or registration/patent for Seller Intellectual Property, or to Sellers' Knowledge for Jointly Owned Intellectual Property, is the subject of any legal or governmental proceeding before any Governmental Agency in any jurisdiction, including any office action or other form of preliminary or final refusal of registration.

(c)     *Schedule 3.15(c)* sets forth a complete list as of the date hereof of (i) all written (and to the Knowledge of Sellers, oral) licenses, sublicenses, cross-licenses and other agreements in which Sellers, or to the Knowledge of Sellers any sublicensee of any Seller, has granted to any person the right to use the Intellectual Property; and (ii) other written (and to the Knowledge of Sellers, oral) forbearances to sue, and settlement agreements to which any Seller is a party relating to the Intellectual Property or the intellectual property of any third party relating to the Business. Except as set forth on *Schedule 3.15(c)*, no Seller is under any obligation to pay royalties or other payments in connection with any license, sublicense or other agreement relating to the Intellectual Property, in each case other than (x) such licenses, sublicenses and other agreements providing for royalties or other payments of less than $10,000 per annum, and (y) such licenses, sublicenses and other agreements relating to (A) "off-the-shelf" software, (B) software contained within equipment owned or leased by Sellers pursuant to a Contract listed on *Schedule 3.14(a)* or any supplement provided pursuant to *Section 5.1(c)(viii)*, or (C) software relating principally to Sellers' administrative functions (as opposed to Business operations).

(d)     To the Knowledge of any Seller, no former or present employee, officer or director of any Seller holds any right, title or interest, directly or indirectly, in whole or in part, in or to any material Intellectual Property.

(e)     Except as set forth on *Section 3.15(e)*, none of the material designs, plans, trade secrets, inventions, processes, procedures, research records, manufacturing know-how and manufacturing formulae, wherever located, the value to the Business of which is contingent upon maintenance of the confidentiality thereof, has been disclosed by any Seller to any Person other than employees, representatives and agents of Sellers except as required pursuant to the filing of a patent application by any Seller or pursuant to customary confidentiality agreements.

20

1093038.30

**Section 3.16.    Software.**

(a)    All Software as of the date hereof, excluding "off-the-shelf" software, application program interfaces, work group developed tools, shareware and individually developed desktop tools (including Excel spreadsheets), is set forth and described on *Schedule 3.16(a)-1* hereto. Except as set forth on *Schedule 3.16(a)-2*, to the extent any material Software has been designed or developed by any Seller or by any employee of Seller, or by consultants on any Seller's behalf, such Software is original and is protected by the copyright laws of the United States, and such Seller has complete rights to and sole ownership of such Software. To the Knowledge of any Seller, no part of any such Software or the use thereof violates or infringes upon the rights of any other person or entity, including, without limitation, copyrights, patents, trade secrets and rights of privacy.

(b)    Except as set forth on *Schedule 3.16(b)*, the Software is free from any significant software defect or programming or documentation error that (i) would be material, or (ii) is not mitigated by alternate working methods or software patches.

(c)    No Seller has knowingly altered the data, or any Software or supporting software which may in turn damage the integrity of the data, stored in electronic, optical or magnetic form. Except as set forth on *Schedule 3.16(c)* hereto, Sellers have no Knowledge of the existence of any material bugs or viruses with respect to the Software.

**Section 3.17.    Labor Relations.** No Seller is a party to any collective bargaining agreement covering Business Employees. Except as disclosed on *Schedule 3.17*, there are no unfair labor practice proceedings pending or, to Sellers' Knowledge, threatened in writing between any Seller and any of its current or former Business Employees or any labor or other collective bargaining unit representing any current or former Business Employee of such Seller that would reasonably be expected to result in a labor strike, general slow-down or general work stoppage.

**Section 3.18.    ERISA.** There are no Multiemployer Plans or Union Welfare Benefit Plans to which Sellers or any other member of the Control Group is, or has been, required to make a contribution or other payment.

**Section 3.19.    Insurance.** *Schedule 3.19* sets forth a list of all insurance policies and all material fidelity bonds or other insurance service contracts (the "*Insurance Policies*") providing coverage for the properties or operations of the North American Business as of the date of this Agreement, the type and amount of coverage, and the expiration dates of the Insurance Policies, whether or not the Insurance Policies will be included in the Purchased Assets. As of the date of this Agreement, (i) there is no material claim by any Seller pending under any of the Insurance Policies as to which coverage has been questioned, denied or disputed by the underwriters of such policies, (ii) all premiums payable under all such policies have been paid on or prior to their due date, (iii) Sellers have otherwise complied in all material respects with the terms and conditions of all the Insurance Policies and (iv) such policies are valid and enforceable in accordance with their terms, are in full force and effect and insure against risk and liabilities customary in the industry. Except as set forth on *Schedule 3.19*, as of the date of this

1093038.30

Agreement, no Seller has received notice from any insurance carrier: (i) threatening a suspension, revocation, modification or cancellation of any material insurance policy or a material increase in any premium in connection therewith, or (ii) informing such Seller that any material coverage listed on *Schedule 3.19* will or may not be available in the future on substantially the same terms as now in effect.

Section 3.20.     **Litigation.**  Including with respect to Excluded Matters:

(a)     Except as set forth on *Schedule 3.20*, as of the date hereof, there are no actions, suits, proceedings, labor disputes or investigations (collectively, "*Proceedings*") pending or to Sellers' Knowledge threatened in writing by or against any Seller, any of its Affiliates (other than officers, directors and Non-Seller Subsidiaries), or, to Sellers' Knowledge, any of their respective officers, directors, or employees in their capacity as such involving, affecting or relating to the Business, any Purchased Asset, Assumed Liability, Contract or Lease or the transactions contemplated by this Agreement. *Schedule 3.20* sets forth a list and a summary description of all such Proceedings.

(b)     Except (x) as set forth on *Schedule 3.20*, (y) for the Bankruptcy Case and customary motions filed in connection with the administration thereof and (z) for any Proceeding or threat thereof by or on behalf of any holder of equity securities of Genuity in their capacity as such, as of the Closing Date, there will be no Proceedings pending or to Sellers' Knowledge threatened against any Seller, any of its Affiliates (other than officers, directors and Non-Seller Subsidiaries), or, to Sellers' Knowledge, any of their respective officers, directors, or employees in their capacity as such, that would reasonably be expected to materially adversely affect:  (i) the assets, liabilities, results of operations, properties or operational or financial condition of the Business following the Closing, or (ii) the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements.

(c)     Neither Sellers, the Business nor any of the Purchased Assets are subject to any Order (other than the Sale Order) that materially adversely affects or would reasonably be expected to materially adversely affect: (i) the assets, liabilities, results of operations, properties or operational or financial condition of the Business, or (ii) the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements.

Section 3.21.     **Environmental Matters.**  Except as described on *Schedule 3.21*:

(a)     Sellers are in compliance in all material respects with all Environmental Laws in connection with the ownership, use, maintenance and operation of the Owned Real Property and Leased Property and otherwise in connection with the conduct of the Business;

(b)     Sellers have no Liability, whether contingent or otherwise, under any Environmental Law with respect to the Business or the Purchased Assets;

(c)     since December 31, 2001, no request for information, notice, Governmental Agency inquiry, demand letter, notice of violation or alleged violation of,

22

1093038.30

non-compliance or alleged non-compliance with or any Liability under, any Environmental Law to which any Purchased Asset or the Business is subject including its operations, has been received by or threatened against any Seller;

(d)    there are no Orders outstanding, or any administrative, civil or criminal actions, suits, proceedings or investigations pending or, to Sellers' Knowledge, threatened, against any Seller with respect to any Purchased Asset, Assumed Liability or the Business relating to compliance with or Liability under any Environmental Law;

(e)    Sellers have obtained or applied for all Permits, required under any Environmental Law necessary for the conduct of the Business or the ownership or present use of the Owned Real Property or Leased Property, improvements or equipment located thereon;

(f)    Sellers have not caused or contributed to any Release, nor is there a threat of a Release, of any Hazardous Material on or from the Owned Real Property, Leased Property or any other real property used in connection with the Business in violation of any Environmental Law or that would reasonably be expected to result in Liability to Sellers under any Environmental Law, nor have Sellers used, generated, stored or otherwise allowed to be present on the Owned Real Property or Leased Real Property, any Hazardous Material in violation of any Environmental Law or that would reasonably be expected to result in Liability to Sellers under any Environmental Law;

(g)    no Seller is required to give notice of or record or deliver to any Governmental Agency an environmental disclosure document or statement by virtue of the transactions set forth herein and contemplated hereby, or as a condition to the recording of any mortgage or the effectiveness of any of the transactions contemplated hereby;

(h)    none of the Owned Real Property or Leased Property (and any buildings, structures, fixtures or materials on such real property): (i) contains or includes any asbestos, polychlorinated biphenyls, or any underground storage tanks, piping, or sumps (or other underground structures which contain Hazardous Material), (ii) is included or proposed for inclusion on the National Priorities List or any similar list maintained under any Environmental Law, (iii) constitutes a habitat for any species designated as threatened or endangered pursuant to the Endangered Species Act, or (iv) contains any wetlands;

(i)    Sellers have not disposed of, transported, or arranged for the disposal or transportation of any Hazardous Material to any offsite location that is or has been the subject of any inquiry or investigation by any Governmental Agency relating to alleged non-compliance with or liability under Environmental Law; and

(j)    Sellers have provided Purchaser with (x) all material internal reports prepared by or on behalf of Sellers concerning the environmental history of the Owned Real Property and Leased Property during the two years preceding the date hereof, and

1093038.30

(y) any and all Phase I or Phase II Environmental Assessments relating to the Owned Real Property and Leased Property in the Sellers' possession or control.

### Section 3.22.    Tax Matters.

(a)    **Tax Liens.**  As of the date of this Agreement, there is no Lien (other than Permitted Liens or a Lien that will be extinguished by the Sale Order) affecting any of the Purchased Assets that arose in connection with any failure or alleged failure to pay any Tax.

(b)    **Tax Exempt Property.**  None of the Purchased Assets secures any Indebtedness, the interest on which is tax-exempt under Section 103(a) of the Code. None of the Purchased Assets are "tax-exempt use property" within the meaning of Section 168(h) of the Code.

### Section 3.23.    Interim Operations.  From the Interim Balance Sheet Date (or in the case of Inventory or other Personal Property, from September 1, 2002) through the date hereof, except (a) as set forth on *Schedule 3.23*, (b) as have been cured prior to the date hereof, (c) for the failure by Sellers to pay amounts due under Contracts and Leases that would be cured by the payment of the Cure Amount, and (d) with respect to *Section 5.1(b)* and *(d)*, agreements to purchase services under tariff, Sellers have not taken any action that would have constituted a violation of *Section 5.1* of this Agreement (other than *Sections 5.1(b)(ii), (b)(iii), (c)* and *(d)(i)*, *(d)(ii), (d)(iii)* and *(d)(iv)C)* if such *Section 5.1* had been in effect from the Interim Balance Sheet Date.

### Section 3.24.    [Intentionally omitted.]

### Section 3.25.    Customers and Suppliers.  *Schedule 3.25* lists the twenty-five largest customers and the twenty-five largest suppliers (measured by dollar volume for the twelve (12) calendar months ended September 30, 2002) of the Business ("*Major Customers*" and "*Major Suppliers*," respectively) and the revenue derived from or payments made to each Major Customer and Major Supplier in such 12-month period.  As of the date of this Agreement, except as set forth on *Schedule 3.25*, (i) no Seller is engaged in a material dispute with any Major Customer or Major Supplier, (ii) there has been no material reduction in business volume with any Major Customer or Major Supplier with respect to the Business since June 30, 2002 through the date hereof, and (iii) since June 30, 2002 through the date hereof, no Major Customer or Major Supplier has proposed to Sellers in writing any material modification or change in the business relationship with any Seller.

### Section 3.26.    [Intentionally omitted.]

### Section 3.27.    [Intentionally omitted.]

### Section 3.28.  Certain Payments.  Since December 31, 2001, neither Sellers nor any of their directors, officers, or employees, or to Sellers' Knowledge any other Person acting for or on behalf of any Seller, has made (a) any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services in violation of any Legal Requirement or (b) established

1093038.30

or maintained any fund or asset for any purpose described in clause (a) above that has not been recorded in the books and records of the Business.

Section 3.29.    **Network Operations.**

(a)    *Schedule 3.29(a)* sets forth the service level credits granted by Sellers for the calendar months of June, July, August, September and October 2002 to each Major Customer and to the other customers of Sellers in accordance with the service level agreements and similar provisions contained in Contracts with such customers.

(b)    The Network (inside the United States of America):

(i)    has complied as of the date of this Agreement (and will comply as of the Closing Date) on a point-of-presence to point-of-presence basis with the performance levels set forth on *Schedule 3.29(b)-1*, determined based on an average of the Network reporting metrics for the six full calendar months ended prior to the date of this Agreement (or the Closing Date as the case may be); and

(ii)    has complied with the performance levels set forth on *Schedule 3.29(b)-2* determined based on an average of the Network reporting metrics for the six full calendar months ended prior to the date of this Agreement (or the Closing Date, as the case may be).

(c)    Since December 31, 2001, the Network equipment owned or leased by Sellers, to the extent directly or indirectly maintained by any Seller, has been maintained by Sellers in a manner consistent with Sellers' historical practices and is without material defect, other than normal wear and tear.

(d)    The capacities of the Network are not less than those set forth on *Schedule 3.29(d)*; provided, however, such DSL capacities and AS-1 capacities may be reduced prior to the Closing Date as a result of Network optimization activities set forth in *Schedule 5.1*.

Section 3.30.    **Schedule Updates.** The Schedule Updates as of the Closing Date will set forth all of the information required to be set forth therein were the corresponding representations and warranties made as of the Closing Date, notwithstanding the fact that such representations and warranties expressly speak as of the date of this Agreement or as of a different date.

**ARTICLE IV.**

**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Each of Purchaser and Parent jointly and severally represents and warrants to Sellers as follows:

Section 4.1.    **Authority of Purchaser.** Each of Parent and Purchaser is a corporation or limited liability company duly organized, validly existing, and in good standing

1093038.30

under the laws of the State of Delaware. Each of Parent and Purchaser has the corporate power or limited liability company power, as the case may be, and authority to execute, deliver and perform its obligations under this Agreement and each of the Ancillary Agreements to which it is a party. The execution and delivery by each of Parent and Purchaser of this Agreement and the Ancillary Agreements to which it is a party, the performance by each of Parent and Purchaser of its obligations under this Agreement and the Ancillary Agreement to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary corporate action or limited liability company action, as the case may be, on the part of Parent and Purchaser, and this Agreement constitutes, and each of the Ancillary Agreements to which it is a party upon its execution will constitute (in each instance, assuming such agreements constitute valid and binding obligations of the other parties thereto), the legal, valid and binding obligation of Parent and Purchaser enforceable in accordance with its terms, except as such enforcement may be limited by applicable bankruptcy, insolvency, moratorium, or similar Legal Requirements from time to time in effect which affect creditors' rights generally, and by legal and equitable limitations on the enforceability of equitable remedies. Each of Parent and Purchaser has the corporate power or limited liability company power, as the case may be, and authority to own its properties and to carry on its business presently being conducted by it.

Section 4.2.    No Conflict or Violation.  Except as set forth on *Schedule 4.2*, neither the execution and delivery of this Agreement and the Ancillary Agreements by Parent and Purchaser, the consummation of the transactions contemplated hereby or thereby by Parent and Purchaser, nor the fulfillment of the terms and compliance with the provisions hereof or thereof by Parent and Purchaser will (with or without notice or lapse of time):

(a)    contravene, conflict with, or result in a violation of (i) any provision of the certificate of incorporation, by-laws, articles of organization or limited liability company agreement of Parent or Purchaser, (ii) any resolution adopted by the board of directors or the stockholders of Parent or Purchaser or (iii) any agreement the contravention of, conflict with or violation of which would materially impair Parent's and Purchaser's ability to consummate the transactions contemplated hereby;

(b)    contravene, conflict with, or result in a violation in any material respect of, or give any Governmental Agency the right to challenge any of the transactions contemplated hereby or thereby or to exercise any remedy or obtain any relief under any Legal Requirement to which Purchaser or Parent is subject; or

(c)    require the consent, approval, or authorization of, or registration or filing with, any Governmental Agency with respect to Purchaser or Parent except for (i) the filing of a notification and report form under the HSR Act, and the rules and regulations promulgated thereunder, and the expiration or earlier termination of the applicable waiting period thereunder, and (ii) and approval of the Sale Order and the Bidding Procedures Order by the Bankruptcy Court.

Section 4.3.    Litigation.  There are no actions, causes of action, claims, suits, proceedings, orders, writs, injunctions or decrees pending or, to the knowledge of Purchaser, threatened against Purchaser or Parent at law, in equity, or admiralty, or before or by any

26

1093038.30

Governmental Agency, which seeks to restrain or enjoin the consummation of (or would materially impair Purchaser's or Parent's ability to consummate) the transactions contemplated hereby.

Section 4.4.    **Brokers.**  All negotiations relative to this Agreement and the transactions contemplated hereby have been carried on by Purchaser and Parent without the intervention of any other person acting on its behalf in such manner as to give rise to any valid claim by any such person against Sellers or their Affiliates for a finder's fee, brokerage commission or other similar payment based on an arrangement with Purchaser or Parent.

Section 4.5.    **Certificate and By-Laws.**  True and correct copies of the certificate or articles of incorporation and by-laws of Parent and Purchaser have previously been made available to the Sellers.

Section 4.6.    **Financing.**  Purchaser has, and on the Closing Date will have, access to sufficient funds to deliver the Purchase Price to Sellers and to consummate the transactions contemplated hereby.

Section 4.7.    **Solvency.**  Neither Parent nor Purchaser intends to file a voluntary petition for relief pursuant to the Bankruptcy Code.

Section 4.8.    **Implementation Agreement.**  Parent has previously delivered to Genuity a true, correct and complete copy of the agreement listed on *Schedule 4.8* (the conditions to effectiveness contained in Section 3 of such agreement as so delivered to Genuity and in effect on the date hereof are referred to as the *"Implementation Agreement Conditions"*).

## ARTICLE V.

## CERTAIN COVENANTS OF SELLERS

Sellers covenant with Purchaser that from and after the date hereof through the Closing Date:

Section 5.1.    **Conduct of Business.**  With respect to the Business (except as (w) expressly provided for in this Agreement, (x) set forth on *Schedule 5.1*, (y)  set forth in a *Section 5.1* Consent, or (z) relates to Excluded Matters):

(a)    Operate in the Ordinary Course.  Sellers shall operate the Business only in the Ordinary Course of Business (other than the commencement and pendency of the Bankruptcy Cases and motions in the Bankruptcy Cases not inconsistent with the other provisions of this *Section 5.1*).

(b)    Actions with Respect to Certain Agreements.  With respect to Contracts and Leases with (I) Major Customers and Major Suppliers (excluding agreements for services under tariffs with Major Suppliers for an amount not in excess of $50,000 during their stated term) and (II) other Contracts and Leases which, in the case of this clause (II), require the annual payment or exchange of value of $100,000 or more (collectively, the "*Section 5.1 Agreements*"):

27

1093038.30

(i)      Sellers shall not materially amend or modify, or waive any material term of, any Section 5.1 Agreement, except for settlements of disputes with the counterparty of such Section 5.1 Agreement in the Ordinary Course of Business that are not reasonably expected to alter to the detriment of Purchaser the post-Assumption Date obligations of the parties under the Section 5.1 Agreement were it to become an Assumed Contract or an Assumed Lease as of the Closing Date.

(ii)      With respect to each Section 5.1 Agreement (other than Contracts with customers) that (x) expires upon the conclusion of its stated term prior to the Closing Date, (y) contains a renewal option that will expire prior to the Closing Date if not exercised, or (z) contains a right of Sellers which if timely exercised will prevent automatic renewal and which right will expire prior to the Closing Date:

A.      Sellers shall give Purchaser reasonable advance written notice of such expiration, but in any event, shall give such notice not less than ten (10) Business Days prior to such expiration date (or, if applicable, any earlier required notice date with respect to such expiration date) (the "*Renewal Expiration Date*") which notice shall specify:

(1)      the Section 5.1 Agreement;

(2)      the Renewal Expiration Date; and

(3)      whether Sellers intend to extend or renew such Section 5.1 Agreement or allow or cause such Section 5.1 Agreement to terminate or lapse.

B.      With respect to each Section 5.1 Agreement for which Sellers have indicated in the notice delivered pursuant to paragraph *A* above that their intention is to extend or renew such Section 5.1 Agreement, unless Purchaser shall, not less than five (5) Business Days prior to the Renewal Expiration Date have provided Sellers with a written request to allow, or cause, such Section 5.1 Agreement to expire (a "*Lapse Request*"), then Sellers shall:

(1)      In the case of Section 5.1 Agreements described in *Section 5.1(b)(ii)(x)*, use commercially reasonable efforts to renew such Section 5.1 Agreement.

(2)      In the case of Section 5.1 Agreements described in *Section 5.1(b)(ii)(y)*, exercise such renewal option.

(3)      In the case of Section 5.1 Agreements described in *Section 5.1(b)(ii)(z)*, allow such Section 5.1 Agreement to automatically renew.

1093038.30

C.    In the event Purchaser delivers a Lapse Request, such Lapse Request shall not restrict the ability of Sellers to extend or renew the relevant Section 5.1 Agreement; provided that, if notwithstanding the receipt of a Lapse Request Sellers extend or renew the relevant Section 5.1 Agreement, then no claims for rejection damages pursuant to Section 365 of the Bankruptcy Code with respect to the extended or renewal term of such Section 5.1 Agreement shall be deemed to be "Rejection Claims."

D.    With respect to each Section 5.1 Agreement for which Sellers have indicated in the notice delivered pursuant to paragraph *A* above that their intention is to allow or cause such Section 5.1 Agreement to terminate or lapse, Purchaser may provide Sellers with a written direction not less than five (5) Business Days prior to the Renewal Expiration Date to extend such Section 5.1 Agreement (a "*Renewal Request*"). Upon timely receipt of a Renewal Request, Sellers shall (1) in the case of Section 5.1 Agreements described in *Section 5.1(b)(ii)(x)*, use commercially reasonable efforts to renew such Section 5.1 Agreement, (2) in the case of Section 5.1 Agreements described in *Section 5.1(b)(ii)(y)*, exercise such renewal option, and (3) in the case of Section 5.1 Agreements described in *Section 5.1(b)(ii)(z)*, take no action to prevent such automatic renewal. To the extent a Renewal Request is not timely received, Sellers shall allow or cause such Section 5.1 Agreement to terminate or lapse.

(iii)    Sellers shall not allow or suffer to terminate any Section 5.1 Agreement (other than those that expire in accordance with their terms as permitted by *Section 5.1(b)(ii)*).

(c)    <u>Additional Affirmative Covenants</u>:  Sellers shall

(i)    operate the Network in compliance with the performance levels set forth on *Schedule 3.29(b)*.

(ii)    continue to maintain, in all material respects, their properties in accordance with present practices in a condition, taken as a whole, reasonably suitable for their current use;

(iii)    make any and all filings required under applicable Legal Requirements and file all applications required for the renewal of the Permits held by Sellers and necessary for the conduct of the North American Business or the ownership or use of the Purchased Assets in connection therewith, as currently conducted, owned and used by Sellers in a timely fashion;

(iv)    use commercially reasonable efforts in the Ordinary Course of Business to (x) keep available generally the services of the present officers and key Business Employees, and (y) except as permitted by *5.1(b)(ii)*, preserve

29

1093038.30

generally the present relationships with customers and significant vendors having material business dealings with the Business;

(v)    perform in all material respects their obligations under:

A.    all Contracts and Leases with Major Customers and Major Suppliers, except for defaults in the payment of amounts due that would be cured by the payment of a Cure Amount; and

B.    each other Contracts and Leases except for defaults either (x) in the payment of amounts due that would be cured by the payment of a Cure Amount, or (y) that would not prevent the assumption by Sellers of the Contract or Lease and the assignment of such Contract or Lease to Purchaser pursuant to the Sale Order.

(vi)    use commercially reasonable efforts to keep in full force and effect insurance comparable in amount and scope to coverage maintained by it (or on behalf of it) on the date hereof;

(vii)    renew and keep in full force and effect all Intellectual Property and Software necessary for the operation of the Network;

(viii)    on or before the later of five (5) Business Days after the date hereof and December 6, 2002, deliver to Purchaser a supplement to *Schedule 3.14(a)* as if the dollar figure set forth in *Schedule 3.14(a)* were $25,000 instead of $100,000, such supplement shall be deemed to be a Schedule Update for purposes of this Agreement; and

(ix)    on or before the later of five (5) Business Days after the date hereof and December 6, 2002, deliver to Purchaser a schedule identifying (A) all of Sellers' outstanding purchase orders with vendors as of the date of this Agreement with a gross value in excess of $100,000, (B) the amount of the uninvoiced balance with respect to each such purchase order; (C) which of such purchase orders have remaining commitments in excess of $50,000, and (D) which of such purchase orders are "blanket" purchase orders with remaining amounts in excess of $50,000.

(d)    Additional Negative Covenants:  Sellers shall not:

(i)    following the commencement of the Bankruptcy Case, take any action with respect to any customer, supplier, or vendor that would require an Order of the Bankruptcy Court under the Bankruptcy Code other than any amendment, modification, waiver, extension, renewal, termination or lapse of a Section 5.1 Agreement expressly permitted by *Section 5.1(b)* or prepayment of expenses not prohibited by *Section 5.1(d)(ii)*;

(ii)    prepay any expenses, except (A) pursuant to obligations existing on the date of this Agreement pursuant to the terms of Contracts or Leases set

1093038.30

forth on the Schedules to this Agreement, (B) prepayments of up to 30 days of expenses as is necessary for Sellers to remain in compliance with the other covenants contained in this *Section 5.1*, or (C) prepayments for equipment required for the provisioning of customer orders.

(iii)    enter into a new service order under an existing Contract with a vendor or supplier for an amount relating to the period after the Closing Date in excess of $50,000 during the stated term;

(iv)    not enter into a new Contract (including, for purposes of this *Section 5.1(d)(iv)*, any renewal of Customers Contracts) or Lease of the type described in *A, B*, or *C* below:

A.    a Contract or Lease with any Major Customer or Major Supplier (excluding agreements for services under tariffs for an amount relating to the period after the Closing Date not in excess of $50,000);

B.    a Contract or Lease on terms which, taken as a whole, are both materially (x) inconsistent with Sellers' existing practices as of October 31, 2002 for customers and suppliers who are similarly situated, and (y) less favorable to Sellers than the prevailing market terms for similar arms length contracts entered into as of that date; or

C.    a Contract or Lease which meets all of the following criteria: (x) has a first year order value in excess of $100,000, in the case of Customer Contracts, and $50,000, in the case of other Contracts or Leases, (y) is entered into following the commencement of the Bankruptcy Case and not fully performed prior to the Closing Date, and (z) by its terms is not capable of being assigned to Purchaser by Sellers without the consent of the counterparty thereto;

(v)    make any sale, assignment, transfer, abandonment, or other conveyance of any of their assets or any part thereof, except (i) transactions pursuant to existing Contracts set forth on *Schedule 3.14(a)* and (ii) providing goods and services in the Ordinary Course of Business;

(vi)    settle, release or forgive any material claim or litigation or waive any material right, except for settlements of disputes with the counterparty of Contracts or Leases in the Ordinary Course of Business that are not reasonably expected to alter to the detriment of Purchaser the post-Assumption Date obligations of the parties under the Contract or Lease were it to become an Assumed Contract or an Assumed Lease as of the Closing Date;

(vii)    enter into any material transaction (other than pursuant to Contracts in effect on the date hereof and set forth on *Schedule 3.13*) of any nature with, any director, executive officer or Business Employee;

31

(viii)    acquire, lease or agree to acquire or lease any "indefeasible right of use" for any telecommunications facility or service; and

(ix)    incur, or suffer to exist, any Lien on the assets of the Business other than Permitted Liens and Liens that will be extinguished by the Sale Order.

(e)    Purchaser shall be deemed to have approved any request for waiver of this *Section 5.1* as it relates to a specific set of facts and circumstances five (5) Business Days after either (a) a specific e-mail request is sent to it at raouf.abdel@level3.com, with a copy, which shall not constitute notice, to mlefkort@willkie.com, or (b) a specific notice is given pursuant to *Section 13.1*, unless prior to such fifth (5th) Business Day, Purchaser shall have sent a objection to such request by e-mail to savruch@genuity.com, with a copy to ira.parker@genuity.com.

(f)    No action taken by any Seller in accordance with the express terms of any Lapse Request or a *Section 5.1* Consent (other than a Renewal Request or a denial of a request for a waiver or consent) shall constitute a breach of any representation, warranty or other covenant that would arise out of undertaking the action specifically requested or directed.

(g)    From the date of commencement of the Bankruptcy Case to the earlier of the Closing Date or the termination of this Agreement, Purchaser shall have no right to equitable or monetary remedies with respect to this *Section 5.1; provided, however,* that this sentence shall not restrict Purchaser from asserting closing conditions in accordance with *Section 7.2,* or terminating this Agreement in accordance with *Section 12.1*. For the avoidance of doubt, nothing in this *Section 5.1* shall restrict the board of directors of any Seller from taking any action which they believe is required by their fiduciary duty; provided, however, that, subject to the preceding sentence, in such event the Sellers shall continue to remain liable to Purchaser for monetary damages for the breach of this Section.

**Section 5.2.    Information and Access.**  Sellers shall, upon reasonable prior notice, permit representatives of Purchaser to have reasonable access during normal business hours, and in a manner so as not to interfere with the normal operations of, and otherwise reasonably acceptable to, Sellers, to all premises, properties, personnel, accountants, books, records, contracts and documents of or pertaining to the Business. If requested by Purchaser, Sellers shall also permit Purchaser (and assist Purchaser as reasonably necessary) to perform, at Purchaser's sole cost and expense, Phase I and Phase II environmental site assessments. Purchaser and each of its representatives will treat and hold as confidential all information obtained by or provided to them in connection with the transactions contemplated by this Agreement in accordance with the terms and provisions of the Confidentiality Agreement, which Confidentiality Agreement remains in full force and effect. No investigation by or other information received by Purchaser shall operate as a waiver or otherwise affect any representation, warranty, covenant or agreement given or made by Sellers hereunder.

**Section 5.3.    Confidentiality Agreements.**  At the Closing, Sellers shall, to the maximum extent assignable pursuant to Section 363 and/or Section 365 of the Bankruptcy Code,

1093038.30

assign to Purchaser the benefits of all confidentiality agreements entered into after October 1, 2001, relating to the possible sale of the Business or any material portion of the assets thereof.

Section 5.4.    **Notices of Certain Events.**  Sellers shall promptly after obtaining Knowledge thereof, notify Purchaser of:

(a)    any written notice from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(b)    any written notice from any Governmental Agency in connection with the transactions contemplated by this Agreement;

(c)    any Proceedings commenced or, to Sellers' Knowledge, threatened in writing against Sellers that if pending on the date of this Agreement, would have been required to have been disclosed pursuant to *Section 3.20(a)*; and

(d)    the breach by any Seller of any representation, warranty, covenant or agreement contained in this Agreement or the occurrence of any event that in any such case would reasonably be expected to result in the failure of any of the conditions set forth in *Section 7.2*; provided, however, that any failure by Sellers to perform the covenant contained in this clause (d) shall not be considered noncompliance with a covenant for purposes of *Section 7.2(b)*.

Section 5.5.    **Schedule Updates.**

(a)    Not less than two (2) Business Days prior to the Closing Date, Sellers shall deliver to the Purchaser updates of *Schedules 3.10(a)-1 and –2, 3.10(b)-1, -2 and -3, 3.10(c), 3.10(g), 3.11(b), 3.12(a), 3.12(b), 3.14(a), 3.14(b), 3.14(c), 3.15(b), 3.20, 3.23, 3.29(a)*, and *3.29(b)*, which shall set forth the additional information that would be required were Sellers required to make the representations and warranties in the corresponding Sections of this Agreement as of the Closing Date notwithstanding the fact that such representations and warranties expressly speak as of the date of this Agreement or as of a different date as well as an update of the Customer Contract Schedule as of such date (collectively, the "*Schedule Updates*").

(b)    The Schedule Updates shall not affect the determination as to whether any representation or warranty contained in this Agreement (other than *Section 3.30*) was breached as of the date of this Agreement or as of the Closing Date.

Section 5.6.    **Purchaser Schedule Updates**.  At any time, and from time to time, prior to the Closing, Purchaser may deliver a written notice to Sellers indicating which if any of the Leases or Contracts listed in the Schedule Updates or the information delivered pursuant to *Section 5.1(c)(viii)* or *(ix)* shall be added to *Schedule 1.6*, whereupon such Schedule shall be deemed amended without any further action required by the parties to this Agreement. Any Contract or Lease listed in the Schedule Updates or the information delivered pursuant to *Section 5.1(c)(viii)* or *(ix)* that was not previously listed on the Schedules and that is not the

33

1093038.30

subject of a notice pursuant to the first sentence of this Section shall be deemed to be an Undesignated Agreement.

**Section 5.7.    Title Insurance.**  Should Purchaser at its own cost and expense choose to obtain title insurance with respect to the Owned Real Property, Sellers shall use commercially reasonable efforts to cooperate with Purchaser with respect to obtaining such title insurance.

# ARTICLE VI.

# CERTAIN COVENANTS AND AGREEMENTS

**Section 6.1.    Hart-Scott-Rodino and Other Filings.**

(a)    As promptly as practicable, and in any event within five (5) Business Days following the execution and delivery of this Agreement by the parties, Genuity and Purchaser shall each prepare and file, or shall cause its "ultimate parent" (as defined in the HSR Act) to prepare and file, any required notification and report form under the HSR Act, in connection with the transactions contemplated hereby.  Genuity and Purchaser shall each bear one-half of any filing fees in connection with such filing and if Genuity or Purchaser pays more than one-half of any such filing fees, Genuity or Purchaser, as applicable, will, upon request of the other, reimburse the other for any amount in excess of one-half.  Sellers and Purchaser shall, or shall cause their ultimate parents, to take or cause to be taken all actions and do or cause to be done all things necessary, proper or advisable to obtain prompt termination of the waiting period under the HSR Act, which efforts shall include, without limitation, to the extent necessary (i) interviewing the parties' relevant employees, (ii) reviewing the parties' relevant non-confidential documents and data and (iii) reviewing industry analyses specifically related to the transactions contemplated by this Agreement.

(b)    Sellers and Purchaser shall cooperate, (i) in determining whether, in addition to the filings required by the HSR Act, any action by or in respect of, or filing with, any Governmental Agency in connection with the consummation of the transactions contemplated by this Agreement is required and (ii) in taking such commercially reasonable actions or making any such filings, furnishing information required in connection therewith.  As promptly as practicable, following the execution and delivery of this Agreement by the parties, Sellers and Purchaser shall prepare and file any other application, report, or other filing required to be submitted to any other Governmental Agency in connection with the transactions contemplated hereby, the filing fees of which (except as provided in clause *(a)* above) shall be borne by the party required to make such filing.

**Section 6.2.    Bankruptcy Matters; Bidding Process.**

(a)    Promptly, but in no event later than five (5) Business Days after the date that the Bankruptcy Case is commenced, Genuity shall file with the Bankruptcy Court a

34

1093038.30

motion (the "*Sale Motion*"), notices and proposed orders, each in form and substance reasonably satisfactory to Purchaser seeking the Bankruptcy Court's issuance of:

   (i) an Order in the form of *Exhibit F* hereto (the "*Bidding Procedures Order*"); and

   (ii) an Order in the form of *Exhibit G* hereto (the "*Sale Order*"):

  (b) Sellers shall serve a copy of the Sale Motion on all taxing authorities that have jurisdiction over the Business, all Governmental Agencies having jurisdiction over the Business with respect to Environmental Laws, and on the attorneys general of all states in which the Purchased Assets are located. Sellers shall serve a notice of the Sale Motion on all parties to Contracts and Leases (other than Excluded Matters).

  (c) Pursuant to Bankruptcy Code Section 364(c)(1), the Expense Reimbursement and the Break-Up Fee shall receive superpriority administrative claim status. Pursuant to Bankruptcy Code Section 364(c)(1), the administrative claims in respect of the Expense Reimbursement and the Break-Up Fee shall have priority over any and all administrative expenses of the kinds specified in Bankruptcy Code Sections 503(b), 506(c), 507(a) or 507(b) (the "*Purchaser Protection Superpriority Claims*").

  (d) The rights of Purchaser to the Expense Reimbursement, the Break-Up Fee and the Purchaser Protection Superpriority Claims shall all survive rejection or breach of this Agreement, and shall be unaffected thereby.

  (e) Sellers shall use their best efforts to provide Purchaser with copies of all motions, applications and supporting papers prepared by or on behalf of the Sellers (including forms of orders and notices to interested parties) directly relating to the Purchased Assets or this Agreement at least two (2) Business Days, unless the exigencies of time prevent the period from being that long, prior to the filing thereof in the Bankruptcy Cases so as to allow Purchasers to provide reasonable comments for incorporation into same; except that the Sale Motion (including forms of orders and notices to interested parties) shall be provided to Purchasers at least three (3) Business Days prior to its filing. The Sellers shall also give to the Purchaser written notice and a copy of all motions, applications and pleadings filed in the Bankruptcy Case with the Bankruptcy Court from and after the date hereof, at the time of such filing.

  **Section 6.3.**   **Transfer Taxes.** To the extent any sales, recording, transfer, use or other similar Taxes or fees (other than gains and income Taxes) imposed as a result of the sale of the Business to Purchaser pursuant to this Agreement are not exempted by the Sale Order, they shall be borne by Sellers. Genuity and Purchaser shall accurately prepare and timely file all Tax Returns with respect to any such sales, transfer, use or other similar Taxes. At the Closing, Purchaser shall remit to Genuity such properly completed resale exemption certificates and other similar certificates or instruments as are necessary to claim available exemptions from the payment of sales, transfer, use or other similar Taxes under applicable law. Purchaser shall cooperate with Sellers in preparing such forms and shall execute and deliver such affidavits and forms as are reasonably requested by Sellers.

35

1093038.30

**Section 6.4.     Property Taxes**. Matters relating to real and personal property Taxes and other *ad valorem* Taxes and assessments on Purchased Assets ("*Property Taxes*") shall be determined as provided in this *Section 6.4*.

    (a)   Straddle Period Property Taxes.

        (i)   With respect to each jurisdiction in which a Governmental Agency imposes Property Taxes, the Property Taxes arising out of the Assessment Date immediately preceding or occurring on the Closing Date (the "*Straddle Period Property Taxes*") shall be allocated between Purchaser and Sellers based on the number of days in the period between the Assessment Date immediately preceding the Closing Date (the "*Last Assessment Date*") and the Assessment Date immediately following the Closing Date (the "*Next Assessment Date*"). The pro rata portion of the Straddle Period Property Taxes attributable to the period from the Last Assessment Date to the Closing Date shall be allocated to Sellers ("*Sellers' Property Tax Portion*"). The pro rata portion of the Straddle Period Property Taxes attributable to the period from the Closing Date to the Next Assessment Date shall be allocated to Purchaser ("*Purchaser's Property Tax Portion*").

        (ii)   The Straddle Period Property Taxes (A) paid by Sellers prior to the Closing Date or (B) assessed by a Governmental Agency to which Sellers fail to provide appropriate notice of the Bankruptcy Case and the Sale Motion in accordance with *Section 6.4(f)* shall constitute Excluded Liabilities, and any Straddle Period Property Taxes other than those described in (A) and (B) shall constitute Assumed Liabilities.

        (iii)   The Base Price shall be increased by the amount, if any, by which the Straddle Period Property Taxes paid by Sellers before the Closing Date exceeds Sellers' Property Tax Portion. The Base Price shall be decreased by the amount, if any, by which Sellers' Property Tax Portion exceeds the Straddle Period Property Taxes paid by Sellers before the Closing Date.

    (b)   Other Property Taxes. With respect to each jurisdiction in which a Governmental Agency imposes Property Taxes, the Property Taxes arising out of any Assessment Date prior to the Last Assessment Date (the "*Old Property Taxes*") shall constitute Excluded Liabilities.

    (c)   Sellers shall have the right to commence, control, prosecute, settle and compromise any and all Proceedings relating to (i) Old Property Taxes, and (ii) the valuation of the Purchased Assets for which the relevant Assessment Date is more than six months prior to the Closing Date and the resulting Straddle Period Property Taxes. Such right shall not derogate Purchaser's right to a pro rata share of any refund, abatement or similar reduction based on the Purchaser's Property Tax Portion. Purchaser shall take all action reasonably necessary for Sellers to exercise the rights provided to them pursuant to this clause *(c)*.

36

1093038.30

(d)     Purchaser shall accurately prepare and timely file all Tax Returns relating to Straddle Period Property Taxes due after the Closing Date. Purchaser shall have the right to commence, control, prosecute, settle and compromise any and all Proceedings relating to the valuation of the Purchased Assets for which the relevant Assessment Date is six months or less prior to the Closing Date and the resulting Straddle Period Property Taxes. Such rights shall not derogate Sellers' right to a pro rata share of any refund, abatement or similar reduction based on Sellers' Property Tax Portion. Sellers shall take all action reasonably necessary for Purchaser to exercise the rights provided to it pursuant to this clause *(d)*, including without limitation to the extent required to file Tax Returns appointing Purchaser as Sellers' agent, and executing powers of attorney. Sellers shall have the right to participate, at their own expense, in any Proceeding described in this clause *(d)*.

(e)     In connection with any Proceeding pursuant to this *Section 6.4*, the parties shall reasonably assist each other and cooperate with each other in the conduct of such Proceeding, including by making their personnel and books and records reasonably available to the other parties hereto.

(f)     Sellers shall (i) provide appropriate notice of the Bankruptcy Case, the Sale Motion and related matters to all Governmental Agencies that may seek to collect Property Taxes or impose on Sellers, Purchaser or any Purchased Asset penalties for any Property Taxes, and (ii) use all commercially reasonable efforts to obtain certificates, releases or other appropriate documentation from such Governmental Agencies to the extent such Governmental Agencies provide such certificates, releases or documentation in the ordinary course, providing that such Property Taxes have been paid or are not owed.

### Section 6.5.     Certain Provisions Relating to Consents, Cooperation and Adequate Assurance.

(a)     Subject to the limitations of *Section 5.1*, Sellers shall use commercially reasonable efforts prior to and after the Closing Date to obtain all consents of Governmental Agencies and counterparties to Contracts and Leases that Purchaser has designated as Assumed Contracts or Assumed Leases that are required in connection with the transactions contemplated by this Agreement; provided, however, that Sellers shall not be obligated to offer or to pay any consideration or grant any financial accommodation in connection therewith.

(b)     Parent and Purchaser shall prior to and after the Closing Date cooperate as reasonably necessary or desirable to secure such consents of Governmental Agencies and to provide adequate assurance of performance to counterparties to Assumed Contracts and Assumed Leases, including, without limitation, providing to such Third Party information, including financial information, regarding Purchaser's intended use of the Purchased Assets. Upon the written request of Sellers, Purchaser shall use commercially reasonable efforts to cooperate with Sellers with respect to the matters referred to in clauses *(c)*, *(d)* and *(e)* of *Section 6.7*.

1093038.30

**Section 6.6.     Certain Actions With Respect to Customer Contracts.**
Sellers shall not reject the Contract set forth on *Schedule 6.6* without giving at least twenty (20)
days' notice to the counterparty to such Contract.

**Section 6.7.     Best Efforts.**  Upon the terms and subject to the conditions of this
Agreement, and subject to *Section 6.5* with respect to the matters covered thereby, each of the
parties hereto shall use its best efforts to take, or cause to be taken, all action, and to do, or cause
to be done, all things necessary, proper or advisable consistent with applicable Legal
Requirements to consummate and make effective in the most expeditious manner practicable the
transactions contemplated hereby.  Without limiting the foregoing, Sellers shall not voluntarily
dismiss the Bankruptcy Case once filed and shall use their best efforts to:

>        (a)     commence the Bankruptcy Case within five (5) Business Days of the date
of this Agreement;

>        (b)     file the Sale Motion within five (5) Business Days of commencing the
Bankruptcy Case;

>        (c)     obtain the Bidding Procedures Order within twenty one days following the
commencement of the Bankruptcy Case;

>        (d)     obtain the Sale Order on or prior to January 31, 2003 and cause it to be a
Final Order on or prior to February 10, 2003;

>        (e)     obtain the Settlement Agreement Order on or prior to January 31, 2003,
and cause it to be a Final Order on or prior to February 10, 2003; and

>        (f)     prevent the dismissal of the Bankruptcy Case or the conversion of the
Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code.

**Section 6.8.     Takeover Proposals; Confidential Information.**

>        (a)     Sellers shall promptly notify Purchaser orally and in writing of any request
for information, proposal, discussion, negotiation or inquiry received after the date of this
Agreement in connection with any Takeover Proposal and Sellers shall promptly (but in
any event within one (1) Business Day) communicate to Purchaser the material terms and
conditions of any such proposal, discussion, negotiation or inquiry which it may receive
(and will promptly provide to Purchaser copies of any written materials received by
Sellers in connection with such proposal, discussion, negotiation or inquiry) and the
identity of the person making such proposal or inquiry or engaging in such discussions or
negotiation.

>        (b)     Sellers shall not furnish information concerning their business, properties
or assets to any Third Party, except pursuant to a confidentiality agreement with terms
and conditions no less restrictive than those contained in the Confidentiality Agreement.
Sellers shall not release any Third Party from, or waive any provision of, any such
confidentiality agreement or any similar confidentiality or standstill agreement to which
any Seller is a party.  Sellers shall promptly provide to Purchaser any non-public

1093038.30

information concerning the Sellers provided to any other Person which was not previously provided to Purchaser. To the extent that this *Section 6.8(b)* conflicts with the Bidding Procedures Order, the Bidding Procedures Order shall govern.

(c)    Sellers shall keep Purchaser informed of the status and material details (including amendments or proposed amendments) of any Takeover Proposal. Sellers shall promptly (and in any event within one (1) Business Day) notify Purchaser in writing at such time as any Takeover Proposal has been determined to be a Qualified Bid.

**Section 6.9.    Obligations of Parent and Purchaser; Joint and Several Liability.** Without limitation of Parent's obligations hereunder, including without limitation *Sections 6.5* and *6.7*, Parent will take all action necessary to cause Purchaser to perform its obligations under this Agreement and the Ancillary Agreements, including, without limitation, providing sufficient funds to Purchaser to enable it, and otherwise causing it, to timely pay all amounts required to be paid by Purchaser hereunder and under the Ancillary Agreements. Parent and Purchaser shall be jointly and severally liable for all obligations of Parent and/or Purchaser hereunder and under the Ancillary Agreements. Each Seller shall be jointly and severally liable for all obligations of the other Sellers hereunder and under the Ancillary Agreements.

**Section 6.10.    FCC Applications and State PUCs Applications.** To the extent required by the nature of the Purchased Assets:

(a)    Purchaser and Sellers shall generally cooperate with each other, and take such actions in good faith as are reasonable and appropriate to timely effect, the preparation of all appropriate applications for FCC approval, and such other documents as may be required, with respect to the assignment to Purchaser of the FCC Licenses set forth on *Schedule 6.10(a)* (collectively, the "*FCC Applications*"). As promptly as practicable, and in any event within ten (10) Business Days after the date of this Agreement, Sellers and Purchaser shall file, or cause to be filed, the FCC Applications.

(b)    Purchaser and Sellers shall generally cooperate with each other, and take such actions in good faith as are reasonable and appropriate to timely effect, the preparation of all appropriate applications for approval by State PUCs, and such other documents as may be required, with respect to the assignment to Purchaser of the licenses set forth on *Schedule 6.10(b)* (collectively, the "*State PUC Applications*"). As promptly as practicable, and in any event within ten (10) Business Days after the date of this Agreement, Sellers and Purchaser shall file, or cause to be filed, the State PUC Applications.

(c)    Sellers and Purchaser shall use their commercially reasonable efforts to prosecute the FCC Applications and the State PUC Applications with due diligence before the FCC and the State PUCs and in connection therewith shall take such action or actions as may be necessary or reasonably required in connection with the FCC Applications and the State PUC Applications, including furnishing to the FCC and the State PUCs any documents, materials or other information requested by the FCC and the State PUCs in order to obtain such approvals as expeditiously as practicable. As promptly as practicable, and in any event within five (5) Business Days after the date of

1093038.30

this Agreement, Sellers shall designate a representative who shall have the responsibility of coordinating with Purchaser the prosecution of the FCC Applications and the State PUC Applications.

**Section 6.11.    Sales/Use Taxes.** Sellers shall (i) provide appropriate notice of the Bankruptcy Case, the Sale Motion and related matters to all appropriate Governmental Agencies that may seek to collect sales and/or use Taxes or impose on Sellers, Purchaser or any Purchased Asset penalties for unpaid sales and/or use Taxes with respect to any Purchased Asset and relating to a time period prior to the Closing and (ii) use all commercially reasonable efforts to obtain certificates, releases or other appropriate documentation from such taxing authorities providing that such Taxes have been paid or are not owed. Sellers shall deposit funds in escrow in an amount necessary to pay to such taxing authority any sales and/or use Taxes asserted by such taxing authority with respect to any Purchased Asset and relating to a time period prior to the Closing.

## ARTICLE VII.

## CONDITIONS TO CLOSING

**Section 7.1.    Conditions to Sellers' Obligations.** The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the satisfaction (unless waived in writing by Genuity) of each of the following conditions on or prior to the Closing Date:

(a)    **Representations and Warranties.** The representations and warranties of Purchaser and Parent contained in this Agreement shall be true and correct, without giving effect to any qualification as to materiality (or any variation of such term) contained in any particular representation or warranty, on and as of the date of this Agreement and on and as of the Closing Date, as though such representations and warranties were made on and as of the Closing Date (it being understood, however, that for purposes of this sentence the accuracy of any representation or warranty that expressly speaks as of the date of this Agreement or another date prior to this Agreement shall be determined on the Closing Date solely as of the date of this Agreement or such other date and not as of the Closing Date), except to the extent that any such breach together with all other such breaches does not materially impair Purchaser's or Parent's ability to perform its obligations hereunder. Each of Purchaser and Parent shall have delivered to Genuity a certificate of its President or a Vice President, dated the Closing Date, to the foregoing effect.

(b)    **Compliance with Agreement.** Each of Purchaser and Parent shall have performed and complied in all material respects with all covenants to be performed or complied with by it on or prior to the Closing Date. Each of Purchaser and Parent shall have delivered to Genuity a certificate of its President or a Vice President, dated the Closing Date, to the foregoing effect.

(c)    **Bankruptcy Court Approval; No Injunction.** The Sale Order shall have been entered by the Bankruptcy Court. As of the Closing Date, there shall not be in

Hrg. Date (Bid Procedures): **TO BE DETERMINED BY COURT**
Obj. Due (Bid Procedures): **TO BE DETERMINED BY COURT**

Hrg. Date (Sale): **TO BE DETERMINED BY COURT**
Obj. Due (Sale): **TO BE DETERMINED BY COURT**

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000
J. Gregory Milmoe (JM 0919)
Sally McDonald Henry (SH 0839)
Cheri L. Hoff (CH 5193)

-and-

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, DE 19899-0636
(302) 651-3000
Eric M. Davis
David R. Hurst

Attorneys for Genuity Inc., et al.,
Debtors and Debtors-in-Possession

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                          :
In re:                                                    :        Chapter 11
                                                          :
GENUITY INC., et al.,                                     :        Case No. 02-43550 (PCB)
                                                          :
                                   Debtors.               :        (Jointly Administered)
                                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION FOR ORDER UNDER 11 U.S.C. §§ 105(a), 363, 365 AND 1146(c)
AND FED. R. BANKR. P. 2002, 6004 AND 6006 (I) (A) APPROVING NOTICE
AND BIDDING PROCEDURES, (B) APPROVING BID PROTECTIONS,
INCLUDING BREAKUP FEE, OVERBID PROTECTIONS AND EXPENSE
REIMBURSEMENT, IN CONNECTION WITH THE PROPOSED SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS AND (C) SCHEDUL-
ING HEARING AND SETTING BIDDING AND OBJECTION DEADLINES
IN CONNECTION WITH SUCH SALE; AND (II) AUTHORIZING AND
APPROVING (A) ASSET PURCHASE AGREEMENT WITH LEVEL 3
COMMUNICATIONS, INC. AND LEVEL 3 COMMUNICATIONS, LLC, (B)
SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND
CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, (C) ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES AND (D) CERTAIN RELATED RELIEF**

Genuity Inc. ("Genuity") and certain of its subsidiaries (the "Subsid-

iary Debtors"), debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), hereby move for entry of an order under 11 U.S.C. §§

105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (i) (a)

approving notice and bidding procedures and bidding protections, including a

breakup fee, overbid protections and an expense reimbursement, in connection with

the proposed sale (the "Sale") of substantially all of the Debtors' assets pursuant to

the Asset Purchase Agreement, by and among Level 3 Communications, Inc., Level 3

Communications, LLC (the "Purchaser"), and Genuity Inc. ("Genuity"), Genuity

International Inc., Genuity International Networks Inc., Genuity Solutions Inc.,

Genuity Telecom Inc. and Genuity Employee Holdings LLC (collectively, the

"Sellers"), dated as of November 27, 2002 (as amended from time to time, the

"Purchase Agreement"),[1] to the Purchaser or an alternative successful bidder, and (b) scheduling a hearing (the "Sale Hearing") and setting bidding and objection deadlines in connection with such Sale; (ii) authorizing and approving (a) the Purchase Agreement and the Sellers' assumption thereof and certain Ancillary Agreements substantially in the forms attached as exhibits to the Purchase Agreement, (b) the sale to the Purchaser of substantially all of the Debtors' assets (as defined more specifically in the Purchase Agreement, the "Purchased Assets") free and clear of all Claims and Interests (each as defined herein), other than Permitted Liens and Assumed Liabilities, and exempt under 11 U.S.C. § 1146 from any stamp, transfer, sales, recording or similar tax, (c) the assumption and assignment of certain of the Debtors' executory contracts (as defined more specifically in the Purchase Agreement, the "Assumed Contracts") and unexpired leases (as defined more specifically in the Purchase Agreement, the "Assumed Leases"), subject to certain assumption procedures set forth herein and (d) certain related relief.  In support of this Motion, the Debtors respectfully represent as follows:

---

[1]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Purchase Agreement, a copy of which is attached hereto as Exhibit A.

# BACKGROUND

### A.    The Chapter 11 Cases

1.    On November 27, 2002 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for reorganization relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code").  The Debtors continue to manage and operate their businesses as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

2.    No trustee or examiner has been appointed in these chapter 11 cases, and no committees have yet been appointed or designated.

3.    The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2).

4.    The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, 365 and 1146 and rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

### B.    Business Operations

5.    The Debtors and their non-Debtor affiliates and subsidiaries (the "Non-Debtor Affiliates") (collectively, the Debtors and the Non-Debtor Affiliates will be referred to as the "Genuity Group") are leading providers of IP networking services to enterprises and service providers.  Genuity is the non-operating parent

4

corporation of the Genuity Group. The Genuity Group has three primary operating

subsidiaries that are Debtors in these cases: Genuity Solutions Inc. ("Genuity

Solutions"), Genuity Telecom Inc. ("Genuity Telecom") and Genuity International

Networks Inc. ("Genuity International"). Genuity Solutions provides managed

Internet services through a global fiber optic network. Genuity Telecom is a com-

mon carrier that offers high-bandwidth, high-speed, fiber optic network services for

voice and data applications. Genuity International presently holds certain interna-

tional network assets. Genuity Solutions, Genuity Telecom and Genuity Interna-

tional all are wholly-owned direct subsidiaries of Genuity.

      6.     The Genuity Group offers comprehensive suites of managed

Internet infrastructure services, including dedicated and broadband access, Web

hosting and content delivery, and value added services such as Voice over IP and

managed Internet security services. The Genuity Group also operates a global fiber

optic network that consists of broadband fiber optic cable throughout the United

States, points of Internet access to end users, secure data centers and undersea and

international fiber optic cable capacity.

      7.     The Genuity Group's large base of on-network users and

content, combined with their extensive network, positions the Genuity Group as one

of the leading Internet backbone providers in the world. In 2001, the Genuity Group

recognized over $1.22 billion in revenue and had approximately 4,400 employees in the United States and abroad.

## C.    Events Leading to Chapter 11 Filings

8.    The Genuity Group's net loss increased to $4.0 billion in 2001 compared with $947.5 million in 2000, in part due to a recording of a special charge of $2.6 billion to reduce the carrying value of its network assets and goodwill. In response to these significant continuing net losses, the Genuity Group announced a plan to reduce future expenditures on May 3, 2001. This plan resulted in a 16% reduction of full-time equivalent employees and a reduction of capital expenditures from $2.2 billion to $1.4 billion and, eventually, down to $1.2 billion. In addition, the Genuity Group reduced its capital expenditure program for the four-year period ending December 31, 2004 to between $4.0 billion and $5.0 billion.

9.    On November 1, 2001, the Genuity Group announced another company-wide restructuring and cost savings plan. Under this new plan, the Genuity Group reduced its work force by an additional 21%. The Genuity Group also undertook a review of its leased facilities for opportunities for consolidation and future cost savings. As a result of this review, approximately fifty-eight locations were identified as sites which would be vacated. Moreover, in July 2002, the Genuity Group reduced its workforce by an additional 22.5%.

6

10.     As set forth more fully in the Affidavit of Daniel Patrick
O'Brien Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11
Petitions and First-Day Orders, filed previously in these cases, on July 24, 2002,
Verizon Communications Inc. ("Verizon") converted all but one of its shares of Class
B common stock into Class A common stock, thereby effectively relinquishing its
option to take voting control of Genuity. Verizon's unexpected relinquishment of its
option resulted in an immediate event of default under credit facilities Genuity had
entered into in 2001 with both Verizon and with a consortium of global banks (the
"Bank Group").

11.     On July 29, 2002, Genuity, Genuity Solutions and Genuity
Telecom entered into a fourteen-day standstill agreement with the Bank Group, so
that the parties could seek to renegotiate Genuity's debts. Similarly, on August 13,
2002, Genuity, Genuity Solutions and Genuity Telecom entered into a standstill
agreement with Verizon. The standstill agreements with the Bank Group and
Verizon subsequently were extended several times - - ultimately until November 25,
2002, when the standstill agreements expired at 10:00 p.m. (Eastern Time).

12.     During the standstill periods, the Genuity Group focused on
various restructuring alternatives which included, among other things, strategic
opportunities, asset sales and seeking relief under the Bankruptcy Code. On Novem-
ber 27, 2002, the Debtors reached a definitive agreement (the "Purchase Agreement")

7

with Level 3 Communications, LLC ("Level 3"). Under the Purchase Agreement, Level 3 will acquire the Debtors' Tier 1 network, their operations and a substantial portion of the customer base for approximately $242.2 million in cash, subject to certain purchase price adjustments, and intends to assume a significant portion of liabilities in connection with the Debtors' existing long-term operating agreements.

13.     Accordingly, the Debtors commenced these chapter 11 cases to consummate the Purchase Agreement and thus protect the businesses of the Genuity Group and value for all of their constituents. As of the Petition Date, the Debtors and their affiliated entities had approximately $830 million at their disposal to fund ongoing operations.

## RELIEF REQUESTED

14.     As set forth in detail below, subject to the approval of this Court, the Sellers have entered into the Purchase Agreement, pursuant to which the Sellers have agreed to sell the Purchased Assets to the Purchaser. In connection therewith, and as required by the Purchase Agreement, the Debtors respectfully request entry of an order in the form attached hereto as Exhibit B (the "Procedures Order") (a) approving notice and bidding procedures and bid protections, including a breakup fee, overbid protections and an expense reimbursement, in connection with the proposed Sale of substantially all of the Debtors' assets to the Purchaser or an

8

alternative successful bidder, and (b) scheduling a date for the Sale Hearing, and setting bidding and objection deadlines in connection with such Sale.

15.     In addition, assuming that the Court enters the Procedures Order, the Debtors respectfully request entry of an order in the form attached hereto as Exhibit C (the "Sale Order") authorizing and approving (a) the Purchase Agreement and the Sellers' assumption thereof and certain Ancillary Agreements substantially in the forms attached as exhibits to the Purchase Agreement, (b) the sale to the Purchaser of the Purchased Assets, free and clear of all Claims and Interests (both as defined herein), other than Permitted Liens and Assumed Liabilities, and exempt under 11 U.S.C. § 1146 from any stamp, transfer, sales, recording or similar tax, (c) the assumption and assignment of the Assumed Contracts and Assumed Leases, subject to certain assumption procedures set forth herein, and (d) certain related relief.

## BASIS FOR RELIEF

16.     Prior to filing these chapter 11 cases, the Debtors retained Lazard Freres & Co. ("Lazard") as financial advisors and investment bankers to, among other things, assist the Debtors in assessing and evaluating restructuring alternatives for the Debtors. Following Verizon's July 24th announcement that it would not seek to reacquire control of Genuity, Lazard and the Debtors received several inquiries regarding the purchase of some or all of the Debtors' assets. After

9

reviewing initial proposals from interested parties and considering other restructuring alternatives, the Debtors and Lazard focused on proposals from the Purchaser and Verizon, which proposals in the Debtors' business judgment appeared (i) to provide the greatest value to the Debtors' estates, and (ii) to have the greatest likelihood of resulting in a definitive agreement and successfully closing.

17.    The Debtors, in conjunction with Lazard, held repeated discussions with Verizon and the Purchaser in an attempt to arrive at the best restructuring alternative. The Debtors, in an exercise of their business judgment, ultimately concluded that the Purchaser's proposal offered the most advantageous terms and greatest economic benefit to the Debtors and their estates. Accordingly, on or about October 24, 2002, the Debtors agreed to deal with the Purchaser and began negotiating a definitive purchase agreement. As a result of these arms'-length negotiations, the Purchase Agreement was signed on November 27, 2002.

18.    The Debtors believe that the Purchase Agreement - - coupled with certain proposed bidding procedures - - will ensure that the Debtors obtain the highest and best offer for the assets to be purchased by Level 3. Because the Debtors believe that the value of their estates will be maximized through the Purchase Agreement and because the funds that will be generated by the proposed sale are

10

instrumental to this result, the Debtors' ability to maximize the value of their estates will be jeopardized unless the sale to Level 3 can be completed quickly.[2]

## THE ASSET PURCHASE AGREEMENT

19.    The principal terms of the Purchase Agreement are summarized as follows:[3]

(a)    Purchase Price.  On the terms and subject to the conditions set forth in the Purchase Agreement, the purchase price for the Purchased Assets shall be $242,156,160 less the Delay Cost (the "Base Price"), less the Severance Amount, subject to adjustment as provided in Article II of the Purchase Agreement (as so adjusted, the "Purchase Price").

(b)    Purchase Price Adjustment.  The Base Price is subject to a purchase price adjustment as set forth specifically in Article II of the Purchase Agreement.

(c)    Escrow.  The Purchase Agreement provides for the creation of an escrow (the "Escrow"), into which the Seller shall cause $20 million (the "Escrow Amount") to be transferred pursuant to the Escrow Agreement.

(d)    Purchased Assets.  The Purchased Assets consist all of the Sellers' property other than the Excluded Assets, including rights under the Assumed Contracts and Assumed Leases.

---

[2]    Indeed, the Purchaser's commitment to proceed with the Sale requires that the Sale be consummated quickly.  Pursuant to Section 12.1(d)(vi) of the Purchase Agreement, the Purchaser may terminate the Purchase Agreement if the Sale Order is not approved by January 31, 2003.  Moreover, under the Purchase Agreement, the Purchase Price is reduced for every day the Closing Date is extended beyond December 31, 2002.

[3]    This summary of the Purchase Agreement is provided as a convenience only.  To the extent that the summary differs in any way from the terms of the Purchase Agreement, the terms of the Purchase Agreement shall control.

(e)     <u>Sale Free and Clear</u>.  The Purchased Assets are to be transferred free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities).

(f)     <u>Assumed Liabilities</u>.  The Assumed Liabilities consist of (i) with respect to Assumed Contracts and Assumed Leases, Liabilities arising with respect to the performance after the Assumption Date of the Assumed Contracts and the Assumed Leases, excluding any Liability resulting from any breach thereof by any Seller on or prior to the Assumption Date; (ii) Liabilities arising after the Closing Date in connection with the operation of the Business or the ownership of the Purchased Assets by the Purchaser; (iii) Straddle Period Property Taxes to the extent provided in Section 6.4(a) of the Purchase Agreement; (iv) the Allegiance Payment and the Verizon Payment, in each case only to the extent the Purchase Price has been reduced with respect thereto pursuant to Section 2.5(b)(ii) of the Purchase Agreement; and (v) service credits pursuant to service level agreements that constitute Assumed Customer Contracts, only to the extent that the amounts of such service credits results in an Adjustment pursuant to Section 2.4(b) of the Purchase Agreement, in each case excluding Excluded Liabilities.  Except as otherwise provided in the Purchase Agreement, the Sale Order or other order of this Court, after the Closing, the Sellers will have no further liabilities or obligations with respect to the Assumed Liabilities and all holders of claims related to or otherwise connected with the Assumed Liabilities will be barred and estopped from asserting such claims against the Debtors, their successors or assigns and/or each of their respective assets.

(g)     <u>Excluded Liabilities</u>.  The Purchaser shall not assume or in any manner whatsoever be liable or responsible for any Liabilities of Sellers other than the Assumed Liabilities.

(h)     <u>Executory Contracts and Unexpired Leases</u>.

(i)     On the Closing Date (or shortly thereafter for certain Customer Contracts), the Sellers shall assume and assign to the Purchaser the Assumed Customer Contracts, the Assumed Contracts listed on Schedule 1.1 to the Purchase Agreement and the Assumed Leases listed on Schedule 1.2 to the Purchase Agreement.

(ii)    Subsequent to the Closing Date, the Sellers shall assume and assign to the Purchaser certain Undesignated Agreements and Underlying Service Agreements pursuant to certain assignment procedures set forth herein.

(iii)    In connection with any such assumption and assignment of the Assumed Contracts and Assumed Leases, the Sellers shall be responsible for payment of any Cure Amounts.

(i)    Bidding Protections.  Under the terms of the Purchase Agreement, the Purchaser is entitled to payment of the Breakup Fee and Expense Reimbursement (together, the "Bidding Protections").

(i)    Breakup Fee.  Under certain conditions, upon termination of the Purchase Agreement, the Purchaser may be entitled to a fee (the "Breakup Fee") in the amount of $10 million.

(ii)    Expense Reimbursement.  Under certain conditions, upon termination of the Purchase Agreement, the Purchaser may be entitled to a fee (the "Expense Reimbursement") in an amount not to exceed $3 million, on account of actual out-of-pocket costs and expenses (including, without limitation, the reasonable and documented fees and expenses of its outside counsel) incurred by Purchaser in connection with its due diligence investigation of the Sellers and the negotiation and execution of the Purchase Agreement and the transactions contemplated thereby.

## THE BIDDING PROCEDURES

20.    Consistent with the Purchase Agreement, the Debtors are proposing the Bidding Procedures as the procedures most likely to maximize the realizable value of the Purchased Assets for the benefit of the Debtors' estates, creditors and other interested parties.  Pursuant to Section 6.2 of the Purchase Agreement, the Debtors are required to file a motion seeking approval of the Proce-

13

dures Order as a means of implementing the Sale to the Purchaser. Accordingly, the

Debtors seek approval of the proposed Bidding Procedures, which provide in

relevant part as follows:[4]

a. Determination of "Qualified Bidder" Status. In order to partic-
ipate in the Bidding Process, each person (a "Potential Bid-
der"), other than Level 3 Communications, LLC (the "Pro-
posed Purchaser"), must deliver (unless previously delivered)
to the Sellers: (i) an executed confidentiality agreement in
form and substance satisfactory to the Sellers; and (ii) current
audited financial statements of the Potential Bidder or, if the
Potential Bidder is an entity formed for the purpose of acquir-
ing the Purchased Assets, current audited financial statements
of the equity holder(s) of the Potential Bidder or such other
form of financial disclosure acceptable to the Sellers and their
advisors demonstrating such Potential Bidder's ability to close
a proposed transaction. A "Qualified Bidder" is a Potential
Bidder (x) that timely delivers the documents described in (i)
and (ii) above and (y) that the board of directors of Genuity in
its business judgment determines is financially able to con-
summate the purchase of the Purchased Assets. The Proposed
Purchaser will be deemed a Qualified Bidder.

b. Due Diligence for Qualified Bidders. To obtain due diligence
access or additional information from the Sellers, a Qualified
Bidder must first advise the Sellers in writing of its prelimi-
nary (non-binding) proposal regarding (i) the purchase of the
Purchased Assets, (ii) a purchase price range, (iii) the pro-
posed structure and financing of the transaction (including the
amount of equity to be committed and sources of financing),
(iv) any additional conditions to closing that such Qualified
Bidder may wish to impose, and (v) the nature and extent of
additional due diligence such Qualified Bidder may wish to

---

[4]  The following description of the Bidding Procedures is a summary of the terms set forth in
Exhibit B to the Procedures Order. To the extent that there are any discrepancies between
this summary and Exhibit B to the Procedures Order, the terms and language of Exhibit B to
the Procedures Order control.

conduct. If, based on the preliminary proposal and such addi-
tional factors as the Sellers determine are relevant, the Sellers,
in their business judgment, determine that the preliminary
proposal is reasonably likely to result in a bona fide and seri-
ous higher or otherwise better offer for the Purchased Assets,
the Sellers will afford the Qualified Bidder access to relevant
due diligence. The Sellers will designate an employee or other
representative to coordinate all reasonable requests for addi-
tional information and due diligence access from such Quali-
fied Bidders. Any additional due diligence will not continue
after the Bid Deadline (as defined below). None of the Sellers,
their affiliates or any of their respective representatives are
obligated to furnish any information relating to the Purchased
Assets to any person except to a Qualified Bidder who makes
an acceptable preliminary proposal.

c.     <u>Bid Deadline</u>. A Qualified Bidder who desires to make a bid
must deliver a written copy of its bid to Skadden, Arps, Slate,
Meagher & Flom LLP, Four Times Square, New York, New
York 10036, Attention: J. Gregory Milmoe, Esq., <u>and</u>
Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney
Square, P.O. Box 636, Wilmington, Delaware 19899-0636,
Attention: Eric M. Davis, Esq., not later than the bid deadline
(the "Bid Deadline") established by the Court in the Proce-
dures Order. Upon receipt, the Sellers shall immediately
distribute a copy of each such bid to the Proposed Purchaser.

d.     <u>Determination of "Qualified Bid" Status</u>. A bid received from
a Qualified Bidder will constitute a "Qualified Bid" only if it
includes all of the Required Bid Documents listed below and
meets all of the Bid Requirements set forth below. Notwith-
standing the foregoing, the Purchase Agreement will be
deemed a Qualified Bid for all purposes in connection with the
Bidding Process, the Auction (as defined below) and the Sale.

(1)     <u>Required Bid Documents</u>. All bids must include the following
documents (collectively, the "Required Bid Documents"): (a) a
written offer stating that (i) the Qualified Bidder offers to
purchase all or substantially all of the Purchased Assets, (ii)
the Qualified Bidder is prepared to enter into a legally binding

15

purchase and sale agreement for the acquisition of the Business on terms and conditions no less favorable to the Sellers than the Purchase Agreement within not more than one (1) day after entry by the Bankruptcy Court of the Sale Order and (iii) the Qualified Bidder's offer is irrevocable until the closing of the purchase of the Purchased Assets; and (b) a good faith deposit (the "Good Faith Deposit") in the form of a certified check (or other form acceptable to the Sellers in their sole discretion) payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to or greater than the sum of the maximum amount of the Expense Reimbursement plus the Breakup Fee; provided, however, that in no event shall the Proposed Purchaser be required to make the Good Faith Deposit.

(2)    Bid Requirements.  All bids must satisfy the following requirements (collectively, the "Bid Requirements"): (a) the Sellers must determine, in the good faith opinion of their board of directors after consultation with an independent financial advisor, that the bid (i) is not materially more burdensome or conditional than the terms of the Purchase Agreement and (ii) has a value greater than or equal to the sum of (w) the amount of the Breakup Fee, plus (x) the maximum amount of the Expense Reimbursement, plus (y) the consideration to the Sellers arising out of the Purchase Agreement including the payment of the Purchase Price and the assumption of the Assumed Liabilities, plus (z) five percent (5%) over the amount specified in the preceding clause (y); (b) the bid is on substantially the same or better terms and conditions than those set forth in the Purchase Agreement; (c) the bid is accompanied by satisfactory evidence of committed financing or other ability to perform the acquisition of the Purchased Assets; (d) the bid is not conditioned upon the Bankruptcy Court's approval of any bid protections, such as a breakup fee, termination fee, expense reimbursement or similar type of payment; (e) the bid acknowledges and represents that the bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer, (ii) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the

16

Purchased Assets in making its bid and (iii) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidding Procedures; and (f) the bid is received by the Bid Deadline.

e.   <u>Auction</u>.  If more than one Qualified Bid is received, the Sellers will conduct an auction (the "Auction") with respect to the Purchased Assets.  If no Qualified Bid (other than that of the Proposed Purchaser) is received by the Bid Deadline, the Sellers shall report the same to the Bankruptcy Court, the Proposed Purchaser's bid will be deemed the highest or otherwise best offer for the Purchased Assets (the "Successful Bid") and the Sellers will proceed with the transactions contemplated by the Purchase Agreement.  The Auction, if required, will commence at 9:00 a.m. (Eastern Time) on the date established by the Court in the Procedures Order, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 or at such later time or other place as agreed by the Proposed Purchaser and the Sellers, and which the Sellers will notify all Qualified Bidders who have submitted Qualified Bids.

At least one (1) business day prior to the Auction, the Sellers will provide to the Proposed Purchaser and all other Qualified Bidders a copy of the highest or otherwise best Qualified Bid received and copies of all other Qualified Bids.  In addition, the Sellers will inform the Proposed Purchaser and each Qualified Bidder who has expressed its intent to participate in the Auction of the identity of all Qualified Bidders that may participate in the Auction.

Only the Proposed Purchaser, the Sellers, Qualified Bidders who have submitted Qualified Bids and representatives of any statutory committee appointed in these cases (collectively, the "Committee") will be entitled to attend, participate and be heard at the Auction, and only the Proposed Purchaser and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

17

During the Auction, bidding will begin at the purchase price stated in the highest or otherwise best Qualified Bid (taking into account the Breakup Fee and Expense Reimbursement), and will subsequently continue in minimum increments of at least $1 million higher than the previous Qualified Bid.  Subsequent Qualified Bids submitted by the Proposed Purchaser will be deemed to include a credit in an amount equal to the sum of the Breakup Fee and the maximum amount of the Expense Reimbursement.

Bidding at the Auction will continue until such time as the highest or otherwise best Qualified Bid is determined.  Upon conclusion of the Auction, the Sellers will (i) review each Qualified Bid on the basis of financial and contractual terms and other factors relevant to the Sale process, including those factors affecting the speed and certainty of consummating the Sale, and (ii) identify the highest or otherwise best offer for the Purchased Assets (as defined above, the "Successful Bid").

f.     Acceptance of Qualified Bids.  At the Sale Hearing, the Sellers will seek entry of an order authorizing and approving the Sale (i) if no Qualified Bid is received (other than that of the Proposed Purchaser), to the Proposed Purchaser pursuant to the terms and conditions set forth in the Purchase Agreement; or (ii) if another Qualified Bid is received by the Sellers, to the Proposed Purchaser or such other Qualified Bidder as the Sellers, in the exercise of their business judgment, determine to have made the highest or otherwise best offer to purchase the Purchased Assets (the "Successful Bidder").  The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing.

The Sellers' presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute the Sellers' acceptance of the bid, except with respect to the bid of the Proposed Purchaser as reflected in the Purchase Agreement (subject to higher or otherwise better Qualified Bids and subject to Bankruptcy Court approval).  The Sellers will be deemed to have accepted any other bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

Following the Sale Hearing approving the Sale of the Purchased Assets to the Successful Bidder, if such Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, will be deemed to be the Successful Bid and the Sellers will be authorized, but not required, to consummate the Sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court.

g.    Return of Good Faith Deposit.  The Good Faith Deposits of all Qualified Bidders will be retained by the Sellers and all Qualified Bids will remain open until closing of the purchase of the Purchased Assets; provided, however, that in no event shall the Proposed Purchaser be required to make the Good Faith Deposit.

If a Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Sellers will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit irrevocably will become property of the Sellers.

h.    Modifications.  The Sellers may (a) determine, in their business judgment, which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid (other than that of the Proposed Purchaser) that, in the Sellers' sole discretion, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Purchase Agreement, or (iii) contrary to the best interests of the Sellers, their estates and their creditors.  At or before the Sale Hearing, the Sellers may impose such other terms and conditions upon Qualified Bidders (other than the Proposed Purchaser) as they determine to be in the best interests of the Sellers' estates, their creditors and other parties in interest in these cases.

## BIDDING PROTECTIONS

21.     Pursuant to this Motion, the Debtors seek immediate approval of payment in certain circumstances of a Breakup Fee and Expense Reimbursement as set forth in Section 12.2 of the Purchase Agreement.

22.     The Purchaser has expended, and likely will continue to expend, considerable time, money and energy pursuing the Sale and has engaged in extended and lengthy good faith negotiations.  The Purchase Agreement is the culmination of these efforts.

23.     In recognition of this expenditure of time, energy and resources, and the benefits to the Debtors' estates of securing a "stalking horse" or minimum bid, the Sellers have agreed to provide the Bidding Protections to the Purchaser.  Specifically, among other things, as set forth more fully in Section 12.2 of the Purchase Agreement, the Debtors seek to provide to the Purchaser a Breakup Fee in the amount of $10 million.  The Bidding Protections set forth in the Purchase Agreement also provide for an Expense Reimbursement, which is capped at $3 million.

24.     The Sellers are obligated to pay the Expense Reimbursement upon the termination of the Purchase Agreement pursuant to Section 12.1 of the Purchase Agreement (other than pursuant to Section 12.1(c) of the Purchase Agreement).  In such case, the Purchaser is required to provide to the Sellers a reasonably

detailed calculation of the actual out-of-pocket costs and expenses (including, without limitation, the reasonable and documented fees and expenses of its outside counsel) incurred by the Purchaser in connection with its due diligence investigation of the Sellers and the negotiation and execution of the Purchase Agreement and the transactions contemplated thereby. Upon receiving the Purchaser's calculation, the Sellers are required to pay the Purchaser an "Expense Reimbursement" in cash in an amount equal to such costs and expenses.

25.    The Sellers are obligated to pay the Breakup Fee in the event the Purchase Agreement is terminated (i) by the Sellers pursuant to Section 12.1(g) of the Purchase Agreement; or (ii) at a time when the Purchaser has the right to terminate the Purchase Agreement pursuant to (A) both Section 12.1(b) of the Purchase Agreement (by virtue of a breach of 6.7(d) or (e) of the Purchase Agreement) and Section 12.1(d)(vi) or (vii), or (B) Section 12.1(d)(i) through (v) of the Purchase Agreement. In such cases, the Sellers are required to pay the Purchaser, concurrently with such termination, a "Breakup Fee" in an amount in cash equal to $10 million by wire transfer of immediately available funds to an account designated in writing by the Purchaser. If the Purchase Agreement is terminated at a time when the Purchaser has the right to terminate the Purchase Agreement pursuant to Section 12.1(d)(vi) or (vii) of the Purchase Agreement (but is not entitled to immediate payment of the Breakup Fee) and within six months after such termination the Sellers

21

enter into an agreement with respect to an Superior Transaction, then upon consummation of such Superior Transaction (or a similar Superior Transaction with the original counterparty to such Superior Transaction) whether during or after such six month period, the Sellers are required to pay the Purchaser an amount in cash equal to the Breakup Fee by wire transfer of immediately available funds to an account designated in writing by the Purchaser. In no event, however, shall more than one Breakup Fee be payable to the Purchaser.

26.    The Bidding Protections were a material inducement for, and a condition of, the Purchaser's entry into the Purchase Agreement. The Debtors believe that the Bidding Protections are fair and reasonable in view of, among other things, (a) the intensive analysis, due diligence investigation and negotiation undertaken by the Purchaser in connection with the Sale and (b) the fact that the efforts of the Purchaser have increased the chances that the Debtors will receive the highest and best offer for the Purchased Assets, by establishing a bid standard or minimum for other bidders, placing the property of the Sellers' estates in a sales configuration mode thereby attracting other bidders to the Auction, and serving as a catalyst for other potential or actual bidders, to the benefit of the Debtors, their estates, their creditors and all other parties in interest.

27.    The Purchaser is unwilling to commit to hold open its offer to purchase the Purchased Assets under the terms of the Purchase Agreement unless the

Bidding Protections are approved and payment of the Expense Reimbursement and the Breakup Fee are authorized. The Debtors thus request that the Court approve the Bidding Protections and authorize payment of the Expense Reimbursement and Breakup Fee pursuant to the terms and conditions of the Purchase Agreement.

28.     The Debtors submit that the proposed Breakup Fee is (a) an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of Bankruptcy Code section 503(b), (b) of substantial benefit to the Debtors, (c) reasonable and appropriate, in light of the size and nature of the Sale and the efforts that have been and will be expended by the Purchaser notwithstanding that the proposed Sale is subject to higher or better offers for the Purchased Assets, and (d) necessary to ensure that the Purchaser will continue to pursue its proposed acquisition of the Purchased Assets. See, e.g., The Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F. 3d 49 (2d Cir. 1993); In re App Plus, Inc., 223 B.R. 870 (Bankr. E.D.N.Y 1998).

## NOTICE OF BIDDING PROCEDURES AND AUCTION

29.     Substantially concurrently with filing this Motion, the Debtors will serve a copy of this Motion, the Purchase Agreement, the proposed Procedures Order, the Proposed Sale Order and all exhibits to such orders upon the following persons by first-class mail, postage prepaid: (i) the Office of the United States

Trustee; (ii) counsel to the Purchaser; (iii) counsel to any statutory committees appointed in these cases (collectively, the "Committee"); (iv) counsel to Verizon Investments Inc. and Verizon Communications Inc. (together, "Verizon"); (v) counsel to the administrative agent for the Debtors' prepetition lenders (the "Bank Group") under the Amended and Restated Credit Agreement, dated as of September 24, 2001; (vi) all entities known to have expressed an interest in acquiring any of the Purchased Assets; (vii) all entities known to have asserted any Lien in or upon any of the Purchased Assets; (viii) all federal, state and local taxing authorities that have jurisdiction over the Business; (ix) all regulatory authorities or recording offices that have a reasonably known interest in the relief requested in the Motion; (x) all governmental agencies having jurisdiction over the Business with respect to environmental laws; (xi) parties to governmental approvals or permits; (xii) the United States Attorney's office and the attorneys general of all states in which the Purchased Assets are located; (xiii) the Federal Communications Commission and applicable state public utility commissions; (xiv) the Securities and Exchange Commission; and (xv) all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 2002 as of the date hereof (collectively, the "Bidding Procedures Parties").

30.    Assuming the Court enters the proposed Procedures Order, the Debtors, no later than five (5) business days after entry of the Procedures Order, shall

cause the Notice of Auction and Sale Hearing attached as Exhibit A to the Proce-

dures Order to be (i) published in the national editions of The Wall Street Journal

and The New York Times pursuant to Bankruptcy Rule 2002(l) and (ii) served upon

all creditors and parties in interest in these cases, including (x) all creditors who have

filed proofs of claim in these cases, and (y) all parties that have filed notices of

appearance in these bankruptcy cases under Bankruptcy Rule 2002 as of the date

hereof. The Debtors submit that such notice, together with the other notice described

herein, is good, adequate, sufficient and proper notice to such interested parties.

    31.    Finally, in addition to the publication and service of the Notice

of Auction and Sale Hearing provided for in the preceding paragraph, no later than

five (5) business days after entry of the Procedures Order, the Debtors shall cause a

copy of the Notice of Auction and Sale Hearing and the Procedures Order (in the

form approved by the Court) to be served upon the following persons by first-class

mail, postage prepaid: (i) the Bidding Procedures Parties; (ii) all non-Debtor parties

to the Assumed Contracts and Assumed Leases, all Underlying Service Agreements

and all identified Undesignated Agreements; and (iii) all other parties that have filed

a notice of appearance and demand for service of papers in these bankruptcy cases

under Bankruptcy Rule 2002 as of the date hereof (collectively, the "Auction Notice

Parties").

32.    The Debtors believe that the foregoing notice to the Bidding

Procedures Parties and the Auction Notice Parties is sufficient to provide effective

notice of the Bidding Procedures, the Auction and the proposed Sale to potentially

interested parties in a manner designed to maximize the chance of obtaining the

broadest possible participation in the Sale process while minimizing costs to the

estates.  Accordingly, the Debtors request that the Court find that notice in this

manner is sufficient and that no further notice of the Auction, the Bidding Procedures

or the proposed Sale is required.

## ASSUMPTION AND ASSIGNMENT
## OF CONTRACTS AND LEASES

33.    As part of the Motion, the Debtors seek authority under

Bankruptcy Code sections 105(a) and 365 to (i) assume and assign the Assumed

Contracts and Assumed Leases to the Purchaser (or the Successful Bidder, as the

case may be), free and clear of all Claims[5] and Interests[6] (other than Permitted Liens and Assumed Liabilities) of any kind or nature whatsoever, effective as of the applicable Assumption Date, and (ii) execute and deliver to the Purchaser (or the Successful Bidder, as the case may be) such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts and Assumed Leases to the Purchaser (or the Successful Bidder, as the case may be). With respect to the Assumed Customer Contracts, the Assumed Contracts listed on Schedule 1.1 to the Purchase Agreement and the Assumed Leases listed on Schedule 1.2 to the Purchase Agreement (collectively, the "Initial Assumed Agreements"), the Assumption Date will be the Closing Date (or with respect to certain Customer Contracts, shortly

---

[5]     As used herein, the term "Claims" means all debts arising under, relating to, or in connection with any acts of the Debtors, claims (as that term is defined in section 101(5) of the Bankruptcy Code), Liabilities, obligations, demands, guaranties, options, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these cases, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, claims and encumbrances (i) that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of any of the Sellers' or the Purchaser's interests in the Purchased Assets, or any similar rights, or (ii) in respect of taxes, restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership).

[6]     As used herein, the term "Interests" means Liens, mortgages, security interests, conditional sales or other title retention agreements, pledges, claims, judgments, demands, encumbrances (including, without limitation, claims and encumbrances (i) that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Sellers' or the Purchaser's interests in the Purchased Assets or (ii) in respect of taxes, restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership).

27

thereafter).  With respect to the Assumed Contracts and Assumed Leases that are not

Initial Assumed Agreements (the "Later Assumed Agreements"), the Assumption

Date will be determined according to the Assumption Procedures set forth below.

      34.     On or before the applicable Assumption Date, the Debtors will

pay in full all Cure Amounts in respect of undisputed cure claims and the undisputed

portion of any Cure Amount in respect of a disputed cure claim, and will segregate

the disputed portion of any Cure Amount in respect of any disputed cure claim

pending the resolution of any such dispute by this Court or mutual agreement of the

parties.

      35.     In order to facilitate the timely and efficient resolution of

objections relating to the proposed assumptions and assignments, the Debtors request

that the Debtors and the Purchaser (or the Successful Bidder, as the case may be) be

authorized to settle, compromise or otherwise resolve any disputed Cure Amounts

with the relevant non-Debtor party to an Assumed Contract or Assumed Lease

without Bankruptcy Court approval or the need for any other or further (i) order of

this Court or (ii) notice to any party.

      36.     <u>Initial Assumed Agreements</u>.  No later than five (5) business

days after the entry of the Procedures Order, the Debtors shall serve upon all

non-Debtor parties to the Customer Contracts, the Assumed Contracts listed on

Schedule 1.1 to the Purchase Agreement and the Assumed Leases listed on Schedule

28

1.2 to the Purchase Agreement (collectively, the "Assumption Notice Parties"), a

notice (the "Initial Assumption Notice") substantially in the form of Exhibit C to the

Procedures Order of, among other things, (i) the Debtors' intention to assume, assign

and transfer the designated agreements to the Purchaser as of the Closing Date (or,

with respect to certain Customer Contracts, shortly thereafter) and (ii) the Cure

Amount, if any, required to be paid to cure any monetary default related to each such

designated agreement.[7]

       37.     The Debtors propose that each Assumption Notice Party shall

have until the deadline (the "Assignment Objection Deadline") established by the

Court in the Procedures Order to file with the Bankruptcy Court and serve on certain

notice parties (the "Notice Parties")[8] an objection to the assump

---

[7]    As set forth above, Initial Assumption Notices will be sent to, among other parties, all non-Debtor parties to Customer Contracts. Pursuant to Section 2.8(b) of the Purchase Agreement, the Purchaser has until the date (the "Customer Contract Election Date") which is the later of (x) five (5) business days prior to the Closing Date and (y) twenty (20) business days subsequent to the date that a copy of the Customer Contract is listed and received or made available to the Purchaser, to designate certain Customer Contracts that the Purchaser does not intend to assume (all such contracts, the "Excluded Customer Contracts"). As soon as practicable after the Customer Contract Election Date for each Excluded Customer Contract, the Debtors will send a notice (the "Excluded Customer Contract Notice") substantially in the form of Exhibit D to the Procedures Order to all holders of Excluded Customer Contracts providing that, among other things, such Excluded Customer Contracts will not be assumed and assigned pursuant to the Purchase Agreement.

[8]    The Notice Parties are: (i) Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attention: J. Gregory Milmoe, Esq., and Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636, Attention: Eric M. Davis, Esq.; (ii) Willkie Farr & Gallagher, 787 Seventh Avenue, New York, New York 10019, Attention: John Longmire, Esq.; and (iii) the Office of the United States Trustee, 33 Whitehall Street, New York, New York 10004, Attention: Brian
(continued...)

tion and assignment of its respective agreement or the Cure Amount with respect thereto, and must state in its objection (each, an "Assignment Objection") with specificity what Cure Amount it asserts is required (with appropriate documentation in support thereof).[9] If no Assignment Objection is timely received from any such non-Debtor party, the applicable Assumed Contract or Assumed Lease will be assigned to the Purchaser (or the Successful Bidder, as the case may be) on the Closing Date (or with respect to certain Customer Contracts, shortly thereafter),[10] and the Cure Amount will be fixed at the amount set forth in the Initial Assumption Notice, notwithstanding anything to the contrary in any Assumed Contract or Assumed Lease or any other document, and the Assumption Notice Party will be (i) deemed to have waived and released any right to assert an objection to the proposed assignment of the Initial Assumed Agreement or the Cure Amount, and to have otherwise consented to the assumption and assignment of the Initial Assumed Agreement and (ii) forever barred, permanently enjoined and estopped from asserting or claiming any other or further claims against the Debtors, the Purchaser (or the Successful Bidder, as the case may be), their respective successors and assigns, the

---

[8]    (...continued)
       Masumoto, Esq.

[9]    Assignment Objections must be served so as to be actually received by the Assignment
       Objection Deadline by the Notice Parties.

[10]   As set forth above, Excluded Customer Contracts will not be assumed and assigned pursuant
       to the Purchase Agreement.

Purchased Assets, or the property or assets of any or all such parties, as to such

Assumed Contract or Assumed Lease or on grounds that any additional amounts are

due or defaults exist, or conditions to assignment must be satisfied, under such

Assumed Contract or Assumed Lease except with respect to defaults occurring

wholly after the Assumption Date.

38.     If one or more Assignment Objections are received, hearings

with respect to any such objections may be held (a) at the Sale Hearing or (b) at such

other date as the Court may designate, provided that if the subject Assumed Contract

or Assumed Lease is assumed and assigned to the Purchaser, the Debtors will pay in

full all Cure Amounts in respect of undisputed cure claims and the undisputed

portion of any Cure Amount in respect of a disputed cure claim, and will segregate

the disputed portion of any Cure Amount in respect of any disputed cure claim

pending the resolution of any such dispute by this Court or mutual agreement of the

parties.

39.     A properly filed Assignment Objection shall reserve such

objecting party's rights against the Debtors (but not against any purchaser of the

Purchased Assets) with respect to the relevant Cure Amount obligation, but shall not

constitute an objection to the remaining relief requested in this Motion.

40.     Later Assumed Agreements.  Pursuant to Section 2.9 of the

Purchase Agreement, on or prior to a date that is three (3) months following the

31

Closing Date (the "Election Date"), the Purchaser may elect to have the Sellers

assume and assign to the Purchaser (a) one or more Undesignated Agreements and

(b) one or more Underlying Service Agreements.

41.    The Debtors propose that the following procedures (the

"Assumption Procedures") apply to the assumption and assignment of any

Undesignated Agreement or Underlying Service Agreement:

(i)    At any time after entry of the Sale Order and on or prior to the Elec-
tion Date, the Purchaser may notify the Debtors, in writing pursuant to
the terms of the Purchase Agreement, of its desire for the relevant
Debtor to assume and assign to the Purchaser any Underlying Service
Agreement or Undesignated Agreement (each agreement subject to
such a notice, an "Assumed Transition Agreement").

(ii)    Within two (2) business days of such notice, the Debtors will file with
the Court and serve on (i) each non-Debtor party to such agreement,
(ii) counsel to the Purchaser, (iii) counsel to the Committee, (iv)
counsel to Verizon and (v) counsel to the administrative agent for the
Bank Group (collectively, the "Notice Parties"), a notice (an "As-
sumption Notice") substantially in the form attached as Exhibit B to
the Sale Order of the assumption and assignment of such Assumed
Transition Agreement to the Purchaser pursuant to section 365 of the
Bankruptcy Code and the terms of the Sale Order.  Each Assumption
Notice will identify the relevant Assumed Transition Agreement and
set forth the Debtors' proposed "cure amount" with respect to the
relevant Assumed Transition Agreement.

(iii)    Each non-Debtor party to an Assumed Transition Agreement will
have ten (10) days from the date of the relevant Assumption Notice to
file with the Court and serve on the Notice Parties an objection (a
"Cure Objection") (a) pursuant to section 365(b)(1)(A) of the Bank-
ruptcy Code, to the proposed cure amount set forth in such Assump-
tion Notice and/or (b) asserting actual pecuniary losses of the type
referred to in section 365(b)(1)(B) of the Bankruptcy Code.  No other
form of objection to any Assumption Notice will be permitted.  If no

32

Cure Objection is timely filed and served as described above with respect to a particular Assumed Transition Agreement, the "cure amount" for such Assumed Transition Agreement will be that proposed by the Debtors in the relevant Assumption Notice, and such cure amount will be paid by the Debtors as of the respective Assumption Date. If a Cure Objection is timely filed and served as described above with respect to a particular Assumed Transition Agreement, then the Debtors shall pay the full amount of the undisputed portion of such cure amount and segregate the full amount of the disputed portion of such cure amount pending resolution of such Cure Objection, and pay to the objecting party, upon resolution of such dispute by agreement of the parties or order of the Court, the remaining cure amount, if any, set forth in such agreement or order.

(iv)    Regardless of whether a Cure Objection is timely filed and served as described above, the relevant Assumed Transition Agreement will be assumed by the relevant Debtor and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code, without the need for any further notice, motion, hearing or order, as of the date that is ten (10) days following the date of the relevant Assumption Notice. All necessary authority for such assumption and assignment, including a finding that the Debtors and the Purchaser have provided "adequate assurance of future performance" as and to the extent required by sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code, will be provided by the Sale Order, and the entry of same will bar, estop and prohibit any non-Debtor party to an Assumed Transition Agreement from asserting any future objection, other than a Cure Objection, to such assumption and assignment.

(v)    Upon assignment of the relevant Assumed Transition Agreement on the relevant Assumption Date, the Debtors will be relieved pursuant to Bankruptcy Code section 365(k) from any liability for any breach of such agreement.

## REJECTION PROCEDURES FOR
## CERTAIN CONTRACTS AND LEASES

42.    At any time after fifteen (15) business days prior to the

Closing Date and on or prior to the Election Date, the Purchaser may elect to direct

33

the Debtors not to reject any (a) Undesignated Agreement or (b) Underlying Service

Agreement effective on or prior to a date so long as such date is (A) no later than the

later of (x) three (3) months following the Election Date, or (y) the effective date of

the confirmation of a plan of reorganization in these cases and (B) no earlier than

fifteen (15) business days subsequent to the date of such notice.  To facilitate

rejection of Undesignated Agreements and Underlying Service Agreements that will

not be assigned to the Purchaser and that are otherwise unneeded by the bankruptcy

estates, the Debtors seek approval of certain rejection procedures (the "Rejection

Procedures"), as set forth more fully below.

    43.  The Debtors propose that the following Rejection Procedures

apply to the rejection of Undesignated Agreements and Underlying Service Agree-

ments:

    (i)  At any time after fifteen (15) business days prior to the Closing Date
and on or prior to the Election Date, the Purchaser may notify the
Debtors, in writing pursuant to the terms of the Purchase Agreement:
(a) that it does not intend to seek assignment of any particular Under-
lying Service Agreement or Undesignated Agreement pursuant to the
terms of the Purchase Agreement (each agreement subject to such a
notice, a "Rejected Transition Agreement") and (b) the earliest date
(the "Migration Date") on which the relevant Debtor may reject (or
assign to any third party) such Rejected Transition Agreement; pro-
vided, however, that no Migration Date for any Rejected Transition
Agreement will be later than the date (the "Migration Deadline") that
is the later to occur of (y) six (6) months after the Closing Date and
(z) the effective date of confirmation of a plan of reorganization in
these cases.

(ii)    At any time prior to the Migration Date for a particular Rejected Transition Agreement, the Purchaser may, by written notice to the Debtors, set an earlier Migration Date for such Rejected Transition Agreement; provided, however, that such earlier Migration Date will not be less than fifteen (15) days after the date of the notice referred to in this clause (ii). The Purchaser may issue multiple such notices with respect to a single Rejected Transition Agreement.

(iii)    If the Purchaser has not notified the Debtors, on or before the Election Date, that a particular Underlying Service Agreement or Undesignated Agreement will be treated as an Assumed Transition Agreement or a Rejected Transition Agreement, such agreement will, absent further order of the Court sought by or at the request of the Purchaser, be treated as a Rejected Transition Agreement, and the Migration Date for such Rejected Transition Agreement will be the Election Date.

(iv)    After the date the Sale Order is approved and not less than ten (10) days prior to the Migration Date for a given Rejected Transition Agreement, the Debtors may file with the Court and serve on the Notice Parties a notice (a "Rejection Notice") substantially in the form attached to the Sale Order as Exhibit C of the effective date (the "Rejection Effective Date") of the rejection of such Rejected Transition Agreement. As of each Rejection Effective Date, the relevant Rejected Transition Agreement will be rejected pursuant to section 365 of the Bankruptcy Code and the terms of this Order, without the need for any further notice, motion, hearing or order; provided, however, that no Rejection Effective Date will be earlier than the relevant Migration Date; provided, further, that the Debtors are not required to reject, pursuant to these rejection procedures or otherwise, any Underlying Service Agreement or Undesignated Agreement designated as a Rejected Transition Agreement.

(v)    Each Rejection Notice will provide that the non-Debtor party to the relevant Rejected Transition Agreement will be forever barred, estopped and prohibited from asserting any claim in these cases for damages arising from the rejection of such Rejected Transition Agreement unless such party files a claim for such damages on or before the date that is thirty (30) days after the Rejection Effective Date set forth in such Rejection Notice.

(vi)    All necessary authority for the rejection of each Rejected Transition Agreement will be provided by the Sale Order, and the entry of same will bar, estop and prohibit any non-Debtor party to a Rejected Transition Agreement from asserting any future objection to such rejection.

## NOTICE OF CONTRACTS AND LEASES SUBJECT TO ASSUMPTION AND REJECTION PROCEDURES

44.    No later than five (5) business days after the entry of the Procedures Order, the Debtors shall serve upon all non-Debtor parties to the Underlying Service Agreements and identified Undesignated Agreements (collectively, the "Transition Agreements Notice Parties"), a notice (the "Transition Agreements Notice") substantially in the form attached as Exhibit E to the Procedures Order of the procedures for assumption and assignment of Underlying Service Agreements and Undesignated Agreements.[11]   The Transition Agreements Notice shall be served on non-Debtor parties to Undesignated Agreements identified after such initial service date as soon as practicable after the identification of such agreements.

---

[11]    As set forth above, Transition Agreements Notices will be sent to all non-Debtor parties to Underlying Service Agreements and identified Undesignated Agreements.  Pursuant to Section 2.11(a) of the Purchase Agreement, the Purchaser has until the date (the "Transition Agreements Election Date") that is fifteen (15) business days prior to the Closing Date, to designate certain Underlying Service Agreements and Undesignated Agreements as Excluded Agreements (all such agreements, the "Excluded Transition Agreements").  As soon as practicable after the Purchaser identifies such Excluded Transition Agreements, the Debtors will serve a notice (the "Excluded Transition Agreements Notice") substantially in the form of Exhibit F to the Procedures Order by first-class mail upon the holder of each such Excluded Transition Agreement providing that, among other things, such Excluded Transition Agreement will not be subject to the Assumption Procedures and Rejection Procedures set forth herein.

## APPLICABLE AUTHORITY

**A.    The Proposed Sale is Within the Debtors' Sound Business Judgment**

45.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Bankruptcy Code section 105(a) provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

46.    The Debtors' sale or use of property of the estate outside the ordinary course of business should be approved by the Court if the Debtors can demonstrate a sound business justification for the proposed transaction. See, e.g., Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Ionosphere Clubs, Inc., 100 B.R. 670, 680 (Bankr. S.D.N.Y. 1989); Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991).

47.    The Debtors submit that there is more than adequate business justification to sell the Purchased Assets to the Purchaser (or the Successful Bidder, as the case may be). As set forth above, the Debtors' businesses have deteriorated significantly since 2000 - - and the Debtors' operating losses continue to mount. Based upon the results of their exhaustive analysis of the Debtors' ongoing and future

business prospects, the Debtors' management and financial advisors have concluded that the best way to maximize the value of the Debtors' estates is to sell the Debtors' businesses as a going concern, thereby preserving the substantial goodwill of the businesses, maintaining customer relationships and avoiding a liquidation sale or sales at depressed prices.

48.    The Purchaser has offered substantial value for the Purchased Assets and is anxious to consummate the transaction.  As set forth above, the Purchase Agreement requires the Purchaser (or the Successful Bidder, as the case may be) to pay  $242,156,160 for the Purchased Assets (subject to certain adjustments), and to ensure that the Debtors' total rejection claims do not exceed $600 million.  The Debtors respectfully submit that such consideration is both fair and reasonable.  Furthermore, to dispel any doubt, the sale of the Purchased Assets to the Purchaser is subject to competing bids, thereby enhancing the Debtors' ability to receive the highest and best value for their businesses.  Consequently, the fairness and reasonableness of the consideration to be received by the Debtors ultimately will be demonstrated by a "market check" through an auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

49.    Finally, all creditors and parties in interest will receive adequate notice of the Bidding Procedures, the Auction and the proposed Sale pursuant to the procedures proposed above.  Such notice is reasonably calculated to

provide timely and adequate notice to the Debtors' major creditor constituencies, those parties most interested in these cases, those parties potentially interested in bidding on the Purchased Assets and others whose interests are potentially implicated by the proposed Sale. The Debtors submit that such notice is sufficient for entry of the Sale Order and satisfies requisite notice conditions for approval of the Sale under Bankruptcy Code section 363(b).

50.    Under these circumstances, sound business reasons exist that justify the immediate sale of the Purchased Assets outside the ordinary course of business and prior to the confirmation of a reorganization plan. Accordingly, the Debtors submit that the proposed Sale to the Purchaser pursuant to Bankruptcy Code section 363 should be approved. Furthermore, in order to facilitate the Sale to the Purchaser, the Debtors should be authorized to assume the Purchase Agreement under Bankruptcy Code section 365 as of the Closing Date.

**B.    The Purchaser is Entitled to the Protections of Bankruptcy Code Section 363(m)**

51.    The Purchase Agreement has been negotiated at arms'-length and in good faith and, thus, the Purchaser is entitled to the protections of Bankruptcy Code section 363(m). As set forth above, the Purchaser was selected by the Debtors and Lazard only after screening other potential purchasers and determining that the Purchaser's terms were likely to be the most favorable submitted by any party. The Second Circuit has indicated that a party would have to show fraud or collusion

39

between the purchaser and the debtor-in-possession or trustee in order to demonstrate

a lack of good faith.  See Kabro Assocs. of West Islip, LLC, v. Colony Hill Assocs.

(In re Colony Hill Assocs.), 111 F.3d 269, 276 (2d Cir. 1997) ("[t]ypically, the

misconduct that would destroy a purchaser's good faith status at a judicial sale

involves fraud, collusion between the purchaser and other bidders or the trustee, or

an attempt to take grossly unfair advantage of other bidders"); see also In re Angelika

Films 57th, Inc., Nos. 97 Civ. 2239 (MBM), 97 Civ. 2241 (MBM), 1997 WL 283412,

at *7 (S.D.N.Y. 1997); In re Bakalis, 220 B.R. 525, 537 (Bankr. E.D.N.Y. 1998).  No

such facts exist here.  Accordingly, the Debtors request that the Court make a finding

that the Purchase Agreement reached with the Purchaser was at arms'-length and is

entitled to the protections of Bankruptcy Code section 363(m).

**C.    The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Liens, Claims, Encumbrances and Interests**

52.    Under Bankruptcy Code section 363(f), a debtor-in-possession

may sell property free and clear of any interest in such property of an entity other

than the estate only if, among other things:

(1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

40

     (4)    such interest is in bona fide dispute; or

     (5)    such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets "free and clear" of Liens and Interests. See 11 U.S.C. § 363(f); In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, *12 (Bankr. S.D.N.Y. 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met"); In re Bygaph, Inc., 56 B.R. 596, 606 n. 8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Security Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991), cert. dismissed, 503 U.S. 978 (1992) (stating that Bankruptcy Code section 363(f) written in disjunctive; holding that court may approve sale "free and clear" provided at least one of subsections of Bankruptcy Code section 363(f) is met).

     53.    The Debtors submit that one of the subsections of Bankruptcy Code section 363(f) applies to holders of Liens and Interests in or against the Purchased Assets. The Lien and Interest holders will be adequately protected, because their Liens and/or Interests will attach to the net proceeds of the Sale, subject

to any claims and defenses the Debtors may possess with respect thereto.  Accord-

ingly, the sale should be approved under Bankruptcy Code section 363(f).

   54.  In addition, the Debtors submit that the Purchased Assets may

be sold free and clear of Claims, including successor liability claims, as neither the

Purchaser nor its affiliates, successors or assigns will, as a result of any action taken

in connection with the purchase of the Purchased Assets (a) be a successor to the

Debtors; (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be a

continuation or substantial continuation of the Debtors or any enterprise of the

Debtors.  Several courts have held that notwithstanding the use of the term "interest"

in the statutory language of Bankruptcy Code section 363(f), such section grants

bankruptcy courts the power to convey assets free and clear of claims.  See e.g., In re

Trans World Airlines Inc., No. 01-0056 (PJW), 2001 WL 1820325 at *5 (Bankr. Del.

Mar. 27, 2001) ("Authorizing the sale [of debtor's assets] free and clear of ... succes-

sor liability claims achieves the purpose of [Bankruptcy Code] section 363 intended

by Congress.").  Other courts, concluding that Bankruptcy Code section 363(f) does

not empower them to convey assets free and clear of claims, have nevertheless found

that Bankruptcy Code section 105(a) provides such authority.  See Volvo White

Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75

B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority

to sell assets free and clear of claims poses no impediment to such a sale, as such

42

authority is implicit in the court's equitable powers when necessary to carry out the
provisions of title 11)

### D.    The Debtors' Request for Relief from Transfer Taxes Under Bankruptcy Code Section 1146(c) Should Be Granted

55.    Bankruptcy Code section 1146(c) provides that "[t]he issu-
ance, transfer, or exchange of a security, or the making or delivery of an instrument
of transfer under a plan confirmed under section 1129 of this title, may not be taxed
under any law imposing a stamp tax or similar tax." 11 U.S.C. § 1146(c).  This
language has been construed to include transfers pursuant to a sale outside of, but in
furtherance of effectuating, a reorganization plan.  See City of New York v.
Jacoby-Bender, Inc. (In re Jacoby-Bender, Inc.), 758 F.2d 840, 842 (2d Cir. 1985)
(holding that where a transfer is necessary to the consummation of a plan, the transfer
is "under a plan" within meaning of Bankruptcy Code section 1146(c)); In re United
Press Int'l, Inc., Case No. 91 B 13955 (FGC), 1992 Bankr. LEXIS 842, at *4 (Bankr.
S.D.N.Y. May 18, 1992) (holding that Bankruptcy Code section 1146(c) exemption
applied to section 363 sale where it found "the value of Debtor's assets ... likely to
deteriorate [during] time necessary to ... confirm a plan."); In re Permar Provisions,
Inc., 79 B.R. 530, 533-34 (Bankr. E.D.N.Y. 1987) (stating that determination of
applicability of Bankruptcy Code section 1146(c) exemption is same for pre- and
post-confirmation dispositions of property, namely "whether the sale of property is
essential to confirmation of the plan"); City of New York v. Smoss Enters. Corp. (In

43

re Smoss Enters. Corp.), 54 B.R. 950, 951 (E.D.N.Y. 1985) (stating that 1146(c) was designed to reach transfer on which "plan hinged and which the court had to approve prior to the confirmation") (citations omitted).

56.    The Debtors seek this Court's approval of the sale of substan-tially all of the Debtors' businesses operations, thereby facilitating the formulation and ultimate confirmation of a reorganization plan that will yield the highest possible returns to the Debtors' creditors. The Sale is in furtherance of the Debtors' plan of reorganization and, in light of the foregoing, the Debtors respectfully submit that the Sale is a necessary step toward a reorganization plan and, accordingly, should be exempt under Bankruptcy Code section 1146(c) from any stamp, transfer, sales, recording or similar taxes.

**E.    The Assumption and Assignment of Assumed Contracts and Assumed Leases Should Be Authorized**

57.    Bankruptcy Code section 365(f)(2) provides, in pertinent part, that:

> The trustee may assign an executory contract or unexpired lease of the debtor only if--
>
> (A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and
>
> (B)    adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2).  Under Bankruptcy Code section 365(a), a debtor, "subject to

the court's approval, may assume or reject any executory contract or unexpired lease

of the debtor."  11 U.S.C. § 365(a).  Bankruptcy Code section 365(b)(1), in turn,

codifies the requirements for assuming an unexpired lease or executory contract of a

debtor.  This subsection provides:

> (b)(1)  If there has been a default in an executory contract or unexpired lease
> of the debtor, the trustee may not assume such contract or lease
> unless, at the time of assumption of such contract or lease, the trustee-
>
>> (A)    cures, or provides adequate assurance that the trustee will
>> promptly cure, such default;
>>
>> (B)    compensates, or provides adequate assurance that the trustee
>> will promptly compensate, a party other than the debtor to
>> such contract or lease, for any actual pecuniary loss to such
>> party resulting from such default; and
>>
>> (C)    provides adequate assurance of future performance under such
>> contract or lease.

11 U.S.C. § 365(b)(1).

      58.    The meaning of "adequate assurance of future performance"

depends on the facts and circumstances of each case, but should be given "practical

pragmatic construction."  <u>EBG Midtown South Corp. v. McLaren/Hart Envtl.</u>

<u>Engineering Corp. (In re Sanshoe Worldwide Corp.)</u>, 139 B.R. 585, 592 (S.D.N.Y.

1992) (citations omitted), <u>aff'd</u>, 993 F.2d 300 (2d Cir. 1993); <u>see</u> <u>Carlisle Homes, Inc.</u>

<u>v. Azzari (In re Carlisle Homes, Inc.)</u>, 103 B.R. 524, 538 (Bankr. D.N.J. 1988)

("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance").

59.    Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

60.    To the extent that any defaults exist under any Assumed Contract or Assumed Lease, the Sellers will cure any such default prior to the assumption and assignment of such agreements (or, with respect to disputed Cure Amounts, will segregate funds sufficient to pay such amounts).

61.    Moreover, the Debtors will adduce facts at the Sale Hearing to show the financial credibility, experience in the industry, and willingness and ability to perform under the Assumed Contracts and Assumed Leases of the Purchaser (or the Successful Bidder, as the case may be).

62.    The Sale Hearing therefore will provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser (or the Successful Bidder, as the case may be) to provide adequate

assurance of future performance under the contracts to be assumed, as required under

Bankruptcy Code sections 365(b)(1)(C) and 365(f)(2)(B). Accordingly, the Debtors

submit that the assumption and assignment of the Assumed Contracts and Assumed

Leases as set forth herein should be authorized.

**F.       The Breakup Fee and Expense Reimbursement are Warranted**

63.      To compensate the Purchaser for serving as a "stalking horse"

whose bid will be subject to higher or better offers, the Debtors and the Purchaser

seek authority for the Debtors to pay the Purchaser a Breakup Fee and an Expense

Reimbursement in the event that the Purchaser is not the Successful Bidder. The

Debtors and the Purchaser believe that the Breakup Fee and Expense Reimbursement

are fair and reasonable, given the benefits to the estates of having a definitive

Purchase Agreement and the risk to the Purchaser that a third-party offer ultimately

may be accepted, and are necessary to preserve and enhance the value of the Debtors'

estates.

64.      Bidding incentives such as the Breakup Fee and Expense

Reimbursement encourage a potential purchaser to invest the requisite time, money

and effort to negotiate with a debtor, and perform the necessary due diligence

attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of

the chapter 11 process. Historically, bankruptcy courts in this Circuit have approved

bidding incentives similar to the Breakup Fee and Expense Reimbursement under the

47

"business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); In re Marrose Corp., Nos. 89 B 12171-12179 (CB), 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) ("[a]greements to provide breakup fees or reimbursement of fees and expenses are meant to compen-sate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); see also In re Integrated Resources, 147 B.R. 650, 657-58 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (establishing three basic factors for determining whether to permit such fees in bankruptcy: whether (1) the relationship of parties who negotiated breakup fee is tainted by self-dealing or manipulation; (2) the fee hampers, rather than encourages, bidding; and (3) the amount of the fee is unreasonable relative to the purchase price). The Debtors submit that all requisite elements for approval of the Breakup Fee and Expense Reimbursement are met here.

65.    In sum, the Debtors' ability to offer the Breakup Fee and Expense Reimbursement enables the Debtors to ensure the Sale of the Purchased Assets to a contractually-committed bidder at a price the Debtors believe to be fair

48

while, at the same time, providing the Debtors with the potential of an even greater

return to the estates.  Thus, the Debtors believe that the Breakup Fee and Expense

Reimbursement should be approved.

### G.    The Debtors' Request for Relief from Bulk Sales Laws Should Be Granted

66.    The Debtors request that no bulk sales law or any similar law

of any state or other jurisdiction shall apply in any way to any of the transactions

under the Purchase Agreement.  Although the Debtors have not conducted a compre-

hensive study of such requirements for each jurisdiction in which the Purchased

Assets are located, such jurisdictions may have statutes or regulations requiring

creditor notification before bulk sales are conducted.  In the context of chapter 11

cases such as these, however, such statutes and regulations are redundant because

creditors will be given advance notice of the Sale as well as an opportunity to be

heard before this Court.  Accordingly, the Debtors believe such requirements should

not apply for the limited purpose of conducting the Sale.

67.    Moreover, certain of the statutes and regulations specifically

may provide or have been interpreted to mean that if a liquidation or bankruptcy sale

is court authorized, then a company need not comply with the regulations.  In

particular, courts have held that 28 U.S.C. § 959(b) does not apply to debtors

liquidating assets.  See, e.g., California State Bd. of Equalization v. Goggin, 191 F.2d

726 (9th Cir. 1951) (28 U.S.C. § 959 does not apply to transactions that are in the

nature of a liquidation); see also In re Borne Chemical Co., Inc., 54 B.R. 126, 135

(Bankr. D.N.J. 1984) (holding that 28 U.S.C. § 959(b) is applicable only where

property is being managed or operated for the purpose of continuing operations).

Here, the Sale will be conducted under the supervision of this Court, and no aspect of

the relief sought is intended to alter laws or regulations affecting public safety.  For

these and other reasons, the Debtors submit that 28 U.S.C. § 959(b) should not be

read to apply to the Sale.

        68.     Additionally, bankruptcy courts have recognized that federal

bankruptcy law preempts state and local laws that contravene policies underlying the

Bankruptcy Code.  See, e.g., In re Shenango Group, Inc., 186 B.R. 623, 628 (Bankr.

W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal

obligations pursuant to the bankruptcy code. ... [A] state statute cannot place burdens

on them where the result would contradict the priorities established by the federal

bankruptcy code.").  While preemption of state law is not always appropriate, see In

re Baker & Drake, 35 F.3d 1348, 1353-54 (9th Cir. 1994) (no preemption where state

law prohibiting taxicab leasing was promulgated in part as a public safety measure),

it is appropriate where, as here, the only state laws involved concern economic

regulation rather than the protection of public health and safety.  See id. at 1353

(cases suggest that "federal bankruptcy preemption is more likely ... where a state

1093038.30

effect any order, decree, judgment or injunction issued by any Governmental Agency of competent jurisdiction which enjoins, restrains or prohibits consummation of the transactions contemplated by this Agreement.

(d)    **Hart-Scott-Rodino.**  All applicable waiting periods (and any extensions thereof) under the HSR Act shall have expired or otherwise been terminated.

(e)    **Corporate Documents.**  Sellers shall have received from Parent and Purchaser certified copies of the resolutions duly adopted by the board of directors of Parent and Purchaser approving the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and such resolutions shall be in full force and effect as of the Closing Date.

(f)    **Governmental Approvals.**  All Governmental Approvals set forth on *Schedule 7.1(f)* shall have been obtained.

(g)    **Ancillary Agreements.**  Purchaser shall have executed and delivered the Ancillary Agreements to which it is a party.

(h)    **Rejection Claims.**  The Rejection Claims as of the Closing Date shall not exceed $600 million.

**Section 7.2.    Conditions to Purchaser's Obligations.**  The obligation of Purchaser and Parent to consummate the transactions contemplated by this Agreement is subject to the satisfaction (unless waived in writing by Purchaser) of each of the following conditions on or prior to the Closing Date:

(a)    **Representations and Warranties.**  The representations and warranties of Sellers contained in this Agreement (other than (A) the representations and warranties contained in *Section 3.2* and the last sentence of *Section 3.15(a)*, in each case to the extent related to non-exclusive licenses of Intellectual Property with respect to which a Seller is a licensee, and (B) the representations and warranties contained in the next to last sentence of *Section 3.14(c)*, to the extent they apply to Sellers' Knowledge with respect to Verizon, AOL or any of their Affiliates as of the Closing Date) shall be true and correct, without giving effect to (x) any qualification as to materiality or Material Adverse Effect (or any variation of such terms) contained in any particular representation or warranty (other than qualifications as to materiality contained in *Sections 3.5, 3.20(b)* or *3.20(c)*, the first sentence of *Section 3.10(b)*, clause *(xi)* of *Section 3.14(b)* and the first sentence of *Section 3.19*) on the date hereof and on and as of the Closing Date with the same force and effect as though made on and as of the Closing Date (it being understood, however, that for purposes of this sentence the accuracy of any representation or warranty that expressly speaks as of the date of this Agreement or another date prior to this Agreement shall be determined solely as of the date of this Agreement or such other date and not as of the Closing Date), except to the extent any such breach together with all other such breaches does not, and would not reasonably be expected to result in a Material Adverse Effect.  Each Seller shall have delivered to Purchaser a certificate of its President or a Vice President, dated the Closing Date, to the foregoing effect.

41

1093038.30

(b) **Compliance with Agreement.** Sellers shall have performed and complied in all material respects with all covenants to be performed or complied with by them on or prior to the Closing Date, except for *Sections 2.1* and *9.2*, in each case to the extent related to assignments of non-exclusive licenses of Intellectual Property with respect to which Seller is a licensee. Each Seller shall have delivered to Purchaser a certificate of its President or a Vice President, dated the Closing Date, to the foregoing effect.

(c) **Bankruptcy Court Approval; No Injunction.** The Sale Order shall have become a Final Order. As of the Closing Date, there shall not be in effect any order, decree, judgment or injunction issued by any Governmental Agency of competent jurisdiction which enjoins, restrains or prohibits consummation of the transactions contemplated by this Agreement.

(d) **Hart-Scott-Rodino.** All applicable waiting periods (and any extensions thereof) under the HSR Act shall have expired or otherwise been terminated.

(e) **Corporate Documents.** Purchaser shall have received from Sellers certified copies of the resolutions duly adopted by the board of directors of each Seller approving the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby, and such resolutions shall be in full force and effect as of the Closing Date.

(f) **Ancillary Agreements.** Each of the Sellers shall have executed and delivered the Ancillary Agreements to which it is a party.

(g) **Consents; Governmental Approvals.** All Governmental Approvals, consents, Permits, authorizations, approvals and waivers which are listed on *Schedule 7.2(g)* hereto shall have been obtained.

(h) **Major Contracts.** The contracts listed on *Schedule 7.2(h)* shall: (i) be in full force and effect, (ii) have no material default thereunder by any Seller that is continuing at Closing (determined without giving effect to any amendment or waiver that expires on or after Closing) and (iii) concurrently with the Closing be assumed by Sellers and assigned to Purchaser pursuant to a Final Order of the Bankruptcy Court.

(i) **Satisfaction of Implementation Agreement Condition.** All of the Implementation Agreement Conditions, as in effect on the date of this Agreement (other than (x) the occurrence of the Closing, and (y) only if such condition has been waived by Verizon, 3(e)), shall have been satisfied or waived by all parties entitled to the benefit thereof.

1093038.30

## ARTICLE VIII.

### POST-CLOSING AGREEMENTS

**Section 8.1.    Assistance in Collection of Receivables.**  From and after the Closing, Purchaser shall provide Sellers with reasonable access to the books and records of the Business in order to assist Sellers in collecting any Receivables that constitute Excluded Assets.

**Section 8.2.    Mail.**  Sellers agree that after the Closing Purchaser and Purchaser's Affiliates shall have the right and authority to open all mail received by the Business, even if addressed to Sellers, for processing or prompt forwarding to Sellers to the extent related to Excluded Matters.

**Section 8.3.    Sums Received in Respect of Business.**  Sellers shall pay or cause to be paid over to Purchaser, promptly after the receipt thereof after the Closing Date, all sums received in respect or on account of the Purchased Assets other than the consideration received by Sellers as set forth in *Article II* hereof and other amounts paid to Sellers by Purchaser pursuant to this Agreement or the Ancillary Agreements.  Purchaser shall pay or cause to be paid to Sellers, promptly after the receipt thereof after the Closing Date, all sums received in respect or on account of the Excluded Assets.

**Section 8.4.    Further Assurances.**  In addition to the provisions of this Agreement, at any time and from time to time after the Closing, Sellers and Purchaser at the other party's reasonable request and without further consideration except as contemplated by the Transition Services Agreement, shall execute and deliver such further documents, and perform such further acts, as may be necessary in order to implement more effectively the transfer and conveyance of the Purchased Assets to Purchaser and the assumption of the Assumed Liabilities by the Purchaser on the terms herein contained, and to otherwise comply with the terms of this Agreement and consummate the transactions herein provided.

**Section 8.5.    Intellectual Property.**  After the Closing, except as provided in the Transition Services Agreement, Sellers shall not use, seek to register, register or authorize others to use, seek to register or register the Intellectual Property anywhere in the world and will not challenge Purchaser's right to use, seek to register or register the Intellectual Property anywhere in the world.

**Section 8.6.    Transition Services Agreement.**  After the Closing, Sellers and Purchaser shall perform their respective obligations under the Transition Services Agreement.

### ARTICLE IX.

### THE CLOSING

**Section 9.1.    The Closing.**  The Closing of the transactions contemplated hereby (the "*Closing*") shall be held within one (1) Business Day after each of the conditions precedent set forth in *Article VII* (except those conditions which by their nature cannot be satisfied or waived until the Closing and subject to satisfaction of such conditions at the Closing) have been satisfied or waived, or at such other time as Genuity and Purchaser shall agree in writing (the

1093038.30

"*Closing Date*"). The Closing shall be held at the offices of Willkie Farr & Gallagher, 787 Seventh Avenue, New York, New York 10019 or at such other place as Genuity and Purchaser shall agree. At the Closing, all of the transactions provided for in *Article II* hereof shall be consummated on a substantially concurrent basis.

**Section 9.2.    Deliveries by Sellers at the Closing.** At the Closing, Sellers shall deliver, or cause to be delivered, to Purchaser the following items:

(a)    the duly executed officer's certificates referred to in *Sections 7.2(a)* and *7.2(b)*;

(b)    the corporate documents required by *Section 7.2(e)*;

(c)    the Ancillary Agreements and such other executed assignments, each dated the Closing Date, as are reasonably necessary to transfer to Purchaser all of Sellers' right, title and interest in, to and under the Purchased Assets purchased at the Closing, including duly executed assignments for all Intellectual Property constituting Purchased Assets in customary form reasonably acceptable to Purchaser (the "*Intellectual Property Assignment Agreement*");

(d)    the items listed on Schedule 7.2(g);

(e)    title to the Owned Real Property by recordable special warranty (or the equivalent in the state in which the Owned Real Property is located) deeds (together with all applicable transfer tax forms);

(f)    a certificate that no Seller is a foreign person within the meaning of Section 1445 of the Code, which certificate shall set forth all information required by, and otherwise be executed in accordance with, Treasury Regulation Section 1.1445-2(b);

(g)    all other previously undelivered documents that Sellers are required to deliver to Purchaser pursuant to this Agreement or the Ancillary Agreements;

(h)    such other instruments and documents as are reasonably necessary in connection with the transactions contemplated by this Agreement; and

(i)    physical possession and control of the Purchased Assets as soon thereafter as possible.

**Section 9.3.    Deliveries by Parent and Purchaser at the Closing.** At the Closing, Purchaser shall deliver, or cause to be delivered, to Sellers, the following items:

(a)    the duly executed officer's certificates referred to in *Sections 7.1(a)* and *7.1(b)*;

(b)    the corporate documents required by *Section 7.1(e)*;

(c)    the Ancillary Agreements and such other executed assumptions, each dated the Closing Date, as are reasonably necessary to transfer to Purchaser and have Purchaser assume the Assumed Liabilities being assumed by Purchaser at the Closing;

(d)    such other instruments and documents as are reasonably necessary in connection with the transactions contemplated by this Agreement; and

(e)    the amount in immediately available funds to be paid to Sellers pursuant to *Section 2.5(b)(ii)*.

## ARTICLE X.

## INDEMNIFICATION

**Section 10.1. Survival.**  All of the representations and warranties of Sellers contained in *Article III* of this Agreement or in any certificate delivered by Sellers pursuant to this Agreement and the covenants of Sellers contained in *Sections 5.1, 5.2, 5.4, 5.5 5.7, 6.7, 6.8* and *13.4* (the "*Limited Survival Covenants*") and all of the representations and warranties of Purchaser contained in this Agreement shall survive the Closing until the date that is nine months after the Closing Date.  Notwithstanding the foregoing, any notice given in accordance with *Section 13.1* of this Agreement claiming an alleged breach of any representation, warranty or Limited Survival Covenant hereunder shall without further action extend the survival period for the representation, warranty or Limited Survival Covenant alleged to have been breached as applied to the circumstances set forth in such notice until immediately after the final resolution of the matter.  All covenants and agreements of Sellers (other than the Limited Survival Covenants) and of Purchaser contained in this Agreement shall survive the Closing.

### Section 10.2. Indemnification Provisions for Benefit of Purchaser.

(a)    Subject to *Section 10.5*, in the event any Seller breaches any of its representations, warranties or covenants contained in this Agreement or Ancillary Agreements or in any certificate delivered by any Seller pursuant to this Agreement or Ancillary Agreements and provided that, as to any claim for breach of representation or warranty or of Limited Survival Covenants, Purchaser makes a written claim for indemnification against Sellers within the applicable survival period, then Sellers shall jointly and severally indemnify Purchaser and its Affiliates from and against all Damages Purchaser and its Affiliates suffer resulting from or arising out of, relating to or caused by such event; *provided, however,* that:  (i) Sellers shall not have any obligation to indemnify Purchaser for the first $2.5 million of Damages resulting from the breach of any representation or warranty of Sellers contained in *Article III* of this Agreement or in any certificate delivered by any Seller pursuant to this Agreement, and no such indemnity shall be payable until Purchaser has suffered aggregate Damages, by reason of all such breaches in excess of $5 million, and (ii) Sellers shall not have any obligation to indemnify Purchaser from and against any Damages resulting from the breach of any representation or warranty of Sellers contained in *Article III* of this Agreement or of any covenant contained in *Section 5.1* in excess of the Escrowed Funds (the "*Cap*").

(b)      Without limiting the generality or effect of the foregoing, Sellers shall indemnify, defend and hold harmless Purchaser and its Affiliates from and against any and all Damages resulting from or arising out of any Excluded Liability or any claim by a Third Party for payment of an Excluded Liability.

(c)      The Indemnification provided for in this *Section 10.2* shall not be limited by any investigation at any time made by or on behalf of Purchaser or Parent or any knowledge or information that Purchaser or Parent may have.

### Section 10.3.  Indemnification Provisions for Benefit of Sellers.

(a)      Subject to *Section 10.5*, in the event Purchaser breaches any of its representations, warranties or covenants contained in this Agreement or any Ancillary Agreement or in any certificate delivered by Purchaser pursuant to this Agreement or any Ancillary Agreement and provided that, as to any claim for breach of representation or warranty, Sellers make a written claim for indemnification against Purchaser within the applicable survival period, then Purchaser shall indemnify Sellers and their Affiliates from all Damages Sellers suffer resulting from or arising out of, relating to or caused by such event.

(b)      Without limiting the generality or effect of the foregoing, Purchaser shall indemnify, defend and hold harmless Sellers and their Affiliates from and against any and all Damages resulting from or arising out of any Assumed Liability or any claim by a Third Party for payment of an Assumed Liability.

### Section 10.4.  Matters Involving Third Parties.  Subject to *Section 6.4(c)*, *(d)* and *(e)*:

(a)      If any third party notifies any party hereto (the "*Indemnified Party*") with respect to any matter which may give rise to a claim for indemnification against the other party hereto (the "*Indemnifying Party*") under this *Article X*, then the Indemnified Party shall use reasonable efforts to notify the Indemnifying Party thereof promptly and in any event within ten (10) days after receiving any written notice from a third party; provided, however, that no delay on the part of the Indemnified Party in notifying the Indemnifying Party shall relieve the Indemnifying Party from any obligation hereunder unless, and then solely to the extent that, the Indemnifying Party is actually prejudiced thereby.

(b)      Once the Indemnified Party has given notice of the matter to the Indemnifying Party, the Indemnified Party may, subject to the Indemnifying Party's rights to assume the defense of such matter pursuant to paragraph *(c)* below, defend against the matter in any manner it deems appropriate.  The Indemnified Party shall keep the Indemnifying Party informed as to the status of such actions.

(c)      The Indemnifying Party may at any point in time choose to assume the defense of all of such matter if:

(i)      the Indemnifying Party provides evidence reasonably satisfactory to the Indemnified Party of its ability to provide the indemnification required

46

1093038.30

pursuant to this *Article X*, which shall be deemed satisfied if the amount of the Escrowed Funds, less the amount of pending claims against the Escrow Funds, is greater than the amount at issue;

(ii)    in the case where Purchaser is the Indemnified Party, the Purchaser does not notify the Indemnifying Party following a request by the Indemnifying Party to assume the defense of the matter that in Purchaser's reasonable judgment the Damages to which Purchaser is exposed exceed the Cap; and

(iii)    there are no legal defenses available to the Indemnified Party that are different from or additional to those available to the Indemnifying Party.

(d)    Upon assumption of the defense by the Indemnifying Party:

(i)    the Indemnifying Party shall defend the Indemnified Party against the matter with counsel of its choice reasonably satisfactory to the Indemnified Party,

(ii)    the Indemnified Party may retain separate counsel at its sole cost and expense (except that the Indemnifying Party shall be responsible for the fees and expenses of one separate co-counsel for all Indemnified Parties to the extent the Indemnified Party is advised, in writing by its outside counsel, that either (x) the counsel the Indemnifying Party has selected has a conflict of interest, or (y) there are legal defenses available to the Indemnified Party that are different from or additional to those available to the Indemnifying Party),

(iii)    the Indemnifying Party shall reimburse the Indemnified Party for the reasonable costs of defense or investigation for the period prior to the assumption of the defense, and

(iv)    The Indemnified Party shall make available to the Indemnifying Party and its attorneys and accountants all books and records of the Indemnified Party relating to such proceedings or litigation and the parties agree to render to each other such assistance as they may reasonably require of each other in order to ensure the proper and adequate defense of any such action or proceeding.

(e)    Assumption of the defense of any matter by the Indemnifying Party shall without further action constitute an irrevocable waiver by the Indemnifying Party of its right to claim at a later date that such third party action for which the defense was assumed is not a proper matter for indemnification pursuant to this *Article X*.

(f)    The Indemnified Party shall not consent to the entry of a judgment or enter into any settlement with respect to any matter which may give rise to a claim for indemnification without the written consent of the Indemnifying Party, which consent may not be unreasonably withheld or delayed; provided, however, that if the Indemnifying Party has failed to provide indemnification required to be provided pursuant to this *Article X* for twenty (20) days after a request therefor, then the

47

Indemnified Party may take any such action without the consent of the Indemnifying Party.

(g)    The Indemnifying Party shall not consent to the entry of a judgment with respect to any matter which may give rise to a claim for indemnification or enter into any settlement which does not include a provision whereby the plaintiff or claimant in the matter releases the Indemnified Party from all liability with respect thereto, without the written consent of the Indemnified Party (not to be unreasonably withheld or delayed).

### Section 10.5.    Certain Additional Provisions Relating to Indemnification.

(a)    The indemnification provisions set forth in this *Article X* shall only apply after the Closing Date, and after the Closing Date shall constitute the sole and exclusive recourse and remedy available to the parties hereto with respect to monetary damages for the breach of any representation, warranty, covenant or agreement contained in this Agreement or in any Ancillary Agreement or in any certificate delivered pursuant to this Agreement except for actual fraud.

(b)    Notwithstanding anything in this Agreement to the contrary, Purchaser's sole recourse for claims for breach of any representation or warranty of Sellers contained in *Article III* of this Agreement or covenant contained in *Section 5.1* shall be to the Escrowed Funds, except in the case of actual fraud, or as provided for in the next two sentences. Sellers shall directly pay to Purchaser any indemnification due pursuant to this *Article X* for all matters, other than claims for breach of any representation or warranty of Sellers contained in *Article III* or covenant contained in *Section 5.1*, and unless Purchaser expressly consents thereto in writing, such amounts shall not be payable from, or reduce the Escrowed Funds. In the event that any indemnification with respect to a matter other than a breach of any representation or warranty of Sellers contained in *Article III* of this Agreement or of any covenant contained in *Section 5.1* is paid from the Escrowed Funds, Sellers shall restore such amount to the Escrowed Funds by wire transfer of immediately available funds within three (3) Business Days.

(c)    Notwithstanding anything in this Agreement to the contrary, for purposes of this *Article X*, in determining the existence of a breach of any representation, warranty, covenant or agreement and the amount of Damages, no effect shall be given to any qualification as to materiality or Material Adverse Effect (other than qualifications contained in *Sections 3.5, 3.20(b), 3.20(c), 5.1(b)(i), 5.1(c)(ii), 5.1(d)(vi),* and *5.1(d)(vii),* and the first sentence of *Section 3.10(b),* clause *(xi)* of *Section 3.14(b)* and the first sentence of *Section 3.19*).

(d)    No indemnification shall be available to Purchaser for breach of any representation, warranty, covenant or agreement by Sellers to the extent such breach results in an Adjustment to the Purchase Price.

(e)    Pursuant to Bankruptcy Code Section 364(c)(1), the indemnification obligations of Sellers pursuant to this *Article X* shall receive superpriority administrative claim status. Pursuant to Bankruptcy Code Section 364(c)(1), the administrative claims

1093038.30

in respect of the indemnification obligations of Sellers pursuant to this *Article X* shall have priority over any and all administrative expenses of the kinds specified in Bankruptcy Code Sections 503(b), 506(c), 507(a) or 507(b).

(f)     All payments by an Indemnifying Party under *Article X* shall be treated as an adjustment to the Purchase Price for all foreign, federal, state and local income Tax purposes.

## ARTICLE XI.

## EMPLOYEES AND EMPLOYEE BENEFIT PLANS

### Section 11.1.     Employment.

(a)     **Schedule of Employees.**  Genuity shall deliver to Purchaser not later than fifteen (15) days after the date of this Agreement: (i) a complete and accurate schedule (the *"Business Employee Schedule"*) setting forth, as of such date, (x) the name and position of each Business Employee, (y) the annual base salary or hourly rate, as applicable, for each Business Employee, and (z) the date each Business Employee commenced employment with Genuity or any of its predecessors or any Seller or any of their predecessors, and (ii) copies of any employment agreements, retention agreements, stay bonus agreements, severance agreements and plans, and any similar policies, plans or agreements with respect to such Business Employees, including, without limitation, a copy of the Genuity Solutions Inc. Employee Retention Agreement between Genuity and each Business Employee dated as of July 1, 2002 (the *"Retention Agreement"*), for each such Business Employee.

(b)     **Offer to Hire.**  No later than the later of (x) five (5) days after the entry of the Sale Order, or (y) forty-five (45) days after receipt by Purchaser of the Business Employee Schedule, Purchaser shall (i) pursuant to a written offer letter (an *"Offer Letter"*) offer to hire, effective as of the Closing Date, such of the Business Employees set forth on the Business Employee Schedule as it may choose and (ii) deliver to Genuity a complete and accurate schedule (the *"Business Employee Offeree Schedule"*) setting forth the name and title of each Business Employee who Purchaser has offered to hire (each such Business Employee, a *"Business Employee Offeree"*), and (A) the proposed annual base salary or hourly rate, as applicable, for each Business Employee Offeree, (B) the proposed job title of each such Business Employee Offeree as an employee of Purchaser, and (C) the primary geographical location where each Business Employee Offeree is expected to perform the duties of his or her employment with Purchaser. Purchaser shall promptly provide Genuity with a copy of each Offer Letter.  Those Business Employee Offerees who accept Purchaser's offer of employment are referred to as the *"Transferred Employees."*  Other than with respect to its obligations to be performed prior to the Closing Date under *Section 11.1(b)* and *(c)*, and those set forth in *Section 11.6*, Purchaser shall have no liability or obligation whatsoever with respect to (i) any Business Employee Offeree until such time as such Business Employee Offeree accepts Purchaser's offer of employment and  commences employment with Purchaser or an Affiliate of Purchaser or (ii) any Business Employee, including any Business

1093038.30

Employee Offeree, who is not a Transferred Employee. Purchaser shall deliver to Genuity not later than fifteen (15) days subsequent to the Closing Date a complete and accurate schedule setting forth, as of the Closing Date, the name, title and primary geographical work location of each Transferred Employee.

(c)    **Terms of Employment.** Purchaser shall not assume any Employee Benefit Plan or any other plan, program or arrangement, and, except as expressly provided in this *Article XI*, the terms of a Transferred Employee's employment with the Purchaser (or an Affiliate) after the Closing shall be upon such terms and conditions as Purchaser, in its sole discretion, shall determine. Purchaser shall grant each Transferred Employee all service credit with Sellers (based on the employment commencement date set forth in Business Employee Schedule), for purposes of eligibility and participation in the benefit plans, programs and arrangements (including, without limitation, the vacation policy and, subject to *Section 11.3(a)*, the severance plan) of Purchaser. Upon request of Purchaser, Sellers shall provide Purchaser access to and provide data (including computer data) regarding employment information concerning the Business Employees and, subject to applicable Legal Requirements, such other personnel records as Purchaser may reasonably request.

**Section 11.2.    Health and Welfare Benefits for Transferred Employees.**
Effective on the Closing Date, Purchaser shall provide the Transferred Employees with health and welfare benefits on the same basis as similarly situated employees of Parent or of Purchaser (or an Affiliate of Parent), as determined by Parent, as of the Closing Date; provided, however, that Purchaser reserves the right to modify or terminate such benefits and its benefit plans and programs from time to time, to the extent not inconsistent with *Section 11.3*. The Transferred Employees shall participate under Purchaser's medical and dental plans as of the Closing Date, such participation shall be without any waiting periods, evidence of insurability or application of any preexisting physical or mental condition restrictions, except to the extent applicable under Sellers' Employee Welfare Benefit Plans.

**Section 11.3.    Certain Additional Provisions Relating to Severance and Retention Bonuses for Transferred Employees.**

(a)    **Severance.**

(i)    As a condition to Purchaser's offer of employment to each Business Employee Offeree, such Business Employee Offeree shall be required to waive the payment (such waiver to be effective as of the Closing Date), of any benefits under the Genuity Inc. 2002 Severance Benefit Plan (as such plan was in effect on October 23, 2002, the "*Genuity Severance Plan*"). A copy of the Genuity Severance Plan as in effect on October 23, 2002, is attached hereto as *Schedule 11.3*.

(ii)    In the event that during the twelve month period following the Closing Date, the employment of any Transferred Employee (excluding any Transferred Employee whose employment agreement is listed on Item 2 of *Schedule 1.1*) terminates (the effective date of such termination being referred to

50

1093038.30

as the "*Transferred Employee Termination Date*") such that he or she would have been entitled to severance benefits under the Genuity Severance Plan had such Transferred Employee remained an employee of Genuity until the Transferred Employee Termination Date and the employment of such Transferred Employee with Genuity terminated as of the Transferred Employee Termination Date (disregarding the waiver described in *Section 11.3(a)(i)*), then Purchaser shall, pursuant to a severance plan sponsored and maintained by Purchaser that provides for lump sum severance benefits that are no less favorable than the severance benefits provided under the Genuity Severance Plan, pay to such Transferred Employee as lump sum severance an amount equal to the severance amount such Transferred Employee would have been entitled to receive under the Genuity Severance Plan assuming the Genuity Severance Plan had remained in effect (including an amount equal to the costs associated with financial planning and outplacement services, plus an amount equal to the greater of (x) the cost of continuation coverage under Purchaser's medical and dental plans for each such Transferred Employee's severance period less the Transferred Employee's cost for such coverage based on (A) the medical and dental plan elections in place under Purchaser's plans for such Transferred Employee on the date immediately prior to such Transferred Employee's termination of employment, and (B) such Transferred Employee's title or color "band" as provided in the Genuity Severance Plan, and (y) the cost of such continuation coverage under COBRA for the severance period (as determined pursuant to clause (B)), plus in either case an amount equal to the income taxes that would be payable with respect to such greater amount utilizing the top marginal bracket for federal and state income taxes) less the Employee's portion of the premium for such coverage); provided that no severance benefits will be paid unless and until the terminated Transferred Employee executes and delivers to Parent a valid and binding waiver and release of all claims against Parent and its Affiliates, and their respective employees, officers, directors, shareholders, representatives, agents, attorneys and advisors and their successors, within a reasonable time period specified by Parent, and the revocation period set forth in such release has expired.

(b)    **Retention Payments**.

(i)    In connection with Purchaser's offer of employment to the Business Employee Offerees (including for this purpose any person whose employment agreement is listed on Item 2 of *Schedule 1.1*), such Business Employee Offerees shall be required to waive the payment from the Sellers, as of the Closing Date, of twenty-five percent (25%) of the aggregate benefits payable under such Business Employee Offeree's Retention Agreement.

(ii)    With respect to any Transferred Employee who waives the payment, as of the Closing Date, of twenty-five percent (25%) of the aggregate benefits under such Transferred Employee's Retention Agreement, the terms of such Transferred Employee's Offer Letter shall include Purchaser's obligation to pay a retention bonus of equal amount payable within fifteen (15) days of

51

June 30, 2003, subject to the conditions set forth in such Transferred Employee's Retention Agreement.

**Section 11.4.     Terms of Offer Letters.**   Each Offer Letter shall include terms substantially as provided in *Sections 11.1(b)*, and *11.3*.

**Section 11.5.     WARN Act Compliance.**   Prior to the Closing Date, Sellers and their Affiliates shall comply in all material respects with the requirements of the WARN Act (including reliance on provisions of the WARN Act that serve to reduce the notification period), and shall indemnify and hold Purchaser and its Affiliates harmless from and against any and all Liabilities that Purchaser and its Affiliates may incur by reason of any noncompliance by Sellers with the WARN Act.   Prior to the Closing Date, Genuity shall notify Purchaser in writing of every employment termination from Sellers' single sites of employment at which the Business is conducted, including, without limitation, terminations that may under the WARN Act be a basis for imposing WARN Act liability against Sellers.

**Section 11.6.     Plan Liabilities.**   Purchaser shall not assume any Liability for any Employee Benefit Plan maintained, sponsored by or contributed to by any Sellers or their Affiliates covering current or former Business Employees.   Sellers or their Affiliates shall be responsible for providing continuation coverage under its Employee Welfare Benefit Plans for the Employees of Sellers and any other employees or former employees of Sellers, as required by Section 4980B of the Code and Part 6 of Title I of ERISA and the regulations thereunder (together "*COBRA*"), or any relevant benefit continuation requirements under applicable Legal Requirements; provided that if at any time following the Closing Date, Sellers and each other entity (other than Purchaser and its Affiliates) which together with any Seller would be considered an "employer" for purposes of COBRA, cease altogether to provide a "group health plan" (as defined in COBRA), Purchaser shall, commencing on the date of such cessation, provide group health plan continuation coverage pursuant to COBRA under the corresponding group health plan of Purchaser (or an Affiliate) to employees of Sellers and their subsidiaries and former employees of Sellers and their subsidiaries and their "qualified beneficiaries" (as defined in COBRA), whether or not such coverage is required under COBRA.   The duration of the coverage provided by Purchaser to such employees of Sellers and their subsidiaries, former employees of Sellers and their subsidiaries and their qualified beneficiaries shall be the period described under Treasury Regulation Section 54.4980B-7.   Sellers shall use commercially reasonable efforts to give Purchaser sufficient prior written notice of the termination of any Employee Benefit Plan under which employees or former employees of Sellers and their subsidiaries receive medical plan continuation coverage or the occurrence of any other qualifying event that shall result in any qualified beneficiary of any Seller or any subsidiary of any Seller having the right to elect COBRA to permit Purchaser to deliver to any such qualified beneficiary appropriate election materials necessary to commence receipt of COBRA continuation coverage immediately upon the occurrence of such event.   Except with respect to the obligations of Purchaser described in this *Article XI*, Sellers shall be solely responsible for, and Sellers shall indemnify Purchaser against, any and all Liabilities of Sellers which have arisen or may arise in connection with the Employee Benefit Plans, any and all Liabilities of Sellers that have arisen or may arise in any way from the employment by Sellers of, or the compensation or benefits provided by Sellers to, any Business Employee, former Business Employee or other present or former employee of Sellers, or the termination thereof, including, without limitation, any

52

1093038.30

Liability arising out of or relating to any act or omission by Sellers, any violation of or non-compliance with or obligation arising under any applicable Legal Requirement respecting employment and the termination thereof based on any act or omission by Sellers, compensation or benefits, and any and all Liabilities for severance pay (except as contemplated by *Section 11.3(a)*), accrued vacation pay, sick pay and other benefits relating to any period of employment with Sellers, whether arising as a matter of contract, Legal Requirements or otherwise.

        **Section 11.7.    No Employee Rights**.  Notwithstanding anything herein to the contrary (but subject to the proviso contained in this *Section 11.7*), no provision of this *Article XI* will create any third party beneficiary or other rights in any Business Employee, former Business Employee, or other present or former employee including any dependent, survivor or beneficiary thereof, of Sellers in respect of employment (or resumed employment) with Purchaser and no provision of *Article XI* shall create any such rights in any such persons in respect of any benefits that may be provided, directly or indirectly, under any employee benefit plan or arrangement which may be established or made available by Purchaser to the Transferred Employees; provided that the foregoing shall not diminish or impair the rights and remedies of a Transferred Employee under an Offer Letter, which has been executed and delivered by the parties thereunder as contemplated herein.

## ARTICLE XII.

## TERMINATION

        **Section 12.1.  Termination**.  Anything in this Agreement to the contrary notwithstanding, this Agreement and the transactions contemplated hereby may be terminated in any of the following ways at any time before the Closing and in no other manner:

        (a)    By mutual written consent of Purchaser and Genuity.

        (b)    By Purchaser upon five (5) Business Days notice if, at or before the Closing Date, satisfaction of any condition set forth in *Section 7.2* is or becomes impossible (other than through the breach by Purchaser of any of its representations or warranties or the failure of Purchaser to perform any of its obligations pursuant to this Agreement) and Purchaser shall not have waived such condition in writing at or before the Closing Date.

        (c)    By Sellers upon five (5) Business Days notice if, at or before the Closing Date, satisfaction of any condition set forth in *Section 7.1* is or becomes impossible (other than through the breach by Sellers of any of their representations or warranties or the failure of Sellers to perform any of their obligations pursuant to this Agreement) and Sellers shall not have waived such condition in writing at or before the Closing Date.

        (d)    By Purchaser, immediately if any of the following shall have occurred:

        (i)    any Seller (A) agrees in writing, (B) publicly announces its intention, or (C) is authorized by its board of directors either (x) to proceed with an Alternative Transaction other than in accordance with the Bidding Procedures, irrespective of whether or not such Alternative Transaction is approved by the

Bankruptcy Court and/or consummated, or (y) not to sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an assets sale, stock sale, merger, reorganization or other similar transaction, all or a material portion of the Purchased Assets to Purchaser or a Third Party whether as a result of the proposal of a stand alone plan of reorganization or otherwise;

(ii)    the Bankruptcy Court approves an Alternative Transaction, or an Alternative Transaction is consummated;

(iii)    prior to the Closing, other than in accordance with the Bidding Procedures, any Seller files a motion with the Bankruptcy Court to approve a sale to a Third Party of all or any material portion of the Purchased Assets which under this Agreement are intended to be conveyed to Purchaser;

(iv)    prior to Closing, any Seller files with the Bankruptcy Court a plan of reorganization the form and content of which has not been approved by Purchaser;

(v)    the voluntary dismissal or conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

(vi)    either (x) the Sale Order is not entered by January 31, 2003, (y) the Sale Order is not a Final Order by February 14, 2003 (or if the Sale Order was entered in the ten (10) days prior to such date and no appeal has been perfected, eleven (11) days after the date the Sale Order was entered) or (z) the Bankruptcy Court shall have denied the Sale Motion; or

(vii)    either (x) the Settlement Agreement Order is not entered by January 31, 2003, (y) the Settlement Agreement Order is not a Final Order by February 14, 2003 (or if the Settlement Agreement Order was entered in the ten (10) days prior to such date and no appeal has been perfected, eleven (11) days after the date the Settlement Agreement Order was entered), or (z) the Bankruptcy Court shall have denied a motion seeking approval of the Settlement Agreement Order.

(e)    By Purchaser, immediately if any of the following shall have occurred:

(i)    Prior to the Closing Date the Bankruptcy Case is involuntarily dismissed;

(ii)    Sellers fail to commence the Bankruptcy Case within five (5) Business Days of the date of this Agreement;

(iii)    Sellers fail to file the Sale Motion or a motion seeking approval of the Settlement Agreement Order within five (5) Business Days of commencing the Bankruptcy Case; or

1093038.30

(iv)    Sellers fail to obtain the Bidding Procedures Order within twenty one (21) days following the commencement of the Bankruptcy Case.

(f)    After February 15, 2003 (or if both the Sale Order and Settlement Agreement Order were entered prior to such date (with at least one of such Orders being entered into in the ten (10) days prior to such date) and no appeal has been perfected, twelve (12) days after the date the last such Order was entered) by Purchaser or Sellers, if the Closing has not occurred on or before such date, provided that the right to terminate pursuant to this clause shall not be available to any party whose failure to perform any of its obligations under this Agreement has been the cause of or resulted in the failure of the Closing to occur on or before such date.

(g)    By Sellers if the Bankruptcy Court approves an Alternative Transaction.

**Section 12.2.  Effect of Termination; Expense Reimbursement; Breakup Fee.**

(a)    In the event this Agreement is terminated pursuant to *Section 12.1*, all further obligations of the parties hereunder shall terminate, except for the obligations set forth in the third sentence of *Section 5.2*, the second sentence of *Section 6.1(a)*, the last clause of *Section 6.1(b)*, this *Section 12.2* and *Article XIII* (to the extent applicable to the aforesaid surviving provisions), and except that nothing in this *Section 12.2* shall relieve any party hereto of any liability for the willful breach of any of the covenants or of any of the representations or warranties contained in this Agreement prior to such termination.

(b)    Upon the termination of this Agreement pursuant to *Section 12.1* other than pursuant to *Section 12.1(c)*, Purchaser may provide to Seller a reasonably detailed calculation of the actual out-of-pocket costs and expenses (including, without limitation, the reasonable and documented fees and expenses of its outside counsel) incurred by Purchaser in connection with its due diligence investigation of Sellers and the negotiation and execution of this Agreement and the transactions contemplated hereby and thereupon Sellers shall pay Purchaser in cash an amount equal to such costs and expenses (the "*Expense Reimbursement*"); provided, however, that in no event shall the Expense Reimbursement exceed $3 million less the amount previously paid pursuant to the Fee Reimbursement Letter as provided in *Section 13.5*.

(c)    Upon the termination of this Agreement (i) by Sellers pursuant to *Section 12.1(g)*; or (ii) at a time when Purchaser has the right to terminate this Agreement pursuant to (A) both *Section 12.1(b)* (by virtue of a breach of *6.7(d)* or *(e)*) and *12.1(d)(vi)* or *(vii)*, or (B) *Section 12.1(d)(i)* through *(v)*, Sellers shall concurrently with such termination pay Purchaser an amount in cash equal to $10 million (the "*Breakup Fee*") by wire transfer of immediately available funds to an account designated in writing by Purchaser.  If this Agreement is terminated at a time when Purchaser has the right to terminate this Agreement pursuant to *Section 12.1(d)(vi)* or *(vii)* (but is not entitled to immediate payment of the Breakup Fee) and within six months after such termination Sellers enter into an agreement with respect to a Superior Transaction, then upon consummation of such Superior Transaction (or a similar Superior Transaction with the original counterparty to such Superior Transaction) whether during or after such six

55

month period, Sellers shall pay Purchaser an amount in cash equal to the Breakup Fee by wire transfer of immediately available funds to an account designated in writing by Purchaser. In no event shall more than one Breakup Fee be payable.

(d)    Purchaser and Sellers hereby agree that the Expense Reimbursement and the Breakup Fee: (i) are not a penalty, but rather, are a reasonable estimate of the damages to be suffered by Purchaser in the event the transactions contemplated by this Agreement are not consummated under the circumstances set forth herein, (ii) are a necessary inducement for Purchaser to propose the transactions contemplated by this Agreement and (iii) shall be the sole remedy of Purchaser for breach of this Agreement (other than non-payment of the Expense Reimbursement) if this Agreement is terminated under circumstances where the Breakup Fee is payable.

## ARTICLE XIII.

## MISCELLANEOUS PROVISIONS

**Section 13.1.  Notices**.  All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when delivered personally to the recipient, (b) one (1) Business Day after the date when sent to the recipient by reputable express courier service (charges prepaid), or (c) seven (7) Business Days after the date when mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid. Notice by Purchaser to Genuity shall be deemed to be notice to all Sellers. Such notices, demands and other communications shall be sent to Sellers and to Purchaser at the addresses indicated below:

If to any Seller:                    Genuity Inc.
                                     225 Presidential Way
                                     Woburn, MA 01801
                                     Attention:  General Counsel


With a copy to:                      Skadden, Arps, Slate, Meagher & Flom LLP
(which shall not                     Four Times Square
constitute notice)                   New York, NY 10036-6522
                                     Attention:  J. Gregory Milmoe, Esq.

                                     and

1093038.30

Skadden, Arps, Slate, Meagher & Flom LLP
One Beacon Street
Boston, MA 02108-3194
Attention: Kent A. Coit, Esq.

If to Purchaser:                Level 3 Communications, LLC
                                c/o Level 3 Communications, Inc.
                                1025 Eldorado Boulevard
                                Broomfield, CO  80021
                                Attention: General Counsel

With a copy to:                 Willkie Farr & Gallagher
(which shall not                787 Seventh Avenue
constitute notice)              New York, New York 10019
                                Attention: John S. D'Alimonte, Esq.

or to such other address as either party hereto may, from time to time, designate in writing delivered pursuant to the terms of this Section.

Section 13.2. **Amendments.**  The terms, provisions and conditions of this Agreement may not be changed, modified or amended in any manner except by an instrument in writing duly executed by all of the parties hereto.

Section 13.3. **Assignment and Parties in Interest.**

(a)     Neither this Agreement nor any of the rights, duties, or obligations of any party hereunder may be assigned or delegated (by operation of law or otherwise) by either party hereto except with the prior written consent of the other party hereto; provided, however, that (i) prior to or after the Closing, Purchaser may assign all or any part of its rights hereunder to any Affiliate of Purchaser, provided that such assignment is subject to the restrictions of the Bankruptcy Code and no such assignment shall relieve Purchaser of its obligations hereunder, and (ii) after the Closing, Purchaser may assign all of its rights hereunder to any other Person which acquires all or substantially all of the assets of, or equity interest in, the Business.

(b)     This Agreement shall not confer any rights or remedies upon any person or entity other than the parties hereto and their respective permitted successors and assigns.

Section 13.4. **Announcements.**  All press releases, notices to customers and suppliers and similar public announcements prior to or within five days after the Closing Date with respect to this Agreement and the transactions contemplated by this Agreement shall be approved by both Purchaser and Genuity prior to the issuance thereof; provided that either party may make any public disclosure it believes in good faith is required by law, regulation or rule of any stock exchange on which its securities are traded (in which case the disclosing party shall

1093038.30

use reasonable efforts to advise the other party prior to making such disclosure and to provide the other party a reasonable opportunity to review the proposed disclosure).

   **Section 13.5. Expenses.** Upon entering into this Agreement, Genuity shall pay to Purchaser all amounts payable to Purchaser under the Fee Reimbursement Letter through the date hereof and all further obligations of the parties under such letter shall terminate. After the date hereof, except as otherwise expressly set forth in this Agreement, each party to this Agreement shall bear all of its legal, accounting, investment banking, and other expenses incurred by it or on its behalf in connection with the transactions contemplated by this Agreement, whether or not such transactions are consummated.

   **Section 13.6. Entire Agreement.** This Agreement (including the Ancillary Agreements and the Exhibits and Schedules attached hereto and thereto) constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, supersedes and is in full substitution for any and all prior agreements and understandings among them relating to such subject matter, including, without limitation, the Fee Reimbursement Letter, and no party shall be liable or bound to the other party hereto in any manner with respect to such subject matter by any warranties, representations, indemnities, covenants, or agreements except as specifically set forth herein. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

   **Section 13.7. Descriptive Headings.** The descriptive headings of the several sections of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any of the provisions hereof.

   **Section 13.8. Counterparts.** For the convenience of the parties, any number of counterparts of this Agreement may be executed by any one or more parties hereto, and each such executed counterpart shall be, and shall be deemed to be, an original, but all of which shall constitute, and shall be deemed to constitute, in the aggregate but one and the same instrument.

   **Section 13.9. Governing Law; Venue.**

   (a) This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed therein and the Bankruptcy Code, to the extent applicable.

   (b) Any proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought against any of the parties in the courts of the State of New York, County of New York, or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

   (c) During the pendency of the Bankruptcy Case any Proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may only be brought against any of the parties in the Bankruptcy Court, and each of the parties

consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

(d)    Process in any Proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

Section 13.10.    Construction.    The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of construction shall be applied against any party.    Any references to any Legal Requirement shall also refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.    Unless otherwise specifically stated: (a) a term has the meaning assigned to it by this Agreement; (b) including means "including but not limited to"; (c) "or" is disjunctive but not exclusive; (d) words in the singular include the plural, and in the plural include the singular; (e) provisions apply to successive events and transactions; (f) "$" means the currency of the United States of America; and (g) "written" or "writing" includes "e-mail" and other similar forms of electronic communication.

Section 13.11.    Severability.    In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by Legal Requirements, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any other such instrument.    Furthermore, in lieu of any such invalid or unenforceable term or provision, the parties hereto intend that there shall be added as a part of this Agreement a provision as similar in terms to such invalid or unenforceable provision as may be possible and be valid and enforceable.

Section 13.12.    Specific Performance.    Without limiting or waiving in any respect any rights or remedies of Purchaser under this Agreement now or hereinafter existing at law or in equity or by statute, each of the parties hereto shall be entitled to seek specific performance of the obligations to be performed by the other in accordance with the provisions of this Agreement.

Section 13.13.    Ancillary Agreements.    To the extent the provisions of any Ancillary Agreement conflict with the provisions of this Agreement, the provisions of this Agreement shall control.

Section 13.14.    Genuity Acting on Behalf of Sellers.    For all purposes hereunder (including performance of obligations), except where the context expressly requires otherwise, Genuity may act on behalf of, and Purchaser shall accept performance by, and may tender performance to, Genuity on behalf of, any and all Sellers.    Unless otherwise directed by Sellers in writing to Purchaser, the payment of money by Purchaser to Genuity shall be deemed a payment of money by Purchaser to Sellers as their interests may appear.

[Remainder of page intentionally left blank.]

59

      IN WITNESS WHEREOF, Sellers, Purchaser and Parent have executed and delivered this Agreement as of the day and year first written above.

GENUITY INC.

By: _____
    Name: Paul R. Gudonis
    Title: Chief Executive Officer

GENUITY INTERNATIONAL INC.

By: _____
    Name: Daniel P. O'Brien
    Title: Vice President and Chief Financial Officer

GENUITY INTERNATIONAL
  NETWORKS INC.

By: _____
    Name: Daniel P. O'Brien
    Title: Executive Vice President and Chief Financial
        Officer

GENUITY SOLUTIONS INC.

By: _____
    Name: Daniel P. O'Brien
    Title: Executive Vice President and Chief Financial
        Officer

GENUITY TELECOM INC.

By: _____
    Name: Daniel P. O'Brien
    Title: Vice President and Chief Financial Officer

GENUITY EMPLOYEE HOLDINGS LLC

By: _____
    Name: Daniel P. O'Brien
    Title: Manager

t093038.30

LEVEL 3 COMMUNICATIONS, LLC

By: _____
     Name:
     Title:

LEVEL 3 COMMUNICATIONS, INC.

By: _____
     Name:
     Title:

## EXHIBIT A

"*Adjustment Report*" shall have the meaning set forth in *Section 2.6*.

"*Adjustments*" shall have the meaning set forth in *Section 2.4*.

"*Affiliate*" means "affiliate" as defined in Rule 405 promulgated under the Securities Act; provided, however, in no event shall Verizon or its subsidiaries be deemed an Affiliate of any Seller.

"*Agreement*" shall have the meaning set forth in the preamble, and shall include all Schedules and Exhibits hereto.

"*Allegiance Payment*" means the payment of $35 million due on or about February 1, 2003 pursuant to the Integrated Network Solution Purchase Agreement between Genuity and Allegiance Telecom Company Worldwide.

"*Alternative Transaction*" means any one of the following transactions with or by a Third Party: (a) a merger, consolidation or similar transaction involving any Seller, or (b) a sale, lease or other disposition directly or indirectly by merger, consolidation, tender offer, share exchange or otherwise of assets of Sellers representing 5% or more of the consolidated assets of Sellers, excluding the Excluded Matters; provided, however, that as used in *Article XII*, the phrase "representing 5% or more of" in the foregoing clause (b) shall be replaced with the words "constituting a majority of."

"*Ancillary Agreements*" means, collectively, the Transition Services Agreement, the Assumption Agreement, the Bill of Sale, the Escrow Agreement and the Intellectual Property Assignment Agreement.

"*Annualized Recurring Revenues*" is intended to reflect the annualized "run rate" of revenue of Sellers as of the Closing Date for both the Business and Excluded Matters, and means the product of (a) the sum, without duplication, of (x) Genuity's consolidated revenues attributable to the Customer Contracts in effect as of the date hereof determined in accordance with GAAP Consistency and the Company's accounting practices as of the date hereof for the last two full calendar months ending prior to the Closing Date, and (y) with respect to Customer Contracts or service orders entered into after the date hereof, having a term through at least June 30, 2003, two times the amount of the monthly recurring revenue with respect to such Customer Contract or service orders; excluding, however, in the case of (x) and (y), (i) revenues attributable to any Customer Contract or service order thereunder (other than (A) a Customer Contract subject to a Lapse Request, (B) a Customer Contract which has lapsed or terminated as a result of Purchaser having delivered to Sellers a Lapse Request with respect to such Customer Contract (it being understood and agreed that for purposes of this definition the monthly recurring revenues attributable to such Customer Contract for the last two full calendar months prior to such lapse or termination shall be included) and (C) a Customer Contract with Purchaser or its Affiliates) for which a notice of termination or cancellation has been given whether at or before the Closing Date, (ii) one-time, extraordinary, or non-recurring revenues,

A-1

1093038.30

(iii) revenues recognized as a result of cancellation of Contracts, and (iv) voice revenues including VOIP revenues in excess of $2,295,000 and (b) six.

"*AOL*" means America Online, Inc.

"*Arbiter*" shall have the meaning set forth in *Section 2.6(c)*.

"*Assessment Date*" means with respect to each Governmental Agency that imposes Property Taxes, the calendar date as of which the value of the real or personal property is fixed for purposes of determining the amount of the Property Tax. The Assessment Date for certain States is set forth in *Schedule 1.7*.

"*Assumed Contracts*" means the Contracts to which any Seller is a party, which are: (a) set forth on *Schedule 1.1*, (b) Assumed Customer Contracts, or (c) Undesignated Agreements and Underlying Service Agreements which Purchaser elects, in writing, in accordance with this Agreement, to assume on or prior to the Election Date.

"*Assumed Customer Contract*" shall have the meaning set forth in *Section 2.8*.

"*Assumed Leases*" means the Leases to which any Seller is a party, which are: (a) set forth on *Schedule 1.2*, or (b) Undesignated Agreements and Underlying Service Agreements which Purchaser elects, in writing, in accordance with this Agreement, to assume on or prior to the Election Date.

"*Assumed Liabilities*" means only the following Liabilities of Sellers relating to the Business: (a) with respect to Assumed Contracts and Assumed Leases, any Liability arising with respect to the performance after the Assumption Date of the Assumed Contracts and the Assumed Leases, excluding any Liability resulting from any breach thereof by any Seller on or prior to the Assumption Date, (b) any Liability arising after the Closing Date in connection with the operation of the Business or the ownership of the Purchased Assets by Purchaser, (c) Straddle Period Property Taxes to the extent provided in *Section 6.4(a)*, (d) the Allegiance Payment and the Verizon Payment, in each case only to the extent the Purchase Price has been reduced with respect thereto pursuant to *Section 2.5(b)(ii)* and (e) service credits pursuant to service level agreements that constitute Assumed Customer Contracts, only to the extent that the amount of such service credits results in an Adjustment pursuant to *Section 2.4(b)*, in each case excluding Excluded Liabilities.

"*Assumption Agreement*" means the Assumption Agreement to be executed at Closing by Purchaser, in the form attached hereto as *Exhibit B*.

"*Assumption Date*" means the date as of which an Assumed Contract, Assumed Lease or Assumed Customer Contract is assumed by a Seller in the Bankruptcy Case and assigned to the Purchaser pursuant to an Order of the Bankruptcy Court (which may be the Sale Order), in accordance with the terms of this Agreement. The Assumption Date with respect to the Assumed Contracts listed on *Schedule 1.1*, the Assumed Leases listed on *Schedule 1.2* and the Customer Contracts that are Assumed Customer Contracts as of the Closing Date, shall be the Closing Date.

A-2

"*Bankruptcy Cases*" shall have the meaning set forth in the Recitals hereto.

"*Bankruptcy Code*" shall have the meaning set forth in the Recitals hereto.

"*Bankruptcy Court*" shall have the meaning set forth in the Recitals hereto.

"*Base Price*" shall have the meaning set forth in *Section 2.3*.

"*Bidding Procedures Order*" shall have the meaning set forth in *Section 6.2(a)*.

"*Bill of Sale*" means the Bill of Sale to be executed at Closing by Sellers, in the form attached hereto as *Exhibit C*.

"*Breakup Fee*" shall have the meaning set forth in *Section 12.2*.

"*Building*" means the buildings owned by Sellers located at 225 and 235 Presidential Way, Woburn, MA 01801.

"*Business*" means the business operations conducted by the Sellers and their subsidiaries (other than Integra S.A. and its subsidiaries) on the date hereof, including the business of providing to customers Internet access, modem services, DSL aggregation, Web hosting, transport and value-added eBusiness services, which include virtual private network services, managed security services and VOIP services.

"*Business Day*" means a day, other than a Saturday or a Sunday, on which commercial banks are not required or authorized to close in the City of New York.

"*Business Employee Offeree*" shall have the meaning set forth in *Section 11.1(b)*.

"*Business Employee Offeree Schedule*" shall have the meaning set forth in *Section 11.1(b)*.

"*Business Employee Schedule*" shall have the meaning set forth in *Section 11.1(a)*.

"*Business Employees*" means all employees of Sellers who, on the applicable date primarily perform services for the Business.

"*Cap*" shall have the meaning set forth in *Section 10.2(a)*.

"*Circuit Service*" means colocation and telecommunications circuit service, including, without limitation, backhaul circuits, access aggregation circuits, managed modem access circuits, tail circuits, peering circuits, PRI circuits, and other offnet services.

"*Closing*" shall have the meaning set forth in *Section 9.1*.

"*Closing Date*" shall have the meaning set forth in *Section 9.1*.

1093038.30

"*COBRA*" shall have the meaning set forth in *Section 11.6*.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Commission*" shall have the meaning set forth in *Section 3.5*.

"*Confidentiality Agreement*" means that certain Confidentiality Agreement, dated as of August 23, 2002, between Level 3 Communications, Inc. and Genuity.

"*Contracts*" means all contracts, agreements, binding commitments, binding arrangements and instruments to which any Seller is a party and relating to the Business, including any tariffs under which Sellers purchase services.

"*Control Group*" means a controlled group of corporations of which any Seller is a member within the meaning of Section 414(b) of the Code, any group of corporations or entities under common control with any Seller within the meaning of Section 414(c) of the Code or any affiliated service group of which any Seller is a member within the meaning of Section 414(m) of the Code.

"*Cure Amounts*" means all amounts payable in order to effectuate, pursuant to the Bankruptcy Code, the assumption by the Sellers and the assignment to the Purchaser of any Assumed Contract or Assumed Lease.

"*Customer Contract*" shall have the meaning set forth in *Section 2.8*.

"*Customer Contract Election Date*" shall have the meaning set forth in *Section 2.8*.

"*Customer Contract Schedule*" shall have the meaning set forth in *Section 2.8*.

"*Damages*" means any losses, amounts paid in settlement, claims, damages, Liabilities, obligations, judgments and reasonable out-of-pocket costs (including, without limitation, costs of investigation or enforcement), expenses and attorneys' fees, including, without limitation, (i) any consequential damages or (ii) any special or punitive damages assessed against an Indemnified Party in a Third Party action.

"*Delay Cost*" means, without duplication, (a) if the Closing occurs on or prior to December 31, 2002, zero, (b) if the Closing occurs after December 31, 2002 and on or prior to January 31, 2003, the product of (i) $326,087, and (ii) the number of days after December 31, 2002 to and including the Closing Date, (c) if the Closing occurs after January 31, 2003 and on or prior to February 15, 2003, $10,108,697 plus the product of (i) $835,389 and (ii) the number of days after January 31, 2003 to and including the Closing Date, or (d) if the Closing occurs after February 15, 2003, $22,639,532 plus the product of (i) $1,309,302 and (ii) the number of days after February 15, 2003 to and including the Closing Date.

"*Election Date*" means the date which is three (3) months following the Closing Date; provided, however, with respect to any Undesignated Agreement that is first

1093038.30

identified to Purchaser after the Closing Date, the Election Date shall be no earlier than twenty (20) Business Days after Sellers deliver to Purchaser a true, correct and complete copy of the Undesignated Agreement.

"*Employee Benefit Plan*" means any Employee Pension Benefit Plan, Employee Welfare Benefit Plan, Multiemployer Plan, retirement, savings stock purchase, stock option, severance, employment, change-in-control, fringe benefit, collective bargaining, bonus, incentive, deferred compensation and all other employee benefit plans, agreements, programs, policies or other arrangements (whether or not subject to ERISA) as to which both (A) any employee or former employee of the Business has any present or future right to benefits, and (B) Sellers or any of their affiliates have any present or future Liability.

"*Employee Pension Benefit Plan*" shall have the meaning set forth in Section 3(2) of ERISA.

"*Employee Welfare Benefit Plan*" shall have the meaning set forth in Section 3(1) of ERISA.

"*Environmental Laws*" means any Legal Requirement relating to protection of human health, safety, the environment, and natural resources, including without limitation Hazardous Materials, drinking water, groundwater, wetlands, landfills, open dumps, storage tanks, underground storage tanks, solid waste, waste water, storm water runoff, waste emissions or wells. Without limiting the generality of the foregoing, the term will encompass each of the following statutes, and the regulations promulgated thereunder, in each case as in effect as of Closing: (a) the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (codified in scattered sections of 26 U.S.C., 33 U.S.C., 42 U.S.C. and 42 U.S.C. § 9601 *et seq.*, "*CERCLA*"); (b) the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*, "*RCRA*"); (c) the Hazardous Materials Transportation Act (49 U.S.C § 1801 *et seq.*, "*HMTA*"); (d) the Toxic Substances Control Act (15 U.S.C. § 2061 *et seq.*, "*TSCA*"); (e) the Clean Water Act (33 U.S.C. § 1251 *et seq.*); (f) the Clean Air Act and Amendments (42 U.S.C. § 7401 *et seq.*); (g) the Safe Drinking Water Act (21 U.S.C. § 349); 42 U.S.C. § 201 and § 300 *et seq.*); (h) the National Environmental Policy Act of 1969 (42 U.S.C. § 4321); (i) the Superfund Amendment and Reauthorization Act of 1986 (codified in scattered sections of 10 U.S.C., 29 U.S.C., 33 U.S.C. and 42 U.S.C., "*SARA*"); and (j) Title III of the Superfund Amendment and Reauthorization Act (42 U.S.C. § 11,001 *et seq.*).

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Escrow Agent*" means a financial institution acting as escrow agent pursuant to the Escrow Agreement, that is mutually acceptable to Purchaser and Sellers.

"*Escrow Agreement*" means the escrow agreement to be entered into by and among the Escrow Agent, Sellers and Purchaser as of the Closing Date substantially in the form of *Exhibit D* hereto.

"*Escrow Amount*" shall have the meaning set forth in *Section 2.5.*

"*Escrowed Funds*" means amounts on deposit with the Escrow Agent pursuant to the terms of the Escrow Agreement.

"*Estimated Severance Amount*" has the meaning set forth in *Section 2.5.*

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Agreements*" means (a) those Contracts and Leases listed on *Schedule 1.6,* (b) Excluded Customer Contracts, and (c) any Underlying Service Agreement or Undesignated Agreement that Sellers are not prohibited from rejecting in the Bankruptcy Case pursuant to *Section 2.11.*

"*Excluded Assets*" means, collectively:

(a)     any cash or cash equivalents of Sellers (including for this purpose all collected funds and items in the process of collection received in bank accounts associated with Seller through 11:59 p.m., New York Time, on the day prior to the Closing Date, but not including cash held in imprest petty cash accounts of Sellers);

(b)     all Receivables;

(c)     any marketable securities beneficially owned by any Seller as of the Closing Date;

(d)     all refunds of, or credits for, Taxes with respect to periods prior to the Closing Date, other than refunds of, or credits for, Taxes described in clause (k) of the definition of the term Purchased Assets;

(e)     any assets of any Employee Benefit Plan maintained by Sellers or any of their Affiliates;

(f)     any property, casualty, workers' compensation or other insurance policy or related insurance services contract relating to Sellers or any of their Affiliates and any rights of Sellers or any of their Affiliates under such insurance policy or contract, other than rights under such insurance policies or contracts with respect to any Assumed Liability or any casualty affecting any of the Purchased Assets or any asset that would have been a Purchased Asset in the absence of the casualty;

(g)     any rights of Seller under this Agreement and the Ancillary Agreements;

(h)     any assets, properties or rights of Sellers listed on *Schedule 1.3*;

(i)     any Contract that is not an Assumed Contract and any Lease that is not an Assumed Lease;

1093038.30

(j)    any books, records and information related primarily to any of the Excluded Assets or Excluded Liabilities; provided, however, Seller shall furnish Purchaser copies of such books and records to the extent they relate to Assumed Contracts, Assumed Leases, Assumed Liabilities or Purchased Assets;

(k)    all past, present or future claims, causes of action, choses in action and rights or actions by any Seller against third parties, except to the extent relating to the Assumed Contracts, the Assumed Leases, the Assumed Liabilities and the other Purchased Assets;

(l)    the capital stock or other equity interest of any Seller or any of its subsidiaries; and

(m)    such other assets of Sellers as Purchaser shall expressly elect prior to the Closing Date to be "Excluded Assets" pursuant to a written notice to Sellers at least two (2) Business Days before the Closing Date.

"*Excluded Customer Contract*" shall have the meaning set forth in *Section 2.8*.

"*Excluded Liabilities*" means all Liabilities of Sellers other than the Assumed Liabilities (for the avoidance of doubt, to the extent a Liability is listed as both an Assumed Liability and an Excluded Liability, such Liability shall constitute an Excluded Liability). Without limiting the generality of the foregoing, the Excluded Liabilities include (a) any Liability of any Seller: (i) arising prior to or on the Closing Date (other than Straddle Period Property Taxes of the type set forth in clause (c) of the definition of Assumed Liabilities), or (ii) arising after the Closing Date to the extent related to any Excluded Asset, (b) any Liability of any Seller arising under any Environmental Law, (c) any Liability of any Seller or any of its Affiliates with respect to (i) Taxes, for any period ended on or prior to the Closing Date (other than Straddle Period Property Taxes of the type set forth in clause (c) of the definition of Assumed Liabilities), (ii) any Taxes in connection with the consummation of the transactions contemplated hereby (including any transfer taxes or income Taxes arising as a result of the transfer by Sellers to Purchaser of the Purchased Assets), (iii) any Taxes under any Tax sharing agreement to which any Seller is a party and (iv) any Taxes of any Person, which any Seller has assumed or becomes liable for as a transferee or successor, by contract, or otherwise, (d) any Liability of Sellers with respect to Indebtedness (other than capital leases that are Assumed Contracts) or Excluded Agreements, (e) without limiting Purchaser's obligations under *Article XI*, any Liability of Sellers with respect to Business Employees or former employees of any Seller or any of their Affiliates or Employee Benefits Plans, including any Liability of any Seller arising out of the WARN Act, (f) any Liability of any Seller arising out of: (i) any business or property formerly owned or operated by Sellers or any of their predecessors but not owned or operated by Sellers immediately prior to the Closing, (ii) any product shipped or manufactured by, or any services provided by, the Sellers prior to the Closing Date; or (iii) any claim of any creditor or equityholder of Sellers or any of their Affiliates in their capacity as such, whether arising prior to, on or after the Closing; (g) any Liability of any Seller arising on or before the Closing Date to any Affiliate of such Seller; (h) any Liability of any Seller with respect to

A-7

1093038.30

an Assumed Contract or Assumed Lease arising on or prior to the Assumption Date (for purposes of this clause (h), any Contract or Lease assumed by Purchaser pursuant to *Section 2.8(d)* or *Section 2.9(d)*, shall be deemed to be an Assumed Contract or Assumed Lease, as the case may be, and the Assumption Date thereof shall be deemed to be the date of such assumption by Purchaser), (i) the Qwest Payment, (j) the Allegiance Payment and the Verizon Payment, except to the extent such payments constitute Assumed Liabilities pursuant to clause (d) of the definition of such term; and (k) service credits under Assumed Customer Contracts with respect to periods prior to the Assumption Date, except to the extent constituting Assumed Liabilities pursuant to clause *(e)* of the definition of such term.

"*Excluded Matters*" means the Excluded Assets and the Excluded Liabilities that are not Transition Matters, and do not arise out of Transition Matters.

"*Expense Reimbursement*" shall have the meaning set forth in *Section 12.2.*

"*Fee Reimbursement Letter*" means the letter dated October 5, 2002 between Parent and Genuity, as amended by letter dated October 24, 2002.

"*Final Order*" means an order or judgment of the Bankruptcy Court, as entered on the docket of the Bankruptcy Court, that has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, seek review or rehearing or petition for certiorari has expired and no timely-filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure or other rules governing procedure in cases before the Bankruptcy Court, may be filed with respect to such order shall not cause such order not to be a Final Order.

"*Financial Statements*" shall have the meaning set forth in *Section 3.5.*

"*Foreign Customer Contract*" means any Customer Contract that involves facilities or service delivery points outside North America.

"*GAAP*" means United States generally accepted accounting principles, as in effect from time to time.

"*GAAP Consistency*" means in accordance with GAAP applied on a basis consistent with that used in the preparation of the Financial Statements.

"*Genuity*" shall have the meaning set forth in the preamble hereto.

"*Genuity Severance Plan*" shall have the meaning set forth in *Section 11.3(a).*

"*Governmental Agency*" means (a) any international, foreign, federal, state, county, local or municipal government or administrative agency or political subdivision

A-8

1093038.30

thereof, (b) any governmental agency, authority, board, bureau, commission, department or instrumentality, (c) any court or administrative tribunal, (d) any non-governmental agency, tribunal or entity that is vested by a governmental agency with applicable jurisdiction, or (e) any arbitration tribunal or other non-governmental authority with applicable jurisdiction.

"*Governmental Approval*" shall have the meaning set forth in *Section 3.2.*

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"*Hazardous Materials*" means each and every element, compound, chemical mixture, contaminant, pollutant, material, waste or other substance which is defined, determined or identified as hazardous or toxic under any Environmental Law or the Release of which is prohibited or regulated under any Environmental Law. Without limiting the generality of the foregoing, the term will include: (a) "*hazardous substances*" as defined in CERCLA, SARA, or Title III of the Superfund Amendments and Reauthorization Act, each as amended to date, and regulations promulgated thereunder; (b) "*hazardous waste*" as defined in RCRA and regulations promulgated thereunder; (c) "*hazardous materials*" as defined in the HMTA, as amended to date, and regulations promulgated thereunder; (d) "*chemical substance or mixture*" as defined in the TSCA as amended to date, and regulations promulgated thereunder; (e) "*petroleum*," including crude oil or any fraction; and (f) "*natural gas*," including liquids and synthetic gas usable for fuel.

"*Implementation Agreement Conditions*" shall have the meaning set forth in *Section 4.8.*

"*Indebtedness*" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned by such Person, whether or not the Indebtedness secured thereby has been assumed, (f) all direct or indirect guarantees or credit supports by such Person of Indebtedness of others, (g) all capital lease obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

A-9

1093038.30

"*Indemnified Party*" shall have the meaning set forth in *Section 10.4*.

"*Indemnifying Party*" shall have the meaning set forth in *Section 10.4*.

"*Insurance Policies*" shall have the meaning set forth in *Section 3.19*.

"*Intellectual Property*" means all of the following, owned or used in connection with the Business:

(a)    trademarks and service marks (registered or unregistered), trade dress, product configurations, trade names and other names and slogans embodying business or product goodwill or indications of origin, all applications or registrations in any jurisdiction pertaining to the foregoing and all goodwill associated therewith;

(b)    patents, patentable inventions, discoveries, improvements, ideas, know-how, formula methodology, processes, technology, computer programs and software (including password unprotected interpretive code or source code, object code, development documentation, programming tools, drawings, specifications and data) and all applications and patents in any jurisdiction pertaining to the foregoing, including re-issues, continuations, divisions, continuations-in-part, renewals or extensions;

(c)    trade secrets, including confidential and other non-public information, and the right in any jurisdiction to limit the use or disclosure thereof;

(d)    copyrights in writings, designs, software programs, mask works or other works, applications or registrations in any jurisdiction for the foregoing and all moral rights related thereto;

(e)    databases and all database rights;

(f)    the Software;

(h)    Internet Web sites, domain names and applications and registrations pertaining thereto;

(i)    licenses, immunities, covenants not to sue and the like relating to the foregoing;

(j)    books and records describing or used in connection with the foregoing; and

(k)    claims or causes of action arising out of or related to infringement or misappropriation of the foregoing.

"*Intellectual Property Assignment Agreement*" shall have the meaning set forth in *Section 9.2*.

"*Interim Balance Sheet*" shall have the meaning set forth in *Section 3.5(c)*.

A-10

1093038.30

"*Interim Balance Sheet Date*" means September 30, 2002.

"*Inventory*" shall have the meaning set forth in *Section 3.9*.

"*Jointly Owned Intellectual Property*" means all Intellectual Property jointly owned by any Seller on the one hand and Verizon or its Affiliates on the other hand.

"*Knowledge*" Sellers shall be deemed to have "Knowledge" of a particular fact or other matter if (a) any executive officer or other employee of any Seller listed on *Schedule 1.5-1*, is actually aware of such fact or other matter; or (b) any of such individuals would reasonably be expected to discover or otherwise become aware of such fact or other matter as a result of a reasonable inquiry which inquiry shall include, among other things with respect to each Person listed on Schedule 1.5 as a Knowledge Party, inquiry of the Persons listed opposite each such Knowledge Party's name on *Schedule 1.5-2*.

"*Leased Property*" shall have the meaning set forth in *Section 3.10(b)*.

"*Leases*" shall have the meaning set forth in *Section 3.10(b)*.

"*Legal Requirement*" means any Order, statute, law, rule, regulation, constitutions, ordinance or treaty of any Governmental Agency or judicial interpretations with respect to the foregoing.

"*Liability*" means any liability or obligation (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

"*Lien*" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge, equitable interest, conditional sale or other title retention device or arrangement, occupancy agreement, license or lease, or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"*Major Customers*" shall have the meaning set forth in *Section 3.25*.

"*Major Suppliers*" shall have the meaning set forth in *Section 3.25*.

"*Material Adverse Effect*" means a material adverse effect with respect to the assets, liabilities, results of operations, properties or operational or financial condition of the Business, taken as a whole but excluding the Excluded Matters.

"*Material Personal Property*" shall have the meaning set forth in *Section 3.11*.

1093038.30

"*Multiemployer Plan*" shall have the meaning set forth in Section 3(37) of ERISA.

"*Network*" means the equipment, fiber, outside plant, points of presence, leased circuits/ports, physical and logical connections, network managements systems, network operations centers, data centers, Personal Property, underlying rights, contracts and services working together in combination to provide the products and services provided under the Customer Contracts in or connected to the United States of America.

"*Non-Seller Subsidiary*" means any subsidiary of any Seller other than (a) a Seller, and (b) Integra S.A. and its subsidiaries.

"*Non-Seller Subsidiary Customer Contract*" means all of the Non-Seller Subsidiaries' contracts with their customers in connection with their business.

"*North American Business*" means (a) the Business to the extent conducted in North America, (b) Sellers' facilities located in North America and the Sellers' interest in undersea cables connected to North America, and (c) the portion of Sellers' international services provided in North America.

"*North American Customer Contracts*" means all Customer Contracts other than Foreign Customer Contracts.

"*Objection Notice*" shall have the meaning set forth in *Section 2.6*.

"*Offer Letter*" shall have the meaning set forth in *Section 11.1(b)*.

"*Order*" means any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any Governmental Agency.

"*Ordinary Course of Business*" means: (a) consistent with the past practices of the Business on or prior to June 30, 2002 and in the ordinary course of the normal day-to-day operations of the Business; and (b) similar in nature and magnitude to actions customarily taken, without any authorization by the board of directors of Genuity, in the ordinary course of the normal day-to-day operations of Sellers on or prior to June 30, 2002.

"*Owned Real Property*" shall have the meaning set forth in *Section 3.10(a)*.

"*Parent*" shall have the meaning set forth in the preamble hereto.

"*Permit*" means any permit, approval, authorization, license, variance permission or product registration required by a Governmental Agency under any Legal Requirement.

"*Permitted Liens*" means, with respect to any Purchased Asset, (a) the Liens set forth on *Schedule 1.4* hereto; provided, however, with respect to subleases of real property listed or referred to on *Schedule 1.4* as to which one or more Sellers are the

A-12

1093038.30

sublessor, such sublease shall only constitute a Permitted Lien to the extent (A) such sublease constitutes an Assumed Lease, (B) the subtenant thereunder has the right under the Bankruptcy Code not to vacate the applicable premises, or (C) such sublease constitutes an Underlying Service Agreement or Undesignated Agreement that Sellers are prohibited from rejecting pursuant to the terms of this Agreement; (b) liens for Taxes that constitute an Assumed Liability; (c) with respect to real property: (i) any covenants, conditions, restrictions, easements, encroachments, encumbrances, right of way, zoning restriction or other minor imperfections of title (other than a Lien securing any Indebtedness) with respect to such asset which, individually or in the aggregate, does not materially detract from the value of, or materially interfere with the present occupancy, operation or use of, such asset and the continuation of the present occupancy, operation or use of such asset; and (ii) mechanic's, materialmen's and similar liens with respect to amounts not yet due and payable; (d) Liens securing capital leases that are Assumed Contracts; and (e) Liens created solely by action of Purchaser at Closing.

"*Person*" means any individual, partnership, corporation, trust, association, limited liability company, Governmental Agency or any other entity.

"*Personal Property*" means all of the machinery, fiber optic cable, equipment, test equipment, computers, tools, discs, molds and parts, vehicles, furniture, furnishings, Inventory, office supplies and other supplies, and other tangible personal property, including any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person (but excluding any Intellectual Property and Software) (a) owned by any Seller, or (b) used in connection with the Business, including all warranties and licenses (to the extent assignable in accordance with the Bankruptcy Code) received from manufacturers and sellers of the aforesaid items and any related claims, credits and rights of recovery with respect to such items.

"*Proceedings*" has the meaning set forth in *Section 3.20(a)*.

"*Property Taxes*" shall have the meaning set forth in *Section 6.4*.

"*Purchase Price*" shall have the meaning set forth in *Section 2.3*.

"*Purchased Assets*" means all of Sellers' properties, assets, goodwill, rights and claims of whatever kind and nature, real or personal, tangible or intangible, known or unknown, actual or contingent and wherever situated, which are used in, held for use by, or related to the Business, but excluding all Excluded Assets, as the same may exist on the Closing Date (or the applicable Assumption Date with respect to Purchased Assets consisting of rights under any Assumed Contract or Assumed Lease assumed by a Seller and assigned to Purchaser after the Closing Date as provided herein), including, without limitation (other than the limitation above excluding from this definition all of the Excluded Assets), the following:

(a)     all Owned Real Property, including the Building (together with the buildings, structures, fixtures and all other improvements thereto) and leaseholds and rights in respect thereof and all easements and uses which benefit such property;

1093038.30

(b)     all Personal Property owned by any Seller;

(c)     all Inventory and inventory of the Business held at any location controlled by any Seller and any inventory of the Business previously purchased by any Seller and in transit to any Seller;

(d)     all rights to products sold or leased and to any products or services under research or development for the Business prior to or on the Closing Date;

(e)     all prepaid expenses (other than those relating solely to Excluded Assets and Excluded Liabilities);

(f)     all of the Intellectual Property;

(g)     all rights under all Assumed Contracts and Assumed Leases, including, without limitation: (i) any Seller's right to receive goods and services pursuant to, such agreements and to assert claims and take other rightful actions in respect of breaches, defaults and other violations of such Assumed Contracts and Assumed Leases and (ii) all security deposits with respect to Assumed Contracts and Assumed Leases;

(h)     all books and records relating primarily to the Business (including such books and records as are contained in computerized storage media), including, without limitation, books and records related to inventory, purchasing, accounting, sales, pricing, research and development, quality control, engineering, manufacturing, maintenance, repairs, marketing, banking, Intellectual Property, shipping records, personnel files for Transferred Employees and all files, customer and supplier lists, records, literature and correspondence and other communication; provided, however, that Sellers shall be entitled to make and retain copies of such books and records:  (i) to the extent they relate to Excluded Assets or Excluded Liabilities, (ii) to the extent necessary or useful for the administration of any action to which it is a party, the filing of any Tax Return or compliance with applicable laws, (iii) to the extent consisting of personnel files or (iv) to the extent they relate to the services provided under the Transition Service Agreement;

(i)     to the extent legally assignable, all Permits held by Sellers or applications therefor;

(j)     claims, deposits, prepayments, prepaid assets, refunds, causes of action, rights of recovery, rights of setoff and rights of recoupment of or made by Sellers as of the Closing Date, including, any such rights of Sellers under any property, casualty, workers' compensation or other Insurance Policy, except to the extent constituting or related to Excluded Assets or Excluded Liabilities;

(k)     all refunds of, or credits for, Taxes which Purchaser paid or that constitute an Assumed Liability;

(l)     all other assets reflected on the Interim Balance Sheet, except to the extent disposed of since the Interim Balance Sheet Date; and

A-14

(m)     any other tangible or intangible assets of Seller primarily related to the Business and which are of a nature not customarily reflected in the books and records of a business, such as assets which have been written off for accounting purposes but which are still used by, or of value to, the Business.

*"Purchaser"* shall have the meaning set forth in the preamble hereto.

*"Purchaser Cure Amounts"* with respect to any Contract or Lease to be assumed by Sellers and assigned to Purchaser to the terms of this Agreement means the portion of the Cure Amount arising out of Purchaser Transition Breaches.

*"Purchaser Transition Breaches"* with respect to any Contract or Lease to be assumed by Sellers and assigned to Purchaser pursuant to the terms of this Agreement means the failure by Purchaser to perform its obligations under the Transition Services Agreement with respect to such Contract or Lease after the Closing Date (or in the case of Undesignated Agreements, the date, if later, that such Contract or Lease was identified to Purchaser in writing by Sellers as an Undesignated Agreement).

*"Purchaser Protection Superpriority Claims"* shall have the meaning set forth in *Section 6.2*.

*"Purchaser's Allocation"* shall have the meaning set forth in *Section 2.12(a)*.

*"Qualified Bid"* shall have the meaning set forth in the Bidding Procedures Order.

*"Qwest Payment"* means the $25 million payment due on or about January 2003 pursuant to the Out of Region Integrated Network Solutions Purchase Agreement, as amended between Genuity and Qwest Enterprise America, Inc.

*"Receivables"* means all accounts receivable, trade accounts and trade notes of Sellers.

*"Rejection Claims"* means the allowed rejection claims pursuant to Section 365 of the Bankruptcy Code against Sellers based solely on the rejection by Sellers in the Bankruptcy Case of Leases listed on *Schedule 3.10(b)-1*, Contracts listed on Schedules 3.11(b), 3.14(a) or 3.15(c), tariffs, or Customer Contracts listed on the Customer Contract Schedule (including any incremental increase in the amount of the rejection claim relating to the renewal of any Contract or Lease as described in Section 2.3(d) of the Transition Services Agreement); provided, however, in calculating the Rejection Claims the following rejection claims shall, without duplication, be excluded:

(i) rejection claims of Verizon and its Affiliates and of Non-Seller Subsidiaries;

(ii) with respect to each Contract or Lease that is listed on *Schedule 1.9(a)* (the *"Identified Agreements"*), the amount of any rejection claim in excess of the amount in the column headed "Rejection Claim" set forth on such Schedule

1093038.30

opposite such Identified Agreement (in calculating the amount of rejection claims for purposes of this subparagraph (ii), no rejection claims with respect to Circuit Vendor Contracts under the Identified Agreements shall be included);

(iii)  with respect to each tariff or agreement for Circuit Service with a counterparty listed on *Schedule 1.9(b)* (a "*Circuit Vendor Contract*"), the amount, which when taken with all other rejection claims by such counterparty with respect to Circuit Vendor Contracts in the relevant column, exceeds the amount set forth on such Schedule opposite such counterparty in the relevant column of such Schedule (for the avoidance of doubt, any rejection claims relating to "take or pay" or minimum commitments to purchase Circuit Services reflected in an Identified Agreement will be governed by clause (ii) rather than this clause (iii));

(iv)  with respect to each Contract or Lease that is not an Identified Agreement or a Circuit Vendor Contract, but which is with a counterparty listed on *Schedule 1.9(c)* (the "*Miscellaneous Contracts*"), the amount of rejection claims which when taken together with all other rejection claims with respect to Miscellaneous Contracts exceeds $14 million;

(v)  all rejection claims relating to Contracts or Leases that are not Identified Agreements, Circuit Vendor Contracts or Miscellaneous Contracts;

(vi)  any rejection claim relating to any Lease or Contract, to the extent attributable to the failure of Sellers to reject such Lease or Contract, on the later of (x) the Closing Date, and (y) the first day on which it was permitted to reject such Lease or Contract, pursuant to the terms of this Agreement;

(vii)  rejection claims with respect to periods prior to any commencement of the Bankruptcy Cases other than up to $40 million of rejection claims that were accrued in accordance with GAAP Consistency prior to the commencement of the Bankruptcy Cases;

(viii)  rejection claims and administrative claims with respect to the period from the commencement of the Bankruptcy Cases to the Assumption Date;

(ix)  rejection claims arising from Contracts: (i) with respect to which (A) a Non-Seller Subsidiary is a co-obligor and (B) Purchaser requested pursuant to *Section 2.8(e)* that the Non-Seller Subsidiary's rights be assigned to a Seller, and then subsequently assigned to Purchaser; and (ii) which assignment to Purchaser was not consummated; and

(x)  rejection claims excluded by virtue of *Section 5.1(b)(ii)C.*

"*Related Person*" means any member of the immediate family of any Affiliate of any Seller or of any director or officer of any Seller or any Affiliate of any Seller.

*"Release"* means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, storing, escaping, leaching, migrating, dumping, burying, abandoning or disposing into the environment.

*"Renewal Expiration Date"* shall have the meaning set forth in *Section 5.1(b).*

*"Renewal Request"* shall have the meaning set forth in *Section 5.1(b)(ii).*

*"Retention Agreement"* shall have the meaning set forth in *Section 11.1(a).*

*"Sale Motion"* shall have the meaning set forth in *Section 6.2(a).*

*"Sale Order"* shall have the meaning set forth in *Section 6.2(a).*

*"Schedule Updates"* shall have the meaning set forth in *Section 5.5.*

*"Schedules"* means, collectively, the various Schedules referred to in this Agreement delivered separately to Purchaser on or before the date of this Agreement and initialled by the parties. No item included on any one Schedule to this Agreement shall be deemed to be included on any other Schedule to this Agreement, except to the extent expressly cross-referenced.

*"SEC Reports"* shall have the meaning set forth in *Section 3.5.*

*"Section 5.1 Agreements"* shall have the meaning set forth in *Section 5.1(b).*

*"Section 5.1 Consent"* shall mean the written consent of Purchaser approving (a) any action of Sellers for which the consent of Purchaser is required pursuant to *Section 5.1,* or (b) a waiver of any requirement set forth in *Section 5.1,* but only to the extent that (i) such written consent indicates on its face that it is a *"Section 5.1 Consent",* (ii) the written consent is delivered pursuant to the notice provisions of *Section 13.1* or the e-mail notification provisions of *Section 5.1(e),* and (iii) the written consent is signed by Raouf Abdel or such other person specifically designated by Purchaser to Sellers as authorized to execute *Section 5.1* Consents.

*"Securities Act"* means the Securities Act of 1933, as amended.

*"Seller Intellectual Property"* means all Intellectual Property other than Jointly Owned Intellectual Property.

*"Sellers"* shall have the meaning set forth in the preamble hereto.

*"Settlement Agreement"* means the Genuity Settlement Agreement and Mutual Release, dated as of the date of this Agreement, by and between Genuity and Verizon as in effect on the date hereof.

*"Settlement Agreement Order"* means an order of the Bankruptcy Court granting Bankruptcy Court approval of the Settlement Agreement.

"*Severance Amount*" means the sum of (a) the product of (i) the maximum amounts payable by Purchaser pursuant to *Section 11.3(a)(ii)*, together with any related FICA, employment or similar Taxes that would be payable, and (ii) a fraction, the numerator of which is the number of Transferred Employees as of the Closing Date less four hundred (400), and the denominator of which is the number of Transferred Employees as of the Closing Date and (b) the maximum amounts payable by Purchaser pursuant to *Section 11.3(b)(ii)*, together with any related FICA, employment or similar Taxes that would be payable.

"*Software*" means (a) all computer software owned or used by any Seller in the Business; (b) the object code, or machine-readable form, of such software; (c) the password unprotected interpretive code or source code, or human readable form, of such software, including, but not limited to, all source files, uncompiled code, graphics, and audio source files, instructions, control logic, flow charts, internal documentation, designs, drawings, prints, technical data and such other documentation as is necessary to recreate, revise, modify or enhance such software or any portion thereof; (d) all materials provided in connection with such software, including, but not limited to, all diskettes, tapes, and print, informational or instructional materials relating to such software; and (e) all copies of any of the foregoing in the possession or control of any Seller.

"*Straddle Period Property Taxes*" shall have the meaning set forth in *Section 6.4*.

"*Superior Transaction*" means an Alternative Transaction which has a value to the Sellers greater than the consideration to Sellers pursuant to this Agreement, including payment of the Purchase Price (taking into account Delay Costs and Adjustments pursuant to *Article II*) and assumption of the Assumed Liabilities, assuming that the closing of the transactions contemplated by this Agreement occurred on the date of termination of this Agreement.

"*Takeover Proposal*" means any inquiry, proposal or offer from any Third Party, whether in writing or otherwise, relating to any Alternative Transaction.

"*Tax Return*" means any report, return, information return or other information required to be supplied to a Governmental Agency in connection with Taxes.

"*Taxes*" means all federal, state, local and foreign taxes, charges, fees, levies, imposts, duties or other assessments, including, without limitation, income, gross receipts, excise, employment, sales, use, transfer, license, payroll, franchise, severance, stamp, occupation, windfall profits, environmental (including taxes under Code Section 59A), premium, federal highway use, commercial rent, customs duties, capital stock, paid up capital, profits, withholding, Social Security, single business and unemployment, disability, real property, personal property, registration, ad valorem, value added, alternative or add-on minimum, estimated, or other tax or governmental fee of any kind whatsoever, imposed or required to be withheld by any Governmental Agency, including any interest, penalties or additions thereto, whether disputed or not.

"*Third Party*" means any Person or group other than Purchaser and its Affiliates.

1093038.30

"*Transferred Employee Termination Date*" shall have the meaning set forth in *Section 11.3(a)*.

"*Transferred Employees*" shall have the meaning set forth in *Section 11.1*.

"*Transition Matters*" means the (a) Customer Contracts prior to the Customer Contract Election Date, and (b) the Undesignated Agreements and the Underlying Service Agreements in either case prior to either (i) the Assumption Date with respect to such Undesignated Agreement or Underlying Service Agreement, or (ii) the first day on which such Undesignated Agreement or Underlying Service Agreement may be rejected by Sellers without violating the restrictions on rejection of Contracts and Leases contained in this Agreement.

"*Transition Services Agreement*" means the transition services agreement to be entered into between Purchaser and Sellers at Closing, in the form attached hereto as *Exhibit E*.

"*Underlying Service Agreements*" means (a) those Contracts and Leases listed on *Schedule 1.8* and (b) all tariffs not listed on *Schedule 1.6*.

"*Undesignated Agreement*" means any Contract or Lease not listed on *Schedule 1.1, 1.2, 1.6* or *1.8* to this Agreement or on the Customer Contract Schedule.

"*Union Welfare Benefit Plan*" means a multi-employer Employee Welfare Benefit Plan or fund contributed to pursuant to one or more collective bargaining agreements.

"*Verizon*" means Verizon Communications Inc., a Delaware corporation.

"*Verizon Payment*" means the payment due on or about January 2003 pursuant to the Agreement for CyberPop Solution between various Verizon operating companies (listed on the signature page of such agreement) and Genuity Solutions, Inc. dated April 22, 2002, with respect to services for calendar year 2003, provided, however, no more than $42,356,160 of such payment shall be deemed to be the Verizon Payment.

"*WARN Act*" means the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Sections 2101, *et. seq.*, and any similar provision of any applicable State law.

**EXHIBIT B**

**Procedures Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                    :

In re:                         :      Chapter 11
                    :

GENUITY INC., et al.,        :      Case No. 02-43550 (PCB)
                    :

           Debtors.   :      (Jointly Administered)
                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER UNDER 11 U.S.C. §§ 105(a) AND 363 AND FED. R. BANKR. P. 2002
AND 6004 (I) APPROVING (A) NOTICE AND BIDDING PROCEDURES
AND (B) BID PROTECTIONS, INCLUDING BREAKUP FEE, OVERBID
PROTECTIONS AND EXPENSE REIMBURSEMENT, IN CONNECTION
WITH PROPOSED SALE OF SUBSTANTIALLY ALL OF DEBTORS'
ASSETS; AND (II) SCHEDULING HEARING AND SETTING BIDDING
AND OBJECTION DEADLINES IN CONNECTION WITH SUCH SALE**

Upon the motion, dated November 27, 2002 (the "Motion"), of the

above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), for,

among other things, entry of (a) an order (the "Procedures Order") pursuant to 11

U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004, among other things,

(i) approving certain bid protections, including a break-up fee (the "Breakup Fee"),

expense reimbursement (the "Expense Reimbursement"), and certain auction

procedures and overbid requirements (collectively, the "Bidding Procedures") with

respect to the proposed sale (the "Sale") of substantially all of the assets of the

Debtors pursuant to that certain Asset Purchase Agreement, by and among Level 3

Communications, Inc., Level 3 Communications, LLC (the "Purchaser"), and

Genuity Inc. ("Genuity"), Genuity International Inc., Genuity International Networks Inc., Genuity Solutions Inc., Genuity Telecom Inc. and Genuity Employee Holdings LLC (collectively, the "Sellers"), dated as of November 27, 2002 (as amended from time to time, the "Purchase Agreement"),[1] to the Purchaser or a successful competing bidder (a "Successful Bidder"), (ii) scheduling a date for the hearing on consideration of the Sale (the "Sale Hearing"), (iii) setting auction, bidding and objection deadlines in connection with the Sale, and (iv) approving the form and manner of notice thereof, and (b) an order approving the Sale; and a hearing having been held on

_____ __, 2002 (the "Bid Procedures Hearing"); and the Court having re-viewed and considered (a) the Motion, (b) the objections thereto, if any, and (c) the arguments of counsel made, and the evidence proffered or adduced, at the Bid Procedures Hearing; and after due deliberation and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction over this matter under 28 U.S.C. §§ 157(a) and 1334 and this matter is a core proceeding under 28 U.S.C.

---

[1]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion or the Purchase Agreement, as the case may be.

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. P. 7052.

§ 157(b)(2)(A), (N), and (O).  Venue of these cases and the Motion in this District is

proper under 28 U.S.C. §§ 1408 and 1409.

           B.     Good and sufficient notice of the relief sought in the Motion

with respect to the proposed Bidding Procedures, Breakup Fee, Expense Reimburse-

ment, notice procedures and other related matters (as set forth herein) has been given

and no other or further notice is required.  A reasonable opportunity to object to or be

heard regarding such relief has been afforded to all interested persons and entities,

including the following: (i) the Office of the United States Trustee; (ii) counsel to the

Purchaser; (iii) counsel to any statutory committees appointed in these cases (collec-

tively, the "Committee"); (iv) counsel to Verizon Investments Inc. and Verizon

Communications Inc. (together, "Verizon"); (v) counsel to the administrative agent

for the Debtors' prepetition lenders (the "Bank Group") under the Amended and

Restated Credit Agreement, dated as of September 24, 2001; (vi) all entities known

to have expressed an interest in acquiring any of the Purchased Assets; (vii) all

entities known to have asserted any Lien in or upon any of the Purchased Assets;

(viii) all federal, state and local taxing authorities that have jurisdiction over the

Business; (ix) all regulatory authorities or recording offices that have a reasonably

known interest in the relief requested in the Motion; (x) all governmental agencies

having jurisdiction over the Business with respect to environmental laws; (xi) parties

to governmental approvals or permits; (xii) the United States Attorney's office and

<div align="center">3</div>

the attorneys general of all states in which the Purchased Assets are located; (xiii) the

Federal Communications Commission and applicable state public utility commis-

sions; (xiv) the Securities and Exchange Commission; and (xv) all other parties that

had filed a notice of appearance and demand for service of papers in these bank-

ruptcy cases under Bankruptcy Rule 2002 as of the date of the Motion (collectively,

the "Initial Notice Parties").  No other or further notice of the request for the relief

granted herein need be given.

        C.      The Debtors' proposed notice of the Sale (including, without

limitation, the sale of the Purchased Assets and the assumption and assignment of the

Assumed Contracts and Assumed Leases) and the Bidding Procedures, as set forth in

the Motion and the Purchase Agreement, is appropriate and reasonably calculated to

provide all interested parties with timely and proper notice of the Sale and the

Bidding Procedures.  Without limiting the generality of the foregoing, the Debtors'

proposed notice of the Sale, the sale of the Purchased Assets, the assumption and

assignment of the Assumed Contracts and Assumed Leases, the Auction and the

Bidding Procedures as set forth herein and in the Motion is good, appropriate,

adequate and sufficient, and is reasonably calculated to provide all interested parties

with timely and proper notice of the Sale, the sale of the Purchased Assets, the

Auction, the assumption and assignment of the Assumed Contracts and Assumed

Leases and the Bidding Procedures, and no other or further notice of the Sale, the

4

sale of the Purchased Assets, the assumption and assignment of the Assumed

Contracts and Assumed Leases and the Bidding Procedures as set forth herein and in

the Motion is required.

        D.     The Bidding Procedures, substantially in the form annexed

hereto as Exhibit B, are fair, reasonable and appropriate and are designed to maxi-

mize the recovery on the Purchased Assets, including the Assumed Contracts and

Assumed Leases.

        E.     The Debtors have demonstrated a compelling and sound

business justification for authorizing the payment of the Breakup Fee and the

Expense Reimbursement to the Purchaser under the circumstances, timing and

procedures set forth in the Motion and the Purchase Agreement.

        F.     The Breakup Fee and the Expense Reimbursement are fair and

reasonable, provide a benefit to the Debtors' estates and creditors, and were negoti-

ated by the parties to the Purchase Agreement in good faith and at arms' length.

        G.     The Debtors' payment to the Purchaser (under the conditions

and as set forth in the Purchase Agreement), of the Breakup Fee and Expense

Reimbursement is (a) an actual and necessary cost and expense of preserving the

Debtors' estates, within the meaning of Bankruptcy Code section 503(b), (b) of

substantial benefit to the Debtors' estates, (c) reasonable and appropriate, in light of,

among other things, (i) the size and nature of the proposed Sale (including, without

5

limitation, the sale of the Purchased Assets, the assumption and assignment of the

Assumed Contracts and Assumed Leases, and the assumption of the Assumed

Liabilities), (ii) the substantial efforts that have been and will be expended by the

Purchaser, and (iii) the benefits the Purchaser has provided to the Debtors' estates

and creditors and all parties in interest herein, notwithstanding that the proposed Sale

is subject to higher or better offers, (d) not a penalty, but rather, a reasonable estimate

of the damages to be suffered by the Purchaser in the event the transactions contem-

plated by the Purchase Agreement are not consummated under the circumstances set

forth therein, and (e) necessary to ensure that the Purchaser will continue to pursue

its proposed acquisition of the Purchased Assets.  In particular, the Purchase Agree-

ment was the culmination of a process undertaken by the Debtors and their profes-

sionals to negotiate a transaction with a bidder who was prepared to pay the highest

or otherwise best purchase price to date for the Purchased Assets (including the

Assumed Contracts and Assumed Leases), while also assuming or otherwise satisfy-

ing certain Assumed Liabilities, in order to maximize the value of the Debtors'

estates.  The payment of the Breakup Fee and the Expense Reimbursement should be

approved because, among other things, (i) no other party to date has been willing to

enter into a definitive agreement for the purchase of the Purchased Assets and the

assumption of the Assumed Liabilities on terms acceptable to the Debtors, (ii) the

execution of the Purchase Agreement is a necessary prerequisite to determining

6

whether any party other than the Purchaser is willing to enter into a definitive

agreement for the purchase of the Purchased Assets and the assumption of the

Assumed Liabilities on terms acceptable to the Debtors and their creditor constituen-

cies, (iii) the protections afforded to the Purchaser by the Breakup Fee and the

Expense Reimbursement were material inducements for, and express conditions of,

the Purchaser's willingness to enter into the Purchase Agreement, and (iv) the

Purchaser is unwilling to commit to hold open its offer to purchase the Purchased

Assets and consummate the other transactions under the terms of the Purchase

Agreement (including the assumption of the Assumed Contracts and Assumed

Leases, and the assumption of the Assumed Liabilities) unless it is assured of

payment of the Breakup Fee and the Expense Reimbursement. Thus, assurance to

the Purchaser of the payment of the Breakup Fee and the Expense Reimbursement

has promoted more competitive bidding by inducing the Purchaser's bid, which bid

otherwise would not have been made and without which initial bid, any competitive

bidding would have been limited. Further, the Breakup Fee and Expense Reimburse-

ment induced the Purchaser to research the value of the Debtors' Business and

propose the transactions contemplated by the Purchase Agreement, including, among

other things, submission of a bid that will serve as a minimum or floor bid on which

all other bidders can rely. Thus, the Purchaser has provided a benefit to the Debtors'

estates by increasing the likelihood that the price at which the Business is sold will

reflect its true worth. Finally, absent authorization to pay the Breakup Fee and the

Expense Reimbursement, the Debtors may lose the opportunity to obtain the highest

and best available offer for the Business. As a result, the payment of the Breakup

Fee and Expense Reimbursement are an expense necessary to maximize the value of

the Debtors' estates.

H.    The entry of this Order is in the best interests of the Debtors

and their estates, creditors and interest holders and all other parties in interest herein;

and it is therefore

ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is GRANTED to the extent set forth herein.

2.    Any objections to the entry of this Procedures Order or the

relief granted herein and in the Motion that have not been withdrawn, waived or

settled, and all reservations of rights included therein, are hereby denied and over-

ruled on the merits with prejudice.

**Notice of Auction and Sale**

3.    The notice (the "Notice of Auction and Sale Hearing") of,

among other things, (i) the Sale, (ii) the assignment and assumption of related

executory contracts and unexpired leases, (iii) the procedures with respect thereto

and (iv) the Bidding Procedures, substantially in the form annexed hereto as Exhibit

A, is approved in all respects.

8

4.      No later than five (5) business days after entry of this Proce-

dures Order, the Debtors shall cause the Notice of Auction and Sale Hearing to be (i)

published in the national editions of The Wall Street Journal and The New York

Times pursuant to Bankruptcy Rule 2002(l) and (ii) served upon all creditors and

parties in interest in these cases, including (x) all creditors who have filed proofs of

claim in these cases, and (y) all parties that had filed notices of appearance in these

cases under Bankruptcy Rule 2002 as of the date of the Motion.  Such notice,

together with the other notice described herein, if any, is good, adequate, sufficient

and proper notice to such interested parties.

5.      Notice of the relief sought in the Motion with respect to the

Sale, the sale of the Purchased Assets pursuant to the Purchase Agreement, the

Auction, the Sale Hearing and other related matters is hereby deemed to be good,

sufficient and proper notice thereof, including to those whose identities are unknown

to the Debtors, and any requirements for other notice are waived and dispensed with

pursuant to Bankruptcy Rules 2002, 6004, 6006 and 9007 and sections 102 and 105

of the Bankruptcy Code, if (in addition to the publication and service of the Notice of

Auction and Sale Hearing provided for in the preceding paragraph), no later than five

(5) business days after entry of this Procedures Order, the Debtors shall have caused

a copy of the Notice of Auction and Sale Hearing and this Procedures Order (in the

form approved by the Court) to be served upon the following persons by first-class

mail, postage prepaid: (i) the Initial Notice Parties; (ii) all non-Debtor parties to the Assumed Contracts and Assumed Leases, all Underlying Service Agreements and all identified Undesignated Agreements; and (iii) all other parties that have filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 2002.

### Notice of Proposed Assignment and Cure Amounts

6.    The notice (the "Initial Assumption Notice") of, among other things, (i) the Debtors' intention to assume, assign and transfer certain designated agreements to the Purchaser as of the Closing Date (or, with respect to certain Customer Contracts, shortly thereafter) and (ii) the amount (the "Cure Amount"), if any, required to be paid to cure any monetary default related to each such designated agreement, substantially in the form annexed hereto as Exhibit C, is approved in all respects.

7.    No later than five (5) business days after entry of this Procedures Order, the Debtors shall serve the Initial Assumption Notice on all non-Debtor parties to the Customer Contracts, the Assumed Contracts listed on Schedule 1.1 to the Purchase Agreement and the Assumed Leases listed on Schedule 1.2 to the Purchase Agreement (collectively, the "Assumption Notice Parties").

8.    Each Assumption Notice Party shall have until 4:00 p.m. (Eastern Time) on _____ __, 2002 (the "Sale Objection Deadline") to file with

10

the Court and serve on certain notice parties (the "Core Parties")[3] an objection to the

assumption and assignment of its respective agreement or the Cure Amount with

respect thereto, and must state in its objection (each, an "Assignment Objection")

with specificity what Cure Amount it asserts is required (with appropriate documen-

tation in support thereof). If no Assignment Objection is timely received from any

such non-Debtor party, (a) the applicable Assumed Contract or Assumed Lease shall

be assigned to the Purchaser (or the Successful Bidder, as the case may be) on the

Closing Date (or, in the case of certain Customer Contracts, shortly thereafter), (b)

the Cure Amount shall be fixed at the amount set forth in the Initial Assumption

Notice, notwithstanding anything to the contrary in any Assumed Contract or

Assumed Lease or any other document, and (c) the Assumption Notice Party shall be

(i) deemed to have waived and released any right to assert an objection to the

proposed assignment of the Initial Assumed Agreement or the Cure Amount with

respect thereto, and to have otherwise consented to the assumption and assignment of

the Initial Assumed Agreement, and (ii) forever barred, permanently enjoined and

estopped from asserting or claiming any other or further claims against the Debtors,

---

[3]     The Core Parties are: (i) Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,
        New York, New York 10036, Attention: J. Gregory Milmoe, Esq., and Skadden, Arps, Slate,
        Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-
        0636, Attention: Eric M. Davis, Esq.; (ii) Willkie Farr & Gallagher, 787 Seventh Avenue,
        New York, New York 10019, Attention: John Longmire, Esq.; and (iii) the Office of the
        United States Trustee, 33 Whitehall Street, New York, New York 10004, Attention: Brian
        Masumoto, Esq.

the Purchaser (or the Successful Bidder, as the case may be), their respective succes-

sors and assigns, the Purchased Assets, or the property or assets of any or all such

parties, as to such Assumed Contract or Assumed Lease or on grounds that any

additional amounts are due or defaults exist, or conditions to assignment must be

satisfied, under such Assumed Contract or Assumed Lease, except with respect to

defaults occurring after the Assumption Date.

9.     If one or more Assignment Objections are received, hearings

with respect to any such objections may be held (a) at the Sale Hearing or (b) at such

other date as the Court may designate; provided, however, that if a disputed Cure

Amount is not resolved by the time of the Sale Hearing, the subject Assumed

Contract or Assumed Lease nonetheless may be assumed and assigned to the

Purchaser; provided, further, that if an Assignment Objection is received with respect

to an Assumed Contract or Assumed Lease, and such Assumed Contract or Assumed

Lease nonetheless is assigned to the Purchaser, the Debtors will pay in full all Cure

Amounts in respect of undisputed cure claims and the undisputed portion of any Cure

Amount in respect of a disputed cure claim, and will segregate the disputed portion

of any Cure Amount in respect of any disputed cure claim pending the resolution of

any such dispute by this Court or mutual agreement of the parties.

10.     A properly filed Assignment Objection shall reserve such

objecting party's rights against the Debtors (but not against any purchaser of the

12

Purchased Assets) with respect to the relevant Cure Amount obligation, but shall not constitute an objection to the remaining relief requested in the Motion.

11.    The Debtors and the Purchaser (or the Successful Bidder, as the case may be) are hereby authorized to settle, compromise or otherwise resolve any disputed Cure Amounts with the relevant non-Debtor party to an Initial Assumed Agreement without Bankruptcy Court approval or the need for any other or further (i) order of this Court or (ii) notice to any party.

### Notice of Customer Contract Exclusion

12.    The notice (the "Excluded Customer Contract Notice") that, among other things, Excluded Customer Contracts will not be assumed and assigned to the Purchaser pursuant to the Purchase Agreement, substantially in the form annexed hereto as Exhibit D, is approved in all respects.

13.    As soon as practicable after the Customer Contract Election Date for each Excluded Customer Contract, the Debtors shall serve an Excluded Customer Contract Notice by first-class mail upon the holder of such Excluded Customer Contract.

### Notice Regarding Underlying Service Agreements and Undesignated Agreements

14.    The notice (the "Transition Agreements Notice") regarding, among other things, the procedures for assumption and assignment of Underlying

13

Service Agreements and Undesignated Agreements, substantially in the form annexed hereto as Exhibit E, is approved in all respects.

15.    No later than five (5) business days after entry of this Procedures Order, the Debtors shall serve the Transition Agreements Notice on all non-Debtor parties to the Underlying Service Agreements and identified Undesignated Agreements. The Transition Agreements Notice shall be served on non-Debtor parties to Undesignated Agreements identified after such initial service date as soon as practicable after the identification of such agreements.

### Notice of Transition Agreement Exclusion

16.    The notice (the "Excluded Transition Agreements Notice") that, among other things, certain Underlying Service Agreements and/or Undesignated Agreements will not be assumed and assigned to the Purchaser pursuant to the Purchase Agreement (the "Excluded Transition Agreements"), substantially in the form annexed hereto as Exhibit F, is approved in all respects.

17.    As soon as practicable after the Purchaser provides notice pursuant to Section 2.11(a) of the Purchase Agreement that certain Underlying Service Agreements and/or Undesignated Agreements are Excluded Agreements, the Debtors shall serve an Excluded Transition Agreements Notice by first-class mail upon the holder of each such Excluded Transition Agreement.

**Purchaser Protections**

18.    Section 12.2(c) of the Purchase Agreement is hereby approved in all respects. In accordance with Section 12.2(c) of the Purchase Agreement, upon the termination of the Purchase Agreement (i) by the Sellers pursuant to Section 12.1(g) of the Purchase Agreement; or (ii) at a time when the Purchaser has the right to terminate the Purchase Agreement pursuant to (A) both Section 12.1(b) of the Purchase Agreement (by virtue of a breach of 6.7(d) or (e) of the Purchase Agreement) and Section 12.1(d)(vi) or (vii), or (B) Section 12.1(d)(i) through (v) of the Purchase Agreement, the Sellers shall concurrently with such termination pay the Purchaser an amount in cash equal to $10 million (as defined previously herein, the "Breakup Fee") by wire transfer of immediately available funds to an account designated in writing by the Purchaser. If the Purchase Agreement is terminated at a time when the Purchaser has the right to terminate the Purchase Agreement pursuant to Section 12.1(d)(vi) or (vii) of the Purchase Agreement (but is not entitled to immediate payment of the Breakup Fee) and within six months after such termination the Sellers enter into an agreement with respect to an Superior Transaction, then upon consummation of such Superior Transaction (or a similar Superior Transaction with the original counterparty to such Superior Transaction) whether during or after such six month period, the Sellers shall pay the Purchaser an amount in cash equal to the Breakup Fee by wire transfer of immediately available funds to an account

15

designated in writing by the Purchaser. In no event shall more than one Breakup Fee be payable.

19. · Section 12.2(b) of the Purchase Agreement is hereby approved in all respects. In accordance with Section 12.2(b) of the Purchase Agreement, upon the termination of the Purchase Agreement pursuant to Section 12.1 of the Purchase Agreement, other than pursuant to Section 12.1(c) of the Purchase Agreement, the Purchaser shall provide to the Sellers a reasonably detailed calculation of the actual out-of-pocket costs and expenses (including, without limitation, the reasonable and documented fees and expenses of its outside counsel) incurred by the Purchaser in connection with its due diligence investigation of the Sellers and the negotiation and execution of the Purchase Agreement and the transactions contemplated thereby, and thereupon the Sellers shall pay the Purchaser in cash an amount equal to such costs and expenses (as defined previously herein, the "Expense Reimbursement"); pro-vided, however, that in no event shall the Expense Reimbursement exceed $3 million less the amount previously paid pursuant to the Fee Reimbursement Letter as provided in Section 13.5 of the Purchase Agreement.

20. The Debtors are authorized and empowered to pay the Breakup Fee and/or the Expense Reimbursement to the Purchaser, as required under and pursuant to the Purchase Agreement, without further order of the Court.

16

21.     Pursuant to section 364(c)(1) of the Bankruptcy Code, the Expense Reimbursement and the Breakup Fee shall receive superpriority administrative claim status.  Pursuant to section 364(c)(1) of the Bankruptcy Code, the administrative claims in respect of (i) the Expense Reimbursement, and (ii) the Breakup Fee shall have priority over any and all administrative expenses of the kinds specified in sections 503(b), 506(c), 507(a) or 507(b) of the Bankruptcy Code (the "Purchaser Protection Superpriority Claims").

22.     The rights of the Purchaser to the Expense Reimbursement, the Breakup Fee and the Purchaser Protection Superpriority Claims shall all survive rejection or breach of the Purchase Agreement, and shall be unaffected thereby.

23.     The Expense Reimbursement and Breakup Fee shall be the sole remedy of the Purchaser for breach of the Purchase Agreement (other than non-payment of the Expense Reimbursement) if the Purchase Agreement is terminated under circumstances where the Breakup Fee is payable.

**Bidding Procedures**

24.     The Bidding Procedures annexed hereto as Exhibit B are hereby approved in all respects and shall apply with respect to, and shall govern all proceedings related to, (i) the Purchase Agreement and (ii) the Auction and the Sale of, and all bids with respect to, the Purchased Assets and the assumption and assignment of the Assumed Contracts and Assumed Leases.

17

25.    Any person wishing to submit a higher or better offer for the Purchased Assets must do so strictly in accordance with the terms of the Bidding Procedures and Section 6.2 of the Purchase Agreement.

26.    During the Auction, bidding shall begin at the purchase price stated in the highest or otherwise best Qualified Bid (as defined in Exhibit B hereto), and will continue in increments of at least $1 million.  As set forth in the Bidding Procedures, a Qualified Bid must, among other things, represent greater value, as determined by the Sellers' board of directors, than the sum of (w) the amount of the Breakup Fee, plus (x) the maximum amount of the Expense Reimbursement, plus (y) the consideration to the Sellers arising out of the Purchase Agreement including the payment of the Purchase Price and the assumption of the Assumed Liabilities, plus (z) five percent (5%) over the amount specified in the preceding clause (y).

27.    The Purchaser shall constitute a Qualified Bidder (as defined in Exhibit B hereto) for all purposes and in all respects with regard to the Auction, the Bidding Procedures and the overall Sale process.

28.    The Sellers may (a) determine, in their business judgment, which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that, in the Sellers' sole discretion, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or

18

the terms and conditions of the Purchase Agreement, or (iii) contrary to the best

interests of the Sellers, their estates and their creditors.

29.    The failure specifically to include or reference any particular

provision, section or article of the Bidding Procedures in this Procedures Order shall

not diminish or impair the effectiveness of such procedure, it being the intent of the

Court that the Bidding Procedures annexed hereto as Exhibit B be authorized and

approved in their entirety.

### The Auction

30.    The Auction, if required, will commence at 9:00 a.m. (Eastern

Time) on _____ __, 2002, at the offices of Skadden, Arps, Slate, Meagher &

Flom LLP, Four Times Square, New York, New York 10036, or at such later time or

other place as agreed by the Purchaser and the Sellers, and which the Sellers will

notify all Qualified Bidders who have submitted Qualified Bids.

### The Sale Hearing

31.    A hearing (as defined above, the "Sale Hearing") with respect

to (i) the Sale, (ii) the assumption and assignment of certain executory contracts and

unexpired leases and certain other relief requested in the Motion, and (iii) the entry

of the proposed Sale Order, shall be held on _____ __, 2002, at __:__ _.m.

(Eastern Time) before this Court.

19

32.     Objections to the entry of the Sale Order, if any, must (a) be in writing, (b) conform to the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules of the United States Bankruptcy Court for the Southern District of New York, (c) set forth the name of the objector and the nature and amount of any claim or interest held by and against the Debtors' estates or property, (d) state the legal and factual basis for the objection and the specific grounds therefor, (e) be filed with this Court and (f) be served upon the Core Parties so as to be actually received by no later than the Sale Objection Deadline (as defined above). Only timely filed and served responses, objections or other pleadings will be considered by the Court at the Sale Hearing.

33.     The failure of any person or entity to timely file its objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, the Sale or the consummation and performance of the Purchase Agreement and the transactions contemplated thereby (including, without limitation, the assumption and assignment of the Assumed Contracts and Assumed Leases).

34.     The Sale Hearing may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of said adjournment in Court or on the Court's calendar on the date scheduled for such hearing.

**Additional Provisions**

35.     The Debtors are authorized and empowered to take such steps, expend such sums of money, and do such other things as may be necessary to implement and effect the terms and requirements established by this Procedures Order.

36.     The Debtors are hereby authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

37.     The automatic stay provisions of section 362 of the Bankruptcy Code shall not apply to the Purchaser's rights to terminate the Purchase Agreement in accordance with the terms thereof.

38.     The Sellers shall promptly notify the Purchaser orally and in writing of any request for information, proposal, discussion, negotiation or inquiry received after the date of the Purchase Agreement in connection with any Takeover Proposal and the Sellers shall promptly (but in any event within one (1) Business Day) communicate to the Purchaser the material terms and conditions of any such proposal, discussion, negotiation or inquiry which it may receive (and will promptly provide to the Purchaser copies of any written materials received by the Sellers in connection with such proposal, discussion, negotiation or inquiry) and the identity of the person making such proposal or inquiry or engaging in such discussions or negotiation.

21

39.     The Sellers shall not furnish information concerning their business, properties or assets to any Third Party, except pursuant to a confidentiality agreement with terms and conditions no less restrictive than those contained in the Confidentiality Agreement. The Sellers shall not release any Third Party from, or waive any provision of, any such confidentiality agreement or any similar confidentiality or standstill agreement to which any Seller is a party. The Sellers shall promptly provide to the Purchaser any non-public information concerning the Sellers provided to any other Person which was not previously provided to the Purchaser. The Sellers shall keep the Purchaser informed of the status and material details (including amendments or proposed amendments) of any such Takeover Proposal.

40.     This Procedures Order shall be binding upon, and inure to the benefit of the Purchaser and its affiliates, successors and assigns, and the Debtors, including any chapter 7 or 11 trustee or other fiduciary appointed for the estates of the Debtors, whether in these cases, subsequent bankruptcy cases or upon dismissal of any of these cases.

41.     Service of the notices described herein on the parties entitled to receive such notices pursuant to this Procedures Order shall constitute proper, timely, adequate and sufficient notice thereof and satisfies the requirements of sections 102, 105 and 363(b) and (f) of the Bankruptcy Code and Rules 2002, 6004, 9007 and 9008 of the Bankruptcy Rules.

22

42.    Notwithstanding Bankruptcy Rules 6004(g) and 6006(d), this Procedures Order shall not be stayed for ten (10) days after the entry hereof and this Procedures Order shall be effective and enforceable immediately upon signature hereof.

43.    This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Procedures Order, including, but not limited to any matter, claim or dispute arising from or relating to the Breakup Fee, the Expense Reimbursement, the Bidding Procedures and/or the implementation of this Procedures Order.

Dated: New York, New York
          _____ __, 2002


                                        _____
                                        Honorable Prudence C. Beatty
                                        United States Bankruptcy Judge

**EXHIBIT A**

**Form of Notice of Auction and Sale Hearing**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                                        :    Chapter 11
                                              :
GENUITY INC., et al.,                         :    Case No. 02-43550 (PCB)
                                              :
                        Debtors.              :    (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF AUCTION AND SALE HEARING

PLEASE TAKE NOTICE THAT:

        Pursuant to the Order Under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004 (I) Approving (A) Notice and Bidding Procedures and (B) Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, in Connection with Proposed Sale of Substantially All of Debtors' Assets; and (II) Scheduling Hearing and Setting Bidding and Objection Deadlines in Connection with Such Sale (Docket No. ___) (the "Procedures Order"),[1] approved by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on _____ __, 2002, Genuity Inc. ("Genuity") and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), will conduct an auction of substantially all of the Debtors' assets (the "Purchased Assets"), including certain unexpired leases and executory contracts (the "Assumed Agreements").

        The Sale. Under the terms of the Asset Purchase Agreement, by and among Level 3 Communications, Inc., Level 3 Communications, LLC (the "Proposed Purchaser"), and Genuity, Genuity International Inc., Genuity International Networks Inc., Genuity Solutions Inc., Genuity Telecom Inc. and Genuity Employee Holdings LLC (collectively, the "Sellers"), dated as of November 27, 2002 (as amended from time to time, the "Purchase Agreement"), the Debtors propose to sell the Purchased Assets, and to assume and assign the Assumed Agreements to the Purchaser, free and clear of liens, claims, encumbrances and interests (except for certain express assumed liabilities and permitted liens), all as more fully set forth in the Purchase Agreement, subject to higher and better offers and Bankruptcy Court approval.

        The Auction. If a Qualified Bid (other than the Purchase Agreement) is received, the Debtors will conduct an auction (the "Auction") for the Purchased Assets beginning on _____ __, 2002 at 9:00 a.m. (Eastern Time) at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036. Attendance and participation at the Auction is subject to certain terms, conditions and procedures (collectively, the "Bidding Procedures") described in and annexed to the Procedures Order. All interested parties are invited to prequalify for

---

[1]    All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures (as defined herein) or the Procedures Order (as applicable). This Notice is qualified in its entirety by the Procedures Order. All persons and entities are urged to read the Procedures Order and the provisions thereof carefully. To the extent this Notice is inconsistent with the Procedures Order, the terms of the Procedures Order shall govern.

the Auction and to present competing offers to purchase the Purchased Assets and the Assumed Agreements in accordance with the Bidding Procedures.

Bidding at the Auction will commence at the purchase price stated in the highest or otherwise best Qualified Bid (taking into account the Breakup Fee and Expense Reimbursement), and will subsequently continue in minimum increments of not less than $1 million until all parties have made their final offers. At the conclusion of the bidding, the Debtors will announce their determination as to the person or entity (the "Successful Bidder") submitting the highest or otherwise best bid for the Purchased Assets (the "Successful Bid").

If the Debtors do not receive any Qualified Bids (other than that of the Proposed Purchaser), the Debtors will report the same to the Bankruptcy Court, the Proposed Purchaser's bid will be deemed the Successful Bid and the Debtors will proceed with the transactions contemplated by the Purchase Agreement. If, however, the Debtors receive one or more Qualified Bids and the Auction is conducted, the Debtors will notify the Bankruptcy Court of the results of the Auction and proceed with a sale to the Successful Bidder. The Debtors will be deemed to have accepted any other bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

The Sale Hearing. A hearing (the "Sale Hearing") to approve entry of an order (the "Sale Order") approving the Sale of the Purchased Assets and the assumption and assignment of the Assumed Agreements to the highest and best bidder will be held on _____ __, 2002 at __:__ _.m. in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, Room ___, before the Honorable Prudence C. Beatty, United States Bankruptcy Judge.

Objections to the Sale of the Purchased Assets. Any objection to the entry of the Sale Order must (i) be in writing, (ii) conform to the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules of the United States Bankruptcy Court for the Southern District of New York, (iii) set forth the name of the objector, (iv) set forth the nature and amount of the objector's claims against or interests in the Debtors' estates or property, (v) state the legal and factual basis for the objection and the specific grounds therefore, (vi) be filed with the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, and (vii) be served upon (a) Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attention: J. Gregory Milmoe, Esq., and Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636, Attention: Eric M. Davis, Esq.; (b) Willkie Farr & Gallagher, 787 Seventh Avenue, New York, New York 10019, Attention: John Longmire, Esq.; and (c) the Office of the United States Trustee, 33 Whitehall Street, New York, New York 10004, Attention: Brian Masumoto, Esq., so as to be actually received by no later than 4:00 p.m. (Eastern Time) on _____ __, 2002.

2

Copies of the Procedures Order, the Purchase Agreement and the motion seeking approval of the same are available from Donlin, Recano & Company, Inc., 419 Park Avenue South, Suite 1206, New York, NY 10016, Attention: Ron Howard, telephone number (212) 481-1411 (Extension 130), or through the website established for these cases located at www._____.htm.

Dated:   New York, New York
         _____ __, 2002

J. Gregory Milmoe (JM 0919)          Eric M. Davis
Sally McDonald Henry (SH 0839)       David R. Hurst
Cheri L. Hoff (CH 5193)              SKADDEN, ARPS, SLATE,
SKADDEN, ARPS, SLATE,                MEAGHER & FLOM LLP
MEAGHER & FLOM LLP                   One Rodney Square
Four Times Square                    P.O. Box 636
New York, New York  10036            Wilmington, Delaware 19899-0636
(212) 735-3000                       (302) 651-3000

Attorneys for Debtors and Debtors-in-Possession

3

**EXHIBIT B**

**Bidding Procedures**

**Genuity Inc.**

**Bidding Procedures**

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed with respect to the transactions contemplated by the Asset Purchase Agreement, by and among Level 3 Communications, Inc., Level 3 Communications, LLC (the "Proposed Purchaser"), and Genuity Inc. ("Genuity"), Genuity International Inc., Genuity International Networks Inc., Genuity Solutions Inc., Genuity Telecom Inc. and Genuity Employee Holdings LLC (collectively, the "Sellers"), dated as of November 27, 2002 (as amended from time to time, the "Purchase Agreement"),[2] concerning the prospective sale (the "Sale") of substantially all of the Sellers' assets (as defined more specifically in the Purchase Agreement, the "Purchased Assets"). The Sellers have moved for, and will seek, entry of an order by the Bankruptcy Court authorizing and approving the Sale to a Qualified Bidder (as defined below) which the Sellers determine to have made the highest or otherwise best offer for the Purchased Assets.

**The Bidding Process**

The Sellers will (i) determine whether any person is a Qualified Bidder, (ii) coordinate the efforts of Qualified Bidders in conducting their respective due diligence investigations regarding the Purchased Assets generally, (iii) receive offers from Qualified Bidders, and (iv) negotiate any offer made to purchase the Purchased Assets (collectively, the "Bidding Process"). Any person who wishes to participate in the Bidding Process must be a Qualified Bidder, and neither the Sellers nor their representatives are obligated to furnish any information of any kind whatsoever relating to the Sellers or the Purchased Assets to any person who is not a Qualified Bidder. The Sellers have the right to adopt such other rules for the Bidding Process which, in their sole judgment, will better promote the goals of the Bidding Process and which are not inconsistent with any of the other provisions hereof or of any Bankruptcy Court order.

---

[2]     Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Purchase Agreement.

## Determination of "Qualified Bidder" Status

In order to participate in the Bidding Process, each person (a "Potential Bidder"), other than the Proposed Purchaser, must deliver (unless previously delivered) to the Sellers:

(i)     An executed confidentiality agreement in form and substance satisfactory to the Sellers; and

(ii)    Current audited financial statements of the Potential Bidder or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, current audited financial statements of the equity holder(s) of the Potential Bidder or such other form of financial disclosure acceptable to the Sellers and their advisors demonstrating such Potential Bidder's ability to close a proposed transaction.

A "Qualified Bidder" is a Potential Bidder (x) that timely delivers the documents described in subparagraphs (i) and (ii) above and (y) that the board of directors of Genuity in its business judgment determines is financially able to consummate the purchase of the Purchased Assets. The Proposed Purchaser will be deemed a Qualified Bidder.

## Due Diligence for Qualified Bidders

To obtain due diligence access or additional information from the Sellers, a Qualified Bidder must first advise the Sellers in writing of its preliminary (non-binding) proposal regarding (i) the purchase of the Purchased Assets, (ii) a purchase price range, (iii) the proposed structure and financing of the transaction (including the amount of equity to be committed and sources of financing), (iv) any additional conditions to closing that such Qualified Bidder may wish to impose, and (v) the nature and extent of additional due diligence such Qualified Bidder may wish to conduct. If, based on the preliminary proposal and such additional factors as the Sellers determine are relevant, the Sellers, in their business judgment, determine that the preliminary proposal is reasonably likely to result in a bona fide and serious higher or otherwise better offer for the Purchased Assets, the Sellers will afford the Qualified Bidder access to relevant due diligence. The Sellers will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from such Qualified Bidders. Any additional due diligence will not continue after the Bid Deadline (as defined below). None of the Sellers, their affiliates or any of their respective representatives are obligated to

2

furnish any information relating to the Purchased Assets to any person except to a Qualified Bidder who makes an acceptable preliminary proposal.

### Bid Deadline

A Qualified Bidder who desires to make a bid must deliver a written copy of its bid to Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attention: J. Gregory Milmoe, Esq., and Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636, Attention: Eric M. Davis, Esq., not later than 12:00 noon (Eastern Time) on _____ __, 2002 (the "Bid Deadline"). Upon receipt, the Sellers shall immediately distribute a copy of each such bid to the Proposed Purchaser.

### Determination of "Qualified Bid" Status

A bid received from a Qualified Bidder will constitute a "Qualified Bid" only if it includes all of the Required Bid Documents listed below and meets all of the Bid Requirements set forth below. Notwithstanding the foregoing, the Purchase Agreement will be deemed a Qualified Bid for all purposes in connection with the Bidding Process, the Auction (as defined below) and the Sale.

Required Bid Documents. All bids must include the following documents (collectively, the "Required Bid Documents"):

a.      A written offer stating that (i) the Qualified Bidder offers to purchase all or substantially all of the Purchased Assets, (ii) the Qualified Bidder is prepared to enter into a legally binding purchase and sale agreement for the acquisition of the Business on terms and conditions no less favorable to the Sellers than the Purchase Agreement within not more than one (1) business day after entry by the Bankruptcy Court of the Sale Order, and (iii) the Qualified Bidder's offer is irrevocable until the closing of the purchase of the Purchased Assets; and

b.      A good faith deposit (the "Good Faith Deposit") in the form of a certified check (or other form acceptable to the Sellers in their sole discretion) payable to the order of the Sellers (or such other party as the Sellers may determine) in an amount equal to or greater than the sum of the maximum amount of the Expense Reimbursement plus the

3

Breakup Fee; provided, however, that in no event shall the Proposed Purchaser be required to make the Good Faith Deposit.

Bid Requirements.  All bids must satisfy the following requirements (collectively, the "Bid Requirements"):

a.    The Sellers must determine, in the good faith opinion of their board of directors after consultation with an independent financial advisor, that the bid (i) is not materially more burdensome or conditional than the terms of the Purchase Agreement and (ii) has a value greater than or equal to the sum of (w) the amount of the Breakup Fee, plus (x) the maximum amount of the Expense Reimbursement, plus (y) the consideration to the Sellers arising out of the Purchase Agreement including the payment of the Purchase Price and the assumption of the Assumed Liabilities, plus (z) five percent (5%) over the amount specified in the preceding clause (y);

b.    The bid is on substantially the same or better terms and conditions than those set forth in the Purchase Agreement;

c.    The bid is accompanied by satisfactory evidence of committed financing or other ability to perform the acquisition of the Purchased Assets;

d.    The bid is not conditioned upon the Bankruptcy Court's approval of any bid protections, such as a breakup fee, termination fee, expense reimbursement or similar type of payment;

e.    The bid acknowledges and represents that the bidder: (1) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to making its offer; (2) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; and (3) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Purchased Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in these Bidding Procedures; and

f.    The bid is received by the Bid Deadline.

4

**Auction**

If more than one Qualified Bid is received, the Sellers will conduct an auction (the "Auction") with respect to the Purchased Assets. If no Qualified Bid (other than that of the Proposed Purchaser) is received by the Bid Deadline, Sellers shall report the same to the Bankruptcy Court, the Proposed Purchaser's bid will be deemed the highest or otherwise best offer for the Purchased Assets (the "Successful Bid") and the Sellers shall proceed with the transactions contemplated by the Purchase Agreement.

The Auction, if required, will commence at 9:00 a.m. (Eastern Time) on _____ __, 2002, at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036 or at such later time or other place as agreed by the Proposed Purchaser and the Sellers, and which the Sellers will notify all Qualified Bidders who have submitted Qualified Bids.

At least one (1) business day prior to the Auction, the Sellers will provide to the Proposed Purchaser and all other Qualified Bidders a copy of the highest or otherwise best Qualified Bid received and copies of all other Qualified Bids. In addition, the Sellers will inform the Proposed Purchaser and each Qualified Bidder who has expressed its intent to participate in the Auction of the identity of all Qualified Bidders that may participate in the Auction and will provide copies of the bids of all such Qualified Bidders.

Only the Proposed Purchaser, the Sellers, Qualified Bidders who have submitted Qualified Bids and representatives of any statutory committee appointed in these cases (collectively, the "Committee") will be entitled to attend, participate and be heard at the Auction, and only the Proposed Purchaser and Qualified Bidders will be entitled to make any subsequent Qualified Bids at the Auction.

During the Auction, bidding will begin at the purchase price stated in the highest or otherwise best Qualified Bid (taking into account the Breakup Fee and Expense Reimbursement), and will subsequently continue in minimum increments of at least $1 million higher than the previous Qualified Bid. Subsequent Qualified Bids submitted by the Proposed Purchaser will be deemed to include a credit in an amount equal to the sum of the Breakup Fee and the maximum amount of the Expense Reimbursement.

5

Bidding at the Auction will continue until such time as the highest or otherwise best Qualified Bid is determined.  Upon conclusion of the Auction, the Sellers will (i) review each Qualified Bid on the basis of financial and contractual terms and other factors relevant to the Sale process, including those factors affecting the speed and certainty of consummating the Sale, and (ii) identify the highest or otherwise best offer for the Purchased Assets (as defined above, the "Successful Bid").

### Acceptance of Qualified Bids

At the Sale Hearing, the Sellers will seek entry of an order authorizing and approving the Sale (i) if no Qualified Bid is received (other than that of the Proposed Purchaser), to the Proposed Purchaser pursuant to the terms and conditions set forth in the Purchase Agreement, or (ii) if another Qualified Bid is received by the Sellers, to the Proposed Purchaser or such other Qualified Bidder as the Sellers, in the exercise of their business judgment, determine to have made the highest or otherwise best offer to purchase the Purchased Assets (the "Successful Bidder").  The Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing.

The Sellers' presentation to the Bankruptcy Court for approval of a particular Qualified Bid does not constitute the Sellers' acceptance of the bid, except with respect to the bid of the Proposed Purchaser as reflected in the Purchase Agreement (subject to higher or otherwise better Qualified Bids and subject to Bankruptcy Court approval).  The Sellers will be deemed to have accepted any other bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing.

Following the Sale Hearing approving the Sale of the Purchased Assets to the Successful Bidder, if such Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the next highest or otherwise best Qualified Bid, as disclosed at the Sale Hearing, will be deemed to be the Successful Bid and the Sellers will be authorized, but not required, to consummate the Sale with the Qualified Bidder submitting such bid without further order of the Bankruptcy Court.

## Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders will be retained by the Sellers and all Qualified Bids will remain open until closing of the purchase of the Purchased Assets; provided, however, that in no event shall the Proposed Purchaser be required to make the Good Faith Deposit.

If a Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Sellers will not have any obligation to return the Good Faith Deposit deposited by such Successful Bidder, and such Good Faith Deposit irrevocably will become property of the Sellers.

## Modifications

The Sellers may (a) determine, in their business judgment, which Qualified Bid, if any, is the highest or otherwise best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid (other than that of the Proposed Purchaser) that, in the Sellers' sole discretion, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures or the terms and conditions of the Purchase Agreement, or (iii) contrary to the best interests of the Sellers, their estates and their creditors. At or before the Sale Hearing, the Sellers may impose such other terms and conditions upon Qualified Bidders (other than the Proposed Purchaser) as they determine to be in the best interests of the Sellers' estates, their creditors and other parties in interest in these cases.

**EXHIBIT C**

**Form of Initial Assumption Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GENUITY INC., et al., | : | Case No. 02-43550 (PCB) |
| | : | |
| Debtors. | : | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### NOTICE OF PROPOSED ASSUMPTION AND ASSIGNMENT OF CONTRACT(S)

PLEASE TAKE NOTICE that, on November ___, 2002, the above captioned debtors and debtors-in-possession (collectively, the "Debtors") filed the:

Motion for Order Under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (I) (A) Approving Notice and Bidding Procedures, (B) Approving Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, in Connection with the Proposed Sale of Substantially All of the Debtors' Assets and (C) Scheduling Hearing and Setting Bidding and Objection Deadlines in Connection with Such Sale; and (II) Authorizing and Approving (A) Asset Purchase Agreement with Level 3 Communications, Inc. and Level 3 Communications, LLC, (B) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances, (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (D) Certain Related Relief (Docket No. ___) (the "Sale Motion").

PLEASE TAKE FURTHER NOTICE that, on _____ __, 2002, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") granted certain relief requested in the Sale Motion by entering the:

Order Under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004 (I) Approving (A) Notice and Bidding Procedures and (B) Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, in Connection with Proposed Sale of Substantially All of Debtors' Assets; and (II) Scheduling Hearing and Setting Bidding and Objection Deadlines in Connection with Such Sale (Docket No. ___) (the "Procedures Order").

PLEASE TAKE FURTHER NOTICE that, among other things, the Sale Motion seeks approval of the Asset Purchase Agreement, by and among Level 3 Communications, Inc., Level 3 Communications, LLC (the "Purchaser"), and Genuity Inc. ("Genuity"), Genuity International Inc., Genuity International Networks Inc., Genuity Solutions Inc., Genuity Telecom Inc. and Genuity Employee Holdings LLC (collectively, the "Sellers"), dated as of November 27, 2002 (as amended from time to time, the "Purchase Agreement"), pursuant to which the Debtors are selling substantially all of their assets (the "Purchased Assets") and assuming and assigning certain executory contracts and unexpired leases (collectively, the "Proposed Assumed Contracts"), including certain contracts between one or more of the Sellers and their customers (collectively, the "Customer Contracts"), to the Purchaser or an alternative successful bidder (a "Successful Bidder"), free and clear of liens, claims,

encumbrances and interests (except for certain express assumed liabilities and permitted liens), all as more fully set forth in the Purchase Agreement, subject to higher and better offers in accordance with certain Bankruptcy Court-approved bidding procedures, and Bankruptcy Court approval.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Purchase Agreement, the Sale Motion and the Procedures Order, the Debtors hereby provide notice of their intent to assume the Proposed Assumed Contracts identified on Exhibit 1 attached hereto, and to assign such Proposed Assumed Contracts to the Purchaser in connection with the proposed sale pursuant to terms of the Purchase Agreement.

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 2.8(b) of the Purchase Agreement, the Purchaser has until the Customer Contract Election Date (as defined in the Purchase Agreement), which date generally is five (5) business days prior to the closing of the transactions contemplated by the Purchase Agreement (the "Closing Date"), to exercise its right to designate certain Customer Contracts that the Purchaser does not intend to assume (all such contracts, the "Excluded Customer Contracts"). As soon as practicable after the applicable Customer Contract Election Date for each Excluded Customer Contract, the Debtors will send a notice (the "Excluded Customer Contract Notice") to the holder of each such Excluded Customer Contract providing that, among other things, such Excluded Customer Contract will not be assumed and assigned pursuant to the Purchase Agreement. The non-Debtor parties to Excluded Customer Contracts shall not be entitled to object to such agreements' classification as Excluded Customer Contracts, and the Debtors reserve their rights to later assume or reject such Excluded Customer Contracts, on notice to the non-Debtor parties thereto and with the approval of the Bankruptcy Court, pursuant to Bankruptcy Code section 365.

PLEASE TAKE FURTHER NOTICE that with respect to each Proposed Assumed Contract that is not an Excluded Customer Contract (collectively, the "Assumed Contracts"), on the Closing Date or, if the Customer Contract Election Date is later than the Closing Date, the Customer Contract Election Date (the applicable date being referred to as the "Effective Date"), the Debtors will pay, as the amount necessary to "cure" any and all "defaults" (each within the meaning of Bankruptcy Code section 365(b)) outstanding under such Assumed Contract, the amount (the "Cure Amount") set forth opposite such Assumed Contract on Exhibit 1 hereto. The Debtors' records reflect that, other than the Cure Amount, all prepetition and postpetition amounts owing under the Assumed Contract(s) have been paid, and that there are no other defaults outstanding under the Assumed Contract(s). Postpetition amounts owing under the Assumed Contract(s) will continue to be paid by the Debtors until the assumption and assignment of the Assumed Contract(s).

PLEASE TAKE FURTHER NOTICE that objections, if any, to the proposed assumption and assignment of any Proposed Assumed Contract in connection with the sale and as proposed in the Sale Motion, or to the amount of the Cure Amount stated on Exhibit 1 hereto with respect to such Proposed Assumed Contract, must be made in writing, filed with the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, and be served upon (a) Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attention: J. Gregory Milmoe, Esq., and Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636, Attention: Eric M. Davis, Esq.; (b) Willkie Farr & Gallagher, 787 Seventh Avenue, New York, New York 10019, Attention: John Longmire, Esq.; and (c) the Office of the United States Trustee, 33 Whitehall Street, New York, New York 10004, Attention: Brian Masumoto, Esq., so as to be actually received by no

later than 4:00 p.m. (Eastern Time) on _____ __, 2002 (the "Objection Deadline"). Objections to the Cure Amount must state with specificity what cure amount is believed to be required, and provide appropriate documentation in support thereof.

PLEASE TAKE FURTHER NOTICE that if no objection is filed and served as set forth above with respect to the proposed assumption and assignment of an Assumed Contract, (a) the applicable Assumed Contract shall be assigned to the Purchaser (or the Successful Bidder, as the case may be) on the Effective Date, (b) the Cure Amount shall be fixed at the amount set forth on Exhibit 1 hereto, notwithstanding anything to the contrary in any Assumed Contract or any other document, and (c) the non-Debtor party to such Assumed Contract shall be (i) deemed to have waived and released any right to assert an objection to the proposed assumption and assignment of the Assumed Contract or the Cure Amount with respect thereto, and to have otherwise consented to the assumption and assignment of the Assumed Contract, and (ii) forever barred, permanently enjoined and estopped from asserting or claiming any other or further claims against the Debtors, the Purchaser (or the Successful Bidder, as the case may be), their respective successors and assigns, the Purchased Assets, or the property or assets of any or all such parties, as to such Assumed Contract or on grounds that any additional amounts are due or defaults exist, or conditions to assignment must be satisfied, under such Assumed Contract, except with respect to defaults occurring wholly after the Effective Date.

PLEASE TAKE FURTHER NOTICE that, upon assignment, the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser, in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including provisions of the type described in Bankruptcy Code sections 365(b)(2), (e)(1) and (f)(1)) which prohibits, restricts or conditions such assignment or transfer. Unless a non-Debtor party to an Assumed Contract objects to the Sellers' assumption and assignment thereof to the Purchaser as set forth above, and such objection is sustained by the Bankruptcy Court, the non-Debtor party to such Assumed Contract shall be deemed to have consented to such assignment under Bankruptcy Code section 365(c)(1)(B), and the Purchaser shall enjoy all of the rights and benefits under each such Assumed Contract as of the Effective Date without the necessity of obtaining such non-Debtor party's written consent to the assumption and assignment thereof.

PLEASE TAKE FURTHER NOTICE that, upon assignment of the Assumed Contracts, the Purchaser is assuming all liabilities arising under the Assumed Contracts on and after the Effective Date, and the Debtors and their estates shall be relieved from any liability for any breach of any Assumed Contract after such assignment to and assumption by the Purchaser on the Effective Date.

PLEASE TAKE FURTHER NOTICE that, if the Sale Order (as defined in the Purchase Agreement) is entered, the Purchaser will have no liability or responsibility for any liability or other obligation of the Debtors arising under any Assumed Contract prior to the assignment to and assumption by the Purchaser of such Assumed Contract on the Effective Date, except as provided in the Purchase Agreement.

PLEASE TAKE FURTHER NOTICE that, upon assignment of the Assumed Contracts, no default shall exist under any Assumed Contract and no non-Debtor party to any Assumed Contract shall be permitted to declare a default by the Purchaser under such Assumed Contract or otherwise take action against the Purchaser as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Assumed Contract, including any

failure to pay any amounts necessary to cure any Debtor's defaults thereunder. Upon entry of the Sale Order (as defined in the Purchase Agreement) and assumption and assignment of the Assumed Contracts, the Purchaser shall be deemed in compliance with all terms and provisions of such Assumed Contracts.

PLEASE TAKE FURTHER NOTICE that if an objection is timely filed and served to the assumption and assignment of an Assumed Contract according to the procedures set forth above, a hearing with respect to the objection will be held on _____ __, 2002 at __:__ _.m. in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, Room ___, before the Honorable Prudence C. Beatty, United States Bankruptcy Judge, or on such other date and time as the Bankruptcy Court may schedule.

PLEASE TAKE FURTHER NOTICE that even if an objection is timely filed and served to the assumption and assignment of an Assumed Contract, the subject Assumed Contract may be assumed and assigned to the Purchaser (or the Successful Bidder, as the case may be) on the Effective Date; provided, however, that in such cases the Debtors will pay in full all Cure Amounts in respect of undisputed cure claims and the undisputed portion of any Cure Amount in respect of a disputed cure claim, and will segregate the disputed portion of any Cure Amount in respect of any disputed cure claim pending the resolution of any such dispute by the Bankruptcy Court or mutual agreement of the parties.

Copies of the Sale Motion, the Procedures Order and related documents are available from Donlin, Recano & Company, Inc., 419 Park Avenue South, Suite 1206, New York, NY 10016, Attention: Ron Howard, telephone number (212) 481-1411 (Extension 130), or through the website established for these cases located at www._____.htm.

Dated:  New York, New York
        _____ __, 2002

J. Gregory Milmoe (JM 0919)              Eric M. Davis
Sally McDonald Henry (SH 0839)           David R. Hurst
Cheri L. Hoff (CH 5193)                  SKADDEN, ARPS, SLATE,
SKADDEN, ARPS, SLATE,                    MEAGHER & FLOM LLP
MEAGHER & FLOM LLP                       One Rodney Square
Four Times Square                        P.O. Box 636
New York, New York  10036                Wilmington, Delaware 19899-0636
(212) 735-3000                           (302) 651-3000

Attorneys for Debtors and Debtors-in-Possession

4

**EXHIBIT 1**

**Contract(s) to be Assumed and Assigned to Purchaser on Effective Date**

| Contract Description | Effective Date of Assumption | Cure Amount |
|---|---|---|
|  |  |  |

**EXHIBIT D**

**Form of Excluded Customer Contract Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - -  x

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| GENUITY INC., et al., | : Case No. 02-43550 (PCB) |
| | : |
| Debtors. | : (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - -  x

### NOTICE OF CUSTOMER CONTRACT EXCLUDED FROM ASSET SALE

PLEASE TAKE NOTICE that, on November ___, 2002, the above captioned debtors and debtors-in-possession (collectively, the "Debtors") filed the:

Motion for Order Under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (I) (A) Approving Notice and Bidding Procedures, (B) Approving Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, in Connection with the Proposed Sale of Substantially All of the Debtors' Assets and (C) Scheduling Hearing and Setting Bidding and Objection Deadlines in Connection with Such Sale; and (II) Authorizing and Approving (A) Asset Purchase Agreement with Level 3 Communications, Inc. and Level 3 Communications, LLC, (B) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances, (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (D) Certain Related Relief (Docket No. ___) (the "Sale Motion").

PLEASE TAKE FURTHER NOTICE that, on _____ __, 2002, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") granted certain relief requested in the Sale Motion by entering the:

Order Under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004 (I) Approving (A) Notice and Bidding Procedures and (B) Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, in Connection with Proposed Sale of Substantially All of Debtors' Assets; and (II) Scheduling Hearing and Setting Bidding and Objection Deadlines in Connection with Such Sale (Docket No. ___) (the "Procedures Order").

PLEASE TAKE FURTHER NOTICE that, among other things, the Sale Motion seeks approval of the Asset Purchase Agreement, by and among Level 3 Communications, Inc., Level 3 Communications, LLC (the "Purchaser"), and Genuity Inc. ("Genuity"), Genuity International Inc., Genuity International Networks Inc., Genuity Solutions Inc., Genuity Telecom Inc. and Genuity Employee Holdings LLC (collectively, the "Sellers"), dated as of November 27, 2002 (as amended from time to time, the "Purchase Agreement"), pursuant to which the Debtors intend to sell substantially all of their assets (the "Purchased Assets") and to assume and assign certain executory contracts and unexpired leases (collectively, the "Proposed Assumed Contracts"), including certain contracts between one or more of the Sellers and their customers (collectively, the "Customer Contracts"), to the Purchaser or an alternative successful bidder (a "Successful Bidder"), free and clear of liens, claims,

encumbrances and interests (except for certain express assumed liabilities and permitted liens), all as more fully set forth in the Purchase Agreement, subject to higher and better offers in accordance with certain Bankruptcy Court-approved bidding procedures, and Bankruptcy Court approval.

PLEASE TAKE FURTHER NOTICE that, on or about December ___, 2002, the Debtors provided notice (the "Assumption Notice") of their intent to assume the Proposed Assumed Contracts identified on an exhibit attached thereto (including those set forth on Exhibit 1 attached hereto), and to assign such Proposed Assumed Contracts to the Purchaser (or the Successful Bidder, as the case may be) in connection with the proposed sale pursuant to terms of the Purchase Agreement.

PLEASE TAKE FURTHER NOTICE that, subsequent to the service of the Assumption Notice, the Purchaser exercised its right under the Purchase Agreement to designate certain Customer Contracts that will not be assumed and assigned to the Purchaser pursuant to the Purchase Agreement (all such contracts, the "Excluded Customer Contracts"), including the Customer Contracts identified on Exhibit 1 hereto. Accordingly, the Excluded Customer Contracts identified on Exhibit 1 hereto will not be assumed and assigned in connection with the proposed sale pursuant to terms of the Purchase Agreement. The non-Debtor parties to Excluded Customer Contracts are not entitled to object to such contracts' classification as Excluded Customer Contracts, and the Debtors reserve their rights to later assume or reject such Excluded Customer Contracts, on notice to the non-Debtor parties thereto and with the approval of the Bankruptcy Court, pursuant to Bankruptcy Code section 365.

Copies of the Sale Motion, the Procedures Order and related documents are available from Donlin, Recano & Company, Inc., 419 Park Avenue South, Suite 1206, New York, NY 10016, Attention: Ron Howard, telephone number (212) 481-1411 (Extension 130), or through the website established for these cases located at www._____.htm.

Dated:   New York, New York
         _____ __, 2002

J. Gregory Milmoe (JM 0919)                Eric M. Davis
Sally McDonald Henry (SH 0839)             David R. Hurst
Cheri L. Hoff (CH 5193)                    SKADDEN, ARPS, SLATE,
SKADDEN, ARPS, SLATE,                      MEAGHER & FLOM LLP
MEAGHER & FLOM LLP                         One Rodney Square
Four Times Square                          P.O. Box 636
New York, New York  10036                  Wilmington, Delaware 19899-0636
(212) 735-3000                             (302) 651-3000


Attorneys for Debtors and Debtors-in-Possession

2

**EXHIBIT 1**

**Contract(s) not to be Assumed and Assigned Pursuant to Asset Sale**

| Contract Description |
|---|
|  |

**EXHIBIT E**

**Form of Notice of Contracts Subject to
Assumption and Rejection Procedures**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                                          :    Chapter 11
                                                :
GENUITY INC., et al.,                           :    Case No. 02-43550 (PCB)
                                                :
                            Debtors.            :    (Jointly Administered)

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF CONTRACTS SUBJECT TO
## ASSUMPTION AND REJECTION PROCEDURES

PLEASE TAKE NOTICE that, on November ___, 2002, the above captioned debtors and debtors-in-possession (collectively, the "Debtors") filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") the:

Motion for Order Under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (I) (A) Approving Notice and Bidding Procedures, (B) Approving Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, in Connection with the Proposed Sale of Substantially All of the Debtors' Assets and (C) Scheduling Hearing and Setting Bidding and Objection Deadlines in Connection with Such Sale; and (II) Authorizing and Approving (A) Asset Purchase Agreement with Level 3 Communications, Inc. and Level 3 Communications, LLC, (B) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances, (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (D) Certain Related Relief (Docket No. ___) (the "Sale Motion").

PLEASE TAKE FURTHER NOTICE that, among other things, the Sale Motion seeks approval of the Asset Purchase Agreement, by and among Level 3 Communications, Inc., Level 3 Communications, LLC (the "Purchaser"), and Genuity Inc. ("Genuity"), Genuity International Inc., Genuity International Networks Inc., Genuity Solutions Inc., Genuity Telecom Inc. and Genuity Employee Holdings LLC (collectively, the "Sellers"), dated as of November 27, 2002 (as amended from time to time, the "Purchase Agreement"), pursuant to which the Debtors intend to sell substantially all of their assets (the "Purchased Assets") and to assume and assign certain executory contracts and unexpired leases (collectively, the "Assumed Contracts"), to the Purchaser or an alternative successful bidder (a "Successful Bidder"), free and clear of liens, claims, encumbrances and interests (except for certain express assumed liabilities and permitted liens), all as more fully set forth in the Purchase Agreement, subject to higher and better offers and Bankruptcy Court approval.

PLEASE TAKE FURTHER NOTICE that the Sale Motion also seeks approval of certain contract assumption and rejection procedures, pursuant to which the executory contracts and/or unexpired leases listed on Exhibit 1 hereto (the "Subject Contract(s)") may be (i) assumed and assigned to the Purchaser (or the Successful Bidder, as the case may be) or (ii) rejected, in either case pursuant to Bankruptcy Code section 365.

PLEASE TAKE FURTHER NOTICE that if the Sale Motion is approved, the contract assumption procedures (the "Assumption Procedures") set forth below will apply to the Subject Contract(s):

(i)    At any time on or before the date (the "Election Date") which is three (3) months following the date of closing (the "Closing Date") of the transactions contemplated by the Purchase Agreement, the Debtors may serve on each non-Debtor party to a Subject Contract a notice (an "Assumption Notice") of the assumption and assignment and transfer of such Subject Contract to the Purchaser (or the Successful Bidder, as the case may be) pursuant to Bankruptcy Code sections 363 and 365. The Assumption Notice will identify the relevant Subject Contract and set forth the Debtors' proposed "cure amount" with respect to such agreement.

(ii)    Each non-Debtor party to the Subject Contract will have ten (10) days from the date of the relevant Assumption Notice to file with the Bankruptcy Court and serve on certain designated notice parties an objection (a "Cure Objection") (a) pursuant to Bankruptcy Code section 365(b)(1)(A), to the proposed cure amount set forth in such Assumption Notice and/or (b) asserting actual pecuniary losses of the type referred to in Bankruptcy Code section 365(b)(1)(B) (together, the "Permitted Grounds"). If no Cure Objection is timely filed and served as described above with respect to a particular Subject Contract, the "cure amount" for such Subject Contract shall be that proposed by the Debtors in the relevant Assumption Notice, and such cure amount shall be paid by the Debtors as of the respective date of assumption and assignment. If a Cure Objection is timely filed and served as described above with respect to a particular Subject Contract, then the Debtors shall pay the full amount of the undisputed portion of such cure amount and segregate the full amount of the disputed portion of such cure amount pending resolution of such Cure Objection, and pay to the objecting party, upon resolution of such dispute by agreement of the parties or order of the Bankruptcy Court, the remaining cure amount, if any, set forth in such agreement or order.

(iii)    Regardless of whether a Cure Objection is timely filed and served as described above, the relevant Subject Contract shall be assumed by the relevant Debtor and assigned to the Purchaser pursuant to Bankruptcy Code section 365, without the need for any further notice, motion, hearing or order, as of the date that is ten (10) days following the date of the relevant Assumption Notice.

PLEASE TAKE FURTHER NOTICE that under the Assumption Procedures, the non-Debtor party to a Subject Contract may only object to assumption and assignment of such Subject Contract pursuant to the Assumption Procedures on the Permitted Grounds set forth above. All other grounds for objection to such assumption and assignment, including objections to the Assumption Procedures, must be raised as objections to entry of the order (the "Sale Order") approving the Sale Motion as set forth below. Once the Sale Order has been approved by the Bankruptcy Court, all non-Debtor parties to the Subject Contract(s) will be (i) barred, estopped and prohibited from asserting any future objection, other than a Cure Objection, to the assumption and assignment of their respective agreements and (ii) deemed to have consented to such assignment under Bankruptcy Code section 365(c)(1)(B).

2

PLEASE TAKE FURTHER NOTICE that, upon assignment, the Subject Contract(s) shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser, in accordance with their respective terms, notwithstanding any provision in any such Subject Contract (including provisions of the type described in Bankruptcy Code sections 365(b)(2), (e)(1) and (f)(1)) which prohibits, restricts or conditions such assignment or transfer.

PLEASE TAKE FURTHER NOTICE that, upon assignment of the Subject Contract(s), the Purchaser is assuming all liabilities arising under the Subject Contract(s) on and after the effective date of such assignment, and the Debtors and their estates shall be relieved from any liability for any breach of any Subject Contract after such assignment to and assumption by the Purchaser.

PLEASE TAKE FURTHER NOTICE that, if the Sale Order is entered, the Purchaser will have no liability or responsibility for any liability or other obligation of the Debtors arising under any Subject Contract prior to the assignment to and assumption by the Purchaser of such Subject Contract on the effective date of such assignment, except as provided in the Purchase Agreement.

PLEASE TAKE FURTHER NOTICE that, upon assignment of the Subject Contract(s), no default shall exist under any Subject Contract and no non-Debtor party to any Subject Contract shall be permitted to declare a default by the Purchaser under such Subject Contract or otherwise take action against the Purchaser as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Subject Contract, including any failure to pay any amounts necessary to cure any Debtor's defaults thereunder. Upon entry of the Sale Order and assumption and assignment of the Subject Contract(s), the Purchaser shall be deemed in compliance with all terms and provisions of such Subject Contract(s).

PLEASE TAKE FURTHER NOTICE that if the Sale Motion is approved, the contract rejection procedures (the "Rejection Procedures") set forth below will apply to the Subject Contract(s):

(i)     At any time on or before the Election Date, the Debtors may file with the Bankruptcy Court and serve on each non-Debtor party to a Subject Contract a notice (a "Rejection Notice") of the effective date (the "Rejection Effective Date") of the rejection of such Subject Contract. The Rejection Effective date (a) will be no sooner than ten (10) days after the date of service of the Rejection Notice; and (b) will be no later than the later of (x) the date that is 180 days after the Closing Date and (y) the date a plan of reorganization is confirmed in these cases. As of each Rejection Effective Date, the relevant Subject Contract will be rejected pursuant to Bankruptcy Code section 365, without the need for any further notice, motion, hearing or order of the Bankruptcy Court.

(ii)    At any time prior to the Rejection Effective Date for a particular Subject Contract, the Debtors may serve a revised Rejection Notice accelerating the Rejection Effective Date to a date (the "Revised Rejection Effective Date") no earlier than fifteen (15) days after service of such revised Rejection Notice. No objection to the revised Rejection Notice will be permitted, and the Subject Contract will be rejected as of the Revised Rejection Effective Date without further notice, motion, hearing or order of the Bankruptcy Court.

3

(iii)    Each Rejection Notice will provide that the non-Debtor party to the relevant Subject Contract will be forever barred, estopped and prohibited from asserting any claim in these cases for damages arising from the rejection of such Subject Contract unless such party files a claim for such damages on or before the date that is thirty (30) days after the Rejection Effective Date set forth in such Rejection Notice.

PLEASE TAKE FURTHER NOTICE that under the Rejection Procedures, the non-Debtor party to a Subject Contract may not object to rejection of such Subject Contract pursuant to the Rejection Procedures. All grounds for objection to such rejection, including objections to the Rejection Procedures, must be raised as objections to entry of the Sale Order as set forth below. Once the Sale Order has been approved by the Bankruptcy Court, the non-Debtor parties to the Subject Contract(s) will be barred, estopped and prohibited from asserting any future objection to rejection of their respective agreements.

PLEASE TAKE FURTHER NOTICE that a hearing (the "Sale Hearing") to approve the Sale of the Purchased Assets and the assumption and assignment of the Assumed Contracts to the highest and best bidder will be held on _____ , 2002 at __:__ _.m. in the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, Room ___, before the Honorable Prudence C. Beatty, United States Bankruptcy Judge.

PLEASE TAKE FURTHER NOTICE that, pursuant to Section 2.11(a) of the Purchase Agreement, the Purchaser has until the date (the "Transition Agreements Election Date") that is fifteen (15) business days prior to the closing of the transactions contemplated by the Purchase Agreement (the "Closing Date"), to exercise its right to designate certain Subject Contract(s) that will not be subject to the Assumption Procedures and Rejection Procedures set forth herein (all such agreements, the "Excluded Transition Agreements"). As soon as practicable after the Transition Agreements Election Date, the Debtors will send a notice (the "Excluded Transition Agreements Notice") to the holder of each such Excluded Transition Agreement providing that, among other things, such Excluded Transition Agreement will not be subject to the Assumption Procedures and Rejection Procedures set forth herein. The non-Debtor parties to Excluded Transition Agreements shall not be entitled to object to such agreements' classification as Excluded Transition Agreements, and the Debtors reserve their rights to later assume or reject such Excluded Transition Agreements, on notice to the non-Debtor parties thereto and with the approval of the Bankruptcy Court, pursuant to Bankruptcy Code section 365. Upon issuance of an Excluded Transition Agreements Notice, the agreement(s) subject to such notice shall no longer be considered Subject Contract(s).

PLEASE TAKE FURTHER NOTICE that any objection to entry of the Sale Order, including objections to the Sale of the Purchased Assets, the Assumption Procedures, the Rejection Procedures and/or the assumption and assignment of the Assumed Contracts must be in writing, conform to the requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules of the United States Bankruptcy Court for the Southern District of New York, set forth the name of the objector, set forth the nature and amount of the objector's claims against or interests in the Debtors' estates or property, and state the legal and factual basis for the objection and the specific grounds therefore, and be filed with the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, and served so as to be received by (i) Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036,

4

Attention: J. Gregory Milmoe, Esq., <u>and</u> Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636, Attention: Eric M. Davis, Esq.; (ii) Willkie Farr & Gallagher, 787 Seventh Avenue, New York, New York 10019, Attention: John Longmire, Esq.; and (iii) the Office of the United States Trustee, 33 Whitehall Street, New York, New York 10004, Attention: Brian Masumoto, Esq., by 4:00 p.m. (Eastern Time) on _____ __, 2002.

        Copies of the Sale Motion, the Purchase Agreement and related documents are available from Donlin, Recano & Company, Inc., 419 Park Avenue South, Suite 1206, New York, NY 10016, Attention: Ron Howard, telephone number (212) 481-1411 (Extension 130), or through the website established for these cases located at www._____.htm.

Dated:   New York, New York
         _____ __, 2002

| | |
|---|---|
| J. Gregory Milmoe (JM 0919) | Eric M. Davis |
| Sally McDonald Henry (SH 0839) | David R. Hurst |
| Cheri L. Hoff (CH 5193) | SKADDEN, ARPS, SLATE, |
| SKADDEN, ARPS, SLATE, | MEAGHER & FLOM LLP |
| MEAGHER & FLOM LLP | One Rodney Square |
| Four Times Square | P.O. Box 636 |
| New York, New York  10036 | Wilmington, Delaware 19899-0636 |
| (212) 735-3000 | (302) 651-3000 |

Attorneys for Debtors and Debtors-in-Possession

**EXHIBIT 1**

**Contract(s) Subject to Assumption and Rejection Procedures**

| Contract Description |
|---|
| |

**EXHIBIT F**

**Form of Excluded Transition Agreement Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| GENUITY INC., et al., | : | Case No. 02-43550 (PCB) |
| | : | |
| Debtors. | : | (Jointly Administered) |

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF TRANSITION AGREEMENTS
## EXCLUDED FROM ASSET SALE

PLEASE TAKE NOTICE that, on November ___, 2002, the above captioned debtors and debtors-in-possession (collectively, the "Debtors") filed the:

Motion for Order Under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (I) (A) Approving Notice and Bidding Procedures, (B) Approving Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, in Connection with the Proposed Sale of Substantially All of the Debtors' Assets and (C) Scheduling Hearing and Setting Bidding and Objection Deadlines in Connection with Such Sale; and (II) Authorizing and Approving (A) Asset Purchase Agreement with Level 3 Communications, Inc. and Level 3 Communications, LLC, (B) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances, (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (D) Certain Related Relief (Docket No. ___) (the "Sale Motion").

PLEASE TAKE FURTHER NOTICE that, on _____ __, 2002, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") granted certain relief requested in the Sale Motion by entering the:

Order Under 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002 and 6004 (I) Approving (A) Notice and Bidding Procedures and (B) Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, in Connection with Proposed Sale of Substantially All of Debtors' Assets; and (II) Scheduling Hearing and Setting Bidding and Objection Deadlines in Connection with Such Sale (Docket No. ___) (the "Procedures Order").

PLEASE TAKE FURTHER NOTICE that, among other things, the Sale Motion seeks approval of the Asset Purchase Agreement, by and among Level 3 Communications, Inc., Level 3 Communications, LLC (the "Purchaser"), and Genuity Inc. ("Genuity"), Genuity International Inc., Genuity International Networks Inc., Genuity Solutions Inc., Genuity Telecom Inc. and Genuity Employee Holdings LLC (collectively, the "Sellers"), dated as of November 27, 2002 (as amended from time to time, the "Purchase Agreement"), pursuant to which the Debtors intend to sell substantially all of their assets (the "Purchased Assets") and to assume and assign certain executory contracts and unexpired leases (collectively, the "Proposed Assumed Contracts"), to the Purchaser or an alternative successful bidder (a "Successful Bidder"), free and clear of liens, claims, encumbrances

and interests (except for certain express assumed liabilities and permitted liens), all as more fully set forth in the Purchase Agreement, subject to higher and better offers in accordance with certain Bankruptcy Court-approved bidding procedures, and Bankruptcy Court approval.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Purchase Agreement and the Procedures Order, on or about December ___, 2002, the Debtors provided notice (the "Procedures Notice") that certain executory contracts and/or unexpired leases identified on an exhibit attached thereto (the "Transition Agreements"), including those executory contracts and/or unexpired leases set forth on Exhibit 1 attached hereto, would be subject to certain contract assumption and rejection procedures (the "Procedures") set forth in the Procedures Notice.

PLEASE TAKE FURTHER NOTICE that, subsequent to the service of the Procedures Notice, the Purchaser exercised its right under the Purchase Agreement to designate certain Transition Agreements that will not be subject to the Procedures (all such agreements, the "Excluded Transition Agreements"), including the Transition Agreements identified on Exhibit 1 hereto. Accordingly, the Excluded Transition Agreements identified on Exhibit 1 hereto will not be assumed or rejected pursuant to the Procedures. The non-Debtor parties to Excluded Transition Agreements are not entitled to object to such Transition Agreements' classification as Excluded Transition Agreements, and the Debtors reserve their rights to later assume or reject such Excluded Transition Agreements, on notice to the non-Debtor parties thereto and with the approval of the Bankruptcy Court, pursuant to Bankruptcy Code section 365.

Copies of the Sale Motion, the Procedures Order and related documents are available from Donlin, Recano & Company, Inc., 419 Park Avenue South, Suite 1206, New York, NY 10016, Attention: Ron Howard, telephone number (212) 481-1411 (Extension 130), or through the website established for these cases located at www._____.htm.

Dated:   New York, New York
         _____ __, 2002

J. Gregory Milmoe (JM 0919)          Eric M. Davis
Sally McDonald Henry (SH 0839)       David R. Hurst
Cheri L. Hoff (CH 5193)              SKADDEN, ARPS, SLATE,
SKADDEN, ARPS, SLATE,                MEAGHER & FLOM LLP
MEAGHER & FLOM LLP                   One Rodney Square
Four Times Square                    P.O. Box 636
New York, New York  10036            Wilmington, Delaware 19899-0636
(212) 735-3000                       (302) 651-3000


Attorneys for Debtors and Debtors-in-Possession

2

**EXHIBIT 1**

**Transition Agreements Not Subject to**
**Assumption and Rejection Procedures**

| Contract Description |
| --- |
|  |

**EXHIBIT C**

**Sale Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                         :

In re:                      :      Chapter 11
                         :

GENUITY INC., et al.,      :      Case No. 02-43550 (PCB)
                         :

              Debtors.   :      (Jointly Administered)
                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER UNDER 11 U.S.C. §§ 105(a), 363, 365 AND 1146(c)
AND FED. R. BANKR. P. 2002, 6004 AND 6006 AUTHORIZING
AND APPROVING (I) ASSET PURCHASE AGREEMENT WITH LEVEL 3
COMMUNICATIONS, INC. AND LEVEL 3 COMMUNICATIONS, LLC; (II)
SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND
CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (III) ASSUMPTION
AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND
UNEXPIRED LEASES; AND (IV) CERTAIN RELATED RELIEF**

Upon the motion, dated November 27, 2002 (the "Motion"), of the

above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), for,

among other things, entry of: (a) an order approving, among other things, (i) certain

bid protections, including a break-up fee, expense reimbursement, auction procedures

and overbid requirements (collectively, the "Bidding Procedures"), and (ii) the form

and manner of notice with respect to such procedures and the hearing to consider

entry of this Order; and (b) an order (the "Sale Order") under 11 U.S.C. §§ 105(a),

363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (i) approving the

Asset Purchase Agreement by and among Level 3 Communications, Inc. (the

"Parent"), Level 3 Communications, LLC (the "Purchaser"), and Genuity Inc.

("Genuity"), Genuity International Inc., Genuity International Networks Inc., Genuity Solutions Inc., Genuity Telecom Inc. and Genuity Employee Holdings LLC (collectively, the "Sellers"), dated as of November 27, 2002 (as amended from time to time, the "Purchase Agreement"),[1] a copy of which is attached hereto as Exhibit A), and certain Ancillary Agreements (including the Transition Services Agreement), substantially in the forms attached as exhibits to the Purchase Agreement, (ii) authorizing the Sellers to sell (the "Sale") to the Purchaser, substantially all of their assets (as defined more specifically in the Purchase Agreement, the "Purchased Assets") free and clear of all Liens (other than Permitted Liens), all Liabilities (other than Assumed Liabilities), Interests (as defined herein) and Claims (as defined herein), and exempt under 11 U.S.C. § 1146(c) from any stamp, transfer, sales, recording or similar tax, (iii) authorizing the assumption and assignment of the Assumed Contracts and the Assumed Leases, and (iv) granting certain related relief; and this Court having entered an order on _____ __, 2002 (the "Procedures Order") approving, among other things, the proposed Bidding Procedures and notice of the Sale; [and an auction (the "Auction") having been held on _____ __, 2002 in accordance with the Bidding Procedures]; and the Sellers having determined that the Purchaser has submitted the highest or otherwise best bid [at the Auction] for

---

[1]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion or the Agreement, as the case may be.

2

the Purchased Assets; and a hearing having been held on _____ __, 2002 (the

"Sale Hearing"); and adequate and sufficient notice of the Bidding Procedures, the

Purchase Agreement and all transactions contemplated thereunder and in this Sale

Order having been given to all parties in interest in these cases and as required by

Section 6.2(c) of the Purchase Agreement; and all interested parties having been

afforded an opportunity to be heard with respect to the Motion and all relief related

thereto; and the Court having reviewed and considered (i) the Motion, (ii) the

objections thereto, if any, and (iii) the arguments of counsel made, and the evidence

proffered or adduced, at the Sale Hearing; and after due deliberation thereon; and

good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[2]

A.      This Court has jurisdiction over the Motion under 28 U.S.C.

§§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. §

157(b)(2)(A).  Venue of these cases and the Motion in this District is proper under 28

U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Motion are

sections 105(a), 363, 365 and 1146(c) of the United States Bankruptcy Code, 11

---

[2]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be
construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

3

U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

        C.      This Court entered the Procedures Order on _____ \_\_, 2002, and the Procedures Order has become a final and non-appealable order.

        D.      As evidenced by the affidavits of service and publication filed with this Court and based on representations of counsel at the Sale Hearing, (i) due, proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Sale and the transactions contemplated thereby, including without limitation, the assumption and assignment of the Assumed Contracts and Assumed Leases, has been provided in accordance with Bankruptcy Code sections 102(1), 105(a), 363 and 365 and Bankruptcy Rules 2002, 6004 and 6006, and in compliance with the Bidding Procedures and the Purchase Agreement; (ii) such notice was good, sufficient and appropriate under the circumstances; and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale or the transactions contemplated thereby (including, without limitation, the assumption and assignment of the Assumed Contracts and the Assumed Leases), is or shall be required.

        E.      A reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including the following: (i) the Office of the United States Trustee; (ii) counsel to the Purchaser; (iii) counsel to any statutory committees

appointed in these cases (collectively, the "Committee"); (iv) counsel to Verizon

Investments Inc. and Verizon Communications Inc. (together, "Verizon"); (v)

counsel to the administrative agent for the Debtors' prepetition lenders (the "Bank

Group") under the Amended and Restated Credit Agreement, dated as of September

24, 2001; (vi) all entities known to have expressed an interest in acquiring any of the

Purchased Assets; (vii) all entities known to have asserted any Lien in or upon any of

the Purchased Assets; (viii) all federal, state and local taxing authorities that have

jurisdiction over the Business; (ix) all regulatory authorities or recording offices that

have a reasonably known interest in the relief requested in the Motion; (x) all

governmental agencies having jurisdiction over the Business with respect to environ-

mental laws; (xi) parties to governmental approvals or permits; (xii) the United

States Attorney's office and the attorneys general of all states in which the Purchased

Assets are located; (xiii) the Federal Communications Commission and applicable

state public utility commissions; (xiv) the Securities and Exchange Commission;

(xv) all non-Debtor parties to the Contracts and Leases; and (xvi) all other parties

that had filed a notice of appearance and demand for service of papers in these

bankruptcy cases under Bankruptcy Rule 2002 as of the date of the Motion.

        F.      The Sellers may sell the Purchased Assets free and clear of all

Interests because each entity with a security interest in any Purchased Assets to be

transferred on the Closing Date, including the Assumed Contracts and the Assumed

5

Leases (collectively, the "Assumed Agreements"), (i) has consented to the Sale

(including the assumption and assignment of the Assumed Contracts and Assumed

Leases) or is deemed to have consented to the Sale; (ii) could be compelled in a legal

or equitable proceeding to accept money satisfaction of such interest; or (iii) other-

wise falls within the provisions of section 363(f) of the Bankruptcy Code, and

therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5)

of the Bankruptcy Code has been satisfied.  Those holders of Interests who did not

object, or who withdrew their objections, to the Sale Motion are deemed to have

consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of

Interests who did object are adequately protected by having their Interests, if any,

attach to the cash proceeds of the Sale ultimately attributable to the property against

or in which they claim an Interest, subject to the terms hereof.

        G.      Good and sufficient reasons for approval of the Purchase

Agreement and the Sale have been articulated.  The relief requested in the Motion is

in the best interests of the Debtors, their estates, their creditors and other parties in

interest.

        H.      The Debtors have demonstrated both (i) good, sufficient and

sound business purpose and justification and (ii) compelling circumstances for the

Sale other than in the ordinary course of business, pursuant to Bankruptcy Code

section 363(b), in that, among other things, the immediate consummation of the Sale

to the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates; the Sale will provide the means for the Debtors to maximize distributions to creditors and enable the successful confirmation of a plan of reorganization; and absent consummation of the Sale, the Debtors may be forced to discontinue their operations and liquidate.

I.    Each Seller has full corporate power and authority to execute the Purchase Agreement, and all other documents contemplated thereby (including, without limitation, the Ancillary Agreements (including the Transition Services Agreement)), and to consummate the transactions contemplated by the Purchase Agreement. The Purchase Agreement and all of the transactions contemplated thereby have been duly and validly authorized by all necessary corporate action of each of the Sellers. No consents or approvals, other than the consent and approval of this Court and those expressly provided for in the Purchase Agreement, are required for each of the Sellers to consummate the Sale.

J.    The Purchase Agreement was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in good faith and from arms'-length bargaining positions. The Purchaser is not an "insider" of any of the Debtors, as that term is defined in Bankruptcy Code section 101. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Bankruptcy Code section 363(n).

7

K.     The Purchaser is a good faith purchaser under Bankruptcy Code section 363(m) and, as such, is entitled to all of the protections afforded thereby. The Purchaser will be acting in good faith within the meaning of Bankruptcy Code section 363(m) in closing the transactions contemplated by the Purchase Agreement and at all times after the entry of this Sale Order.

L.     The consideration provided by the Purchaser pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, and (iii) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

M.     The Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

N.     The transfer of the Purchased Assets to the Purchaser pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Purchased Assets, and vests or will vest the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets free and clear of Liens, mortgages, security interests, conditional sales or other title retention agreements, pledges, claims, judgments, demands, encumbrances (including, without limitation, claims, and

8

encumbrances (i) that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Sellers' or the Purchaser's interests in the Purchased Assets or (ii) in respect of taxes, restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, the "Interests"), with the exception of Permitted Liens (as defined in the Purchase Agreement), with all such non-assumed Interests to attach to the Sellers' interest in the proceeds of the Sale (the "Sale Proceeds") in order of priority, subject to any rights, claims and defenses of the Debtors with respect thereto.

O.    Neither the Purchaser nor its affiliates, successors or assigns, as a result of any action taken in connection with the purchase of the Purchased Assets: (a) are a successor to the Debtors; (b) have, de facto or otherwise, merged with or into the Debtors; or (c) are a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.

P.    The Sale must be approved and consummated promptly in order to preserve the viability of the Debtors' businesses as a going concern, to maximize the value of the Debtors' estates and to position the Debtors to emerge from chapter 11.  The Sale is a prerequisite to the Debtors' ability to confirm and consummate a plan of reorganization.  The Sale is in contemplation of a plan of

9

reorganization and, accordingly, constitutes a transfer to which Bankruptcy Code section 1146(c) applies.

Q.    The Debtors have demonstrated that assuming and assigning the Assumed Contracts and Assumed Leases in connection with the Sale is an exercise of their sound business judgment, and that such assumption and assignment is in the best interests of the Debtors' estates.

R.    The Debtors have cured, or have provided adequate assurance of cure of, any default existing prior to the applicable Assumption Date, within the meaning of Bankruptcy Code section 365(b)(1)(A), under any of the Assumed Agreements (a) that will be assigned to the Purchaser as of the Closing Date and (b) that are or will become Assumed Customer Contracts (together, the "Initially Assumed Agreements"), and have provided compensation or adequate assurance of compensation to any non-Debtor party to such contracts or leases for any of their actual pecuniary losses resulting from any default arising prior to the applicable Assumption Date under any of such Initially Assumed Agreements, within the meaning of Bankruptcy Code section 365(b)(1)(B) (collectively, the "Cure Amounts").

S.    As of the relevant Assumption Date, each Assumed Contract and Assumed Lease will be in full force and effect and enforceable against the non-Debtor party thereto in accordance with its terms.

10

T.      On or before the Assumption Date, the Debtors will pay in full all Cure Amounts in respect of undisputed cure claims and the undisputed portion of any Cure Amount in respect of a disputed cure claim, and will segregate the disputed portion of any Cure Amount in respect of any disputed cure claim pending the resolution of any such dispute by this Court or mutual agreement of the parties. Any non-Debtor party to any Assumed Agreement who objected to the Cure Amounts (a "Cure Amount Objection") is protected by having such disputed portion of such Cure Amount segregated on or before the Assumption Date.

U.      The Debtors have, to the extent necessary, satisfied the requirements of Bankruptcy Code sections 365(b)(1) and 365(f) in connection with the Sale, the assumption and assignment of the Assumed Agreements (except with respect to Cure Amounts related to Assumed Contracts and Assumed Leases that are not Initially Assumed Agreements, which shall be dealt with pursuant to the terms set forth hereinafter), and shall upon assignment thereof on the Closing Date, be relieved from any liability for any breach thereof; and it is therefore

ORDERED, ADJUDGED AND DECREED THAT:

1.      The Motion is GRANTED (other than with respect to matters previously addressed by the Procedures Order).

2.      Any objections to the entry of this Sale Order or the relief granted herein and requested in the Motion that have not been withdrawn, waived or

11

settled, and all reservations of rights included therein, hereby are denied and over-
ruled on the merits with prejudice.

### Approval of the Purchase Agreement

3.    The Purchase Agreement and the Ancillary Agreements
(including the Transition Services Agreement), and all of the terms and conditions
thereof, including, but not limited to, the sale of the Purchased Assets and assump-
tion of the Assumed Liabilities, in exchange for the Purchase Price, as set forth in the
Purchase Agreement, are hereby approved.

4.    Pursuant to Bankruptcy Code section 365, the Debtors will be
deemed to have assumed the Purchase Agreement as of the Closing Date.

5.    Pursuant to Bankruptcy Code sections 363(b) and (f), the
Debtors are authorized and (subject to the applicable closing conditions set forth in
the Purchase Agreement) directed to consummate the Sale, pursuant to and in
accordance with the terms and conditions of the Purchase Agreement.

6.    The Debtors are authorized and (subject to the applicable
closing conditions set forth in the Purchase Agreement) directed to execute and
deliver, and empowered to perform under, consummate and implement, the Purchase
Agreement, collectively with all additional instruments and documents (including,
without limitation, the Ancillary Agreements (including the Transition Services
Agreement)) that may be reasonably necessary or desirable to implement the Pur-

12

chase Agreement, and to take all further actions as may be requested by the Purchaser

for the purpose of transferring the Purchased Assets to the Purchaser or as may be

necessary or appropriate to the performance of the obligations contemplated by the

Purchase Agreement. The Purchaser shall not be required to seek or obtain relief

from the automatic stay under section 362 of the Bankruptcy Code to enforce any of

its remedies under the Purchase Agreement, the Ancillary Agreements (including the

Transition Services Agreement) or any other Sale related document. The automatic

stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent

necessary to implement the preceding sentence.

### Transfer of Purchased Assets

7.     Except as expressly permitted or otherwise specifically

provided for in the Purchase Agreement or this Sale Order, pursuant to Bankruptcy

Code sections 105(a) and 363(f), the Purchased Assets shall be transferred to the

Purchaser and, as of the Closing Date or the applicable Assumption Date, as the case

may be, shall be free and clear of (a) all Interests, and (b) all debts arising under,

relating to, or in connection with any acts of the Debtors, claims (as that term is

defined in section 101(5) of the Bankruptcy Code), Liabilities, obligations, demands,

guaranties, options, rights, contractual commitments, restrictions, interests and

matters of any kind and nature, whether arising prior to or subsequent to the com-

mencement of these cases, and whether imposed by agreement, understanding, law,

13

equity or otherwise (including, without limitation, claims and encumbrances (i) that

purport to give to any party a right or option to effect any forfeiture, modification,

right of first refusal, or termination of any of the Sellers' or the Purchaser's interests

in the Purchased Assets, or any similar rights, or (ii) in respect of taxes, restrictions,

rights of first refusal, charges or interests of any kind or nature, if any, including, but

not limited to, any restriction on the use, voting, transfer, receipt of income or other

exercise of any attributes of ownership) (collectively, "Claims"), with the exception

of Permitted Liens and Assumed Liabilities, with all such non-assumed Interests and

Claims to attach to the Debtors' interest in the Sale Proceeds, in the order of their

priority, with the same validity, force and effect which they now have against the

Purchased Assets, subject to any rights, claims and defenses the Debtors may possess

with respect thereto.

        8.    Except as expressly permitted by the Purchase Agreement, all

persons and entities, including, but not limited to, all debt security holders, equity

security holders, governmental, tax and regulatory authorities, lenders, trade and

other creditors, holding Interests or Claims of any kind or nature whatsoever against

or in the Debtors or the Purchased Assets (whether legal or equitable, secured or

unsecured, matured or unmatured, contingent or non-contingent, liquidated or

unliquidated, senior or subordinated), arising under or out of, in connection with, or

in any way relating to, the Debtors, the Purchased Assets, the operation of the

14

Debtors' businesses prior to the Closing Date or the transfer of the Purchased Assets to the Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against the Purchaser, its property, its successors and assigns, its affiliates or the Purchased Assets, such persons' or entities' Interests or Claims (with the exception of Permitted Liens and Assumed Liabilities).  Following the Closing Date (or the applicable Assumption Date, with respect to Assumed Agreements other than Initially Assumed Agreements), no holder of an Interest in or Claim against the Debtors (other than holders of Permitted Liens or Assumed Liabilities) shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to such Interests or Claims, and all such Claims and Interests, if any, shall be, and hereby are channeled, transferred and attached solely and exclusively to the Sale Proceeds.

9.    The transfer of the Purchased Assets to the Purchaser pursuant to the Purchase Agreement shall not result in (i) the Purchaser having any liability or responsibility for any claim (other than for Permitted Liens or Assumed Liabilities) against the Debtors or against an insider of the Debtors, or (ii) the Purchaser having any liability or responsibility to the Debtors except pursuant to the Purchase Agreement, the Ancillary Agreements (including the Transition Services Agreement) and this Sale Order.

10.    The Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Purchased Assets other than as expressly set forth in the Purchase Agreement. Without limiting the effect or scope of the foregoing, the transfer of the Purchased Assets from the Debtors to the Purchaser does not and will not subject the Purchaser or its affiliates, successors or assigns or their respective properties (including the Purchased Assets) to any liability for claims (as that term is defined in section 101(5) of the Bankruptcy Code) against the Debtors or the Purchased Assets by reason of such transfer under the laws of the United States or any state, territory or possession thereof applicable to such transactions. Neither the Purchaser nor its affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Purchased Assets to:  (a) be a successor to the Debtors; (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors. Neither the Purchaser nor its affiliates, successors or assigns is acquiring or assuming any liability, warranty or other obligation of the Debtors, including, without limitation, any tax incurred but unpaid by the Debtors prior to the Closing Date, including, but not limited to, any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, fixed or audited, whether or not paid, and whether or not

16

contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction, except as otherwise expressly provided in the Purchase Agreement.

        11.      The transfer of the Purchased Assets to the Purchaser pursuant to the Purchase Agreement constitutes a legal, valid and effective transfer of the Purchased Assets, and shall vest the Purchaser with all right, title and interest of the Debtors in and to the Purchased Assets free and clear of all Claims and Interests (other than Permitted Liens and Assumed Liabilities) of any kind or nature whatsoever.

        12.      On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets or a bill of sale transferring good and marketable title in the Purchased Assets to the Purchaser. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

        13.      This Order is and shall be effective as a determination that, all Liens (other than Permitted Liens) shall be, and are, without further action by any person or entity, released with respect to the Purchased Assets as of the Closing Date (or with respect to Assumed Contracts and Assumed Leases assumed after the Closing Date, as of the Assumption Date).

17

14.    This Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

15.    The transactions contemplated by the Purchase Agreement, and the execution, delivery and/or recordation of any and all documents or instruments necessary or desirable to consummate the transactions contemplated by the Purchase Agreement shall be, and hereby are, exempt from the imposition and payment of all recording fees and taxes, stamp taxes and/or sales, transfer or any other similar taxes, pursuant to section 1146(c) of the Bankruptcy Code.

### Assumption and Assignment of
### Assumed Contracts and Assumed Leases

16.    The Debtors are hereby authorized, in accordance with Bankruptcy Code sections 105(a), 363 and 365, to (a) assume and assign to the Purchaser, effective upon the Assumption Dates, the Assumed Contracts and Assumed Leases, and to transfer, sell and deliver to the Purchaser all of Sellers' right, title and interest in and to the Assumed Contracts and Assumed Leases, free and

18

clear of all Interests and Claims of any kind or nature whatsoever (provided, how-
ever, that nothing herein shall defeat any right which a party to an Assumed Contract
or Assumed Lease may have under section 365 of the Bankruptcy Code), and (b)
execute and deliver to the Purchaser such documents or other instruments as may be
necessary to assign and transfer the Assumed Contracts and Assumed Leases to the
Purchaser.

17.    The requirements of sections 365(b)(1) and 365(f)(2) of the
Bankruptcy Code are hereby deemed satisfied with respect to the Assumed Contracts
and Assumed Leases (subject to the "cure amount" procedures set forth herein).

18.    The Assumed Contracts and Assumed Leases shall be trans-
ferred to, and remain in full force and effect for the benefit of, the Purchaser, in
accordance with their respective terms, notwithstanding any provision in any such
Assumed Contract or Assumed Lease (including provisions of the type described in
sections 365(b)(2), (e)(1) and (f)(1) of the Bankruptcy Code) which prohibits,
restricts or conditions such assignment or transfer. The non-Debtor party to each
Assumed Contract or Assumed Lease shall be deemed to have consented to such
assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser
shall enjoy all of the rights and benefits under each such Assumed Contract or
Assumed Lease as of the applicable Assumption Date without the necessity of

19

obtaining such non-Debtor party's written consent to the assumption and assignment thereof.

19. Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any liability for any breach of any Assumed Contract or Assumed Lease after such assignment to and assumption by the Purchaser on the applicable Assumption Date.

20. All liquidated monetary defaults, claims or other obligations of the Debtors arising or accruing under each Assumed Contract or Assumed Lease prior to the assumption of such Assumed Contract or Assumed Lease (without giving effect to any acceleration clauses or any default provisions of the kind specified in Bankruptcy Code section 365(b)(2)) shall be promptly cured by the Debtors upon assumption and assignment as provided in Bankruptcy Code section 365(b)(1).

21. If the Debtors receive a Cure Amount Objection, they shall attempt to resolve such disputed Cure Amount with the party asserting the objection. If consensual resolution of the Cure Amount Objection cannot be reached, the Debtors will (i) pay in full the undisputed portion of such Cure Amount on or before the applicable Assumption Date and (ii) segregate the disputed portion of such Cure Amount (the "Segregated Amounts") pending the resolution of the Cure Amount Objection by this Court or by mutual agreement of the parties. In light of these procedures, the fact that any Cure Amount Objection is not resolved shall not prevent

or delay the occurrence of any Assumption Date or the assumption and assignment of any Assumed Contract or Assumed Agreement, and the objectors' only recourse after the relevant Assumption Date shall be to the Segregated Amounts.

22.    Subject to the terms hereof with respect to the Segregated Amounts, all defaults or other obligations of the Debtors under the Initially Assumed Agreements (and, upon payment of all Cure Amounts with respect to other Assumed Transition Agreements (defined below), all Assumed Contracts and Assumed Leases) arising or accruing prior to the Assignment Date have been cured or shall promptly be cured by the Debtors in accordance with the terms hereof such that the Purchaser shall have no liability or obligation with respect to any default or obligation arising or accruing under any Assumed Contract or Assumed Lease prior to the Assumption Date, except to the extent expressly provided in the Purchase Agreement. Each non-Debtor party to an Assumed Contract or Assumed Lease is forever barred, estopped and permanently enjoined from asserting against the Purchaser or its property or affiliates, or any thereof, any breach or default under any Assumed Contract or Assumed Lease, any claim of lack of consent relating to the assignment thereof, or any counterclaim, defense, setoff, right of recoupment or any other matter arising prior to the Assignment Date for such Assumed Contract or Assumed Lease or with regard to the assumption and assignment thereof pursuant to the Purchase Agreement or this Order.

21

23.    Upon assignment of the Assumed Contracts and Assumed Leases to the Purchaser on the applicable Assumption Date, no default shall exist under any Assumed Contract or Assumed Lease and no non-Debtor party to any Assumed Contract or Assumed Lease shall be permitted to declare a default by the Purchaser under such Assumed Contract or Assumed Lease or otherwise take action against the Purchaser as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Assumed Contract or Assumed Lease, including any failure to pay any amounts necessary to cure any Debtor's defaults thereunder. Upon entry of this Sale Order and assumption and assignment of the Assumed Contracts and Assumed Leases, the Purchaser shall be deemed in compliance with all terms and provisions of the Assumed Contracts and Assumed Leases.

24.    Notwithstanding anything to the contrary in this Sale Order, upon assumption of the Assumed Contracts and Assumed Leases, the Purchaser is assuming all liabilities arising under the Assumed Contracts and Assumed Leases arising and accruing on and after the applicable Assumption Date.

**Assumption and Rejection Procedures Applicable to
Underlying Service Agreements and Undesignated Agreements**

25.    The Debtors are hereby authorized to assume and assign to the Purchaser, or to reject, each Underlying Service Agreement and each Undesignated Agreement pursuant to section 365 of the Bankruptcy Code, without the need for any

22

further notice, motion, hearing or order.  The timing of such assumption and assign-

ment or rejection, as the case may be, the "cure amounts," if any, required to be paid

upon such assumption and assignment, and the other matters set forth in this para-

graph, shall be determined in accordance with the following procedures:

        A.     Assumption:

(i)     At any time after entry of this Order and on or prior to the Election Date, the Purchaser may notify the Debtors, in writing pursuant to the terms of the Purchase Agreement, of its desire for the relevant Debtor to assume and assign to the Purchaser any Underlying Service Agreement or Undesignated Agreement (each agreement subject to such a notice, an "Assumed Transition Agreement").

(ii)    Within two (2) business days of such notice, the Debtors shall file with the Court and serve on (i) each non-Debtor party to such agreement, (ii) counsel to the Purchaser, (iii) counsel to the Committee, (iv) counsel to Verizon and (v) counsel to the administrative agent for the Bank Group (collectively, the "Notice Parties"), a notice (an "Assumption Notice") substantially in the form annexed hereto as Exhibit B of the assumption and assignment of such Assumed Transition Agreement to the Purchaser pursuant to section 365 of the Bankruptcy Code and the terms of this Order.  Each Assumption Notice shall identify the relevant Assumed Transition Agreement and set forth the Debtors' proposed "cure amount" with respect to the relevant Assumed Transition Agreement.

(iii)   Each non-Debtor party to an Assumed Transition Agreement shall have ten (10) days from the date of the relevant Assumption Notice to file with the Court and serve on the Notice Parties an objection (a "Cure Objection") (a) pursuant to section 365(b)(1)(A) of the Bankruptcy Code, to the proposed cure amount set forth in such Assumption Notice and/or (b) asserting actual pecuniary losses of the type referred to in section 365(b)(1)(B) of the Bankruptcy Code.  No other form of objection to any Assumption Notice shall be permitted.  If no Cure Objection is timely filed and served as described above with respect to a particular Assumed Transition Agreement, the "cure

23

amount" for such Assumed Transition Agreement shall be that proposed by the Debtors in the relevant Assumption Notice, and such cure amount shall be paid by the Debtors as of the respective Assumption Date. If a Cure Objection is timely filed and served as described above with respect to a particular Assumed Transition Agreement, then the Debtors shall pay the full amount of the undisputed portion of such cure amount and segregate the full amount of the disputed portion of such cure amount pending resolution of such Cure Objection, and pay to the objecting party, upon resolution of such dispute by agreement of the parties or order of the Court, the remaining cure amount, if any, set forth in such agreement or order.

(iv)   Regardless of whether a Cure Objection is timely filed and served as described above, the relevant Assumed Transition Agreement shall be assumed by the relevant Debtor and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code, without the need for any further notice, motion, hearing or order, as of the date that is ten (10) days following the date of the relevant Assumption Notice. All necessary authority for such assumption and assignment, including a finding that the Debtors and the Purchaser have provided "adequate assurance of future performance" as and to the extent required by sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code, is provided by this Order, and the entry hereof shall bar, estop and prohibit any non-Debtor party to an Assumed Transition Agreement from asserting any future objection, other than a Cure Objection, to such assumption and assignment.

(v)   Upon assignment of the relevant Assumed Transition Agreement on the relevant Assumption Date, the Debtors will be relieved pursuant to Bankruptcy Code section 365(k) from any liability for any breach of such agreement.

B.   Rejection:

(i)   At any time after fifteen (15) business days prior to the Closing Date and on or prior to the Election Date, the Purchaser may notify the Debtors, in writing pursuant to the terms of the Purchase Agreement: (a) that it does not intend to seek assignment of any particular Underlying Service Agreement or Undesignated Agreement pursuant to the terms of the Purchase Agreement and subparagraph A of this para-

24

graph (each agreement subject to such a notice, a "Rejected Transition Agreement") and (b) the earliest date (the "Migration Date") on which the relevant Debtor may reject (or assign to any third party) such Rejected Transition Agreement; provided, however, that no Migration Date for any Rejected Transition Agreement shall be later than the date (the "Migration Deadline") that is the later to occur of (y) six (6) months after the Closing Date and (z) the effective date of confirmation of a plan of reorganization in these cases.

(ii)     At any time prior to the Migration Date for a particular Rejected Transition Agreement, the Purchaser may, by written notice to the Debtors, set an earlier Migration Date for such Rejected Transition Agreement; provided, however, that such earlier Migration Date shall not be less than fifteen (15) days after the date of the notice referred to in this clause (ii).  The Purchaser may issue multiple such notices with respect to a single Rejected Transition Agreement.

(iii)    If the Purchaser has not notified the Debtors, on or before the Election Date, that a particular Underlying Service Agreement or Undesignated Agreement shall be treated as an Assumed Transition Agreement or a Rejected Transition Agreement, such agreement shall, absent further order of the Court sought by or at the request of the Purchaser, be treated as a Rejected Transition Agreement, and the Migration Date for such Rejected Transition Agreement shall be the Election Date.

(iv)    After the date hereof and not less than ten (10) days prior to the Migration Date for a given Rejected Transition Agreement, the Debtors may file with the Court and serve on the Notice Parties a notice (a "Rejection Notice") substantially in the form annexed hereto as Exhibit C of the effective date (the "Rejection Effective Date") of the rejection of such Rejected Transition Agreement.  As of each Rejection Effective Date, the relevant Rejected Transition Agreement shall be rejected pursuant to section 365 of the Bankruptcy Code and the terms of this Order, without the need for any further notice, motion, hearing or order; provided, however, that no Rejection Effective Date shall be earlier than the relevant Migration Date; provided, further, that the Debtors are not required to reject, pursuant to these rejection procedures or otherwise, any Underlying Service Agreement or Undesignated Agreement designated as a Rejected Transition Agreement.

25

(v)     Each Rejection Notice shall provide that the non-Debtor party to the relevant Rejected Transition Agreement shall be forever barred, estopped and prohibited from asserting any claim in these cases for damages arising from the rejection of such Rejected Transition Agreement unless such party files a claim for such damages on or before the date that is thirty (30) days after the Rejection Effective Date set forth in such Rejection Notice.

(vi)    All necessary authority for the rejection of each Rejected Transition Agreement is provided by this Order, and the entry hereof shall bar, estop and prohibit any non-Debtor party to a Rejected Transition Agreement from asserting any future objection to such rejection.

26.     In no event shall any Rejection Claim (as defined in the Purchase Agreement) include any claim amount arising as a result of the fact that a particular Rejection Effective Date is later than the Migration Date for the relevant Rejected Transition Agreement.

27.     At all times from the Closing Date through the date of assumption (with respect to each Assumed Transition Agreement) or the Migration Date (with respect to each Rejected Transition Agreement), (a) no Assumed Transition Agreement or Rejected Transition Agreement shall be (i) assigned by the Debtors to any third party or (ii) rejected by the Debtors, (b) subject to the Purchaser's obligations under Section 4.1 of the Transition Services Agreement, following the Closing the Debtors shall continue to perform their respective obligations under, and shall not terminate or modify, any Assumed Transition Agreement or Rejected Transition Agreement and (c) no party shall have the right to compel, or to seek an order compelling, the Debtors to assume or reject any Assumed Transition

26

Agreement or Rejected Transition Agreement (including any Underlying Service

Agreement or Undesignated Agreement that may become an Assumed Transition

Agreement or Assumed Rejection Agreement), whether pursuant to section 365(d)(2)

of the Bankruptcy Code or otherwise.  Notwithstanding any provision of this Sale

Order to the contrary, nothing in this decretal paragraph or in this Sale Order shall be

in derogation of the right of any party to terminate an executory contract or unexpired

lease by its terms, subject to applicable bankruptcy and  non-bankruptcy law.

28.     If any plan shall be confirmed in these cases prior to the date

that is 180 days after the Closing Date, the Order confirming such plan shall not

allow any Rejected Transition Agreement to be rejected at any time prior to the

conclusion of such 180 day period.

## Claims Arising Out of Excluded Agreements

29.     The Purchaser shall have the right to reasonably direct the

Sellers in the defense of, and in the settlement and compromise of, any claim in these

cases arising out of an Excluded Agreement if such claim could give rise to Rejection

Claims, or at the Sellers' expense, to initiate and/or prosecute any objection to any

claim arising from any Excluded Agreement.  The Sellers shall not settle any claim in

these cases arising out of any Excluded Agreement if such claim could give rise to

Rejection Claims without the Purchaser's prior written consent, which consent shall

not be unreasonably withheld.

27

**Additional Provisions**

30.    The consideration provided by the Purchaser for the Purchased

Assets under the Purchase Agreement is fair and reasonable and may not be avoided

under Bankruptcy Code section 363(n).

31.    The transactions contemplated by the Purchase Agreement are

undertaken by the Purchaser in good faith, as that term is used in Bankruptcy Code

section 363(m) and, accordingly, the reversal or modification on appeal of the

authorization provided herein to consummate the Sale shall not affect the validity of

the Sale to the Purchaser, unless such authorization is duly stayed pending such

appeal.  The Purchaser is a good-faith purchaser of the Purchased Assets, and is

entitled to all of the benefits and protections afforded by Bankruptcy Code section

363(m).

32.    This Court retains jurisdiction to enforce and implement the

terms and provisions of the Purchase Agreement, all amendments thereto, any

waivers and consents thereunder, and of each of the agreements executed in connec-

tion therewith (including, but not limited to, the Ancillary Agreements (including the

Transition Services Agreement)) in all respects, including, but not limited to,

retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Purchaser,

(b) compel assumption of the Assumed Liabilities by the Purchaser, (c) resolve any

disputes arising under or related to the Purchase Agreement, except as otherwise

28

provided therein, and (d) interpret, implement and enforce the provisions of this Sale
Order.

        33.      Pursuant to section 364(c)(1) of the Bankruptcy Code, (i) the
obligation of the Sellers to pay the Adjustments, including interest with respect
thereto, and (ii) the indemnification obligations of the Sellers pursuant to Article X
of the Purchase Agreement, shall receive superpriority administrative claim status.
Pursuant to section 364(c)(1) of the Bankruptcy Code, (i) the administrative claims in
respect of the Adjustments, including interest with respect thereto, and (ii) the
administrative claims in respect of the indemnification obligations of the Sellers
pursuant to Article X of the Purchase Agreement, shall have priority over any and all
administrative expenses of the kinds specified in sections 503(b), 506(c), 507(a) or
507(b) of the Bankruptcy Code.

        34.      All entities who are presently, or on the Closing Date (or the
applicable Assumption Date, with respect to Assumed Agreements other than
Initially Assumed Agreements) may be, in possession of some or all of the Purchased
Assets hereby are directed to surrender possession of the Purchased Assets either to
(i) the Debtors prior to the Closing Date (or the applicable Assumption Date, with
respect to Assumed Agreements other than Initially Assumed Agreements), for
subsequent transfer to the Purchaser on the Closing Date (or the applicable Assump-
tion Date, with respect to Assumed Agreements other than Initially Assumed

Agreements), or (ii) to the Purchaser on the Closing Date (or the applicable Assumption Date, with respect to Assumed Agreements other than Initially Assumed Agreements).

35.    On or before the Closing Date (or the applicable Assumption Date), each of the Debtors' creditors is authorized and directed to execute such documents and take all other actions as may be necessary to release its Interests in the Purchased Assets, if any, as such Interests may have been recorded or otherwise exist.

36.    If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens or other documents or agreements evidencing Interests with respect to the Debtors and/or the Purchased Assets shall not have delivered to the Debtors and the Purchaser prior to the Closing Date, or relevant Assumption Date, as the case may be, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Interests which the person or entity has with respect to the Debtors and/or the Purchased Assets or otherwise, then (i) the Debtors hereby are authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such assets and contracts and (ii) the Purchaser hereby is authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive

30

evidence of the release of all Interests in the Purchased Assets as of the Closing Date or the applicable Assumption Date, as the case may be, of any kind or nature whatsoever (other than the Permitted Liens and Assumed Liabilities).

37.    Any amounts payable by the Sellers pursuant to the Purchase Agreement or any of the documents delivered by the Sellers pursuant to or in connection with the Purchase Agreement shall (i) constitute administrative priority expenses of the Sellers' estates pursuant to Bankruptcy Code sections 503(b) and 507(a)(1), except as otherwise specifically provided in the Purchase Agreement, (ii) be paid by the Sellers in the time and manner provided in the Purchase Agreement without further order of this Court, and (iii) not be discharged, modified or otherwise affected by any plan of reorganization of any of the Sellers.

38.    The terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, the Purchaser and its respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

39.    All persons who hold Claims against or Interests in (other than Permitted Liens and Assumed Liabilities) the Debtors are forever barred, estopped and permanently enjoined from asserting or prosecuting any claims or causes of

31

action against the Purchaser, its affiliates, or any of its respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

40.    After the Closing Date, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Purchased Assets on account of, or (b) collect or attempt to collect from the Purchaser or any of its affiliates, any tax (or other amount alleged to be owing by one or more of the Debtors) (i) for any period commencing before and concluding prior to or after the Closing Date, or (ii) assessed prior to and payable after the Closing Date, except as otherwise specifically provided in the Purchase Agreement.

41.    No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to any of the transactions under the Purchase Agreement.

42.    The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

32

43.    Nothing contained in any chapter 11 plan confirmed in these cases or any order confirming any such plan or in any other order in these cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) shall alter, conflict with, or derogate from, the provisions of the Purchase Agreement or this Sale Order.

44.    The failure specifically to include any particular provisions of the Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Purchase Agreement be authorized and approved in its entirety.  Likewise, all of the provisions of this Sale Order are nonseverable and mutually dependent.

45.    Notwithstanding the provisions of Bankruptcy Rules 6004(g) and 6006(d), this Sale Order shall not be stayed for ten (10) days after the entry hereof, but shall be effective and enforceable immediately upon issuance hereof. Time is of the essence in closing the transactions referenced herein and the Debtors and the Purchaser intend to close the Sale as soon as practicable.  Therefore, any

33

party objecting to this Sale Order must exercise due diligence in filing an appeal and

pursuing a stay, or risk its appeal being foreclosed as moot.

Dated: New York, New York
      _____ \_\_, 2002


                        _____
                        Honorable Prudence C. Beatty
                        United States Bankruptcy Judge

**EXHIBIT A**

**Asset Purchase Agreement**

[To Be Attached Prior to Presentation to Court at Sale Hearing]

**EXHIBIT B**

**Form of Assumption Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
In re:                              :   Chapter 11
                                    :
GENUITY INC., et al.,               :   Case No. 02-43550 (PCB)
                                    :
                    Debtors.        :   (Jointly Administered)
- - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## NOTICE OF ASSUMPTION AND ASSIGNMENT OF CONTRACT(S)

PLEASE TAKE NOTICE that, on November ___, 2002, the above captioned debtors and debtors-in-possession (collectively, the "Debtors") filed the:

> Motion for Order Under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (I) (A) Approving Notice and Bidding Procedures, (B) Approving Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, in Connection with the Proposed Sale of Substantially All of the Debtors' Assets and (C) Scheduling Hearing and Setting Bidding and Objection Deadlines in Connection with Such Sale; and (II) Authorizing and Approving (A) Asset Purchase Agreement with Level 3 Communications, Inc. and Level 3 Communications, LLC, (B) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances, (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (D) Certain Related Relief (Docket No. ___) (the "Sale Motion").

PLEASE TAKE FURTHER NOTICE that, on _____ __, 2002, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") granted certain relief requested in the Sale Motion by entering the:

> Order Under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 Authorizing and Approving (I) Asset Purchase Agreement with Level 3 Communications, Inc. and Level 3 Communications, LLC; (II) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances; (III) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Certain Related Relief (Docket No. ___) (the "Sale Order").

PLEASE TAKE FURTHER NOTICE that, among other things, the Sale Order approves the Asset Purchase Agreement, by and among Level 3 Communications, Inc., Level 3 Communications, LLC, and Genuity Inc. ("Genuity"), Genuity International Inc., Genuity International Networks Inc., Genuity Solutions Inc., Genuity Telecom Inc. and Genuity Employee Holdings LLC (collectively, the "Sellers"), dated as of November 27, 2002 (as amended from time to time, the "Purchase Agreement"), pursuant to which the Debtors agreed to sell (the "Sale") substantially all of their assets (the "Purchased Assets") and assume and assign certain executory contracts and unexpired leases (collectively, the "Assumed Contracts"), including the contracts listed on Exhibit 1 hereto, to **[List Successful Bidder]** (the "Purchaser"), free and clear of liens, claims, encumbrances and interests

(except for certain express assumed liabilities and permitted liens), all as more fully set forth in the Purchase Agreement.

PLEASE TAKE FURTHER NOTICE that, pursuant to the Sale Motion and Sale Order, the Debtors hereby provide notice of their intent to assume the Assumed Contracts listed on Exhibit 1 attached hereto, and to assign such Assumed Contracts to the Purchaser in connection with the Sale and pursuant to terms of the Purchase Agreement, effective as of the date that is ten (10) days following the date of this Notice (the "Effective Date").

PLEASE TAKE FURTHER NOTICE that with respect to each Assumed Contract, on the Effective Date or as soon thereafter as practicable, the Debtors will pay, as the amount necessary to "cure" any and all "defaults" (each within the meaning of Bankruptcy Code section 365(b)) outstanding under such Assumed Contract, the amount (the "Cure Amount") set forth opposite such Assumed Contract on Exhibit 1 hereto. The Debtors' records reflect that all other prepetition and postpetition amounts owing under the Assumed Contract(s) have been paid, and that other than the Cure Amount there are no other defaults outstanding under the Assumed Contract(s). Postpetition amounts owing under the Assumed Contract(s) will continue to be paid by the Debtors or the Purchaser (as set forth in the Purchase Agreement) until the assumption and assignment of the Assumed Contract(s).

PLEASE TAKE FURTHER NOTICE that objections, if any, to the proposed assumption and assignment of any Assumed Contract on grounds (the "Permitted Grounds") that the non-Debtor party to the Assumed Contract (x) disagrees with the Cure Amount listed on Exhibit 1 hereto or (y) asserts actual pecuniary losses of the type referred to in Bankruptcy Code section 365(b)(1)(B), must be made in writing, filed with the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408, and served so as to be received by (i) Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, Attention: J. Gregory Milmoe, Esq., and Skadden, Arps, Slate, Meagher & Flom LLP, One Rodney Square, P.O. Box 636, Wilmington, Delaware 19899-0636, Attention: Eric M. Davis, Esq.; (ii) Willkie Farr & Gallagher, 787 Seventh Avenue, New York, New York 10019, Attention: John Longmire, Esq.; and (iii) the Office of the United States Trustee, 33 Whitehall Street, New York, New York 10004, Attention: Brian Masumoto, Esq., by 4:00 p.m. (Eastern Time) on the Effective Date (the "Objection Deadline"). Objections to the Cure Amount must state with specificity what cure amount is believed to be required, and must include appropriate documentation in support thereof.

PLEASE TAKE FURTHER NOTICE that all necessary authority for the proposed assumption and assignment, including a finding that the Debtors and the Purchaser have provided "adequate assurance of future performance" as and to the extent required by Bankruptcy Code sections 365(b)(1)(C) and (f)(2)(B), is provided by the Sale Order, which Sale Order and the entry thereof bars, estops and prohibits any non-Debtor party to an Assumed Contract from asserting any future objection, other than an objection on the above-stated Permitted Grounds, to such assumption and assignment. Accordingly, objections on grounds other than Permitted Grounds will not be considered by the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE that if an objection on Permitted Grounds is timely filed and served to the proposed assumption and assignment in accordance with the procedures set forth above, the Debtors shall (i) set the objection for hearing before the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004-1408,

2

Room ___, before the Honorable Prudence C. Beatty, United States Bankruptcy Judge, at the next regularly-scheduled omnibus hearing in these cases or on such other date and time as the Bankruptcy Court may schedule; and (ii) pay the full amount of the undisputed portion of such cure amount and segregate the full amount of the disputed portion of such cure amount pending resolution of such Cure Objection, and pay to the objecting party, upon resolution of such dispute by agreement of the parties or order of the Court, the remaining cure amount, if any, set forth in such agreement or order.

PLEASE TAKE FURTHER NOTICE that if no objection on Permitted Grounds is filed and served in accordance with the procedures set forth above with respect to the proposed assumption and assignment of an Assumed Contract, the Cure Amount shall be fixed at the amount set forth opposite such Assumed Contract on Exhibit 1 hereto, notwithstanding anything to the contrary in any Assumed Contract or any other document; and the non-Debtor party to such Assumed Contract shall be (i) deemed to have waived and released any right to assert an objection to the proposed assumption and assignment of the Assumed Contract or the Cure Amount with respect thereto, and to have otherwise consented to the assumption and assignment of the Assumed Contract, and (ii) forever barred, permanently enjoined and estopped from asserting or claiming any other or further claims against the Debtors, the Purchaser, their respective successors and assigns, the Purchased Assets, or the property or assets of any or all such parties, as to such Assumed Contract or on grounds that any additional amounts are due or defaults exist, or conditions to assignment must be satisfied, under such Assumed Contract.

PLEASE TAKE FURTHER NOTICE that regardless of whether an objection is timely filed and served as described above, the relevant Assumed Contract shall be assumed by the relevant Debtor and assigned to the Purchaser pursuant to Bankruptcy Code section 365, without the need for any further notice, motion, hearing or order, as of the Effective Date.

PLEASE TAKE FURTHER NOTICE that, upon assignment, (i) the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser, in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract (including provisions of the type described in Bankruptcy Code sections 365(b)(2) and (f)(1)) which prohibits, restricts or conditions such assignment or transfer; and (ii) the non-Debtor party to such Assumed Contract shall be deemed to consent to such assignment under Bankruptcy Code section 365(c)(1)(B), and the Purchaser shall enjoy all of the rights and benefits under each such Assumed Contract as of the Effective Date without the necessity of obtaining such non-Debtor party's written consent to the assumption and assignment thereof.

PLEASE TAKE FURTHER NOTICE that, upon assignment of the Assumed Contracts, the Purchaser is assuming all liabilities arising under the Assumed Contracts on and after the Effective Date, and the Debtors and their estates shall be relieved from any liability for any breach of any Assumed Contract after such assignment to and assumption by the Purchaser on the Effective Date.

PLEASE TAKE FURTHER NOTICE that, upon assignment of the Assumed Contracts, no default shall exist under any Assumed Contract and no non-Debtor party to any Assumed Contract shall be permitted to declare a default by the Purchaser under such Assumed Contract or otherwise take action against the Purchaser as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Assumed Contract, including any failure to pay any amounts necessary to cure any Debtor's defaults thereunder. Upon assumption and

3

assignment of the Assumed Contracts, the Purchaser shall be deemed in compliance with all terms and provisions of such Assumed Contracts.

        Copies of the Sale Motion, the Sale Order and related documents are available from Donlin, Recano & Company, Inc., 419 Park Avenue South, Suite 1206, New York, NY 10016, Attention: Ron Howard, telephone number (212) 481-1411 (Extension 130), or through the website established for these cases located at www._____.htm.

Dated:  New York, New York
        _____ __, 2002

J. Gregory Milmoe (JM 0919)
Sally McDonald Henry (SH 0839)
Cheri L. Hoff (CH 5193)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
(212) 735-3000

Eric M. Davis
David R. Hurst
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
(302) 651-3000

Attorneys for Debtors and Debtors-in-Possession

4

**EXHIBIT 1**

**Contract(s) to be Assumed and Assigned to Purchaser on Effective Date**

| Contract Description | Effective Date of Assumption | Cure Amount |
|---|---|---|
|  |  |  |

**EXHIBIT C**

**Form of Rejection Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In re:                        :     Chapter 11
                                :
GENUITY INC., et al.,         :     Case No. 02-43550 (PCB)
                                :
                 Debtors.     :     (Jointly Administered)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### NOTICE OF REJECTION OF CONTRACT(S)

         PLEASE TAKE NOTICE that, on November ___, 2002, the above captioned debtors and debtors-in-possession (collectively, the "Debtors") filed the:

         Motion for Order Under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (I) (A) Approving Notice and Bidding Procedures, (B) Approving Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, in Connection with the Proposed Sale of Substantially All of the Debtors' Assets and (C) Scheduling Hearing and Setting Bidding and Objection Deadlines in Connection with Such Sale; and (II) Authorizing and Approving (A) Asset Purchase Agreement with Level 3 Communications, Inc. and Level 3 Communications, LLC, (B) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances, (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (D) Certain Related Relief (Docket No. ___) (the "Sale Motion").

         PLEASE TAKE FURTHER NOTICE that, on _____ __, 2002, the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") granted certain relief requested in the Sale Motion by entering the:

         Order Under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 Authorizing and Approving (I) Asset Purchase Agreement with Level 3 Communications, Inc. and Level 3 Communications, LLC; (II) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances; (III) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Certain Related Relief (Docket No. ___) (the "Sale Order").

         PLEASE TAKE FURTHER NOTICE that, pursuant to the contact rejection procedures proposed in the Sale Motion and approved in the Sale Order, the Debtors hereby provide notice that the executory contract(s) and/or unexpired lease(s) set forth on Exhibit 1 attached hereto (the "Rejected Contracts") will be rejected pursuant to Bankruptcy Code section 365, effective as of the date (the "Effective Date") stated on Exhibit 1 hereto, without further notice, motion, hearing or order of the Court.

         PLEASE TAKE FURTHER NOTICE that all necessary authority for the proposed rejection of each Rejected Contract is provided by the Sale Order, which Sale Order and the entry

thereof bars, estops and prohibits any non-Debtor party to a Rejected Contract from asserting any future objection to such rejection. Accordingly, no objections to the proposed rejection will be considered by the Bankruptcy Court.

PLEASE TAKE FURTHER NOTICE that any claim (each, a "Rejection Damages Claim") arising on account of the rejection of a Rejected Contract must be filed no later than thirty (30) days after the Effective Date. If no Rejection Damages Claim with respect to the rejection of a Rejected Contract is timely filed, the non-Debtor party to the such Rejected Contract shall be forever barred, estopped and prohibited from asserting any claim in these cases for damages arising from the rejection of such Rejected Contract.

PLEASE TAKE FURTHER NOTICE that pursuant to the Sale Order, the Debtors subsequently may serve a revised rejection notice accelerating the Effective Date of rejection set forth on Exhibit 1 hereto to a date (the "Revised Effective Date") no earlier than fifteen (15) days after service of such revised rejection notice. No objection to the revised rejection notice shall be permitted, and the subject agreement shall be rejected as of the Revised Effective Date without further notice, motion, hearing or order of the Court.

Copies of the Sale Motion, the Sale Order and related documents are available from Donlin, Recano & Company, Inc., 419 Park Avenue South, Suite 1206, New York, NY 10016, Attention: Ron Howard, telephone number (212) 481-1411 (Extension 130), or through the website established for these cases located at www._____.htm.

Dated:   New York, New York
              _____ __, 2002

J. Gregory Milmoe (JM 0919)                  Eric M. Davis
Sally McDonald Henry (SH 0839)               David R. Hurst
Cheri L. Hoff (CH 5193)                       SKADDEN, ARPS, SLATE,
SKADDEN, ARPS, SLATE,                         MEAGHER & FLOM LLP
MEAGHER & FLOM LLP                            One Rodney Square
Four Times Square                            P.O. Box 636
New York, New York  10036                    Wilmington, Delaware 19899-0636
(212) 735-3000                               (302) 651-3000

Attorneys for Debtors and Debtors-in-Possession

2

**EXHIBIT 1**

**Contract(s) to be Rejected on Effective Date**

| Contract Description | Effective Date of Rejection |
|---|---|
|  |  |

393099.08-New York S5A

**REED SMITH LLP**                                    **Hearing Date: January 21, 2003**
Deborah A. Reperowitz, Esq. (DR-7989)                              **2:30 p.m.**
Richard P. Norton, Esq.  (RN-2231)
599 Lexington Avenue, 29th Floor
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450

-and-

One Riverfront Plaza
1st Floor
Newark, NJ 07102
Telephone:  (973) 621-3200
Facsimile:  (973) 621-3199
E-mail: dreperowitz@reedsmith.com
         rnorton@reedsmith.com

*Attorneys for CIT Communications Finance Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| GENUITY INC., et al., | Case No. 02-43558 (PCB) |
| Debtors. | (Jointly Administered) |

**LIMITED OBJECTION OF CIT COMMUNICATIONS FINANCE CORPORATION TO
THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR
OF LIENS, CLAIMS AND ENCUMBRANCES AND THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES**

TO:        THE HONORABLE PRUDENCE CARTER BEATTY
           UNITED STATES BANKRUPTCY JUDGE

           CIT Communications Finance Corporation ("CIT"), by and through its counsel,

Reed Smith, LLP, hereby objects to the motion (the "Sale Motion") of Genuity, Inc. , debtor and

debtor-in-possession, and certain related debtor entities (collectively  "the Debtors"), dated

November 27, 2002, seeking, among other things, authority (i) to sell substantially all of the

Debtors' assets free and clear of liens, claims and encumbrances, and (ii) to assume and assign certain executory contracts and unexpired leases (the "Sale"), and in support thereof states as follows:

1.      On or about November 27, 2002 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under Chapter 11, title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").  The Debtors have remained in possession of their property and have continued to operate their businesses pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

2.      On or about the Petition Date, the Debtors filed the Sale Motion.  On December 16, 2002, the Court entered an Order fixing bidding procedures and scheduling a hearing and setting bidding and objection deadlines in connection with the Sale (the "Bidding Procedures Order").

3.      Pursuant to the Bidding Procedures Order, among other things, the hearing to consider the Sale is scheduled to be held on January 21, 2003 and objections to the Sale are required to be filed by January 15, 2003.

4.      CIT is the lessor of certain equipment (the "Equipment") to one or more of the Debtors pursuant to Master Equipment Lease Agreement E212580 (the "Lease"), and various Schedules relating thereto (the "Schedules").  The Equipment is located at various facilities in the Continental United States.

5.      Based upon its review of the Sale Motion and conversations it has had with the Debtors, CIT believes that the Debtors seek to assume and assign the Lease and some  or all of the Schedules.

6.      Although CIT does not object to the sale of substantially all of the Debtors' assets generally, CIT objects to the Sale Motion on the following bases:

a.      The Debtors have failed to provide sufficient information to enable CIT to make an informed decision concerning the relief requested by the Debtors.  Specifically, the Debtors have failed to provide (i) an accurate identification, by Lease and Schedule number, of

the Lease and Schedules to be assumed, and (ii) an itemization of the cure amounts due under the Lease and each of the Schedules they seek to assume.

      b.    The Debtors have failed to provide CIT with adequate assurance of future performance as required by section 365 of the Bankruptcy Code.  Specifically, the Debtors have failed to provide any financial information concerning the purchaser, and thus, it is impossible to determine whether the purchaser has the financial wherewithal to make the future payments which will become due under the Lease and Schedules the Debtors seek to assign.

      7.    In addition, CIT respectfully reserves all rights and remedies available to it under the Lease, applicable law and the Bankruptcy Code, including (i) the right to compel payment of postpetition rent under 11 U.S.C. 365 § (d)(10); (ii) the right to contest the Debtors' assumption and assignment of the Lease under section 365; and (iii) the right to contest any cure amount asserted concerning the Lease and/or the Schedules.

      8.    Finally, CIT reserves the right to raise additional issues before the Bankruptcy Court at the hearing on the Sale Motion.

Dated: January 15, 2003          REED SMITH LLP
       Newark, New Jersey      Attorneys for CIT Communications Finance Corp.


By:_____/s/_____
          Deborah A. Reperowitz, Esq. (DR-7989)
          Richard P. Norton, Esq. (RN-2231)
          599 Lexington Avenue, 29th Floor
          New York, NY 10022
          Telephone: (212) 521-5400
          Facsimile: (212) 521-5450

          -and-

          One Riverfront Plaza
          1st Floor
          Newark, NJ 07102
          Telephone:  (973) 621-3200
          Facsimile:  (973) 621-3199
          E-mail: dreperowitz@reedsmith.com
          rnorton@reedsmith.com

**REED SMITH LLP**
A Limited Liability Partnership formed in the State of Delaware
Deborah A. Reperowitz, Esq. (DR-7989)
Richard P. Norton, Esq.  (RN-2231)
599 Lexington Avenue, 29th Floor
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450

-and-

One Riverfront Plaza
1st Floor
Newark, NJ 07102
Telephone:  (973) 621-3200
Facsimile:  (973) 621-3199
E-mail: dreperowitz@reedsmith.com
          rnorton@reedsmith.com

*Attorneys for CIT Communications Finance Corporation*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| GENUITY INC., et al., | |
| | Case No. 02-43558 (PCB) |
| Debtors. | (Jointly Administered) |

## <u>CERTIFICATION OF SERVICE</u>

CATHY BASSO, of full age, hereby certifies as follows:

1.      I am a legal secretary employed by the firm of Reed Smith LLP, One Riverfront

Plaza, Newark, New Jersey 07102.

2.	On January 15, 2003, before 4:00 p.m. EST, I electronically filed CIT's Limited Objection to Debtors' Sale Motion.

3.	On January 15, 2003, I caused a copy of CIT's Limited Objection to be served upon the individuals on the attached service list via e-mail and First Class Mail.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

<div align="right">

	/s/
CATHY BASSO
</div>

DATED: January 15, 2003

**<u>SERVICE LIST</u>**

William F. McCarthy, Esq.
Ropes & Gray
885 Third Avenue
New York, NY 10022
Phone No.: (646) 840-6800
e-mail: Wmcarthy@ropesgray.com

D. Ross Martin, Esq.
Ropes & Gray
One International Place
Boston, MA 02110-2624
Phone No.: (617) 951-7050
e-mail: rmartin@ropesgray.com

John Longmire, Esq.
Willkie Farr & Gallagher
787 Seventh Avenue
New York, NY 10019
Phone No.: (212) 728-8000
e-mail: jlongmire@willkie.com

Brian Masumoto, Esq.
Office of the United States Trustee
33 Whitehall Street
New York, NY 10004
Phone No.: (212) 510-0500
Fax No.: (212) 668-2255

David Feldman, Esq.
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY 10022
Phone No.: (212) 715-9100
e-mail: dfeldman@kramerlevin.com

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | ) |
| | ) |
| | ) Chapter 11 |
| GENUITY INC., et al., | ) No. 02-43558-PCB |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |
| | ) |

**ORDER UNDER 11 U.S.C. §§ 105(a), 363, 365 AND 1146(c)
AND FED. R. BANKR. P. 2002, 6004 AND 6006 AUTHORIZING
AND APPROVING (I) ASSET PURCHASE AGREEMENT
WITH LEVEL 3 COMMUNICATIONS, INC. AND
LEVEL 3 COMMUNICATIONS, LLC; (II) SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS AND ENCUMBRANCES; (III) ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV)
CERTAIN RELATED RELIEF**

Upon the motion, dated November 27, 2002 (the "Motion"), of the above-captioned

debtors and debtors-in-possession (collectively, the "Debtors"), for, among other things, entry of:

(a) an order approving, among other things, (i) certain bid protections, including a break-up fee,

expense reimbursement, auction procedures and overbid requirements (collectively, the "Bidding

Procedures"), and (ii) the form and manner of notice with respect to such procedures and the

hearing to consider entry of this Order; and (b) an order (the "Sale Order") under I 1 U.S.C. §§

105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (i) approving the Asset

Purchase Agreement by and among Level 3 Communications, Inc. (the "Parent"), Level 3

Communications, LLC (together with its assignee, Greenland Managed Services, LLC, the

"Purchaser"), and Genuity Inc. ("Genuity"), Genuity International Inc., Genuity International

Sale Order

Networks Inc., Genuity Solutions Inc., Genuity Telecom Inc. and Genuity Employee Holdings

LLC (collectively, the "Sellers"), dated as of November 27, 2002 (as amended from time to time,

the "Purchase Agreement"),[1] a copy of which is attached hereto as Exhibit A), and certain

Ancillary Agreements (including the Transition Services Agreement), substantially in the forms

attached as exhibits to the Purchase Agreement, (ii) authorizing the Sellers to sell (the "Sale") to

the Purchaser, substantially all of their assets (as defined more specifically in the Purchase

Agreement, the "Purchased Assets") free and clear of all Liens (other than Permitted Liens), all

Liabilities (other than Assumed Liabilities), Interests (as defined herein) and Claims (as defined

herein), and exempt under 11 U.S.C. § 1146(c) from any stamp, transfer, sales, recording or

similar tax, (iii) authorizing the assumption and assignment of the Assumed Contracts and the

Assumed Leases, and (iv) granting certain related relief; and this Court having entered an order

on December 16, 2002 (the "Procedures Order") approving, among other things, the proposed

Bidding Procedures and notice of the Sale; and the Sellers having determined that the Purchaser

has submitted the highest or otherwise best bid for the Purchased Assets; and a hearing having

been held on January 23-24, 2003 (the "Sale Hearing"); and adequate and sufficient notice of the

Bidding Procedures, the Purchase Agreement and all transactions contemplated thereunder and

in this Sale Order having been given to all parties in interest in these cases and as required by

Section 6.2(c) of the Purchase Agreement; and all interested parties having been afforded an

opportunity to be heard with respect to the Motion and all relief related thereto; and the Court

having reviewed and considered (i) the Motion, (ii) the objections thereto, if any, and (iii) the

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the Motion or the Agreement, as the case may be.

arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and

after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

FOUND AND DETERMINED THAT:[2]

A.      This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334, and

this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A).  Venue of these cases and the

Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief sought in the Motion are sections 105(a),

363, 365 and 1146(c) of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (as

amended, the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules").

C.      This Court entered the Procedures Order on December 16, 2002, and the

Procedures Order has become a final and non-appealable order.

D.      As evidenced by the affidavits of service and publication filed with this Court and

based on representations of counsel at the Sale Hearing, (i) due, proper, timely, adequate and

sufficient notice of the Motion, the Sale Hearing, the Sale and the transactions contemplated

thereby, including without limitation, the assumption and assignment of the Assumed Contracts

and Assumed Leases, has been provided in accordance with Bankruptcy Code sections 102(1),

105(a), 363 and 365 and Bankruptcy Rules 2002, 6004 and 6006, and in compliance with the

Bidding Procedures and the Purchase Agreement; (ii) such notice was good, sufficient and

appropriate under the circumstances; and (iii) no other or further notice of the Motion, the Sale

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be
construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

Hearing, the Sale or the transactions contemplated thereby (including, without limitation, the assumption and assignment of the Assumed Contracts and the Assumed Leases), is or shall be required.

E.       A reasonable opportunity to object and be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including the following: (i) the Office of the United States Trustee; (ii) counsel to the Purchaser; (iii) counsel to the Official Committee of Unsecured Creditors appointed in these cases (the "Committee"); (iv) counsel to Verizon Investments Inc. and Verizon Communications Inc. (together, "Verizon"); (v) counsel to the administrative agent for the Debtors' prepetition lenders (the "Bank Group") under the Amended and Restated Credit Agreement, dated as of September 24, 2001; (vi) all entities known to have expressed an interest in acquiring any of the Purchased Assets; (vii) all entities known to have asserted any Lien in or upon any of the Purchased Assets; (viii) all federal, state and local taxing authorities that have jurisdiction over the Business; (ix) all regulatory authorities or recording offices that have a reasonably known interest in the relief requested in the Motion; (x) all governmental agencies having jurisdiction over the Business with respect to environmental laws; (xi) parties to governmental approvals or permits; (xii) the United States Attorney's office and the attorneys general of all states in which the Purchased Assets are located; (xiii) the Federal Communications Commission and applicable state public utility commissions; (xiv) the Securities and Exchange Commission; (xv) all non-Debtor parties to the Contracts and Leases; and (xvi) all other parties that had filed a notice of appearance and demand for service of papers in these bankruptcy cases under Bankruptcy Rule 2002 as of the date of the Motion.

Sale Order                                    -4-

F.     The Sellers may sell the Purchased Assets free and clear of all Interests because each entity with a security interest in any Purchased Assets to be transferred on the Closing Date, including the Assumed Contracts and the Assumed Leases (collectively, the "Assumed Agreements"), (i) has consented to the Sale (including the assumption and assignment of the Assumed Contracts and Assumed Leases) or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such interest; or (iii) otherwise falls within the provisions of section 363(f) of the Bankruptcy Code, and therefore, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.   Those holders of interests who did not object, or who withdrew their objections, to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.   Those holders of interests who did object are adequately protected by having their Interests, if any, attach to the cash proceeds of the Sale ultimately attributable to the property against or in which they claim an Interest, subject to the terms hereof.

G.     Good and sufficient reasons for approval of the Purchase Agreement and the Sale have been articulated.  The relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

H.     The Debtors have demonstrated both (i) good, sufficient and sound business purpose and justification and (ii) compelling circumstances for the Sale other than in the ordinary course of business, pursuant to Bankruptcy Code section 363(b), in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates; the Sale will provide the means for the Debtors to maximize distributions to creditors and enable the successful confirmation of a plan of reorganization; and

absent consummation of the Sale, the Debtors may be forced to discontinue their operations and liquidate.

        I.        Each Seller has full corporate power and authority to execute the Purchase Agreement, and all other documents contemplated thereby (including, without limitation, the Ancillary Agreements (including the Transition Services Agreement)), and to consummate the transactions contemplated by the Purchase Agreement. The Purchase Agreement and all of the transactions contemplated thereby have been duly and validly authorized by all necessary corporate action of each of the Sellers. No consents or approvals, other than the consent and approval of this Court and those expressly provided for in the Purchase Agreement, are required for each of the Sellers to consummate the Sale.

        J.        The Purchase Agreement was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in good faith and from arms'-length bargaining positions. The Purchaser is not an "insider" of any of the Debtors, as that term is defined in Bankruptcy Code section 101. Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Bankruptcy Code section 363(n).

        K.        The Purchaser is a good faith purchaser under Bankruptcy Code section 363(m) and, as such, is entitled to all of the protections afforded thereby. The Purchaser will be acting in good faith within the meaning of Bankruptcy Code section 363(m) in closing the transactions contemplated by the Purchase Agreement and at all times after the entry of this Sale Order.

        L.        The consideration provided by the Purchaser pursuant to the Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Purchased Assets, and (iii)

constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

M.     The Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

N.     The transfer of the Purchased Assets to the Purchaser pursuant to the Purchase Agreement will be a legal, valid, and effective transfer of the Purchased Assets, and vests or will vest the Purchaser with all right, title, and interest of the Sellers to the Purchased Assets free and clear of Liens, mortgages, security interests, conditional sales or other title retention agreements, pledges, claims, judgments, demands, encumbrances (including, without limitation, claims, and encumbrances (i) that purport to give to any party a right or option to effect any forfeiture, modification or termination of the Sellers' or the Purchaser's interests in the Purchased Assets or (ii) in respect of taxes, restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership) (collectively, the "Interests"), with the exception of Permitted Liens (as defined in the Purchase Agreement), with all such non-assumed Interests to attach to the Sellers' interest in the proceeds of the Sale (the "Sale Proceeds") in order of priority, subject to any rights, claims and defenses of the Debtors with respect thereto.

O.     Neither the Purchaser nor its affiliates, successors or assigns, as a result of any action taken in connection with the purchase of the Purchased Assets: (a) are a successor to the Debtors; (b) have, de facto or otherwise, merged with or into the Debtors; or (c) are a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.

Sale Order                              -7-

P.      The Sale must be approved and consummated promptly in order to preserve the

viability of the Debtors' businesses as a going concern, to maximize the value of the Debtors'

estates and to position the Debtors to emerge from chapter 11.  The Sale is a prerequisite to the

Debtors' ability to confirm and consummate a plan of reorganization. The Sale is in

contemplation of a plan of reorganization and, accordingly, constitutes a transfer to which

Bankruptcy Code section 1146(c) applies.

Q.      The Debtors have demonstrated that assuming and assigning the Assumed

Contracts and Assumed Leases in connection with the Sale is an exercise of their sound business

judgment, and that such assumption and assignment is in the best interests of the Debtors' estates.

R.      The Debtors have cured, or have provided adequate assurance of cure of, any

default existing prior to the applicable Assumption Date, within the meaning of Bankruptcy

Code section 365(b)(1)(A), under any of the Assumed Agreements (a) that will be assigned to

the Purchaser as of the Closing Date and (b) that are or will become Assumed Customer

Contracts (together, the "Initially Assumed Agreements"), and have provided compensation or

adequate assurance of compensation to any non-Debtor party to such contracts or leases for any

of their actual pecuniary losses resulting from any default arising prior to the applicable

Assumption Date under any of such Initially Assumed Agreements, within the meaning of

Bankruptcy Code section 365(b)(1)(B) (collectively, the "Cure Amounts").

S.      As of the relevant Assumption Date, each Assumed Contract and Assumed Lease

will be in full force and effect and enforceable against the non-Debtor party thereto in

accordance with its terms.

T.      On or before the Assumption Date, the Debtors will pay in full all Cure Amounts

in respect of undisputed cure claims and the undisputed portion of any Cure Amount in respect

of a disputed cure claim, and will segregate the disputed portion of any Cure Amount in respect

of any disputed cure claim pending the resolution of any such dispute by this Court or mutual

agreement of the parties.  Any non-Debtor party to any Assumed Agreement who objected to the

Cure Amounts (a "Cure Amount Objection") is protected by having such disputed portion of

such Cure Amount segregated on or before the Assumption Date.

U.      The Debtors have, to the extent necessary, satisfied the requirements of

Bankruptcy Code sections 365(b)(1) and 365(f) in connection with the Sale, the assumption and

assignment of the Assumed Agreements (except with respect to Cure Amounts related to

Assumed Contracts and Assumed Leases that are not Initially Assumed Agreements, which shall

be dealt with pursuant to the terms set forth hereinafter), and shall upon assignment thereof on

the Closing Date, be relieved from any liability for any breach thereof; and it is therefore

ORDERED, ADJUDGED AND DECREED THAT:

1.      The Motion is GRANTED (other than with respect to matters previously

addressed by the Procedures Order).

2.      Any objections to the entry of this Sale Order or the relief granted herein and

requested in the Motion that have not been withdrawn, waived or settled, and all reservations of

rights included therein, hereby are denied and overruled on the merits with prejudice.

**Approval of the Purchase Agreement**

3.      The Purchase Agreement and the Ancillary Agreements (including the Transition

Services Agreement), and all of the terms and conditions thereof, including, but not limited to,

the sale of the Purchased Assets and assumption of the Assumed Liabilities, in exchange for the Purchase Price, as set forth in the Purchase Agreement, are hereby approved.

4.    Pursuant to Bankruptcy Code section 365, the Debtors will be deemed to have assumed the Purchase Agreement as of the Closing Date.

5.    Pursuant to Bankruptcy Code sections 363(b) and (f), the Debtors are authorized and (subject to the applicable closing conditions set forth in the Purchase Agreement) directed to consummate the Sale, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

6.    The Debtors are authorized and (subject to the applicable closing conditions set forth in the Purchase Agreement) directed to execute and deliver, and empowered to perform under, consummate and implement, the Purchase Agreement, collectively with all additional instruments and documents (including, without limitation, the Ancillary Agreements (including the Transition Services Agreement)) that may be reasonably necessary or desirable to implement the Purchase Agreement, and to take all further actions as may be requested by the Purchaser for the purpose of transferring the Purchased Assets to the Purchaser or as may be necessary or appropriate to the performance of the obligations contemplated by the Purchase Agreement. The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Purchase Agreement, the Ancillary Agreements (including the Transition Services Agreement) or any other Sale related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence.

**Transfer of Purchased Assets**

7.      Except as expressly permitted or otherwise specifically provided for in the

Purchase Agreement or this Sale Order, pursuant to Bankruptcy Code sections 105(a) and 363(f),

the Purchased Assets shall be transferred to the Purchaser and, as of the Closing Date or the

applicable Assumption Date, as the case may be, shall be free and clear of (a) all Interests, and

(b) all debts arising under, relating to, or in connection with any acts of the Debtors, claims (as

that term is defined in section 101(5) of the Bankruptcy Code), Liabilities, obligations, demands,

guaranties, options, rights, contractual commitments, restrictions, interests and matters of any

kind and nature, whether arising prior to or subsequent to the commencement of these cases, and

whether imposed by agreement, understanding, law, equity or otherwise (including, without

limitation, claims and encumbrances (i) that purport to give to any party a right or option to

effect any forfeiture, modification, right of first refusal, or termination of any of the Sellers' or

the Purchaser's interests in the Purchased Assets, or any similar rights, or (ii) in respect of taxes,

restrictions, rights of first refusal, charges or interests of any kind or nature, if any, including, but

not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of

any attributes of ownership) (collectively, "Claims"), with the exception of Permitted Liens and

Assumed Liabilities, with all such non-assumed Interests and Claims to attach to the Debtors'

interest in the Sale Proceeds, in the order of their priority, with the same validity, force and effect

which they now have against the Purchased Assets, subject to any rights, claims and defenses the

Debtors may possess with respect thereto.

8.      Except as expressly permitted by the Purchase Agreement, all persons and

entities, including, but not limited to, all debt security holders, equity security holders,

governmental, tax and regulatory authorities, lenders, trade and other creditors, holding Interests

or Claims of any kind or nature whatsoever against or in the Debtors or the Purchased Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with, or in any way relating to, the Debtors, the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Purchased Assets to the Purchaser, shall be and hereby are forever barred, estopped and permanently enjoined from asserting, prosecuting or otherwise pursuing against the Purchaser, its property, its successors and assigns, its affiliates or the Purchased Assets, such persons' or entities' Interests or Claims (with the exception of Permitted Liens and Assumed Liabilities).  Following the Closing Date (or the applicable Assumption Date, with respect to Assumed Agreements other than Initially Assumed Agreements), no holder of an Interest in or Claim against the Debtors (other than holders of Permitted Liens or Assumed Liabilities) shall interfere with the Purchaser's title to or use and enjoyment of the Purchased Assets based on or related to such Interests or Claims, and all such Claims and Interests, if any, shall be, and hereby are channeled, transferred and attached solely and exclusively to the Sale Proceeds.

9.    The transfer of the Purchased Assets to the Purchaser pursuant to the Purchase Agreement shall not result in (i) the Purchaser having any liability or responsibility for any claim (other than for Permitted Liens or Assumed Liabilities) against the Debtors or against an insider of the Debtors, or (ii) the Purchaser having any liability or responsibility to the Debtors except pursuant to the Purchase Agreement, the Ancillary Agreements (including the Transition Services Agreement) and this Sale Order.

10.    The Purchaser shall have no liability or responsibility for any liability or other

obligation of the Debtors arising under or related to the Purchased Assets other than as expressly

set forth in the Purchase Agreement.  Without limiting the effect or scope of the foregoing, the

transfer of the Purchased Assets from the Debtors to the Purchaser does not and will not subject

the Purchaser or its affiliates, successors or assigns or their respective properties (including the

Purchased Assets) to any liability for claims (as that term is defined in section 101(5) of the

Bankruptcy Code) against the Debtors or the Purchased Assets by reason of such transfer under

the laws of the United States or any state, territory or possession thereof applicable to such

transactions.  Neither the Purchaser nor its affiliates, successors or assigns shall be deemed, as a

result of any action taken in connection with the purchase of the Purchased Assets to: (a) be a

successor to the Debtors; (b) have, de facto or otherwise, merged with or into the Debtors; or (c)

be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.

Neither the Purchaser nor its affiliates, successors or assigns is acquiring or assuming any

liability, warranty or other obligation of the Debtors, including, without limitation, any tax

incurred but unpaid by the Debtors prior to the Closing Date, including, but not limited to, any

tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously

assessed, fixed or audited, whether or not paid, and whether or not contested before and

adjudicated by a judicial or administrative tribunal of competent jurisdiction, except as otherwise

expressly provided in the Purchase Agreement.

11.    The transfer of the Purchased Assets to the Purchaser pursuant to the Purchase

Agreement constitutes a legal, valid and effective transfer of the Purchased Assets, and shall vest

the Purchaser with all right, title and interest of the Debtors in and to the Purchased Assets free

and clear of all Claims and Interests (other than Permitted Liens and Assumed Liabilities) of any kind or nature whatsoever.

12.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets or a bill of sale transferring good and marketable title in the Purchased Assets to the Purchaser.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

13.     This Order is and shall be effective as a determination that, all Liens (other than Permitted Liens) shall be, and are, without further action by any person or entity, released with respect to the Purchased Assets as of the Closing Date (or with respect to Assumed Contracts and Assumed Leases assumed after the Closing Date, as of the Assumption Date).

14.     This Order shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Purchased Assets.

15.     The transactions contemplated by the Purchase Agreement, and the execution, delivery and/or recordation of any and all documents or instruments necessary or desirable to

Sale Order                                          -14-

consummate the transactions contemplated by the Purchase Agreement shall be, and hereby are, exempt from the imposition and payment of all stamp taxes and similar taxes, pursuant to section 1146(c) of the Bankruptcy Code, provided that the Debtors shall escrow, pending confirmation of a plan, any amounts that would be payable except for such exemption.

## Assumption and Assignment of
## Assumed Contracts and Assumed Leases

16.     The Debtors are hereby authorized, in accordance with Bankruptcy Code sections 105(a), 363 and 365, to (a) assume and assign to the Purchaser, effective upon the Assumption Dates, the Assumed Contracts and Assumed Leases, and/or to transfer, sell and deliver to the Purchaser all of Sellers' right, title and interest in and to the Assumed Contracts and Assumed Leases, free and clear of all Interests and Claims of any kind or nature whatsoever (provided, however, that nothing herein shall defeat any right which a party to an Assumed Contract or Assumed Lease may have under section 365 of the Bankruptcy Code), and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Contracts and Assumed Leases to the Purchaser.

17.     The requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with respect to the Assumed Contracts and Assumed Leases (subject to the "cure amount" procedures set forth herein).

18.     The Assumed Contracts and Assumed Leases shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser, in accordance with their respective terms, notwithstanding any provision in any such Assumed Contract or Assumed Lease (including provisions of the type described in sections 365(b)(2), (e)(1) and (f)(1) of the Bankruptcy Code) which prohibits, restricts or conditions such assignment or transfer.  The non-

Debtor party to each Assumed Contract or Assumed Lease shall be deemed to have consented to such assignment under section 365(c)(1)(B) of the Bankruptcy Code, and the Purchaser shall enjoy all of the rights and benefits under each such Assumed Contract or Assumed Lease as of the applicable Assumption Date without the necessity of obtaining such non-Debtor party's written consent to the assumption and assignment thereof.

19.     Pursuant to section 365(k) of the Bankruptcy Code, the Debtors and their estates shall be relieved from any liability for any breach of any Assumed Contract or Assumed Lease after such assignment to and assumption by the Purchaser on the applicable Assumption Date.

20.     All liquidated monetary defaults, claims or other obligations of the Debtors arising or accruing under each Assumed Contract or Assumed Lease prior to the assumption of such Assumed Contract or Assumed Lease (without giving effect to any acceleration clauses or any default provisions of the kind specified in Bankruptcy Code section 365(b)(2)) shall be promptly cured by the Debtors upon assumption and assignment as provided in Bankruptcy Code section 365(b)(1).

21.     If the Debtors receive a Cure Amount Objection, they shall attempt to resolve such disputed Cure Amount with the party asserting the objection.  If consensual resolution of the Cure Amount Objection cannot be reached, the Debtors will (i) pay in full the undisputed portion of such Cure Amount on or before the applicable Assumption Date and (ii) segregate the disputed portion of such Cure Amount (the "Segregated Amounts") pending the resolution of the Cure Amount Objection by this Court or by mutual agreement of the parties.  In light of these procedures, the fact that any Cure Amount Objection is not resolved shall not prevent or delay the occurrence of any Assumption Date or the assumption and assignment of any Assumed

Contract or Assumed Agreement, and the objectors' only recourse after the relevant Assumption

Date shall be to the Segregated Amounts.

22.    Subject to the terms hereof with respect to the Segregated Amounts, all defaults or

other obligations of the Debtors under the Initially Assumed Agreements (and, upon payment of

all Cure Amounts with respect to other Assumed Transition Agreements (defined below), all

Assumed Contracts and Assumed Leases) arising or accruing prior to the Assignment Date have

been cured or shall promptly be cured by the Debtors in accordance with the terms hereof such

that the Purchaser shall have no liability or obligation with respect to any default or obligation

arising or accruing under any Assumed Contract or Assumed Lease prior to the Assumption

Date, except to the extent expressly provided in the Purchase Agreement.  Each non-Debtor party

to an Assumed Contract or Assumed Lease is forever barred, estopped and permanently enjoined

from asserting against the Purchaser or its property or affiliates, or any thereof, any breach or

default under any Assumed Contract or Assumed Lease, any claim of lack of consent relating to

the assignment thereof, or any counterclaim, defense, setoff, right of recoupment or any other

matter arising prior to the Assignment Date for such Assumed Contract or Assumed Lease or

with regard to the assumption and assignment thereof pursuant to the Purchase Agreement or this

Order.

23.    Upon assignment of the Assumed Contracts and Assumed Leases to the Purchaser

on the applicable Assumption Date, no default shall exist under any Assumed Contract or

Assumed Lease and no non-Debtor party to any Assumed Contract or Assumed Lease shall be

permitted to declare a default by the Purchaser under such Assumed Contract or Assumed Lease

or otherwise take action against the Purchaser as a result of any Debtor's financial condition,

bankruptcy or failure to perform any of its obligations under the Assumed Contract or Assumed Lease, including any failure to pay any amounts necessary to cure any Debtor's defaults thereunder. Upon entry of this Sale Order and assumption and assignment of the Assumed Contracts and Assumed Leases, the Purchaser shall be deemed in compliance with all terms and provisions of the Assumed Contracts and Assumed Leases.

24.    Notwithstanding anything to the contrary in this Sale Order, upon assumption of the Assumed Contracts and Assumed Leases, the Purchaser is assuming all liabilities arising under the Assumed Contracts and Assumed Leases arising and accruing on and after the applicable Assumption Date.

### Assumption and Rejection Procedures Applicable to Underlying Service Agreements and Undesignated Agreements

25.    The Debtors are hereby authorized to transfer, sell and deliver to the Purchaser and/or assume and assign to the Purchaser, or to reject, each Underlying Service Agreement and each Undesignated Agreement pursuant to section 365 of the Bankruptcy Code, without the need for any further notice, motion, hearing or order. If any item currently characterized under the Purchase Agreement as an Underlying Service Agreement becomes an Excluded Agreement or an Excluded Asset, Purchaser shall not seek to recharacterize such item as anything other than an Underlying Service Agreement for purposes of calculating Rejection Claims, without the Sellers' consent. The timing of such assumption and assignment or rejection, as the case may be, the "cure amounts," if any, required to be paid upon such assumption and assignment, and the other matters set forth in this paragraph, shall be determined in accordance with the following procedures:

A.    Assumption:

(i)    At any time after entry of this Order and on or prior to the Election Date, the Purchaser may notify the Debtors, in writing pursuant to the terms of the Purchase Agreement, of its desire for the relevant Debtor to assume and assign to the Purchaser any Underlying Service Agreement or Undesignated Agreement (each agreement subject to such a notice, an "Assumed Transition Agreement").

(ii)   Within two (2) business days of such notice, the Debtors shall file with the Court and serve on (i) each non-Debtor party to such agreement, (ii) counsel to the Purchaser, (iii) counsel to the Committee, (iv) counsel to Verizon and (v) counsel to the administrative agent for the Bank Group (collectively, the "Notice Parties"), a notice (an "Assumption Notice") substantially in the form annexed hereto as Exhibit B of the assumption and assignment of such Assumed Transition Agreement to the Purchaser pursuant to section 365 of the Bankruptcy Code and the terms of this Order.  Each Assumption Notice shall identify the relevant Assumed Transition Agreement and set forth the Debtors' proposed "cure amount" with respect to the relevant Assumed Transition Agreement.

(iii)  Each non-Debtor party to an Assumed Transition Agreement shall have ten (10) days from the date of the relevant Assumption Notice to file with the Court and serve on the Notice Parties an objection (a "Cure Objection") (a) pursuant to section 365(b)(1)(A) of the Bankruptcy Code, to the proposed cure amount set forth in such Assumption Notice and/or (b) asserting actual pecuniary losses of the type referred to in section 365(b)(1)(B) of the Bankruptcy Code.  No other form of objection to any Assumption Notice shall be permitted.  If no Cure Objection is timely filed and served as described above with respect to a particular Assumed Transition Agreement, the "cure amount" for such Assumed Transition Agreement shall be that proposed by the Debtors in the relevant Assumption Notice, and such cure amount shall be paid by the Debtors as of the respective Assumption Date.  If a Cure Objection is timely filed and served as described above with respect to a particular Assumed Transition Agreement, then the Debtors shall pay the full amount of the undisputed portion of such cure amount and segregate the full amount of the disputed portion of such cure amount pending resolution of such Cure Objection, and pay to the objecting party, upon resolution of such dispute by agreement of the parties or order of the Court, the remaining cure amount, if any, set forth in such agreement or order.

(iv)   Regardless of whether a Cure Objection is timely filed and served as described above, the relevant Assumed Transition Agreement shall be assumed by the relevant Debtor and assigned to the Purchaser pursuant to

section 365 of the Bankruptcy Code, without the need for any further notice, motion, hearing or order, as of the date that is ten (10) days following the date of the relevant Assumption Notice.  All necessary authority for such assumption and assignment, including a finding that the Debtors and the Purchaser have provided "adequate assurance of future performance" as and to the extent required by sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code, is provided by this Order, and the entry hereof shall bar, estop and prohibit any non-Debtor party to an Assumed Transition Agreement from asserting any future objection, other than a Cure Objection, to such assumption and assignment.

(v)     Upon assignment of the relevant Assumed Transition Agreement on the relevant Assumption Date, the Debtors will be relieved pursuant to Bankruptcy Code section 365(k) from any liability for any breach of such agreement.

B.     Rejection:

(i)     At any time after fifteen (15) business days prior to the Closing Date and on or prior to the Election Date, the Purchaser may notify the Debtors, in writing pursuant to the terms of the Purchase Agreement: (a) that it does not intend to seek assignment of any particular Underlying Service Agreement or Undesignated Agreement pursuant to the terms of the Purchase Agreement and subparagraph A of this paragraph (each agreement subject to such a notice, a "Rejected Transition Agreement") and (b) the earliest date (the "Migration Date") on which the relevant Debtor may reject (or assign to any third party) such Rejected Transition Agreement; provided however, that no Migration Date for any Rejected Transition Agreement shall be later than the date (the "Migration Deadline") that is the later to occur of (y) six (6) months after the Closing Date and (z) the effective date of confirmation of a plan of reorganization in these cases.

(ii)    At any time prior to the Migration Date for a particular Rejected Transition Agreement, the Purchaser may, by written notice to the Debtors, set an earlier Migration Date for such Rejected Transition Agreement; provided, however, that such earlier Migration Date shall not be less than fifteen (15) days after the date of the notice referred to in this clause (ii).  The Purchaser may issue multiple such notices with respect to a single Rejected Transition Agreement.

(iii)   If the Purchaser has not notified the Debtors, on or before the Election Date, that a particular Underlying Service Agreement or Undesignated Agreement shall be treated as an Assumed Transition Agreement or a Rejected Transition Agreement, such agreement shall, absent further order

of the Court sought by or at the request of the Purchaser, be treated as a Rejected Transition Agreement, and the Migration Date for such Rejected Transition Agreement shall be the Election Date.

(iv)    After the date hereof and not less than ten (10) days prior to the Migration Date for a given Rejected Transition Agreement, the Debtors may file with the Court and serve on the Notice Parties a notice (a "Rejection Notice") substantially in the form annexed hereto as Exhibit C of the effective date (the "Rejection Effective Date") of the rejection of such Rejected Transition Agreement.  As of each Rejection Effective Date, the relevant Rejected Transition Agreement shall be rejected pursuant to section 365 of the Bankruptcy Code and the terms of this Order, without the need for any further notice, motion, hearing or order; provided, however, that no Rejection Effective Date shall be earlier than the relevant Migration Date; provided, further, that the Debtors are not required to reject, pursuant to these rejection procedures or otherwise, any Underlying Service Agreement or Undesignated Agreement designated as a Rejected Transition Agreement.

(v)    Each Rejection Notice shall provide that the non-Debtor party to the relevant Rejected Transition Agreement shall be forever barred, estopped and prohibited from asserting any claim in these cases for damages arising from the rejection of such Rejected Transition Agreement unless such party files a claim for such damages on or before the date that is thirty (30) days after the Rejection Effective Date set forth in such Rejection Notice.

(vi)    All necessary authority for the rejection of each Rejected Transition Agreement is provided by this Order, and the entry hereof shall bar, estop and prohibit any non-Debtor party to a Rejected Transition Agreement from asserting any future objection to such rejection.

26.    In no event shall any Rejection Claim (as defined in the Purchase Agreement) include any claim amount arising as a result of the fact that a particular Rejection Effective Date is later than the Migration Date for the relevant Rejected Transition Agreement.

27.    At all times from the Closing Date through the date of assumption (with respect to each Assumed Transition Agreement) or the Migration Date (with respect to each Rejected Transition Agreement), (a) no Assumed Transition Agreement or Rejected Transition Agreement shall be (i) assigned by the Debtors to any third party or (ii) rejected by the Debtors, (b) subject

-21-

to the Purchaser's obligations under Section 4.1 of the Transition Services Agreement, following the Closing the Debtors shall continue to perform their respective obligations under, and shall not terminate or modify, any Assumed Transition Agreement or Rejected Transition Agreement and (c) no party shall have the right to compel, or to seek an order compelling, the Debtors to assume or reject any Assumed Transition Agreement or Rejected Transition Agreement (including any Underlying Service Agreement or Undesignated Agreement that may become an Assumed Transition Agreement or Assumed Rejection Agreement), whether pursuant to section 365(d)(2) of the Bankruptcy Code or otherwise.  Notwithstanding any provision of this Sale Order to the contrary, nothing in this decretal paragraph or in this Sale Order shall be in derogation of the right of any party to terminate an executory contract or unexpired lease by its terms, subject to applicable bankruptcy and non-bankruptcy law.

28.     If any plan shall be confirmed in these cases prior to the date that is 180 days after the Closing Date, the Order confirming such plan shall not allow any Rejected Transition Agreement to be rejected at any time prior to the conclusion of such 180 day period.

## Claims Arising Out of Excluded Agreements

29.     The Purchaser shall have the right to reasonably direct the Sellers in the defense of, and in the settlement and compromise of, any claim in these cases arising out of an Excluded Agreement if such claim could give rise to Rejection Claims, or at the Sellers' expense, to initiate and/or prosecute any objection to any claim arising from any Excluded Agreement.  The Sellers shall not settle any claim in these cases arising out of any Excluded Agreement if such claim

could give rise to Rejection Claims without the Purchaser's prior written consent, which consent shall not be unreasonably withheld.

**Additional Provisions**

30.    The consideration provided by the Purchaser for the Purchased Assets under the Purchase Agreement is fair and reasonable and may not be avoided under Bankruptcy Code section 363(n).

31.    The transactions contemplated by the Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in Bankruptcy Code section 363(m) and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale to the Purchaser, unless such authorization is duly stayed pending such appeal.  The Purchaser is a good-faith purchaser of the Purchased Assets, and is entitled to all of the benefits and protections afforded by Bankruptcy Code section 363(m).

32.    This Court retains jurisdiction to enforce and implement the terms and provisions of the Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith (including, but not limited to, the Ancillary Agreements (including the Transition Services Agreement)) in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Purchased Assets to the Purchaser, (b) compel assumption of the Assumed Liabilities by the Purchaser, (c) resolve any disputes arising under or related to the Purchase Agreement, except as otherwise provided therein, and (d) interpret, implement and enforce the provisions of this Sale Order.

33.    Pursuant to section 364(c)(1) of the Bankruptcy Code, (i) the obligation of the Sellers to pay the Adjustments, including interest with respect thereto, and (ii) the

indemnification obligations of the Sellers pursuant to Article X of the Purchase Agreement, shall

receive superpriority administrative claim status. Pursuant to section 364(c)(1) of the

Bankruptcy Code, (i) the administrative claims in respect of the Adjustments, including interest

with respect thereto, and (ii) the administrative claims in respect of the indemnification

obligations of the Sellers pursuant to Article X of the Purchase Agreement, shall have priority

over any and all administrative expenses of the kinds specified in sections 503(b), 506(c), 507(a)

or 507(b) of the Bankruptcy Code.

34.     All entities who are presently, or on the Closing Date (or the applicable

Assumption Date, with respect to Assumed Agreements other than Initially Assumed

Agreements) may be, in possession of some or all of the Purchased Assets hereby are directed to

surrender possession of the Purchased Assets either to (i) the Debtors prior to the Closing Date

(or the applicable Assumption Date, with respect to Assumed Agreements other than Initially

Assumed Agreements), for subsequent transfer to the Purchaser on the Closing Date (or the

applicable Assumption Date, with respect to Assumed Agreements other than Initially Assumed

Agreements), or (ii) to the Purchaser on the Closing Date (or the applicable Assumption Date,

with respect to Assumed Agreements other than Initially Assumed Agreements).

35.     On or before the Closing Date (or the applicable Assumption Date), each of the

Debtors' creditors is authorized and directed to execute such documents and take all other actions

as may be necessary to release its Interests in the Purchased Assets, if any, as such Interests may

have been recorded or otherwise exist.

36.     If any person or entity that has filed financing statements, mortgages, mechanic's

liens, lis pendens or other documents or agreements evidencing Interests with respect to the

Debtors and/or the Purchased Assets shall not have delivered to the Debtors and the Purchaser

prior to the Closing Date, or relevant Assumption Date, as the case may be, in proper form for

filing and executed by the appropriate parties, termination statements, instruments of satisfaction,

releases of all Interests which the person or entity has with respect to the Debtors and/or the

Purchased Assets or otherwise, then (i) the Debtors hereby are authorized to execute and file

such statements, instruments, releases and other documents on behalf of the person or entity with

respect to such assets and contracts and (ii) the Purchaser hereby is authorized to file, register or

otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise

recorded, shall constitute conclusive evidence of the release of all Interests in the Purchased

Assets as of the Closing Date or the applicable Assumption Date, as the case may be, of any kind

or nature whatsoever (other than the Permitted Liens and Assumed Liabilities).

37.    Any amounts payable by the Sellers pursuant to the Purchase Agreement or any

of the documents delivered by the Sellers pursuant to or in connection with the Purchase

Agreement shall (i) constitute administrative priority expenses of the Sellers' estates pursuant to

Bankruptcy Code sections 503(b) and 507(a)(1), except as otherwise specifically provided in the

Purchase Agreement, (ii) be paid by the Sellers in the time and manner provided in the Purchase

Agreement without further order of this Court, and (iii) not be discharged, modified or otherwise

affected by any plan of reorganization of any of the Sellers.

38.    The terms and provisions of the Purchase Agreement and this Sale Order shall be

binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, the

Purchaser and its respective affiliates, successors and assigns, and any affected third parties,

notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

39.     All persons who hold Claims against or Interests in (other than Permitted Liens and Assumed Liabilities) the Debtors are forever barred, estopped and permanently enjoined from asserting or prosecuting any claims or causes of action against the Purchaser, its affiliates, or any of its respective officers, directors, employees, attorneys or advisors, arising out of or in connection with the Sale.

40.     After the Closing Date, no person or entity, including, without limitation, any federal, state or local taxing authority, may (a) attach or perfect a lien or security interest against any of the Purchased Assets on account of, or (b) collect or attempt to collect from the Purchaser or any of its affiliates, any tax (or other amount alleged to be owing by one or more of the Debtors) (i) for any period commencing before and concluding prior to or after the Closing Date, or (ii) assessed prior to and payable after the Closing Date, except as otherwise specifically provided in the Purchase Agreement.

41.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to any of the transactions under the Purchase Agreement.

42.     The Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

43.     Nothing contained in any chapter 11 plan confirmed in these cases or any order

confirming any such plan or in any other order in these cases (including any order entered after

any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) shall alter,

conflict with, or derogate from, the provisions of the Purchase Agreement or this Sale Order.

44.     The failure specifically to include any particular provisions of the Purchase

Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it

being the intent of the Court that the Purchase Agreement be authorized and approved in its

entirety.  Likewise, all of the provisions of this Sale Order are nonseverable and mutually

dependent.

45.     Notwithstanding the provisions of Bankruptcy Rules 6004(g) and 6006(d), this

Sale Order shall not be stayed for ten (10) days after the entry hereof, but shall be effective and

enforceable immediately upon issuance hereof.  Time is of the essence in closing the transactions

referenced herein and the Debtors and the Purchaser intend to close the Sale as soon as

practicable.  Therefore, any party objecting to this Sale Order must exercise due diligence in

filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

46.     The objection of Metromedia Fiber Network, Inc. (Docket No. 313) is adjourned

to the omnibus hearing set for 2:30 p.m. on February 11, 2003.

47.     The objection of Universal Access, Inc. (Docket No. 322) ~~is taken under~~

~~advisement has~~ has been ruled on and denied. **/s/ PCB**

48.     Anything set forth in this Order ~~to the contrary~~ notwithstanding, prior to making

any cure payment in an amount greater than $250,000, the Debtors shall provide to the

Committee, two business days prior to such any such payment, the identity of the payee and the

proposed amount of such payment.  In connection with the Committee's efforts to confirm the

accuracy of the proposed cure payments described in the prior sentence, the Debtors shall

cooperate with the Committee's advisors and provide such advisors with all reasonably requested

related information. **/s/ PCB**

49.    **The objection of Cisco Systems, Inc. and Cisco Systems Capital Corporation**
**(collectively "Cisco") is taken under advisement as to questions of whether consent is**
**required to assumption and assignment of executory contracts to which Cisco and the**
**Debtors, or any of them, are parties and as to Cure Amounts, if any, due to Cisco.  As to**
**other issues raised by said objection, except identification of the executory contracts and**
**leases designated to be assumed or subject to the assumption or rejection procedures, it is**
**denied.  /s/ PCB**

50.    **The Purchase Agreement, as amended to date, shall be filed by the parties**
**within three (3) days of the entry of this Order and is incorporated by reference herein.**
**/s/PCB**

Dated: New York, New York

January 24, 2003

/s/ Prudence Carter Beatty
Honorable Prudence C.  Beatty
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|  |  |  |
|---|---|---|
| | ) | **Hearing Date: January 23, 2003** |
| | ) | **2:00 p.m.** |
| In re: | ) | Chapter 11 |
| | ) | |
| GENUITY INC., et al., | ) | Case No. 02-43558 (PCB) |
| | ) | |
| Debtors. | ) | Jointly Administered |

_____)

**STIPULATION AND ORDER REGARDING LIMITED OBJECTION OF CIT**
**COMMUNICATIONS FINANCE CORPORATION TO THE SALE OF**
**SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR OF LIENS,**
**CLAIMS AND ENCUMBRANCES AND THE ASSUMPTION AND**
**ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED**
**LEASES**

Debtors Genuity Inc. and Genuity Solutions Inc. ("Genuity"), CIT

Communications Finance Corporation ("CIT"), and Level 3 Communications, LLC and

its assignee affiliates ("Level 3"), by their respective counsel, hereby stipulate and agree

as follows:

WHEREAS, Genuity and CIT are parties to the Lease and Schedules (the

"Agreement") described in the January 15 Objection, as herein after defined; and

WHEREAS, on November 27, 2002 (the "Petition Date") Genuity and certain of

its affiliates (collectively, the "Debtors") filed a voluntary petition for relief under

Chapter 11 of  11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") in the Bankruptcy Court

for the Southern District of New York (the "Court"); and

WHEREAS, pursuant to a motion filed by the Debtors on November 27, 2002, the

Debtors have proposed to sell (the "Sale") substantially all their assets (the "Assets") to

Level 3; and

WHEREAS, pursuant to an order of the Court dated December 16, 2002 (the "Procedures Order"), the Debtors submit that they delivered notice to CIT that, in connection with the Sale, the Agreement would be subject to certain assumption and rejection procedures as described in Exhibit E to the Procedures Order; and

WHEREAS, on January 15, 2003, CIT filed an objection (Docket No. 337) to the assumption and assignment of the Agreement (the "January 15 Objection") pursuant to the Sale; and

WHEREAS, Genuity, Level 3 and CIT desire to resolve the January 15 Objection consensually and according to the terms set forth below.

NOW, THEREFORE, in consideration of the terms, conditions and mutual agreements set forth herein, Genuity, Level 3 and CIT hereby agree and stipulate as follows (the "Stipulation"):

1.      On Monday, January 27, 2003, the Debtors shall forward a check , payable to: "CIT Communications Finance, Corp.; via overnight delivery service to CIT Investment Recovery Department, Attn: Jeremy Galton, 1 CIT Drive, Livingston, N.J. 07039, in the amount of $152,492.61 to pay undisputed post-petition arrearages under the Agreement.

2.      As soon as is reasonably practicable, but in no event later than ten (10) calendar days after the entry of the order approving the Sale, the Debtors shall segregate a sum of  $103,206.61 to cover disputed post-petition arrearages (the "Post-petition Reserve Amount") under the Agreement, if any.  The parties shall act diligently and in good faith to resolve any disputed post-petition arrearages as expeditiously as possible.

3.      In addition to the Post-petition Reserve Amount, the Debtors shall, as soon as is reasonably practicable after the closing of the Sale, segregate an additional $12,671.52 against alleged sums due to CIT pursuant to Section 365 (b)(1) of the Bankruptcy Code (the "Cure Reserve Amount" and, together with the Post-petition Reserve Amount, the "CIT Reserve Amount"), if any, in the event that the Agreement is assumed by the Debtors.

4.      The Debtors shall continue to segregate the Post-petition Reserve Amount until such date as (a) the Debtors and CIT (i) resolve their dispute regarding post-petition arrearages, and (ii) execute a letter agreement directing the release of the Post-petition Reserve Amount or, (b) upon further order of this Court.  The Post-petition Reserve Amount may be released in more than one portion in the event that CIT and the Debtors reach agreement regarding the release of a portion of the Post-petition Reserve and execute a letter agreement directing the release of a portion of the Post-petition Reserve Amount.

5.      The Debtors shall continue to segregate the Cure Reserve Amount until the earlier of (i) in the event that the Debtors assume the Agreement pursuant to Section 365 of the Bankruptcy Code, the date that the amounts payable to CIT under Section 365 (b)(1) with respect to such assumption are paid in full to CIT, whether from the Cure Reserve Amount or otherwise, and (ii) in the event that the Debtors reject the Agreement pursuant to Section 365 of the Bankruptcy Code, the effective date of such rejection.

6.      Notwithstanding the foregoing, the Debtors and CIT reserve all their rights to dispute CIT's entitlement to receive payment under Section 365 (b)(1) of the Bankruptcy Code and/or the amount of any such payment.  In addition, the Debtors and CIT reserve all their rights to dispute the existence and amount of any post-petition

arrearages under the Agreement, except those paid pursuant to paragraph 1 of this Stipulation.

7.     Nothing in this Stipulation or the Sale Order shall be deemed to prevent CIT from objecting to the assumption or rejection of any Agreement, or any schedule, service order or purchase order under any Agreement, on the grounds that the Agreement and Schedules and any related service order or purchase order constitute a unitary executory contract which must be assumed or rejected in its entirety.  Nothing in this Stipulation or the Sale Order shall be deemed an admission by Genuity that any Agreement, or any schedule, service order or purchase order under any Agreement, is a unitary contract for the purposes of assumption or rejection.

8.     Nothing herein shall be deemed an agreement to assume or reject any of the Agreement.

9.     The Bankruptcy Court shall retain jurisdiction to hear any matters or disputes arising from or relating to this Stipulation.

10.     This Stipulation may be executed in original or by facsimile signature in counterpart copies, and this Stipulation shall be deemed fully executed when all parties hereto have executed and possess a counterpart, even if no single counterpart contains all signatures.

GENUITY INC.
GENUITY SOLUTIONS INC.
By its attorneys

_____

Don S. DeAmicis (DD-2242)
James S. DeGraw (JD-7553)
Jeffrey B. Storer (JS-6022)
Mark P. Szpak (MS-3963)
Stephen Moeller-Sally (SM-5160)
Ropes & Gray
One International Place
Boston, MA  02110
(617) 951-7000


CIT COMMUNICATIONS FINANCE
CORPORATION
By its attorneys


_____

Deborah A. Reperowitz, Esq. (DR-7989)
Richard P. Norton, Esq. (RN-2231)
599 Lexington Avenue, 29 th Floor
New York, NY 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
-and-
One Riverfront Plaza
1 st Floor
Newark, NJ 07102
Telephone: (973) 621-3200
Facsimile: (973) 621-3199
E-mail: dreperowitz@reedsmith.com
morton@reedsmith.com


LEVEL 3 COMMUNICATIONS, LLC, and
its assignee affiliates

By their attorneys


_____

Marc Abrams (MA-0735)
(A Member of the Firm)
Willkie, Farr & Gallagher
787 Seventh Avenue
New York, NY 10019
Tel: (212) 728-8000

SO ORDERED:


DATE: January 24, 2003              /s/ Prudence Carter Beatty
                                    THE HONORABLE PRUDENCE C. BEATTY
                                    UNITED STATES BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| GENUITY INC., | ) Nos. | 02-43558 (PCB) |
| GENUITY SOLUTIONS INC., | ) | 02-43550 (PCB) |
| BBN ADVANCED COMPUTERS INC., | ) | 02-43551 (PCB) |
| BBN CERTIFICATE SERVICES INC., | ) | 02-43552 (PCB) |
| BBN INSTRUMENTS CORPORATION, | ) | 02-43553 (PCB) |
| BBN TELECOM INC., | ) | 02-43554 (PCB) |
| BOLT BERANEK AND NEWMAN CORPORATION, | ) | 02-43555 (PCB) |
| GENUITY BUSINESS TRUST, | ) | 02-43556 (PCB) |
| GENUITY EMPLOYEE HOLDINGS LLC, | ) | 02-43557 (PCB) |
| GENUITY INTERNATIONAL INC., | ) | 02-43559 (PCB) |
| GENUITY INTERNATIONAL NETWORKS LLC, | ) | 02-43560 (PCB) |
| GENUITY INTERNATIONAL NETWORKS INC., | ) | 02-43561 (PCB) |
| GENUITY TELECOM INC., | ) | 02-43562 (PCB) |
| LIGHTSTREAM CORPORATION, | ) | 02-43563 (PCB) |
| NAP.NET, L.L.C., | ) | 02-43564 (PCB) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

DEBTORS' JOINT CONSOLIDATED PLAN OF LIQUIDATION, AS MODIFIED

ROPES & GRAY LLP
45 Rockefeller Plaza
New York, New York 10111
212-841-5700

        and

William F. McCarthy (WM-1669)
Don S. DeAmicis (DD-2242)
D. Ross Martin (DM-2947)
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110
617-951-7000

Attorneys for Debtors and Debtors-in-Possession

Dated: Boston, Massachusetts
        October 1, 2003

# ARTICLE I
## INTRODUCTION

1.1.    <u>Proposing of Plan</u>.  This Plan is jointly proposed by Genuity Inc. and its subsidiaries that are debtors and debtors-in-possession in the above-captioned bankruptcy cases. All Holders of Claims against and Interests in the Debtors are encouraged to read this Plan and the accompanying solicitation materials, including the Disclosure Statement, in their entirety. No solicitation materials other than the Disclosure Statement and related materials transmitted with this Plan have been authorized for use in soliciting acceptances or rejections of this Plan.

1.2.    <u>Statements Made Solely by Debtors</u>.  All statements in this Plan and the accompanying solicitation materials concerning the history of the Debtors' businesses, the Debtors' past or present financial condition, transactions to which the Debtors were or are party, or the effect of Confirmation of the Plan on secured creditors, unsecured creditors or equity interest holders are attributable exclusively to the Debtors and not to any other party.

1.3.    <u>Amendments</u>.  Subject to applicable restrictions and requirements, including Section 14.3, the Debtors reserve the right to amend, revoke or withdraw this Plan prior to its substantial consummation.

1.4.    <u>Plan as Compromise</u>.  Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits under this Plan, the provisions of this Plan shall constitute a good faith compromise and settlement of all claims or controversies relating to various intercreditor and intercompany disputes arising out of or related to the business and affairs of the Debtors.  As set forth more fully in the Disclosure Statement, the Debtors believe that such a settlement and compromise is justified by administrative, substantive and equitable reasons.

# ARTICLE II
## DEFINITIONS; RULES OF CONSTRUCTION

2.1.    <u>Interpretation, Rules of Construction, Computation of Time</u>

2.1.1.    The provisions of the Plan shall control over any descriptions thereof contained in the Disclosure Statement.

2.1.2.    Any term used in the Plan that is not defined in the Plan, either in Section 2.2 or elsewhere, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in (and shall be construed in accordance with the rules of construction under) the Bankruptcy Code or the Bankruptcy Rules, as the case may be.  Without limiting the foregoing, the rules of construction set forth in Section 102 of the Bankruptcy Code shall apply to the Plan, unless superseded herein.  The definitions and rules of construction contained herein do not apply to the Disclosure Statement or to the Exhibits to the Plan except to the extent expressly so stated in the Disclosure Statement or in each Exhibit to the Plan.

2.1.3.    The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan as a whole and not to any particular Article, Section, subsection or clause contained in the Plan, unless the context requires otherwise.

2.1.4.    Unless specified otherwise in a particular reference, all references in the Plan to Articles, Sections and Exhibits are references to Articles and Sections of, and Exhibits to, the Plan.

2.1.5.    Any reference in the Plan to a contract, document, instrument, release, bylaw, certificate, indenture or other agreement being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions.

2.1.6.    Any reference in the Plan to an existing document or Exhibit means such document or Exhibit as it may have been amended, restated, modified or supplemented as of the Effective Date.

2.1.7.    Whenever from the context it is appropriate, each term stated in either the singular or the plural shall include both the singular and the plural, and each pronoun stated in the masculine, feminine or neuter shall include the masculine, feminine and neuter.

2.1.8.    In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.  Time is of the essence with respect to all time periods and deadlines imposed by this Plan.

2.1.9.    All Exhibits and schedules to the Plan are incorporated into the Plan, and shall be deemed to be included in the Plan, regardless of when Filed.

2.1.10.    The terms "includes and "including" are not limiting.

2.1.11.    If any inconsistency between the Plan and the Disclosure Statement exists, the provisions of the Plan shall control.  If any inconsistency between the Plan and the Liquidating Trust Agreement exists, the provisions of the Liquidating Trust Agreement shall control, provided, however, that the Plan shall control with respect to the matters set forth in Sections 7.3 and 7.4.

2.2.    Definitions.  In addition to such other terms as are defined in other Sections of the Plan, the following terms have the following meanings as used in the Plan:

2.2.1.    "Administrative Claim" means a Claim against any of the Debtors entitled to priority under Bankruptcy Code Section 507(a)(1), except for quarterly fees payable to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6).

2.2.2.    "AlixPartners Retention Agreement" means the Letter Agreement dated January 7, 2003 between Genuity Inc. and AP Services LLC, as amended and in effect from time to time.

2.2.3.      "Allowed" means, with respect to Claims, (a) any Claim or portion thereof, proof of which is timely Filed or by order of the Bankruptcy Court is not, or will not be, required to be Filed, (b) any Claim or portion thereof that has been or is hereafter listed in the Schedules as neither disputed, contingent or unliquidated, and (c) any Claim or portion thereof allowed pursuant to this Plan; and in the cases in (a) and (b) above as to which either (i) no objection to the allowance or level of priority or seniority thereof or no motion to estimate for the purposes of allowance has been interposed within the applicable period of time fixed by this Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court and such time period or extension thereof has expired, or (ii) such an objection or motion has been so interposed and the Claim shall have been allowed by a Final Order (but only to the extent so allowed).

2.2.4.      "Approved Senior Creditor Claim" means, with respect to Senior Creditor Claims, (a) any Senior Creditor Claim or portion thereof for which a statement is timely Filed pursuant to Section 8.8.2 and, (b) any Senior Creditor Claim or portion thereof that is listed in Exhibit B; and in both cases as to which either (i) no objection has been timely Filed in accordance with Section 8.8.3, or (ii) such an objection has been so Filed and the Senior Creditor Claim shall have been approved by a Final Order (but only to the extent so approved).

2.2.5.      "Available Cash" means Effective Date Cash <u>minus</u> Plan Confirmation Cash.

2.2.6.      "Avoidance Actions" means all avoidance actions including all causes of action under Bankruptcy Code Sections 329, 510, 542, 543, 544, 545, 547, 548, 549, 550 and 553(b).

2.2.7.      "Bank Agent" means JPMorgan Chase Bank, as successor in interest to The Chase Manhattan Bank, in its capacity as the Administrative Agent under the Bank Credit Agreement.

2.2.8.      "Bank Credit Agreement" means the Amended and Restated Credit Agreement dated as of September 24, 2001, among Genuity Inc., the Bank Lenders, the Bank Agent, J.P. Morgan Securities Inc., as arranger and book manager, Citibank, N.A., as syndication agent, and Credit Suisse First Boston and Deutsche Bank AG New York Branch, as co-documentation agents, as amended and in effect from time to time.

2.2.9.      "Bank Group Claims" means the Claims of the Bank Lenders relating in any way to the Bank Credit Agreement, but excluding the rights of the Bank Lenders as beneficiaries of the subordination provisions of the BBN Bonds Indenture.

2.2.10.      "Bank Lenders" means the "Lenders" as that term is defined in the Bank Credit Agreement.

2.2.11.      "Bank Loans" means all loans under the Bank Credit Agreement.

2.2.12.      "Bank Tranche Amount" means $116,000,000.00 to the extent available on or after the Effective Date.

2.2.13.    "Bankruptcy Code" means title 11 of the United States Code, as the same was in effect on the Petition Date, as amended from time to time and as applicable to the Chapter 11 Cases.

2.2.14.    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York, or, to the extent that such court ceases to exercise jurisdiction over the Chapter 11 Cases, such other courts or adjuncts thereof that exercise jurisdiction over the Chapter 11 Cases.

2.2.15.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Procedure for the United States Bankruptcy Court for the Southern District of New York, as in effect on the Petition Date and thereafter amended from time to time and as applicable to the Chapter 11 Cases.

2.2.16.    "BBNAC" means BBN Advanced Computers Inc., a Massachusetts corporation, as debtor and debtor-in-possession.

2.2.17.    "BBN Bonds" means the 6% Convertible Subordinated Debentures due April 1, 2012, originally issued by Bolt Beranek and Newman Inc., predecessor in interest to Genuity Solutions.

2.2.18.    "BBN Bonds Claims" means all Claims, except Senior Creditor Claims, represented by, related to or arising under or in connection with the BBN Bonds or the BBN Bonds Indenture or any instruments, documents or agreements entered into, delivered or filed thereunder or in connection therewith, including the principal amount outstanding thereunder, accrued and unpaid interest thereon and all other fees, costs, expenses and other obligations thereunder.

2.2.19.    "BBN Bonds Indenture" means that certain Indenture dated as of April 1, 1987, between Bolt Beranek and Newman Inc. and U.S. Bank N.A., as successor in interest to The First National Bank of Boston, pursuant to which the BBN Bonds were issued, as amended from time to time.

2.2.20.    "BBN Bonds Trustee" means the indenture trustee for the BBN Bonds.

2.2.21.    "BBNC" means Bolt Beranek and Newman Corporation, a Maine corporation, as debtor and debtor-in-possession.

2.2.22.    "BBNCS" means BBN Certificate Services Inc., a Massachusetts corporation, as debtor and debtor-in-possession.

2.2.23.    "BBNI" means BBN Instruments Corporation, a Delaware corporation, as debtor and debtor-in-possession.

2.2.24.    "BBNT" means BBN Telecom Inc., a Massachusetts corporation, as debtor and debtor-in-possession.

2.2.25.    "Beneficial Interests" means the Class A Beneficial Interests and the Class B Beneficial Interests.

2.2.26.    "Business Day" means any day other than a Saturday, Sunday or legal holiday (as defined in Bankruptcy Rule 9006).

2.2.27.    "Cash" means cash and cash equivalents, including wire transfers of immediately available funds, certified checks, money orders, negotiable checks, other readily marketable direct obligations of the United States of America and other similar items.

2.2.28.    "Cash Claims Reserve" means an amount of Cash equal to the sum of (a) the Maximum Amount of each Disputed Cash Claim, plus (b) an amount determined by the Debtors, subject to Section 14.3, sufficient to pay (i) the unpaid estimated Administrative Claims (including Professional Fee Claims) that accrue on or after the Petition Date through the Effective Date and (ii) any unpaid incentive compensation under the AlixPartners Retention Agreement and the Estate Employee Retention Plan that accrues after the Effective Date.

2.2.29.    "Cause of Action" means all claims, rights, causes of action, torts, suits, controversies, accounts, proceedings, avoiding powers, damages and demands, whether asserted or assertable directly or derivatively in law or in equity, known or unknown, contingent or otherwise, that any Debtor or any Estate may have or hold against any Person, including the Avoidance Actions, causes of action for subordination of Claims and causes of action against the directors, officers, agents, accountants and other representatives of any Debtor and its affiliates.

2.2.30.    "Chapter 11 Cases" means the Debtors' cases under chapter 11 of the Bankruptcy Code.

2.2.31.    "Claim" means (a) any right to payment from a Debtor arising on or before the Effective Date, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (b) any right to an equitable remedy against a Debtor arising on or before the Effective Date for breach of performance if such breach gives rise to a right to payment from a Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

2.2.32.    "Claims Objection Bar Date" means, with respect to any Claim, the 120th day following the latest of the Effective Date, the date such Claim is Filed and such later date as may be established from time to time by the Bankruptcy Court as the last date for filing objections to such Claim.

2.2.33.    "Class" means one of the classes of Claims or Interests that are substantially similar in nature to each other, established under Article V of this Plan.

2.2.34.    "Class A Beneficial Interests" means the Class A beneficial interests in the Liquidating Trust.

2.2.35.    "Class B Beneficial Interests" means the Class B beneficial interests in the Liquidating Trust.

2.2.36.    "Class B Subtrust" means the subtrust of the Liquidating Trust, for the benefit of holders of Class B Beneficial Interests, established pursuant to Section 8.3.2(g).

2.2.37.    "Class B Tranche Amount" means $70,000,000.00.

2.2.38.    "Confirmation" means the entry of the Confirmation Order.

2.2.39.    "Confirmation Date" means the date on which the Bankruptcy Court enters the Confirmation Order under Bankruptcy Code Section 1129.

2.2.40.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation, as such hearing may be continued or adjourned from time to time.

2.2.41.    "Confirmation Order" means the Bankruptcy Court's order confirming this Plan pursuant to Bankruptcy Code Section 1129.

2.2.42.    "Consolidation Order" means the Bankruptcy Court's order, or provision of the Confirmation Order, effecting the substantive consolidation of the Debtors.

2.2.43.    "Contested Senior Creditor Claims" means all Senior Creditor Claims for which objections in accordance with Section 8.8.3 have been Filed and have not been resolved by a Final Order.

2.2.44.    "Creditors' Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases.

2.2.45.    "Cure Claims" means all Claims entitled to payment pursuant to Bankruptcy Code Sections 365(b)(1)(A) and (B).

2.2.46.    "Debtor" means any of Genuity Inc., Genuity Solutions, Genuity Telecom, BBNAC, BBNC, BBNCS, BBNI, BBNT, GBT, GEH, Genuity International, GINI, GINLLC, LS and NN.

2.2.47.    "Disallowed" means, with respect to Claims and Interests, any Claim or portion thereof against, or Interest or portion thereof in, a Debtor (i) disallowed, overruled or expunged by a Final Order or this Plan or (ii) not listed in the Schedules or listed in the Schedules as contingent, unliquidated or disputed and, in either case, no proof of claim was Filed in respect thereof.

2.2.48.    "Disbursing Agent" means, as to distributions to be made on the Effective Date, the Debtors, and as to distributions to be made after the Effective Date, the Liquidating Trust or its designee.

2.2.49.    "Disclosure Statement" means the disclosure statement used to solicit acceptances and rejections of this Plan, including all exhibits and schedules thereto, in the form approved by the Bankruptcy Court under Section 1125 of the Bankruptcy Code, as amended, modified and supplemented from time to time.

2.2.50.    "Disputed" means with respect to Claims, any Claim that is not Allowed or Disallowed.  Prior to the Claims Objection Bar Date, for the purposes of the Plan, a Claim shall be considered a Disputed Claim in its entirety if: (i) the amount of the Claim specified in the proof of claim exceeds the amount of any corresponding Claim listed in the Schedules (if any); (ii) any corresponding Claim listed in the Schedules (if any) has been scheduled as disputed, contingent, or unliquidated, irrespective of the amount scheduled; or (iii) no corresponding Claim is listed in the Schedules.

2.2.51.    "Disputed Cash Claims" means Administrative Claims, Cure Claims, Priority Tax Claims, Priority Claims and Miscellaneous Secured Claims that are Disputed Claims.

2.2.52.    "Distribution Record Date" means as to any distribution under the Plan 5:00 p.m. prevailing New York City time on the 15th day prior to such distribution.

2.2.53.    "Effective Date" means the first Business Day after the conditions set forth in Article XII have been satisfied or waived in accordance with Section 12.3, or such later date as established by the Debtors, subject to Section 14.3.

2.2.54.    "Effective Date Cash" means all Cash held by or for the benefit of the Debtors or otherwise in the Debtors' control as of the Effective Date, including all Cash in the Cash Claims Reserve.

2.2.55.    "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461, as amended.

2.2.56.    "Estate" means, with respect to each Debtor, the estate created in the Chapter 11 Cases for such Debtor, by operation of Bankruptcy Code Section 541.

2.2.57.    "Estate Employee Retention Plan" means the obligations of the Debtors and their Estates under the Bankruptcy Court's Order Granting Motion to Authorize Implementation of an Incentive and Retention Program for Estate Employees (Docket No. 619), as amended and in effect from time to time.

2.2.58.    "File," "Filed" or "Filing" means file, filed or filing with the Bankruptcy Court in the Chapter 11 Cases.

2.2.59.    "Final Order" means an order or judgment of the Bankruptcy Court that has not been reversed, stayed, modified or amended and as to which the time to appeal or

seek review, rehearing, reargument or certiorari has expired and as to which no appeal or petition for review, rehearing, reargument, stay or certiorari is pending, or as to which any right to appeal or to seek certiorari, review or rehearing has been waived, or, if an appeal, reargument, petition for review, certiorari or rehearing has been sought, the order or judgment of the Bankruptcy Court that has been affirmed by the highest court to which the order was appealed or from which the reargument, review or rehearing was sought, or certiorari has been denied, and as to which the time to take any further appeal, or seek further reargument, review, certiorari or rehearing has expired.

2.2.60.    "510(b) Claims" means all Claims against any of the Debtors that would be subordinated pursuant to Bankruptcy Code Section 510(b).

2.2.61.    "GBT" means Genuity Business Trust, a Massachusetts business trust, as debtor and debtor-in-possession.

2.2.62.    "GEH" means Genuity Employee Holdings LLC, a Delaware limited liability company, as debtor and debtor-in-possession.

2.2.63.    "General Unsecured Claims" means all Claims against the Debtors that are not Administrative Claims, Priority Claims, Priority Tax Claims, Miscellaneous Secured Claims, Bank Group Claims, 510(b) Claims or Verizon Investments Claims.

2.2.64.    "General Unsecured Creditor" means a Holder of a General Unsecured Claim.

2.2.65.    "Genuity Inc." means Genuity Inc., a Delaware corporation, as debtor and debtor-in-possession.

2.2.66.    "Genuity International" means Genuity International, Inc., a Massachusetts corporation, as debtor and debtor-in-possession.

2.2.67.    "Genuity Solutions" means Genuity Solutions, Inc., a Massachusetts corporation, as debtor and debtor-in-possession.

2.2.68.     "Genuity Telecom" means Genuity Telecom Inc., a Delaware corporation, as debtor and debtor-in-possession.

2.2.69.     "GINI" means Genuity International Networks Inc., a California corporation, as debtor and debtor-in-possession.

2.2.70.    "GINLLC" means Genuity International Networks LLC, a Delaware limited liability company, as debtor and debtor-in-possession.

2.2.71.    "Holder" means the holder of a Claim or Interest.

2.2.72.    "Intercompany Claims" means all Claims of any Debtor against any other Debtor.

2.2.73.    "Interest" means (a) "equity security" as that term is defined in the Bankruptcy Code and any other equity or membership interest, and (b) the legal, equitable, contractual or other right to acquire or receive any of the foregoing.

2.2.74.    "Level 3" means Level 3 Communications LLC.

2.2.75.    "Level 3 Asset Purchase Agreement" means the Asset Purchase Agreement dated as of November 27, 2002 among the Debtors, Level 3 Communication, Inc. and Level 3, as amended and in effect from time to time.

2.2.76.    "Level 3 Sale Order" means the order of the Bankruptcy Court approving the transactions contemplated by the Level 3 Asset Purchase Agreement (Docket No. 438).

2.2.77.    "Lien" means any lien, security interest, or other charge or encumbrance of any kind, or any other type of encumbrance on title to real property.

2.2.78.    "Liquidating Trust" means the trust contemplated by the Liquidating Trust Agreement.

2.2.79.    "Liquidating Trust Agreement" means an agreement substantially in the form attached hereto as Exhibit A, as amended from time to time prior to the Effective Date subject to Section 14.3, such amended document to be Filed.

2.2.80.    "Liquidating Trust Assets" means all assets of the Estates except assets distributed on the Effective Date.

2.2.81.    "Liquidating Trust Oversight Committee" means the board established pursuant to the Liquidating Trust Agreement to advise, assist and supervise the Liquidating Trustee in the administration of the Liquidating Trust.

2.2.82.    "Liquidating Trustee" means Meade A. Monger, who is a Principal of AlixPartners, LLC, or any successor duly appointed pursuant to the terms of the Liquidating Trust Agreement.

2.2.83.    "LS" means LightStream Corporation, a Massachusetts corporation, as debtor and debtor-in-possession.

2.2.84.    "Maximum Amount" means, with respect to any Disputed Claim: (a) the amount agreed to by the Liquidating Trust and the Holder of such Claim; (b) the amount, if any, estimated or determined by the Bankruptcy Court in accordance with Bankruptcy Code Section 502(c); or (c) absent any such agreement, estimation or determination, the liquidated amount set forth in the proof of claim Filed by the Holder of such Claim or, if no amount is so set forth, the amount estimated by the Liquidating Trust.

2.2.85.    "Miscellaneous Secured Claim" means a Claim, other than an Administrative Claim, a Priority Tax Claim, a Priority Claim or a Bank Group Claim,

payment of which is secured by a valid, perfected, enforceable, and non-avoidable Lien on property in which any Estate has an interest, to the extent of the value of the interest of the Holder of the Claim in such Estate's interest in such property, or to the extent such Claim is subject to setoff under Bankruptcy Code Section 553, as applicable, as determined pursuant to Bankruptcy Code Section 506(a); provided, however, that if the Holder of a Miscellaneous Secured Claim elects application of Bankruptcy Code Section 1111(b)(2), then such Holder's Claim shall be a Miscellaneous Secured Claim to the extent such Claim is Allowed.

2.2.86.    "NN" means Nap.Net, L.L.C., a Wisconsin limited liability company, as debtor and debtor-in-possession.

2.2.87.    "Non-Cash Asset" means any asset of any Estate, including Causes of Action and accounts receivable, on or after the Effective Date, other than Cash.

2.2.88.    "Non-Debtor Subsidiary" means any direct or indirect non-Debtor Subsidiary of any Debtor, except Integra S.A. and its Subsidiaries.

2.2.89.    "Person" means an individual, corporation, partnership, limited liability partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or political subdivision thereof, or any other entity.

2.2.90.    "Petition Date" means November 27, 2002.

2.2.91.    "Plan" means this Joint Consolidated Plan of Liquidation, As Modified, as it may be amended and modified from time to time in accordance with the terms hereof, including Section 14.3.

2.2.92.    "Plan Confirmation Cash" means, without duplication, the sum of (a) all Cash distributions required to be paid under the Plan to Holders of Administrative Claims, Cure Claims, Priority Claims, Priority Tax Claims and Miscellaneous Secured Claims that are, in each case, Allowed Claims as of the Effective Date plus (b) the Cash Claims Reserve.

2.2.93.    "Priority Claims" means all Claims against the Debtors accorded priority in right of payment under Bankruptcy Code Section 507(a), other than Administrative Claims and Priority Tax Claims.

2.2.94.    "Priority Tax Claims" means all Claims against the Debtors for taxes, interest and penalties entitled to priority pursuant to Bankruptcy Code Section 507(a)(8).

2.2.95.    "Professional Fee Claims" means Administrative Claims for (i) compensation and reimbursement of expenses of Professionals pursuant to Bankruptcy Code Section 327, 328, 329, 330, 331, 503(b)(1) or 1103, and (ii) Substantial Contribution Claims.

2.2.96.    "Professionals" means those Persons: (a) employed pursuant to Bankruptcy Court order entered in the Chapter 11 Cases in accordance with Bankruptcy Code Section 327, 328 or 1103; or (b) for which the Bankruptcy Court has allowed compensation and reimbursement pursuant to Bankruptcy Code Section 503(b)(2) or (4).

2.2.97.    "Pro Rata Share" means, as of the date of calculation and with respect to an Allowed Claim in a particular Class, a percentage equal to (a) the amount of the Holder's Allowed Claim divided by (b) the total amount of Allowed and Disputed Claims of such Class.

2.2.98.    "Residual Cash" means all Available Cash minus $514,200,000 minus the Class B Tranche Amount minus the Bank Tranche Amount plus all other Cash of the Liquidating Trust (including Cash released from the Cash Claims Reserve and Cash proceeds of Non-Cash Assets, but excluding the Cash previously allocated to the Class B Subtrust).

2.2.99.    "Retiree Benefit Programs" means any plans, funds and programs maintained or established by the Debtors currently in effect providing payments to retirees and their spouses and dependents for medical, surgical or hospital case benefits, or benefits in the event of sickness, accident, disability or death to the extent such plans are subject to Bankruptcy Code Section 1114, but excluding those payments and benefits that the Debtors are not required to make or provide pursuant to Bankruptcy Code Section 1114.

2.2.100.    "Schedules" means the schedules of assets and liabilities that the Debtors have Filed in the Chapter 11 Cases, including any amendments and supplements thereto.

2.2.101.    "Senior Claimant Share" means, as of the date of calculation and with respect to a Senior Creditor Claim, a percentage equal to (a) the amount of the Holder's Senior Creditor Claim divided by (b) the total amount of (i) Approved Senior Creditor Claims and (ii) Contested Senior Creditor Claims.

2.2.102.    "Senior Creditor Claimants" means (i) Persons listed on Exhibit B annexed hereto and (ii) Holders of Senior Creditor Claims described in Section 8.8.2.

2.2.103.    "Senior Creditor Claims" means the Claims of Senior Creditor Claimants having or seeking status as a beneficiary of the subordination provisions of the BBN Bonds Indenture.

2.2.104.    "Subsidiary" means, with respect to any Person, any other Person that either (i) has 50% or more of its voting securities or other ownership interests (by power to vote) owned by such Person or (ii) is controlled, directly or indirectly, by such Person.

2.2.105.    "Subsidiary Debtors" means all of the Debtors except Genuity Inc.

2.2.106.    "Substantial Contribution Claim" means a Claim asserted pursuant to Bankruptcy Code Section 503(b)(4).

2.2.107.  "UCC" means the Uniform Commercial Code, as in effect from time to time.

2.2.108.  "Verizon Investments" means Verizon Investments, Inc., a Delaware corporation.

2.2.109.  "Verizon Investments Claims" means all Claims of Verizon Investments represented by, related to or arising under or in connection with the Credit Agreement dated as of March 5, 2001, between Genuity Inc. and Verizon Investments, as amended and in effect from time to time, including the principal amount outstanding thereunder, accrued and unpaid interest thereon and all other fees, costs, expenses and other obligations thereunder.

2.2.110.  "Voting Deadline" means 5:00 p.m. prevailing New York time on _____, 2003, the date and time fixed by the Bankruptcy Court as the last day for Holders of Claims to vote to accept or reject the Plan.

## ARTICLE III
### METHOD OF CLASSIFICATION OF CLAIMS
### AND INTERESTS AND GENERAL PROVISIONS

3.1.  <u>General Rules of Classification</u>.  A Claim or Interest is classified in a particular Class for voting and distribution purposes only to the extent the Claim or Interest qualifies within the description of that Class, and is classified in another Class or Classes to the extent that the Claim or Interest qualifies within the description of such other Class or Classes.  A Claim or Interest is classified in a particular Class regardless of whether the Claim or Interest is an Allowed Claim or Interest in that Class, or only asserted as such, but only to the extent that it has not been paid, released, Disallowed or otherwise satisfied before the Effective Date.

3.2.  <u>Administrative Claims; Priority Tax Claims; Priority Claims</u>.  Administrative Claims and Priority Tax Claims have not been classified and are excluded from the Classes set forth in Article V in accordance with Bankruptcy Code Section 1123(a)(1).  Priority Claims are classified in Class 1.

3.3.  <u>Satisfaction of Claims</u>.  The treatment to be provided for Allowed Claims pursuant to this Plan and the consideration provided for herein shall be in full satisfaction, settlement and release of such Claims.

## ARTICLE IV
### IDENTIFICATION OF CLASSES OF CLAIMS AND
### INTERESTS IMPAIRED AND UNIMPAIRED BY THIS PLAN

4.1.  <u>Classes of Claims Impaired by this Plan and Entitled to Vote</u>.  Unless otherwise ordered by the Bankruptcy Court, the Claims in Classes 3 and 4 are impaired by this Plan and the Holders thereof are entitled to vote to accept or reject the Plan.

4.2.  <u>Classes Deemed to Reject this Plan</u>.  Claims in Classes 5 and 6 and Interests in Class 7 are impaired and Holders of such Claims and Interests shall not receive or retain any

property under the Plan. Under Bankruptcy Code Section 1126(g), the Holders of such Claims and Interests are deemed to reject this Plan and the votes of such Holders will not be solicited.

4.3.    <u>Unimpaired Classes Conclusively Deemed to Accept this Plan</u>. Unless otherwise ordered by the Bankruptcy Court, Priority Claims (Class 1) and Miscellaneous Secured Claims (Class 2) are unimpaired by this Plan. The Holders of such Claims are unimpaired and, under Bankruptcy Code Section 1126(f), are conclusively presumed to accept this Plan, and the votes of such Holders are not being solicited.

4.4.    <u>Confirmation Pursuant to Bankruptcy Code Section 1129(b)</u>. The Debtors intend to request that the Bankruptcy Court confirm this Plan in accordance with Bankruptcy Code Section 1129(b) because Classes 5, 6 and 7 are deemed to have rejected the Plan. The Debtors also may seek Confirmation under Bankruptcy Code Section 1129(b) to the extent any other Class rejects the Plan.

## ARTICLE V
### CLASSIFICATION OF CLAIMS AND INTERESTS

All Claims and Interests, except Administrative Claims and Priority Tax Claims, are placed in the following Classes.

5.1.    <u>Class 1</u> shall consist of all Priority Claims.

5.2.    <u>Class 2</u> shall consist of all Miscellaneous Secured Claims.

5.3.    <u>Class 3</u> shall consist of all Bank Group Claims.

5.4.    <u>Class 4</u> shall consist of all General Unsecured Claims.

5.5.    <u>Class 5</u> shall consist of all Verizon Investments Claims.

5.6.    <u>Class 6</u> shall consist of all 510(b) Claims.

5.7.    <u>Class 7</u> shall consist of all Interests in the Debtors.

## ARTICLE VI
### TREATMENT OF ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS

6.1.    <u>Treatment of Allowed Administrative Claims</u>. Each Holder of an Allowed Administrative Claim shall be paid in full in Cash the amount of such Allowed Administrative Claim on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date such Administrative Claim becomes Allowed and (iii) the date fixed by the Bankruptcy Court, unless such Holder shall agree to a different treatment of such Claim (including, without limitation, any different treatment that may be provided for in the documentation governing such Claim).

6.2.    <u>Treatment of Allowed Priority Tax Claims</u>. Each Holder of an Allowed Priority Tax Claim shall, at the option of the Liquidating Trust or the Debtors, be paid in full in Cash the

amount of such Allowed Priority Tax Claim on or as soon as reasonably practicable after the later of (a) the Effective Date and (b) the date such Priority Tax Claim becomes Allowed.

## ARTICLE VII
### TREATMENT OF OTHER CLAIMS AND INTERESTS

7.1.    Treatment of Allowed Priority Claims (Class 1).

      7.1.1.    Each Holder of an Allowed Priority Claim shall be paid in full in Cash the amount of such Allowed Priority Claim on or as soon as reasonably practicable after the later of (i) the Effective Date and (ii) the date such Priority Claim becomes Allowed, unless such Holder shall agree to a different treatment of such Claim.

      7.1.2.    Class 1 is not impaired by the Plan and the Holders of Claims in Class 1 shall be deemed to have accepted the Plan.

7.2.    Treatment of Miscellaneous Secured Claims (Class 2).

      7.2.1.    Each Allowed Miscellaneous Secured Claim will be treated, at the election of the Debtors made not later than the Confirmation Hearing, as follows: (a) this Plan shall leave unaltered the legal, equitable and contractual rights with respect to such Claim; (b) the Holder of such Claim shall receive Cash equal to the Allowed amount of such Claim; (c) the Holder of such Claim shall receive the indubitable equivalent of such Claim; (d) such Claim shall be paid in full in Cash on or as soon as reasonably practicable after the later of the Effective Date and the date on which such Claim becomes Allowed; or (e) the Holder of such Claim shall receive such other treatment to which such Holder consents.

      7.2.2.    Class 2 is not impaired by the Plan and the Holders of Claims in Class 2 shall be deemed to have accepted the Plan.

7.3.    Treatment of Bank Group Claims (Class 3).

      7.3.1.    On or as soon as reasonably practicable after the Effective Date, the Bank Agent, on behalf of the Bank Lenders, shall receive the following in respect of all Class 3 Claims:

            (a)    $514,200,000.00; and

            (b)    the Bank Tranche Amount; and

            (c)    68% of the Residual Cash, if any; and

            (d)    the Class A Beneficial Interests, which shall evidence the right to receive the Bank Tranche Amount, to the extent not paid on the Effective Date, and 68% of the Residual Cash, if any, after the Effective Date;

provided, however, that (i) the $514,200,000 payment, not less than $3,840,850 of the Bank Tranche Amount and the Class A Beneficial Interests shall be distributed on the Effective Date to the Bank Agent, on behalf of the Bank Lenders and (ii) any distribution of Cash to be made to the Holders of Class A Beneficial Interests after the Effective Date pursuant to this Section 7.3.1 shall be made net of all applicable reserves and expenses, as provided in the Liquidating Trust Agreement.

7.3.2.    Class 3 is impaired by the Plan and the Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

7.4.    Treatment of General Unsecured Claims (Class 4).

7.4.1.    Each Holder of an Allowed General Unsecured Claim shall receive, on or as soon as reasonably practicable after the later of the Effective Date and the date such Claim is Allowed, such Holder's Pro Rata Share of Class B Beneficial Interests; provided, however, that the Class B Beneficial Interests that otherwise would have been distributed in respect of the BBN Bonds Claims shall be subject to the provisions of Section 8.8.  The Class B Beneficial Interests shall, in the aggregate, evidence the right of the Holders of Allowed General Unsecured Claims to receive from the Class B Subtrust their respective Pro Rata Share of the Class B Tranche Amount plus 32% of the Residual Cash, if any, in each case net of all applicable reserves and expenses, as provided in the Liquidating Trust Agreement.

7.4.2.    Class 4 is impaired by the Plan and the Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

7.5.    Treatment of Verizon Investments Claims (Class 5).

7.5.1.    The Holders of the Allowed Verizon Investments Claims shall receive no distribution under this Plan with respect to such Claims.

7.5.2.    Class 5 is impaired by the Plan and the Holders of Claims in Class 5 shall be deemed to have rejected the Plan.

7.6.    Treatment of 510(b) Claims (Class 6).

7.6.1.    Holders of Allowed 510(b) Claims shall receive no distribution under this Plan with respect to such Claims.

7.6.2.    Class 6 is impaired by `the Plan and the Holders of Claims in Class 6 shall be deemed to have rejected the Plan.

7.7.    Treatment of Interests in the Debtors (Class 7).

7.7.1.    Holders of Class 7 Interests shall receive no distribution under the Plan with respect to such Interests.

7.7.2.    Class 7 is impaired by the Plan and the Holders of Interests in Class 7 shall be deemed to have rejected the Plan.

**ARTICLE VIII**

MEANS FOR IMPLEMENTATION OF THE PLAN

8.1.    Substantive Consolidation.

8.1.1.    Consolidation of Chapter 11 Cases.  This Plan contemplates and is predicated upon entry of an order substantively consolidating all of the Estates for purposes of voting on, making distributions under and administering the Plan only.  On the Confirmation Date or such other date as may be set by an order of the Bankruptcy Court, but subject to the occurrence of the Effective Date:

(a)    all Intercompany Claims of each of the Debtors against any other Debtor shall be eliminated;

(b)    all assets (including Causes of Action) and liabilities of the Subsidiary Debtors and their Estates shall be merged and treated as if they were merged with the assets and liabilities of Genuity Inc. and its Estate;

(c)    any obligation of any of the Debtors and all (i) guarantees thereof by, and (ii) co-liability, joint liability or vicarious liability for such obligation of, any other Debtor shall be deemed to be one (1) obligation of Genuity Inc.;

(d)    Interests in all of the Subsidiary Debtors shall be deemed cancelled for all purposes;

(e)    each Claim Filed or to be Filed against any Debtor shall be deemed Filed only against Genuity Inc. and shall be deemed a single claim against and a single obligation of Genuity Inc., and all duplicate proofs of claim for the same Claim Filed against more than one Debtor will be deemed to be expunged and the Claims asserted thereunder Disallowed;

(f)    each of the officers and directors of each of the Debtors shall be deemed to have resigned;

(g)    each of the Chapter 11 Cases of the Subsidiary Debtors shall be closed, following which any and all contested matters, proceedings, and other matters that could have been brought or otherwise commenced in any of such Chapter 11 Cases shall be brought or commenced in the Chapter 11 Case of Genuity Inc.; and

(h)    all Claims based upon guarantees of collection, payment or performance made by any of the Debtors as to the obligations of another Debtor shall be released and of no further force or effect;

provided, however, that the substantive consolidation of assets and liabilities of the Debtors shall not otherwise affect the separate legal existence of each Debtor for licensing, regulatory, tax or other purposes or result in any actual transfer or merger of assets and liabilities for any purpose (including for tax purposes and State-law purposes) other than the administration of the Chapter 11 Cases and the determination of the rights of Holders of Claims and Interests under the Plan and the making of Plan distributions.

        8.1.2.    Consolidation Order.  Unless the Bankruptcy Court has approved the substantive consolidation of any of the Chapter 11 Cases by a prior order, this Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the Chapter 11 Cases of the Debtors for purposes of voting on, making distributions under, and administering the Plan only.  If no objection to such substantive consolidation is Filed and served on or before the Voting Deadline by any Holder of an impaired Claim, the Consolidation Order may be entered by the Bankruptcy Court.  If any such objections are timely Filed and served, a hearing with respect to substantive consolidation of the Chapter 11 Cases and the objections thereto shall be scheduled by the Debtors and the Bankruptcy Court, which hearing may, but is not required to, coincide with the Confirmation Hearing.

8.2.    Allowance and Disallowance of Claims.

        8.2.1.    Bank Group Claims.  The Bank Group Claims are Allowed Claims in Class 3.  Pursuant to Section 2.14 of the Bank Credit Agreement, and the notes issued pursuant to the Bank Credit Agreement, all distributions by the Debtors in respect of Class 3 Claims (including Class A Beneficial Interests) shall be made to the Bank Agent, on behalf of the Bank Lenders.

        8.2.2.    BBN Bonds.  The BBN Bonds Trustee (on behalf of the Holders of BBN Bonds Claims) is hereby granted an Allowed Claim in Class 4 in the amount of $7,782,736.41.  Such claim shall be subject to the provisions of Section 8.8.  The BBN Bonds Trustee is hereby granted an Allowed Substantial Contribution Claim in the amount of $13,000.00.  The BBN Bonds Trustee may, on the Effective Date, deduct and retain such amount in full payment of its fees and expenses, from Cash held by it.  On the Effective Date, the BBN Bonds Trustee shall transfer, assign and deliver to the Liquidating Trust all other Cash held by the BBN Bonds Trustee, which shall be placed in the Senior Creditor Claims Reserve.  All other Claims of the BBN Bonds Trustee are hereby Disallowed.

        8.2.3.    Administrative Claims Bar Date.  Any Administrative Claim for which a bar date has not been set by prior Bankruptcy Court order, except Claims under the Estate Employee Retention Plan and the AlixPartners Retention Agreement, shall be Filed not later than 5:00 p.m. prevailing New York time on the 30th day after the Effective Date.  Any Administrative Claim Filed after such time shall be Disallowed in its entirety as untimely, except as otherwise ordered by the Bankruptcy Court.  The Debtors shall send a notice of such bar date to all creditors, along with notice of Confirmation.  Any objections to Administrative Claims shall be Filed not later than the 120th day after the Effective Date, or such later deadline as set by the Bankruptcy Court,

provided, however, that objections to Professional Fee Claims shall be Filed not later than the 60th day after the Effective Date.

     8.3.   Corporate Matters upon Consummation.  The following events shall occur, and be deemed to occur simultaneously at the time this Plan is consummated.

       8.3.1.   Cancellation of Interests in Debtors.  The interests of all Holders of Interests in the Debtors, including all members of Class 7, shall be cancelled.

       8.3.2.   Liquidating Trust.

         (a)   Establishment of the Liquidating Trust.  On the Effective Date, the Debtors shall and, in any event, shall be deemed to: (i) enter into the Liquidating Trust Agreement, (ii) take all other steps necessary or appropriate to establish the Liquidating Trust and (iii) transfer, assign and deliver to the Liquidating Trust for the benefit of the holders of the Beneficial Interests all of the Debtors' right, title and interest in, to, under and in connection with the Liquidating Trust Assets, in each case free and clear of any Lien in such property of any other Person; provided, however, that the Creditors' Committee is hereby authorized to execute the Liquidating Trust Agreement in the name of the Debtors and on behalf of the Estates to the extent the Debtors do not execute the Liquidating Trust Agreement and to take all other actions in the name of the Debtors and on behalf of the Estates to establish the Liquidating Trust and to transfer, assign and deliver the Liquidating Trust Assets to the Liquidating Trust.  For federal income tax purposes, the beneficiaries of the Liquidating Trust will be treated as the grantors of the Liquidating Trust and deemed to be the owners of the Liquidating Trust Assets and the Debtors will treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as a deemed transfer to such beneficiaries followed by a deemed transfer by such beneficiaries to the Liquidating Trust.  Any subtrusts within the Liquidating Trust may be treated as separate grantor trusts.  The Liquidating Trustee will be required to value the Liquidating Trust Assets, and all parties, including the Holders of the Beneficial Interests in the Liquidating Trust, must consistently use such valuation for federal income tax purposes.

         (b)   Purposes of the Liquidating Trust. The Liquidating Trust will be organized for the sole purpose of liquidating the Non-Cash Assets and resolving Disputed Claims, with no objective or authority to continue or engage in the conduct of a trade or business.  In particular, the Liquidating Trust shall (i) issue the Beneficial Interests to Holders of Allowed Claims, as provided herein, (ii) collect and reduce the Non-Cash Assets to Cash, (iii) distribute Cash to the holders of the Beneficial Interests, (iv) wind-down the Estates and (v) take such steps as are necessary or appropriate to accomplish these purposes, in each case as more fully provided in, and subject to the terms and conditions of, the Liquidating Trust Agreement.

         (c)   Powers and Obligations of the Liquidating Trust.  As provided in the Liquidating Trust Agreement, from and after the Effective Date, the

Liquidating Trust shall succeed to all of the right of the Debtors necessary to protect, conserve and liquidate all Liquidating Trust Assets as quickly as reasonably practicable, which liquidation shall conclude prior to the fifth anniversary of the Effective Date, unless extended by the Bankruptcy Court for cause.  As of the Effective Date, the Liquidating Trust shall be the successor to the Debtors in all proceedings then pending or thereafter commenced regarding any of the Liquidating Trust Assets, and shall have the exclusive power, as successor to and on behalf and in the name of the Debtors, to investigate, enforce, abandon, prosecute, resolve, defend against, compromise and settle Disputed Claims, all objections thereto and the Causes of Action and to maintain, sell, abandon, liquidate and collect the other Non-Cash Assets.  The expenses of the Liquidating Trust shall be paid out of the Liquidating Trust Assets, as and to the extent provided in the Liquidating Trust Agreement.  The Liquidating Trust shall assume the Debtors' obligations under the Estate Employee Retention Plan and the AlixPartners Retention Agreement.

(d)    <u>Liquidating Trustee; Liquidating Trust Oversight Committee</u>.  The Liquidating Trustee is designated by this Plan.  The Creditors' Committee shall designate the initial three members of the Liquidating Trust Oversight Committee on or before the 20th day prior to the commencement of the Confirmation Hearing.  The Liquidating Trustee shall administer the Liquidating Trust from and after the Effective Date in accordance with the Liquidating Trust Agreement and subject to the oversight of the Liquidating Trust Oversight Committee, as provided therein.

(e)    <u>Issuance of Beneficial Interests</u>.  On or before the Effective Date, the Debtors shall deliver to the Liquidating Trust a list of each Person to receive Beneficial Interests as of the Effective Date pursuant to the Plan and the Liquidating Trust Agreement, including the Allowed amounts of the General Unsecured Claims of, and the address of, each such Person.  On the Effective Date, the Debtors also shall deliver to the Liquidating Trust a list of each Holder of a Disputed General Unsecured Claim as of the Effective Date, including the Maximum Amount of each such Claim, and the address of the Holder thereof.  The Liquidating Trustee shall maintain a record of the Holders of Beneficial Interests, and shall adjust the record of Holders of Class B Beneficial Interests from time to time as Disputed General Unsecured Claims become Allowed.  Class B Beneficial Interests shall be accounted for by amount of the Allowed General Unsecured Claim.  The Liquidating Trust will not issue to any Holder of Class A Beneficial Interests or Class B Beneficial Interests any certificate to evidence ownership of Class A Beneficial Interests or Class B Beneficial Interests.

(f)    <u>Reserve for Disputed General Unsecured Claims</u>.  On the date of any distribution from the Class B Subtrust, the Liquidating Trust shall establish, and maintain thereafter, a reserve, from Cash in the Class B Subtrust, for the benefit of Holders of Disputed General Unsecured Claims.  Such reserve shall consist of an amount of Cash equal to the amount that would be distributable to all Holders of Disputed General Unsecured Claims, in respect of all distributions

made to that date, if those Claims were Allowed in the Maximum Amount. In the event any Disputed General Unsecured Claim becomes an Allowed Claim, the amount of such Allowed Claim shall never exceed the Maximum Amount of such Disputed Claim, and the Liquidation Trust shall distribute to the Holder of such Allowed Claim from the reserve the aggregate amount of Cash and Class B Beneficial Interests that such Holder would have received as of the date of such distribution in respect of such Allowed Claim had such Claim been an Allowed Claim as of the Effective Date.

(g)     Creation of Class B Subtrust.  On the Effective Date, the Liquidating Trust shall establish the Class B Subtrust for the benefit of Holders of Class B Beneficial Interests and shall deposit therein Cash as and to the extent set forth in Section 8.3.3(b).  The Class B Subtrust shall be maintained in one or more segregated, interest-bearing accounts, and amounts deposited in the Class B Subtrust shall be distributed from time to time to the Holders of the Class B Beneficial Interests, in each case as and to the extent provided in the Liquidating Trust Agreement.

(h)     Distributions of Amounts in Class B Subtrust to Holders of Class B Beneficial Interests.  On or as soon as reasonably practicable after the Effective Date, and after establishing appropriate expense and claim reserves in accordance with the Liquidating Trust Agreement, the Liquidating Trust shall distribute all remaining Cash in the Class B Subtrust to the Holders of the Class B Beneficial Interests.  The Liquidating Trust will make subsequent distributions from the Class B Subtrust to the Holders of the Class B Beneficial Interests from time to time after the Effective Date, as and to the extent provided in the Liquidating Trust Agreement.

(i)     Distributions of Other Liquidating Trust Assets.  After paying or otherwise reserving for expenses incurred by the Liquidating Trust in connection with the Causes of Action and the resolution of the Disputed Cash Claims, the Liquidating Trust will distribute the Liquidating Trust Assets from time to time in accordance with Sections 7.3 and 7.4 of the Plan and as and to the extent provided in the Liquidating Trust Agreement.

8.3.3.     Vesting of Assets. Pursuant to Bankruptcy Code Sections 105, 363(b) and (f), 365, 1123(a)(5)(B) and (D) and (b)(4) and (6) and 1141, on the Effective Date all Liquidating Trust Assets shall be deemed to vest in the Liquidating Trust, free and clear of all Liens, claims and interests of any Person, subject to the provisions of Section 7.2.1. Without limiting the foregoing:

(a)     the Cash Claims Reserve shall be maintained by the Liquidating Trust in a segregated, interest-bearing account; and

(b)     Cash shall be placed in the Class B Subtrust in the amount of (i) the Class B Tranche Amount plus (ii) 32% of Residual Cash existing on the

Effective Date, if any, after establishing appropriate expense and claim reserves as provided in the Liquidating Trust Agreement.

8.3.4.    <u>Causes of Action Preserved</u>.

(a)    <u>General</u>.  Except to the extent released by prior action of an Estate, pursuant to this Plan or by a Final Order, all Causes of Action are hereby expressly preserved and shall vest on the Effective Date in the Liquidating Trust. Without limiting the foregoing, pursuant to Bankruptcy Code Section 1123(b)(3)(B), as of the Effective Date all Avoidance Actions of each Debtor and its Estate against any Person, except to the extent released by prior action of such Estate, pursuant to this Plan or by a Final Order, shall vest in the Liquidating Trust.

(b)    <u>Rule 2004 Examinations</u>.  The power of the Debtors to conduct examinations pursuant to Bankruptcy Rule 2004 shall be expressly preserved following the Effective Date, and conferred upon the Liquidating Trust.

(c)    <u>No Preclusion or Res Judicata</u>.  Unless Avoidance Actions and Causes of Action against a Person are waived, relinquished, exculpated or released in this Plan, including the Causes of Action and Avoidance Actions released by Section 10.1, or by a Final Order, the Debtors expressly reserve all Avoidance Actions and other Causes of Action, for later adjudication and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches shall apply to such Avoidance Actions or other Causes of Action as a result of Confirmation or consummation of this Plan.  Any such defenses to such actions that existed prior to Confirmation are preserved and are not abrogated by this Plan.

8.3.5.    <u>Stamp Taxes; Section 1146(c)</u>.  On the Effective Date, all amounts escrowed by each Estate in respect of stamp and similar taxes pursuant to the Level 3 Sale Order shall be released to the Liquidating Trust, as part of the Liquidating Trust Assets.

8.3.6.    <u>Certain Assets Abandoned</u>.  On the Effective Date, Genuity Inc. shall be deemed to have abandoned, pursuant to Bankruptcy Code Section 554, all of the capital stock of Integra SA owned by Genuity Inc.

8.4.    <u>Substantial Consummation of Plan</u>.  This Plan shall be deemed substantially consummated upon the later of (i) the Effective Date and (ii) the first Business Day after the occurrence of all of the matters set forth in Section 8.3 provided that all conditions to the Effective Date have been satisfied or waived in accordance with the terms hereof.

8.5.    <u>Retiree Benefits</u>.  The Debtors do not have any Retiree Benefit Programs, and therefore, no Person shall be entitled to any such benefits after the Effective Date.

8.6.    Exemption from Certain Transfer Taxes.  Pursuant to, and to the fullest extent permitted by, Bankruptcy Code Section 1146(c): (i) the issuance, transfer or exchange of any securities, instruments or documents; (ii) the creation of any Lien; (iii) the making or assignment of any lease or the making or delivery of any deed or other instrument of transfer; and (iv) the vesting, assignment, conveyance, transfer or sale of any real property of any of the Debtors (including to the Liquidating Trust and any subsequent transfers, assignments, sales or conveyances by the Liquidating Trust) under, pursuant to, in furtherance of or in connection with, this Plan, including any deeds, bills of sale or assignments executed in connection with this Plan or the Confirmation Order shall not be subject to any stamp tax, transfer tax, mortgage tax, intangible tax, recording fee, conveyance fee, document recording tax or similar tax, charge or expense, whether imposed by state or local law or otherwise.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any such tax, fee, charge or expense.

8.7.    Implementation of the Plan.

8.7.1.    The Debtors are hereby authorized and directed to take all necessary or desirable steps and execute any documents and perform all necessary or desirable acts, to consummate the terms and conditions of this Plan on the Effective Date.  On or before the Effective Date, the Debtors may, but shall not be required to, File such agreements and other documents as may be necessary or desirable to effectuate or further evidence the terms and conditions of this Plan and the other agreements referred to herein. Pursuant to Delaware General Corporation Law Section 303, Massachusetts General Law c.156B Section 73 and any other similar law governing any of the Debtors, all terms of and actions contemplated by this Plan may be put into effect and carried out without the directors, officers or shareholders of the Debtors taking any further action, and all such Persons shall be deemed to have unanimously approved this Plan and all transactions provided for hereunder or contemplated hereby.

8.7.2.    The Liquidating Trust is hereby authorized and directed to take all necessary or desirable steps and execute any documents and perform all necessary or desirable acts to consummate the terms and conditions of this Plan on and after the Effective Date.  On or after the Effective Date, the Liquidating Trust may File such agreements and other documents as may be necessary or desirable to effectuate or further evidence the terms and conditions of this Plan and the other agreements referred to herein.

8.8.    Subordination of BBN Bonds.

8.8.1.    Subordination.  All property distributable under this Plan (including Class B Beneficial Interests) solely with respect to the BBN Bonds Claims shall be paid over to the Holders of Approved Senior Creditor Claims, as Holders of Class 4 Claims on account of the BBN Bonds Claims.  Each Holder of an Approved Senior Creditor Claim shall receive its Senior Claimant Share of the distributions that would, in the absence of

the subordination provisions of the BBN Bonds Indenture, be made to the BBN Bonds Trustee in respect of the BBN Bonds Claims.

       8.8.2.    <u>Asserting Senior Creditor Claimant Status</u>.  A Person who is not a Holder of a Claim under any agreement set forth in Exhibit B annexed hereto or does not agree with the amount listed thereon may seek treatment as a Senior Creditor Claimant by Filing a statement of such Claim, including the basis for qualification as a Senior Creditor Claimant, not later than the 30th day after the Effective Date.  The requirement to File such a Senior Creditor Claim shall not be construed as a new bar date for such Claims.

       8.8.3.    <u>Objections to Senior Creditor Claimant Status</u>.  The Liquidating Trust, any Senior Creditor Claimant and any beneficial owner of BBN Bonds shall be the only Persons with standing to object to the Senior Creditor Claimant status of any Person Filing a Claim pursuant to Section 8.8.2 or the Holder of an Allowed General Unsecured Claim under any agreement set forth on Exhibit B annexed hereto.  Such objections must be filed within 60 days after the Effective Date.

       8.8.4.    <u>Distributions and Reserves</u>.  On the Effective Date, the Disbursing Agent shall place in a reserve (the "Senior Creditor Claims Reserve"), the Class B Beneficial Interests that would have been distributable to the BBN Bonds Trustee in respect of the BBN Bonds Claims, if not for the subordination provisions set forth in the BBN Bonds Indenture.  The Disbursing Agent shall, as soon as practicable after the date that objections are due under Section 8.8.3: (i) continue to hold in the Senior Creditor Claims Reserve an amount of Class B Beneficial Interests equal to the Senior Claimant Share of such Class B Beneficial Interests that would have been distributed in respect of the maximum amount (as determined by the Liquidating Trust) of all Contested Senior Creditor Claims and (ii) distribute to all other Senior Creditor Claimants holding Approved Senior Creditor Claims their Senior Claimant Share of the other Class B Beneficial Interests in the Senior Creditor Claims Reserve.  From time to time, as Contested Senior Creditor Claims are resolved, Class B Beneficial Interests in respect thereof shall be distributed from Senior Creditor Claims Reserve to the Holders thereof, to the extent such Contested Senior Creditor Claims are determined to be Approved Senior Creditor Claims, and distributed to the other Senior Creditor Claimants who hold Approved Senior Creditor Claims and allocated to (and continue to be held in the Senior Creditor Claims Reserve for) the other Senior Creditor Claimants who hold Contested Senior Creditor Claims that have not yet been resolved, to the extent such Contested Senior Creditor Claims are determined by Final Order not to benefit from such subordination provisions.  If at the time of any distribution of Cash in respect of the Class B Beneficial Interests there are Class B Beneficial Interests in the Senior Creditor Claims Reserve, then the Cash distributable in respect of such Class B Beneficial Interests shall be held in the Senior Creditor Claims Reserve for distribution in the same manner and proportion as such reserved Class B Beneficial Interests.  All Cash and Class B Beneficial Interests distributed from the Senior Creditor Claims Reserve that are to be distributed to the Bank Lenders in their capacity as Senior Creditor Claimants shall be distributed to the Bank Agent, on behalf of the Bank Lenders.

8.8.5.    Regarding the Bond Trustee.  The BBN Bonds Trustee shall have no obligation under this Plan, the Liquidating Trust Agreement or the BBN Bonds Indenture to appeal, and shall not appeal, any ruling or order of any court or any Final Order of the Bankruptcy Court concerning the claims of Senior Creditor Claimants and their entitlement to distributions in respect of the BBN Bonds.

8.9.    Quarterly United States Trustee Fees.  The quarterly fees payable pursuant to 28 U.S.C. § 1930(a)(6) shall be paid when due, by the Debtors on or prior to the Effective Date and by the Liquidating Trust after the Effective Date, through the closing of the Chapter 11 Cases. The Liquidating Trustee shall file all required reports with the Office of the United States Trustee through the closing of the Chapter 11 Cases, and shall be authorized to seek closing of the Chapter 11 Cases.

## ARTICLE IX
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1.    Rejection of Executory Contracts and Unexpired Leases.  On the Effective Date all executory contracts and unexpired leases to which the Debtors are party, and that have not previously been assumed or rejected, are deemed rejected.  For the avoidance of doubt, any contracts, service orders or service requests for telecommunications circuits that have not been specifically identified by the Debtors prior to the Effective Date, for assumption and assignment to Level 3, are deemed rejected as of the Effective Date.  Entry of the Confirmation Order shall constitute approval of such rejections pursuant to Bankruptcy Code Sections 365 and 1123.

9.2.    Bar Date for Rejection Damages.  Any Claim arising from the rejection of any executory contract or unexpired lease pursuant to Section 9.1 shall be forever barred unless a proof of Claim is Filed and served on the Liquidating Trustee within 30 days after the Effective Date.  Objections to any such proof of Claim shall be Filed not later than the Claims Objection Bar Date, and the Bankruptcy Court shall determine any such objections.

## ARTICLE X
### WAIVERS, RELEASES, EXCULPATION AND INJUNCTIONS

In consideration of the global settlement embodied in the Plan and for services rendered during the Chapter 11 Cases, the following waivers, releases, exculpation and injunctive relief shall be provided:

10.1.    **Releases.  The releases in this Section are given for good and valuable consideration, including the benefits of the settlement of Claims and other litigation effected hereby.**

10.1.1.    **Certain Directors and Officers.  On the Effective Date, each of the Debtors and their Estates, and any Person who, directly or indirectly, is receiving distributions under this Plan, including Persons receiving a distribution via an attorney, agent, indenture trustee, or securities intermediary, shall be deemed to have waived and released all claims and causes of action, whether known or unknown, at law or in equity, against all Persons who served as directors or officers of any of the Debtors and their Non-Debtor Subsidiaries, with respect to any action**

or omission on or prior to the Effective Date that relates to the Debtors or their Estates, **provided**, **however**, that this Section shall not release any Person from (i) any criminal liability, (ii) liability to the United States federal government, or (iii) liability pursuant to ERISA § 502(a) with respect to any employee benefit plan sponsored by the Debtors.

      10.1.2.   **Intercompany Matters**.  On the Effective Date, each of the Debtors and their Estates shall be deemed to have waived and released all claims and causes of action, whether known or unknown, at law or in equity, against all other Debtors and their Estates.

      10.1.3.   **Bank Lenders**.  On the Effective Date, each of the Debtors and their Estates, and any Person who, directly or indirectly, is receiving distributions under this Plan, including Persons receiving a distribution via an attorney, agent, indenture trustee, or securities intermediary, shall be deemed to have waived and released all claims, Causes of Action (including, without limitation, Avoidance Actions and actions to subordinate claims) and other causes of action, whether known or unknown, at law or in equity, against the Bank Agent and all Bank Lenders, with respect to any action or omission on or prior to the Effective Date that relates to the Debtors or their Estates, **provided**, **however**, that this Section shall not release any Person from any criminal liability; and, **provided**, **further**, that neither this Section nor any other provision of this Plan shall be deemed to constitute a waiver or release of any rights (including Bank Agent fee and expense reimbursement and indemnification rights under the Bank Credit Agreement), claims, or causes of action of the Bank Agent against the Bank Lenders or of any Bank Lender against the Bank Agent or against any other Bank Lender.

    10.2.   **Exculpation**.  Subject to the occurrence of the Effective Date, the Debtors, the Creditors' Committee, each Person who served as a director or officer of the Debtors, or as a member of the Creditors' Committee, together with such Person's directors, officers, members, managers, partners, employees, attorneys, advisers, agents and representatives shall have no liability to any Person for any actions or omissions on or after the Petition Date that relate to the Debtors or their Estates, except in the case of gross negligence or willful misconduct, **provided**, **however**, that this Section shall not release any Person from (i) any criminal liability or (ii) liability pursuant to ERISA § 502(a) with respect to any employee benefit plan sponsored by the Debtors; **and**, **provided**, **further**, that this Section shall not be deemed to release any attorney of liability to such attorney's client.

    10.3.   Injunction.  **All injunctions or stays provided for in the Chapter 11 Cases pursuant to Bankruptcy Code Section 105, 362 or otherwise and in effect on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases pursuant to Bankruptcy Code Section 350(a).  Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall permanently enjoin all Persons that have held, currently hold or may hold a Claim or an Interest in the Debtors from taking any of the following actions in respect of such Claim or Interest: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against any or all of the Debtors, the Liquidating Trust or their**

**respective property or assets; (b) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against any or all of the Debtors, the Liquidating Trust or their respective property or assets; (c) creating, perfecting or enforcing in any manner, directly or indirectly, any Lien against any or all of the Debtors, the Liquidating Trust or their respective property or assets; (d) asserting any setoff, right of subrogation or recoupment of any kind, directly or indirectly, against any debt, liability or obligation due to the Debtors, the Liquidating Trust or their respective property; and (e) proceeding in any manner in any place whatsoever that does not conform to or comply with or is inconsistent with the provisions of the Plan.**

<div align="center">

**ARTICLE XI**
DISTRIBUTIONS
</div>

11.1.    <u>Disbursing Agent</u>.  The Debtors shall act as the Disbursing Agent under the Plan with respect to distributions of Cash and Beneficial Interests made on the Effective Date, and the Liquidating Trustee shall act as Disbursing Agent thereafter.  The Disbursing Agent shall make all distributions of Cash and Beneficial Interests required to be distributed under the applicable provisions of this Plan and the Liquidating Trust Agreement.  The Disbursing Agent shall serve with reasonable bond after the Effective Date and shall give notice to the United States Trustee prior to canceling or modifying the bond.

11.2.    <u>Distribution Record Date</u>.  For purposes of this Plan, as of the close of business on any Distribution Record Date, the transfer registers for the BBN Bonds and the Bank Loans, and the records of ownership of other Claims against or Interests in the Debtors (including the claims register in the Chapter 11 Cases and the transfer register for the Debtors' stock), will be closed.  For purposes of this Plan, the Debtors, the Estates, the Liquidating Trust, the Bank Agent and the BBN Bonds Trustee shall have no obligation to recognize the transfer of any of the Bank Loans, the BBN Bonds or any Claim against, or Interest in, the Debtors occurring after the Distribution Record Date, and shall be entitled for all purposes relating to this Plan to recognize and deal only with those Holders of record as of the close of business on the Distribution Record Date.

11.3.    <u>Cash Payments</u>.  Any Cash payments made pursuant to this Plan will be made in U.S. dollars.  Cash payments made pursuant to this Plan in the form of a check shall be null and void if not cashed within 180 days of the date of issuance thereof.

11.4.    <u>Delivery of Distributions</u>.  If the distribution to any Holder of an Allowed Claim is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such Holder.  Subject to Section 11.6, undeliverable distributions shall be held by the Liquidating Trust.

11.5.    <u>Withholding Taxes</u>.

11.5.1.    The Debtors and the Liquidating Trust shall comply with all withholding, reporting, certification and information requirements imposed by any federal, state, local or foreign taxing authority and all distributions hereunder shall, to the

extent applicable, be subject to any such withholding, reporting, certification and information requirements.

        11.5.2.    Persons entitled to receive distributions hereunder shall, as a condition to receiving such distributions, provide such information and take such steps as the Disbursing Agent may reasonably require to ensure compliance with such withholding and reporting requirements, and to enable the Disbursing Agent to obtain the certifications and information as may be necessary or appropriate to satisfy the provisions of any tax law.

        11.5.3.    Any Person who does not provide the Disbursing Agent with requisite information after the Disbursing Agent has made at least three attempts (by written notice or request for such information, including on the ballots in these Chapter 11 Cases) to obtain such information, may be deemed to have forfeited such Person's right to such distributions, which shall be treated as unclaimed property under Section 11.6.

        11.6.   <u>Unclaimed Property</u>.  Any Person who fails to claim any distribution or Cash to be distributed hereunder within one (1) year from the initial date for such distribution shall forfeit all rights to any such distributions under this Plan.  Upon such forfeiture of any Beneficial Interest, such Beneficial Interest shall be deemed cancelled and of no further force or effect.  Upon such forfeiture of Cash or other property, such Cash or property shall be the property of the Liquidating Trust.  Nothing herein shall require the Debtors, the Disbursing Agent or the Liquidating Trust to attempt to locate or notify any Person with respect to any forfeited property.  Persons who fail to claim Cash or other property to be distributed under the Plan within such one-year period shall forfeit their rights thereto and shall have no claim whatsoever with respect thereto against the Debtors, their Estates, the Disbursing Agent, the Liquidating Trust, the Liquidating Trustee, the Liquidating Trust Oversight Committee, the Liquidating Trust Assets or any Holder of an Allowed Claim to which distributions are made.

        11.7.   <u>Disputed Claims</u>.  If the Debtors or any other party in interest disputes any Claim or Interest in the Debtors, such dispute shall be determined, resolved or adjudicated, as the case may be, under applicable law by the Bankruptcy Court.  Among other things, the Debtors (on or before the Effective Date) and the Liquidating Trustee (after the Effective Date) may each elect, at their respective sole option, to object to or seek estimation under Bankruptcy Code Section 502 with respect to any proof of Claim or Interest Filed by or on behalf of a Holder of a Claim or Interest in the Debtors.

        11.8.   <u>Objections to Claims and Interests</u>.  Unless a later time is set by Final Order or as provided in Sections 8.2.3 and 8.3.3., all objections to Claims must be filed by the Claims Objection Bar Date; <u>provided</u>, <u>however</u>, that no such objections may be filed against any Claim after the Bankruptcy Court has determined by entry of a Final Order that such Claim is an Allowed Claim.  The failure by any party in interest, including the Debtors and the Creditors' Committee, to object to any Claim, whether or not unpaid, for purposes of voting shall not be deemed a waiver of such party's or the Liquidating Trust's rights to object to, or re-examine, any such Claim in whole or in part.  After the Effective Date, except as set forth in Section 8.8.3, no party in interest shall have the right to object to Claims against, or Interests in, the Debtors or

their Estates other than the Liquidating Trust, which shall be deemed to have standing to object to all such Claims and Interests.

11.9.    No Distributions Pending Allowance.  No payments or distributions shall be made on account of any Claim or portion thereof, including a Disputed Claim, until such Claim becomes an Allowed Claim.

## ARTICLE XII
### CONDITIONS TO CONSUMMATION

12.1.    Condition to Confirmation.  Confirmation shall not occur unless and until the following condition has been satisfied or waived in accordance with Section 12.3:

12.1.1.    The Confirmation Order being satisfactory in form and substance to the Debtors and, subject to Section 14.3, the Creditors' Committee.

12.2.    Conditions to Effective Date.  The Effective Date shall not occur, and the Plan shall not be binding on any party, unless and until each of the following conditions has been satisfied or waived in accordance with Section 12.3:

12.2.1.    The Bankruptcy Court shall have entered the Confirmation Order, and such Confirmation Order shall be a Final Order;

12.2.2.    The Debtors shall have obtained all authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness;

12.2.3.    No court shall have entered an order restraining the Debtors from consummating this Plan;

12.2.4.    The Bank Agent, on behalf of the Bank Lenders, shall have received (i) the $514,200,000 payment and (ii) not less than $3,840,850 of the Bank Tranche Amount;

12.2.5.    The Class B Tranche Amount shall have been deposited into the Class B Subtrust, after appropriate reserves are made in accordance with the Liquidating Trust Agreement;

12.2.6.    The Liquidating Trust Agreement shall have been executed, delivered, issued and in effect, and the Liquidating Trustee and the Liquidating Trust Oversight Committee shall have been appointed; and

12.2.7.    All corporate matters necessary to effect the transactions contemplated by this Plan shall have been completed.

12.3.    Waiver of Conditions.  Subject to Section 14.3, the Debtors shall have the right to waive any conditions to the Effective Date.

# ARTICLE XIII
## RETENTION OF JURISDICTION

Following Confirmation and until such time as all payments and distributions required to be made and all other obligations required to be performed under this Plan and the Liquidating Trust Agreement have been made and performed, the Bankruptcy Court shall retain jurisdiction as is legally permissible, including for the following purposes:

13.1.   <u>Claims and Interests</u>.   To determine the allowability, classification, or priority of Claims against and Interests in the Debtors, and to determine the rights of Senior Creditor Claimants to distributions in respect of the BBN Bonds;

13.2.   <u>Injunction, etc.</u>   To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, including, but not limited to, the waiver, release, injunction and exculpation provisions hereof, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in each Chapter 11 Case with respect to any Person;

13.3.   <u>Fees.</u>   To determine any and all applications for allowance of compensation and expense reimbursement of Professionals for periods on or before the Effective Date;

13.4.   <u>Dispute Resolution</u>.   To resolve any dispute arising under or related to the implementation, execution, consummation or interpretation of the Plan and the Liquidating Trust Agreement and the making of distributions hereunder and thereunder;

13.5.   <u>Leases and Executory Contracts</u>.   To determine any and all motions for the rejection, assumption, or assignment of executory contracts or unexpired leases and to determine the allowance of any Claims resulting from the rejection of executory contracts and unexpired leases;

13.6.   <u>Actions</u>.   To determine all applications, motions, adversary proceedings, contested matters, actions, Causes of Action and any other litigated matters instituted in the Chapter 11 Cases, including any remands;

13.7.   <u>General Matters</u>.   To determine such other matters, and for such other purposes, as may be provided in the Confirmation Order or as may be authorized under provisions of the Bankruptcy Code and the Bankruptcy Rules;

13.8.   <u>Plan Modification</u>.   To modify the Plan under Bankruptcy Code Section 1127, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order so as to carry out the Plan's intent and purposes, in each case in accordance with the Plan;

13.9.  Aid Consummation.  To issue such orders in aid of consummation of the Plan and the Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person, to the full extent authorized by the Bankruptcy Code;

13.10.  Avoidance Actions.  To enable the prosecution of any and all proceedings that are not released pursuant to the Plan which have been or may be brought to set aside Liens and to recover any transfers, assets, properties or damages to which the Estates may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws except as may be waived pursuant to this Plan;

13.11.  Implementation of Confirmation Order.  To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

13.12.  Resolve Disputes.  To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement hearing, or the Confirmation Hearing, for any purpose;

13.13.  Determine Tax Liability.  To determine any tax liability pursuant to Bankruptcy Code Section 505;

13.14.  Orders.  To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in the Chapter 11 Cases;

13.15.  Final Order.  To enter a Final Order closing the Chapter 11 Cases; and

13.16.  Other.  To determine such other matters as may be set forth in the Confirmation Order or as may arise in connection with the Plan, Confirmation Order, the Liquidating Trust Agreement and/or any other agreement or transaction entered into pursuant to or in connection with this Plan.

## ARTICLE XIV
### MISCELLANEOUS PROVISIONS

14.1.  Defect, Omissions, Amendments, and Modifications.

14.1.1.  Pre-Confirmation Modification.  This Plan may be altered, amended or modified by the Debtors before the Confirmation Date as provided in Bankruptcy Code Section 1127.

14.1.2.  Post-Confirmation Immaterial Modification.  The Debtors may, without notice to Holders of Claims and Interests insofar as it does not materially and adversely affect the interest of Holders of Claims or Interests, correct any defect, omission or inconsistency in this Plan in such manner and to such extent as may be necessary to expedite the execution of this Plan.

14.1.3.  Post-Confirmation Material Modification.  This Plan may be altered or amended after the Confirmation Date with the consent of the Debtors in a manner which,

in the opinion of the Bankruptcy Court, materially and adversely affects Holders of Claims, provided that such alteration or modification is after a hearing as provided in Bankruptcy Code Section 1127.

14.2.    <u>Withdrawal or Revocation of the Plan</u>.  The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date.  If the Debtors revoke or withdraw the Plan, then the result shall be the same as if the Confirmation Order were not entered and the Effective Date did not occur as to the Debtors.  The Confirmation Order shall be null and void and of no effect if the Plan is terminated after the Confirmation Date but before the Effective Date.  The Bankruptcy Court shall have sole and exclusive jurisdiction over any disputes regarding the foregoing.

14.3.    <u>Committee Consent Rights</u>.  The form and substance of the Confirmation Order and the Liquidating Trust Agreement, any material modification or amendment of the Plan, any modification or amendment of Section 12.2, any extension of the Effective Date, the calculation of the Cash Claims Reserve and any action under any of Section 1.3, 7.2.1, 7.3, 7.4, 8.2.1, 8.3.2, 8.3.3, 8.8, 10.1, 10.2, 12.1, 12.3, 14.1.1, 14.1.3, 14.2 or 14.10 shall be subject to this Section 14.3 (the provisions hereof being referred to as "Committee Consent Rights").  The Debtors may not take any action subject to Committee Consent Rights without the prior consent of the Creditors' Committee.  If the Debtors request that the Creditors' Committee consent to an action which is subject to Committee Consent Rights, and, after the Debtors' and the Creditors' Committee's good faith discussion of such action, the Creditors' Committee declines to provide such consent, the Debtors and the Creditors' Committee retain the right to seek authority to take or to enjoin the action from the Bankruptcy Court, either by formal motion or by request for chambers conference.  Furthermore, the Creditors' Committee may request amendments to the form of the Liquidating Trust Agreement; and those proposed amendments shall be subject to the foregoing provisions requiring good-faith discussion and permitting either the Creditors' Committee or the Debtors to bring the matter before the Bankruptcy Court, formally or via chambers conference.  Each of the Debtors and the Creditors' Committee and each of its members shall retain all rights that the respective party may have under the Bankruptcy Code or applicable law, including, without limitation, Sections 1121 through 1129 of the Bankruptcy Code, as to any of the aforementioned actions and the form of the Liquidating Trust Agreement.

14.4.    <u>Statutory Committees</u>.  Upon the Effective Date, any official committees appointed in the Chapter 11 Cases, including the Creditors' Committee, shall be dissolved.  All members of such committees, including members of the Creditors' Committee, shall have no further rights or duties arising from such membership.

14.5.    <u>Successors and Assigns</u>.  The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such Person.

14.6.    <u>Governing Law</u>.  Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan and all agreements executed in connection therewith shall be governed by and construed and enforced in accordance with the laws of the State of New York.

14.7.   <u>Notices</u>.  All notices, requests or demands for payments provided for in this Plan shall be in writing and shall be deemed to have been given (a) when personally delivered by hand, or (b) when received by courier service or telecopier.  Notices, requests and demands for payments shall be addressed and sent, postage prepaid or delivered, to:

> The Debtors
> 225 Presidential Way
> Woburn, Massachusetts 01801
> Fax:   781-865-8861
> Attn:   Ira H. Parker and Meade Monger
>
> -and-

Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110
Fax:    617-951-7050
Attn:   William F. McCarthy, Esq.

or to any other address designated by the foregoing by notices to all parties of interest who have filed a notice of appearance (which has not been withdrawn) pursuant to Rule 2002 of the Bankruptcy Rules.

14.8.    <u>Severability</u>.  Except as to terms which would frustrate the overall purpose of this Plan, should any provision in this Plan be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operating effect of any or all other provisions of this Plan.

14.9.    <u>Confirmation Order</u>.  The Confirmation Order shall ratify all transactions effected by the Debtors during the period commencing on the Petition Date and ending on the Confirmation Date.

14.10.    <u>Final Orders</u>.  Subject to Section 14.3, the Debtors may waive any requirement in the Plan that the Confirmation Order or any other order be a Final Order.

14.11.    <u>No Admissions</u>.  Notwithstanding anything herein to the contrary, nothing contained in the Plan or the Disclosure Statement shall be deemed as an admission by the Debtors with respect to any matter set forth herein, including, without limitation, any liability on or treatment of any Claim, or the propriety of a Claim's classification.

14.12.  <u>Binding Effect</u>.  The Plan shall be binding upon and inure to the benefit of the Debtors, Holders of Claims and Interests in the Debtors, and their respective successors and assigns.

Dated:  Woburn, Massachusetts
          October 1, 2003

GENUITY INC.
GENUITY SOLUTIONS INC.
BBN ADVANCED COMPUTERS INC.
BBN CERTIFICATE SERVICES INC.
BBN INSTRUMENTS CORPORATION
BBN TELECOM INC.
BOLT BERANEK AND NEWMAN CORPORATION
GENUITY BUSINESS TRUST
GENUITY EMPLOYEE HOLDINGS LLC
GENUITY INTERNATIONAL INC.
GENUITY INTERNATIONAL NETWORKS LLC
GENUITY INTERNATIONAL NETWORKS INC.
GENUITY TELECOM INC.
LIGHTSTREAM CORPORATION

Debtors and Debtors-in-Possession

  /s/  Ira H. Parker
By:     Ira H. Parker
Title:   President

NAP.NET, L.L.C.

Debtor and Debtor-in-Possession

  /s/  Ira H. Parker
By:     Ira H. Parker
Title:   Authorized Officer

**EXHIBIT A**

<u>LIQUIDATING TRUST AGREEMENT</u>

This Liquidating Trust Agreement (the "Trust Agreement"), dated as of November __, 2003 by and among Genuity Inc., Genuity Solutions Inc., Genuity Telecom Inc., BBN Advanced Computers Inc., BBN Certificate Services Inc., BBN Instruments Corporation, BBN Telecom Inc., Bolt Beranek and Newman Corporation, Genuity Business Trust, Genuity Employee Holdings LLC, Genuity International, Inc., Genuity International Networks LLC, Genuity International Networks Inc., Lightstream Corporation and Nap.Net, L.L.C. (each as a debtor and debtor-in-possession, and collectively, the "Debtors"), on the one hand, and Meade Monger, or his successors and assigns (the "Liquidating Trustee"), on the other hand.  Capitalized terms used in this Trust Agreement and not otherwise defined herein shall have the meanings ascribed to them in the Debtors' Joint Consolidated Plan of Liquidation, As Modified, dated September __, 2003 (as amended, modified and supplemented from time to time, the "Plan").

W I T N E S S E T H

WHEREAS, the Debtors commenced reorganization cases by filing petitions for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101-1330 (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (collectively, the "Liquidation Cases");

WHEREAS, on September __, 2003, the Debtors filed the Plan with the Bankruptcy Court;

WHEREAS, on _____, 2003, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order");

WHEREAS, the Plan provides for the creation of the Liquidating Trust to hold the Liquidating Trust Assets in trust for the benefit of the holders of Beneficial Interests (the "Beneficiaries") pursuant to the terms of the Plan and in accordance with this Trust Agreement;

WHEREAS, this Trust Agreement is being executed to establish the Liquidating Trust and to facilitate the implementation of the Plan;

WHEREAS, the Liquidating Trust is intended to qualify as a liquidating trust that is treated as a "grantor trust" for federal income tax purposes and the Liquidating Trustee shall operate and maintain the Liquidating Trust in accordance United States Internal Revenue Service ("IRS") Revenue Procedure 94-45, 1994-2 C.B. 684 and Sections 1.671-4(a) and 301.7701-4(d) of the income tax regulations (together with any provisions amendatory thereof, supplementary thereto or substituted therefor) under the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), together with any provisions amendatory thereof, supplementary thereto or substituted therefor (the "Treasury Regulations") and all subsequent guidelines regarding liquidating trusts issued by the IRS; and

WHEREAS, the Liquidating Trust is established for the sole purpose of liquidating (i) the Liquidating Trust Assets, (ii) such additional or different corpus as the Liquidating Trustee may from time to time hold in trust under the provisions of this Trust Agreement (the "Additional Assets") and (iii) any and all dividends, rents, royalties, income, proceeds and other receipts of, from or attributable to the foregoing (collectively, the "Liquidating Trust Estate") for the benefit of the Beneficiaries, in accordance with Treasury Regulations Section 301.7701-4(d), with no objective or authority to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust and the Plan.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein and in the Plan, the Debtors and the Liquidating Trustee agree as follows:

ARTICLE 1

ESTABLISHMENT OF THE LIQUIDATING TRUST

1.1.    Establishment of Liquidating Trust.  Pursuant to the Plan, the Debtors hereby establish the Liquidating Trust for the benefit of the Beneficiaries.

1.2.    Purpose of the Liquidating Trust.

(a)    The Liquidating Trust shall be established for the sole purpose of liquidating the Liquidating Trust Estate and winding down the Liquidation Cases, in accordance with Treasury Regulations Section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably related to, and consistent with, the liquidating purpose of the Liquidating Trust and the Plan.  Accordingly, subject to the terms and conditions of this Trust Agreement, the Liquidating Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidating Trust Estate, make timely distributions to the Beneficiaries, and not unduly prolong the duration of the Liquidating Trust.  The Liquidating Trustee shall be charged with liquidating the Liquidating Trust Estate in the most cost-effective manner possible in the shortest reasonable time, with due regard for the risk that undue haste may reduce the liquidation proceeds of any portion of the Liquidating Trust Estate.  In selling or otherwise monetizing the Liquidating Trust Estate, the Liquidating Trustee shall use commercially reasonable efforts to maximize the amount of the net proceeds derived therefrom.  The liquidation of the Liquidating Trust Estate may be accomplished either through the sale of Liquidating Trust Assets and the Additional Assets (in whole or in combination), including, without limitation, the sale of any Causes of Action, or through the prosecution, settlement, compromise or dismissal of any Causes of Action, or otherwise.

(b)    This Trust Agreement is intended to create a trust and a trust relationship and to be governed and construed in all respects as a trust.  The Liquidating Trust is not intended to be, and shall not be deemed to be or treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company or

-2-

association, nor shall the Liquidating Trustee or the Beneficiaries, or any of them, for any purpose be, or be deemed to be or be treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Beneficiaries to the Liquidating Trustee shall be solely that of beneficiaries of a trust and shall not be deemed a principal or agency relationship, and their rights shall be limited to those conferred upon them by this Trust Agreement.

       1.3.    Transfer of Assets and Rights to the Liquidating Trust.

       (a)    As of the Effective Date, the Debtors hereby irrevocably and absolutely transfer, assign, convey and deliver to the Liquidating Trust, in trust for the benefit of the Beneficiaries for the uses and purposes stated herein, all of their right, title, and interest in the Liquidating Trust Assets free and clear of any and all Liens or Claims in such property of any other Person except as otherwise provided in the Plan, and the Liquidating Trust hereby accepts all such Liquidating Trust Assets free and clear of any and all Liens and Claims except to the extent otherwise provided in the Plan and agrees to hold and administer the Liquidating Trust Estate for the benefit of the Beneficiaries, subject to the terms and conditions of this Trust Agreement and the Plan.

       (b)    On or prior to the Effective Date, the Debtors shall deliver or cause to be delivered to the Liquidating Trust any and all documents that relate to or that may be required in connection with the Causes of Action and the other Liquidating Trust Assets (including those maintained in electronic format and original documents) whether held by the Debtors, their agents, advisors, attorneys, accountants and any other professional hired by the Debtors and provide access to such employees of the Debtors, their agents, advisors, attorneys, accountants or any other professionals hired by the Debtors with knowledge of matters relevant to the Causes of Action and the other Liquidating Trust Assets.

       (c)    The Liquidating Trustee on behalf of the Liquidating Trust as successor in interest to the Estates may (i) execute and deliver any instruments, documents, books, and records (including those maintained in electronic format and original documents as may be needed), and (ii) take, or cause to be taken, all such further action in order to evidence, vest, perfect or effectuate the transfer of the Liquidating Trust Assets to the Liquidating Trust and consummation of the transactions contemplated hereby and by the Plan and to otherwise carry out the intent of the parties hereunder and under the Plan.

       1.4.    Title to Liquidating Trust Assets.  The transfer of the Liquidating Trust Assets to the Liquidating Trust shall be made by the Debtors to the Liquidating Trust in accordance with Section 8.3.2 of the Plan, for the benefit and on behalf of the Beneficiaries.  Upon the transfer of the Liquidating Trust Assets, the Liquidating Trust shall succeed to all of the Debtors' right, title and interest in the Liquidating Trust Assets and the Debtors will have no further rights or interest in or with respect to the Liquidating Trust Assets, the Liquidating Trust Estate or the Liquidating Trust.

1.5.    Reliance.  The Liquidating Trustee on behalf of the Liquidating Trust and any advisors, consultants or other professionals retained by the Liquidating Trustee or the Liquidating Trust may rely upon the Debtors' filed schedules and statements of financial affairs and all other information provided by the Debtors or their representatives to the Liquidating Trust concerning Claims filed against the Debtors, and their reconciliation and documents supporting such reconciliation.

1.6.    Valuation of Liquidating Trust Assets. As soon as possible after the Effective Date, but in no event later than [ninety (90)] days thereafter, (i) the Liquidating Trustee shall make a good faith valuation (as of the Effective Date and net of the projected value attributable to any Disputed Claims and Unpaid Administrative Expenses and any expenses) of the Liquidating Trust Assets, and (ii) the Liquidating Trustee shall apprise the Beneficiaries of such valuation (and indicate in such writing, such Beneficiaries' respective percentage ownership interests in the Liquidating Trust based on such Beneficiaries' relative beneficial interests in the Liquidating Trust as of the Effective Date).  The valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Beneficiaries) for all purposes, including, without limitation, federal income tax purposes.

1.7.    Appointment of the Liquidating Trustee.  As of the date hereof the Liquidating Trustee shall be Meade Monger, a Principal of AlixPartners LLC.  The Liquidating Trustee shall be subject to removal and replacement as and to the extent provided in Section 7.2.

1.8.    Status of Liquidating Trust and Liquidating Trustee.  The Liquidating Trust will be the successor-in-interest to the Debtors with respect to any Cause of Action (other than Causes of Action released under the Plan) which was or could have been commenced by the Debtors prior to the Effective Date and shall be deemed substituted for the same as the party in any such litigation.  The Liquidating Trustee on behalf of the Liquidating Trust will be the representative of the Estates as that term is used in Section 1123(b)(3)(B) of the Bankruptcy Code and will have the rights and powers provided in the Bankruptcy Code in addition to any rights and powers granted in this Trust Agreement and in the Plan.  All Causes of Action constituting Liquidating Trust Assets are preserved and retained and may be enforced by the Liquidating Trustee on behalf of the Liquidating Trust as the representative of the Estates pursuant to Bankruptcy Code Section 1123(b)(3)(B).

ARTICLE 2

OVERSIGHT COMMITTEE

2.1.    Membership; Authority; Tenure; Removal and Vacancies.

(a)    As of the Effective Date, the Liquidating Trust Oversight Committee (the "Oversight Committee") shall consist of three members:  JPMorgan

Chase Bank, Citibank, N.A. and Nortel Networks Inc.  JPMorgan Chase Bank and Citibank, N.A. and any members of the Oversight Committee selected by the holders of Class A Beneficial Interests (as defined in Section 3.1(a)) in accordance with Section 2.1(b) in the event of the resignation, removal, death or disability of JPMorgan Chase Bank or Citibank, N.A. or any member that replaces either of the foregoing Persons in accordance with Section 2.1(b) are hereinafter referred to as the "Class A Representatives."  Nortel Networks Inc. and any member of the Oversight Committee selected by the holders of Class B Beneficial Interests (as defined in Section 3.1(a)) in accordance with Section 2.1(b) in the event of the resignation, removal, death or disability of Nortel Networks Inc. or any member that replaces it in accordance with Section 2.1(b) is hereinafter referred to as the "Class B Representative."  The Oversight Committee shall have the authority to supervise and review the activities and performance of the Liquidating Trustee and to remove and replace the Liquidating Trustee in accordance with Section 7.2.  The members of the Oversight Committee shall have the authority to designate counsel and other professional persons to act on their behalf, the reasonable fees and expenses of whom shall be reimbursed by the Liquidating Trust as provided in Article 3.  This Trust Agreement is not intended to create a fiduciary duty, nor shall the Oversight Committee, or any of its members, be deemed to be or be treated in any way as fiduciaries of the Beneficiaries.

(b)  Each member of the Oversight Committee shall hold office until the termination of the Liquidating Trust or the earlier resignation, removal, death or disability of such member.  Any Class A Representative may resign upon 30 days' prior written notice to the Liquidating Trustee, the other members of the Oversight Committee and the holders of Class A Beneficial Interests.  The Class B Representative may resign upon 90 days' prior written notice to the Liquidating Trustee, the other members of the Oversight Committee and the holders of Class B Beneficial Interests.  Any member of the Oversight Committee may be removed by the Bankruptcy Court for cause, and for cause or without cause by a vote of a majority of the outstanding number of Class A Beneficial Interests, in the case of a Class A Representative, and by a vote of a majority of the outstanding number of Class B Beneficial Interests, in the case of the Class B Representative; *provided*, *however*, that no member of the Oversight Committee may be removed without cause prior to the first anniversary of such member's term of office.  In the event of a vacancy on the Oversight Committee, either by resignation, removal, death or disability, (i) the holders of Class A Beneficial Interests by majority vote shall select a proposed member, in the case of a vacancy with respect to a Class A Representative, and (ii) the holders of Class B Beneficial Interests shall select by majority vote a proposed member, in the case of a vacancy with respect to the Class B Representative, which proposed member shall not become a member of the Oversight Committee until such appointment is approved by the Bankruptcy Court, which will retain jurisdiction over matters relating to appointments of members to the Oversight Committee.

2.2.    Governance.

(a)  Except as otherwise provided herein, all three Oversight Committee members must be present to constitute a quorum to conduct Oversight Committee business; *provided, however*, that the Oversight Committee may, by the

unanimous vote of its members, designate a single member of the Oversight Committee to exercise all power of the Oversight Committee in respect of any particular matter. Except as otherwise provided in this Trust Agreement, no Oversight Committee business may be conducted absent a quorum.  Meetings may be held in person, telephonically or electronically, and upon such notice as may be determined from time to time by the Oversight Committee.  Members of the Oversight Committee may act by unanimous written consent in lieu of a meeting.

(b)    Oversight Committee actions other than pursuant to written consent as contemplated by Section 2.2(a) may be approved only by a majority of members entitled to vote on a matter; *provided*, *however*, that Oversight Committee action with respect to (i) any Disputed General Unsecured Claims or the Claims Reconciliation Expenses Reserve (as defined in Section 3.9) may be approved only by the Class B Representative and the Class A Representatives shall not be entitled to vote on any such matter, (ii) Operating Expenses (as defined in Section 3.8) and the matters described in Section 2.3(c) shall require the approval of a majority of the members of the Oversight Committee which must include the Class B Representative and (iii) the settlement, prosecution or compromise of any Avoidance Action which will result in a net yield to the Class B Subtrust of an amount less than 20% of the Allowed General Unsecured Claim to arise as a result of such settlement, prosecution or compromise shall require the approval of a majority of the members of the Oversight Committee which must include the Class B Representative.  The Oversight Committee shall meet at least quarterly during the first year after the Effective Date, and at least semi-annually thereafter, unless the Oversight Committee, in its discretion, elects to meet more or less frequently.  The Oversight Committee is authorized to retain such counsel and other professional persons to represent the Liquidating Trust as selected by a majority of the Oversight Committee members; *provided*, *however*, that the Class B Representative shall be authorized to retain counsel and other professional persons to represent the Liquidating Trust with respect to Disputed General Unsecured Claims.  The Oversight Committee shall have the right to cause the Liquidating Trust to purchase insurance coverage with respect to the liabilities and obligations of its members under this Trust Agreement.

2.3.    <u>Actions Requiring Oversight Committee Approval</u>.  The Liquidating Trustee shall obtain the approval of the Oversight Committee prior to taking any action regarding any of the following matters:

(a)    The commencement, settlement, compromise, dismissal and/or prosecution of any Cause of Action by the Liquidating Trust wherein the amount in controversy exceeds $100,000;

(b)    The sale, transfer, assignment or other disposition of any Non-Cash Assets having a valuation in excess of $100,000;

(c)    The abandonment of any Non-Cash Assets or any other portion of the Liquidating Trust Estate that has a valuation of at least $100,000;

(d)    The engagement, compensation and indemnification on behalf of the Liquidating Trust of consultants, agents, employees and professional persons to assist the Liquidating Trustee with respect to the Liquidating Trustee's responsibilities, powers and duties under this Trust Agreement;

(e)    The compensation and, except as provided in Section 8.1, indemnification of the Liquidating Trustee;

(f)    Any change in the compensation and indemnification of AP Services, LLC as provided in the AlixPartners Retention Agreement;

(g)    The settlement, compromise or other resolution of any Disputed General Unsecured Claims wherein the amount in controversy exceeds $500,000 or any Disputed Cash Claims wherein the amount in controversy exceeds $100,000;

(h)    The borrowing of any funds by the Liquidating Trust or pledge of any portion of the Liquidating Trust Estate;

(i)    Any matter which could reasonably be expected to have a material effect on the amount of distributions to be made by the Liquidating Trust to the Holders of Class A Beneficial Interests or Class B Beneficial Interests;

(j)    The examination of any Person pursuant to Bankruptcy Rule 2004; and

(k)    Notwithstanding anything to the contrary contained herein and consistent with the Plan, all other matters as may be specified in writing by the Oversight Committee.

The Liquidating Trustee shall report in writing to the Oversight Committee in accordance with Section 4.5, as to the status of all Causes of Action, Disputed Claims, Disputed Cash Claims, and all other matters that materially affect the Liquidating Trust or the Liquidating Trust Estate.

ARTICLE 3

BENEFICIARIES; CLASS B SUBTRUST; RESERVES; TRANSFER OF INTERESTS; DISTRIBUTIONS

3.1.    <u>Identification of Beneficiaries of Liquidating Trust</u>.

(a)    On or before the Effective Date, the Debtors shall deliver to the Liquidating Trust a list of each Person to receive Beneficial Interests as of the Effective Date pursuant to the Plan, including the number of Class A Beneficial Interests (the "Class A Beneficial Interests") and Class B Beneficial Interests (the "Class B Beneficial Interests") to be delivered to, and the address of, each such Person.

(b)     On or before the Effective Date, the Debtors also shall deliver to the Liquidating Trust a list of each holder of a Disputed General Unsecured Claim as of the Effective Date, including the Maximum Amount of each such Claim, the address of each such holder and the number of Class B Beneficial Interests that would be distributed to such holder assuming that such Claim were an Allowed Claim in the Maximum Amount of such Claim (the "Disputed Class B Beneficial Interests").

(c)     The Beneficiaries are the holders of the Beneficial Interests and shall be recorded and set forth in a register maintained by the Liquidating Trustee expressly for such purpose.  All references in this Trust Agreement to the Beneficiaries or the holders of Beneficial Interests shall be read to mean holders of record as set forth in the official register maintained by the Liquidating Trustee and shall not mean any beneficial owner not recorded on such official registry.  Unless expressly provided herein or in the Plan, the Liquidating Trustee may establish a record date that it deems practicable for determining the Beneficiaries for a particular purpose which determination shall be consistent with the manner of establishing the Distribution Record Date as set forth in Section 3.12.

3.2.    <u>Distributions of Beneficial Interests</u>.  On or as soon as reasonably practicable after the Effective Date, the Liquidating Trustee shall (i) issue Class A Beneficial Interests and Class B Beneficial Interests to the Persons entitled to receive Class A Beneficial Interests and Class B Beneficial Interests as of the Effective Date in accordance with and as reflected on the Debtors' list described in Section 3.1(a); and (ii) from time to time as Disputed General Unsecured Claims become Allowed Claims, issue the appropriate number of Class B Beneficial Interests and release any distributions attributable thereto from the Disputed General Unsecured Claims Reserve (as defined in Section 3.4) to the relevant Person at the address provided by the Debtors.  Beneficial Interests may be issued in fractional amounts.  The Beneficial Interests will be uncertificated; accordingly, distributions of Beneficial Interests will be accomplished solely by the entry of the names of the holders and their respective Beneficial Interests in the books and records of the Liquidating Trust.

3.3.    <u>Establishment of Class B Subtrust</u>.  On the Effective Date, the Liquidating Trust shall establish the Class B Subtrust for the benefit of holders of Class B Beneficial Interests and shall deposit therein Cash in an amount equal to (i) the lesser of (A) the Class B Tranche Amount and (B) an amount equal to Available Cash minus $514,200,000, plus (ii) 32% of all Residual Cash existing on the Effective Date, if any. The Class B Subtrust shall be maintained in one or more segregated, interest-bearing accounts.

3.4.    <u>Disputed General Unsecured Claims Reserve</u>.

(a)     On the Effective Date, the Liquidating Trust will establish within the Class B Subtrust a reserve for Disputed General Unsecured Claims (the "Disputed General Unsecured Claims Reserve").  For purposes of establishing the Disputed General Unsecured Claims Reserve, the Liquidating Trust will estimate each Disputed General Unsecured Claim at the Maximum Amount of such Claim as reflected on the Debtors' list

described in Section 3.1(b).  As soon as reasonably practicable following the Effective Date, the Liquidating Trust shall deposit into the Disputed General Unsecured Claims Reserve the Disputed Class B Beneficial Interests.  On the date of any distribution from the Class B Subtrust, the Liquidating Trust shall deposit into the Disputed General Unsecured Claims Reserve Cash equal to the amount that would be distributable to all Holders of Disputed General Unsecured Claims, in respect of all distributions made on that date, if such Disputed General Unsecured Claims were Allowed in their respective Maximum Amounts.  The Liquidating Trust shall maintain the Disputed General Unsecured Claims Reserve in a segregated, interest-bearing account (which, except as provided herein, shall not be subject to the claims of any other Person), and shall keep records as to the applicable amounts reserved in respect of each Disputed General Unsecured Claim.  The Liquidating Trust shall pay any taxes due and owing with respect to the Disputed General Unsecured Claims Reserve, and reserve all distributions on account of the Disputed Class B Beneficial Interests net of such taxes; *provided, however,* that the Liquidating Trust may contest in good faith any tax that any taxing authority determines is owed by the Liquidating Trust that is not otherwise inconsistent with the interests of the Beneficiaries.

(b)     All Class B Beneficial Interests attributable to the Disputed General Unsecured Claims Reserve as of any date shall be treated in all respects as issued and outstanding Class B Beneficial Interests and the Liquidating Trust shall deposit in the Disputed General Unsecured Claims Reserve the aggregate Pro Rata Share of all distributions made by the Liquidating Trust on account of Class B Beneficial Interests, net of taxes, if any, paid or payable by the Liquidating Trust with respect thereto.  For purposes of this Trust Agreement, "Pro Rata Share" for any holder of Class B Beneficial Interests at any time of determination means a fraction, the numerator of which is the number of Class B Beneficial Interests held by such Person on such date and the denominator of which is the aggregate number of Class B Beneficial Interests outstanding on such date.

(c)     In the event any Disputed General Unsecured Claim becomes an Allowed Claim, the amount of such Allowed Claim shall never exceed the Maximum Amount of such Disputed Claim, and the Liquidating Trust shall distribute to the holder of such Allowed Claim from the Disputed General Unsecured Claims Reserve the aggregate amount of Cash and Class B Beneficial Interests that such holder would have received through the date of such distribution in respect of such Allowed Claim had such Claim been an Allowed Claim as of the Effective Date.

(d)     Notwithstanding anything to the contrary contained in this Trust Agreement or the Plan, the Liquidating Trust shall have no liability whatsoever to any holder of a Disputed Claim or an Allowed Claim except as provided in this Section 3.4 (or Section 3.6 to the extent such Claim is a Disputed Cash Claim) and to the extent such holder is or becomes a Beneficiary, and no such holder shall have any recourse to or claims against any of the other assets or properties of the Liquidating Trust.

(e)     From time to time as Disputed General Unsecured Claims are Disallowed or become Allowed Claims in amounts less than their respective Maximum

Amounts, (a) the Class B Beneficial Interests in the Disputed General Unsecured Claims Reserve that otherwise would have been distributed to the holders of such Disputed Claims if such Disputed Claims subsequently had become Allowed Claims in an amount equal to their respective Maximum Amounts (and which as a result are not distributable to such holders pursuant to Section 3.4 (c)) shall be deemed cancelled and of no further force or effect and shall not be, and shall no longer be deemed to be, outstanding for any purpose, and (b) the Cash deposited in the Disputed General Unsecured Claims Reserve that otherwise would have been distributed to the holders of such Disputed Claims if such Disputed Claims subsequently had become Allowed Claims in an amount equal to their respective Maximum Amounts (and which as a result is not distributable to such holders pursuant to Section 3.4(c)) (the "Released General Unsecured Claims Cash") shall be released from and no longer held in the Disputed General Unsecured Claims Reserve and, subject to the provisions of Sections 3.8 and 3.9, shall be deposited in the Class B Subtrust.  All distributions described in this Section 3.4 shall be net of taxes, if any, paid or payable by the Liquidating Trust with respect thereto.

      3.5.   Senior Creditor Claims Reserve.

      (a)   On the Effective Date, the Liquidating Trust will establish within the Class B Subtrust a reserve (the "Senior Creditor Claims Reserve") in respect of, and as soon as reasonably practicable following the Effective Date shall deposit into the Senior Creditor Claims Reserve, the Class B Beneficial Interests (the "Senior Creditor Class B Beneficial Interests") that would have been distributable to the BBN Bonds Trustee in respect of the BBN Bonds Claims, if not for the subordination provisions set forth in the BBN Bonds Indenture.  On the date of any distribution from the Class B Subtrust, the Liquidating Trust shall deposit into the Senior Creditor Claims Reserve Cash equal to the amount that would be distributable with respect to the Senior Creditor Class B Beneficial Interests.  The Liquidating Trust shall maintain the Senior Creditor Claims Reserve in a segregated, interest-bearing account (which, except as provided herein, shall not be subject to the claims of any other Person), and shall keep records as to the Senior Creditor Class B Beneficial Interest and the applicable amounts reserved in respect of each Senior Creditor Claim.  The Liquidating Trust shall pay any taxes due and owing with respect to the Senior Creditor Claims Reserve, and reserve all distributions on account of the Class B Beneficial Interests attributable thereto net of such taxes; *provided, however*, that the Liquidating Trust may contest in good faith any tax that any taxing authority determines is owed by the Liquidating Trust that is not otherwise inconsistent with the interests of the Beneficiaries.

      (b)   As soon as practicable subsequent to sixty (60) days after the Effective Date (the "Initial Senior Creditor Claimant Distribution Date"), the Liquidating Trust shall (i) continue to hold in the Senior Creditor Claims Reserve an amount of Class B Beneficial Interests equal to the Senior Claimant Share of such Class B Beneficial Interests that would have been distributed in respect of the maximum amount (as determined by the Liquidating Trust) of all Contested Senior Creditor Claims and (ii) distribute to all Senior Creditor Claimants holding Approved Senior Creditor Claims their respective Senior Claimant Share of the Senior Creditor Class B Beneficial Interests.

(c)     From time to time after the Initial Senior Creditor Claimant Distribution Date, as Contested Senior Creditor Claims are resolved, Class B Beneficial Interests in respect thereof shall be distributed from the Senior Creditor Claims Reserve to the Holders thereof, to the extent such Contested Senior Creditor Claims are determined to be Approved Senior Creditor Claims, and shall be distributed to the other Senior Creditor Claimants who hold Approved Senior Creditor Claims and allocated to (and continue to be held in the Senior Creditor Claims Reserve for) Senior Creditor Claimants who hold Contested Senior Creditor Claims which have not yet been resolved, to the extent such Contested Senior Creditor Claims are determined by Final Order not to benefit from the subordination provisions set forth in the BBN Bonds Indenture.

(d)     All Class B Beneficial Interests attributable to Senior Creditor Claims (both Contested Senior Creditor Claims and Approved Senior Creditor Claims) as of any date shall be treated in all respects as issued and outstanding Class B Beneficial Interests.  On the date of any distribution from the Class B Subtrust, the Liquidating Trust shall deposit into the Senior Creditor Claims Reserve the aggregate Pro Rata Share of all distributions made by the Liquidating Trust on account of Class B Beneficial Interests, net of taxes, if any, paid or payable by the Liquidating Trust with respect thereto.

(e)     Notwithstanding anything to the contrary contained herein, prior to the resolution of all Contested Senior Creditor Claims, Cash deposited in the Senior Creditor Claims Reserve shall not be distributed to holders of Class B Beneficial Interests issued in respect of Approved Senior Creditor Claims but shall be used to pay all costs and expenses incurred by the Liquidating Trust in connection with the investigation, resolution, defense against, compromise and settlement of all Contested Senior Creditor Claims.  Upon the resolution of all Contested Senior Creditor Claims, any Cash in the Senior Creditor Claims Reserve shall be distributed pro rata to the holders of Class B Beneficial Interests issued in respect of Approved Senior Creditor Claims.

3.6.     Cash Claims Reserve.

(a)     On the Effective Date, the Liquidating Trust will establish a reserve (the "Cash Claims Reserve") in respect of Disputed Cash Claims and the unpaid estimated administrative expenses (including, without limitation, accrued and estimated professional fees and the incentive compensation fees payable to AP Services, LLC in accordance with the AlixPartners Retention Agreement) (the "Unpaid Administrative Expenses") of the Debtors and their Estates that accrue through the Effective Date for which no proof of Claim has been Filed and was not yet required to have been Filed.  For purposes of establishing the Cash Claims Reserve, the Liquidating Trust shall estimate each Disputed Cash Claim at the Maximum Amount of such Claim and the Unpaid Administrative Expenses at the amount determined by the Debtors with the prior written consent of the Creditors' Committee.  The Liquidating Trust shall maintain the Cash Claims Reserve in a segregated, interest-bearing account (which, except as provided herein, shall not be subject to the claims of any other Person), and shall keep records as to the applicable amounts reserved in respect of each Disputed Cash Claim and each category of Unpaid Administrative Expenses.  The Liquidating Trust shall pay any taxes due and owing with respect to the Cash Claims Reserve; *provided, however,* that the

Liquidating Trust may contest in good faith any tax that any taxing authority determines is owed by the Liquidating Trust that is not otherwise inconsistent with the interests of the Beneficiaries.

(b)     In the event any Disputed Cash Claim becomes an Allowed Claim, the amount of such Allowed Claim shall never exceed the Maximum Amount of such Disputed Claim, and the Liquidating Trust shall distribute to the holder of such Allowed Claim from the Cash Claims Reserve the aggregate amount of Cash payable to such holder pursuant to the Plan.

(c)     Notwithstanding anything to the contrary contained in this Trust Agreement or the Plan, the Liquidating Trust shall have no liability whatsoever to any holder of a Disputed Claim or an Allowed Claim except as provided in this Section 3.6 (or Section 3.4 to the extent such Claim is a Disputed General Unsecured Claim) and to the extent such holder is or becomes a Beneficiary, and no such holder shall have any recourse to or claims against any of the other assets or properties of the Liquidating Trust.

(d)     From time to time as Disputed Cash Claims are Disallowed or become Allowed Claims in amounts less than their respective Maximum Amounts, the Cash deposited in the Cash Claims Reserve that otherwise would have been distributed to the holders of such Disputed Claims if such Disputed Claims subsequently had become Allowed Claims in an amount equal to their respective Maximum Amounts (and which as a result is not distributable to such holders pursuant to Section 3.6(b)) shall be released from and no longer held in the Cash Claims Reserve, shall be deemed to be Collection Cash and shall be deposited in the Liquidating Trust's bank accounts.  From time to time to the extent that the Oversight Committee determines that actual administrative expenses are less than the amount of Cash deposited in the Cash Claims Reserve with respect thereto and no other Unpaid Administrative Expenses of the Debtors and their Estates have accrued through the Effective Date with respect to which Cash has not been deposited in the Cash Claims Reserve, such excess Cash shall be released from and no longer held in the Cash Claims Reserve, shall be deemed to be Collection Cash and distributed in accordance with Section 6.1.  All distributions described in this Section 3.6 shall be net of taxes, if any, paid or payable by the Liquidating Trust with respect thereto.

3.7.    Collection Expenses Reserve.  On the Effective Date, the Liquidating Trust shall transfer from the Class B Subtrust into a segregated, interest-bearing account and maintain as a reserve (the "Collection Expenses Reserve"), an amount of Cash equal to $_____ (the "Initial Collection Expenses Reserve Level"), which shall be used to pay all costs and expenses (the "Collection Expenses") to be incurred by the Liquidating Trust in connection with the (i) investigation, enforcement, abandonment, prosecution, resolution, defense against, compromise and settlement of all Disputed Cash Claims and objections thereto, all Causes of Action (including Avoidance Actions) and all Unpaid Administrative Expenses and (ii) without duplication, the sale, abandonment, liquidation and collection of all other Non-Cash Assets.  The Initial Collection Expenses Reserve Level may be reduced (provided that prior to such reduction the Collection Expenses Reserve has been replenished to the Initial Collection Expenses Reserve Level and the amount of the reduction in the Initial Collection Expenses Reserve has been

distributed to the Class B Subtrust) or increased (but only out of Collection Cash (as defined in Section 6.1)) pursuant to majority vote of the Oversight Committee (the Initial Collection Expenses Reserve Level as so increased or decreased referred to hereinafter as the "Collection Expenses Reserve Level").  Any additional amounts of Cash so placed in the Collection Expenses Reserve in excess of the Initial Collection Expenses Reserve Level (the "Additional Collection Expenses Reserve") shall not be deemed a part of the Class B Subtrust, and, upon the termination of the Liquidating Trust, shall be distributed in accordance with Section 6.5.

3.8.    Operating Expenses Reserve.  On the Effective Date, the Liquidating Trust shall establish within the Class B Subtrust and maintain in a segregated, interest-bearing account a reserve (the "Operating Expenses Reserve"), consisting of an amount of Cash (the "Initial Operating Expenses Reserve") determined by the Oversight Committee in accordance with Section 2.2(b), sufficient to pay all costs and expenses (the "Operating Expenses") related to the care and maintenance of the Liquidating Trust Estate and the wind down of the Liquidation Cases, including without limitation, the expenses of the Liquidating Trust (including the fees and expenses of the Liquidating Trustee, the expenses of the members of the Oversight Committee, the fees and expenses of all of their respective professionals, and indemnification and tax obligations of the Liquidating Trust) other than Collection Expenses and Claims Reconciliation Expenses (as defined in Section 3.9), which shall be paid from the Collection Expenses Reserve or the Claims Reconciliation Expenses Reserve, as applicable.  The Initial Operating Expenses Reserve may be reduced (and the excess Cash (the "Released Operating Expenses Reserve Cash") distributed to the Class B Subtrust) or increased (but only out of Released General Unsecured Claims Cash or Collection Cash distributed to the Class B Subtrust), pursuant to majority vote of the Oversight Committee in accordance with Section 2.2(b) or pursuant to a Final Order.

3.9.    Claims Reconciliation Expenses Reserve.  On the Effective Date, the Liquidating Trust shall establish within the Class B Subtrust and maintain in a segregated, interest-bearing account a reserve (the "Claims Reconciliation Expenses Reserve") consisting of an amount of Cash (the "Initial Claims Reconciliation Expenses Reserve") determined by the Class B Representative sufficient to pay all costs and expenses (the "Claims Reconciliation Expenses") to be incurred by the Liquidating Trust in connection with the investigation, enforcement, abandonment, prosecution, resolution, defense against, compromise and settlement of all Disputed General Unsecured Claims and objections thereto.  The Initial Claims Reconciliation Expenses Reserve may be reduced (and the excess Cash (the "Released Claims Reconciliation Expenses Reserve Cash") distributed to the Class B Subtrust) or increased (but only out of Released General Unsecured Claims Cash or Collection Cash distributed to the Class B Subtrust) upon the approval of the Class B Representative.

3.10.    Transferability of Beneficial Interests.  Upon notice to the Liquidating Trust by any Beneficiary, the Liquidating Trustee shall amend the register to reflect any transfer of Beneficial Interests by such Beneficiary to a transferee as set forth in the notice; *provided, however,* that the Liquidating Trustee need not reflect any transfer (or make any distribution to any transferee) and will give notice to such Beneficiary that no

transfer has been recognized in the event the Liquidating Trustee reasonably believes that such transfer (or the distribution to such transferee) may constitute a violation of applicable laws or might cause the Liquidating Trust to be required to register Beneficial Interests under the Securities Exchange Act of 1934, as amended.

      3.11.   Initial and Subsequent Distributions; Withholding.  As soon as reasonably practicable after the Effective Date, the Liquidating Trust, after establishing the reserves described in this Article 3, shall distribute to the holders of Class B Beneficial Interests in accordance with their respective Pro Rata Share all Cash in the Class B Subtrust.  In the discretion of the Oversight Committee but not less frequently than quarterly the Liquidating Trust shall distribute Collection Cash to the holders of Class A Beneficial Interests and the Class B Subtrust in accordance with Section 6.1.  In the discretion of the Class B Representative but not less frequently than annually, the Liquidating Trust shall distribute to the holders of Class B Beneficial Interests in accordance with their respective Pro Rata Share all Collection Cash, Released General Unsecured Claims Cash, Released Operating Expenses Reserve Cash and Released Claims Reconciliation Expenses Reserve Cash in the Class B Subtrust; *provided, however*, that no distribution will be required unless such aggregate distribution would be at least $100,000. The Liquidating Trustee may withhold from amounts distributable to any Person any and all amounts, determined in the Liquidating Trustee's reasonable sole discretion, required by any law, regulation, rule, ruling, directive or other governmental requirement.

      3.12.   Manner of Payment or Distribution. As provided in the Plan, all distributions made by the Liquidating Trust to the holders of Beneficial Interests shall be payable to the holders of such Beneficial Interests of record as of 5:00 p.m. prevailing New York City time on the 15th day prior to such distribution (a "Distribution Record Date").  If the distribution shall be in Cash, the Liquidating Trust shall distribute such Cash by wire, check, or such other method as the Liquidating Trustee deems appropriate under the circumstances.

ARTICLE 4

THE LIQUIDATING TRUSTEE

      4.1.   Role of the Liquidating Trustee.  In furtherance of and consistent with the purpose of the Liquidating Trust and the Plan, subject to the powers and rights of the Oversight Committee as set forth in this Trust Agreement, the Liquidating Trustee shall, for the benefit of the Beneficiaries, have the power and authority to hold, manage, and distribute the Liquidating Trust Estate, and the Cash and Non-Cash Assets obtained through the exercise of its power and authority.  In all circumstances, the Liquidating Trustee shall act in the best interests of all Beneficiaries and in furtherance of the purpose of the Liquidating Trust.  In addition to any other limitations on the authority of the Liquidating Trustee set forth in this Trust Agreement, the Liquidating Trustee shall take such actions or refrain from taking action as may be directed in writing by the Oversight Committee.

4.2.    Authority of Liquidating Trustee.  In connection with the administration of the Liquidating Trust, except as set forth in this Trust Agreement, the Liquidating Trustee is authorized to perform any and all acts necessary or desirable to accomplish the purposes of the Liquidating Trust that are not inconsistent with IRS Revenue Procedure 94-45, 1994-2 C.B. 684 and Sections 1.671-4(a) and 301.7701-4(d) of the Treasury Regulations.  Without limiting, but subject to, the role of the Liquidating Trustee as set forth in this Trust Agreement and to the powers of the Oversight Committee set forth in this Trust Agreement, including Sections 2.3 and 4.3 hereof, the Liquidating Trustee shall be expressly authorized, but shall not be required, to:

(a)    hold legal title to any and all rights of the holders of the Beneficial Interests in or arising from the Liquidating Trust Estate, including, without limitation, collecting and receiving any and all money and other property belonging to the Liquidating Trust and the right to vote any claim or interest in a case under the Bankruptcy Code and receive any distribution therein;

(b)    perform the duties, exercise the powers, and assert the rights of a trustee under Sections 704 and 1106 of the Bankruptcy Code, including, without limitation, commencing, prosecuting or settling Causes of Action (including the Avoidance Actions), enforcing contracts, and asserting claims, defenses, offsets and privileges;

(c)    manage, sell, transfer, assign or deal in any other manner with any of the Liquidating Trust Estate in such manner not otherwise provided for herein as the Liquidating Trustee may deem advisable consistent with the terms of this Trust Agreement and the Plan;

(d)    execute and file any and all documents and take any and all other actions related to, or in connection with, the liquidation of the Liquidating Trust Estate, the exercise of the Liquidating Trustee's powers granted herein and the enforcement of any and all instruments, contracts, agreements or causes of action relating to the Liquidating Trust;

(e)    protect and enforce the rights to the Liquidating Trust Estate by any method deemed appropriate including, without limitation, by judicial proceedings or pursuant to any applicable bankruptcy, insolvency, moratorium or similar law and general principles of equity;

(f)    borrow funds, incur or assume liabilities, and pledge any portion of the Liquidating Trust Estate on behalf of the Liquidating Trust in furtherance of or in connection with the Liquidating Trustee's or the Liquidating Trust's duties, powers, authority, and obligations under this Trust Agreement, and determine and satisfy any and all liabilities created, incurred or assumed by the Liquidating Trust;

(g)    file, if necessary, any and all tax and information returns with respect to the Liquidating Trust, the Class B Subtrust, the Disputed General Unsecured Claims Reserve, the Cash Claims Reserve and the Senior Creditor Claims Reserve, and

-15-

pay taxes, if any, properly payable by the Liquidating Trust or the Class B Subtrust, the Disputed General Unsecured Claims Reserve, the Cash Claims Reserve and the Senior Creditor Claims Reserve;

(h)     undertake any actions required to liquidate the Liquidating Trust Estate in accordance with the terms of this Trust Agreement and the Plan;

(i)     pay all expenses and make all other payments relating to the Liquidating Trust Estate;

(j)     obtain reasonable insurance coverage with respect to its liabilities and obligations as Liquidating Trustee under this Trust Agreement (in the form of an errors and omissions policy or otherwise) and indemnification for the Liquidating Trustee and others provided for in the Plan, and this Trust Agreement;

(k)     obtain insurance coverage with respect to real and personal property that may be part of the Liquidating Trust Estate, if any;

(l)     retain and pay such counsel and other professionals as the Liquidating Trustee may select to assist the Liquidating Trustee in its duties, on such terms, including contingency-fee arrangements, as the Liquidating Trustee deems appropriate, without Bankruptcy Court approval.  A law firm or professional shall not be disqualified from representing or otherwise serving the Liquidating Trust solely because of its current or prior retention as counsel or professional to the parties in interest in the Liquidation Cases;

(m)     retain and pay an independent public accounting firm to perform such reviews and/or audits of the financial books and records of the Liquidating Trust as may be appropriate and to prepare and file any tax returns or informational returns for the Liquidating Trust as may be required.  The Liquidating Trustee may commit the Liquidating Trust to and shall pay such independent public accounting firm reasonable compensation for services rendered and expenses incurred;

(n)     retain and pay such third parties as the Liquidating Trustee may deem necessary or appropriate to assist the Liquidating Trustee in carrying out its powers and duties under this Trust Agreement.  The Liquidating Trustee may commit the Liquidating Trust to and shall pay all such persons or entities reasonable compensation for services rendered and expenses incurred, as well as commit the Liquidating Trust to indemnify any such parties in connection with the performance of services;

(o)     assert or waive any privilege or defense on behalf of the Liquidating Trust or the Debtors;

(p)     compromise, adjust, arbitrate, sue on or defend, pursue, prosecute, abandon, exercise rights, powers, and privileges with respect to, or otherwise deal with and settle, in accordance with the terms set forth herein, Causes of Action and all causes of action in favor of or against the Liquidating Trust as the Liquidating Trustee shall

deem advisable; to continue the prosecution of any such efforts commenced by the Debtors and to take and defend appeals of court orders with respect to such matters;

(q)     avoid and recover transfers of the Debtors' property as may be permitted by the Bankruptcy Code or applicable state law, including prosecuting the Avoidance Actions; to continue the prosecutions of any such efforts commenced by the Debtors; and to take and defend appeals of court orders with respect to all such matters;

(r)     execute offsets and assert counterclaims against Claims as provided for in the Plan;

(s)     take all appropriate action with respect to the Liquidating Trust Estate consistent with the purpose of the Liquidating Trust;

(t)     object to any Claims filed or scheduled in the Liquidation Cases; to prosecute such objections; to continue the prosecution of any such objections filed by the Debtors; to take and defend appeals of any court orders with respect to all such objections; and to settle and compromise all such objections;

(u)     seek, by motion or otherwise, to cap or otherwise estimate any unliquidated and/or disputed Claim; to continue the prosecution of any such motions filed by the Debtors; to take and defend appeals of any court orders with respect to such motions; and to settle and compromise such motions;

(v)     abandon property as provided under Bankruptcy Code Section 554, but without further approval of the Bankruptcy Court;

(w)     in accordance with the terms of Section 4.11 hereof, unless reasonably necessary to maintain the value of the Liquidating Trust Estate and to further the liquidating purpose of the Liquidating Trust, to invest in, and only in, demand and time deposits, such as short-term certificates of deposit, in banks or other savings institutions, or other temporary, liquid investments, such as U.S. Treasury bills;

(x)     request any appropriate tax determination with respect to the Liquidating Trust (including the Disputed General Unsecured Claims Reserve, the Cash Claims Reserve and the Senior Creditor Claims Reserve), including, without limitation, a determination pursuant to Section 505(a) and Section 505(b) of the Bankruptcy Code;

(y)     establish and maintain a website for the purpose of providing notice of Liquidating Trust activities in lieu of sending written notice to holders of Beneficial Interests, subject to providing notice of such website to such holders;

(z)     make interim and final distributions of the Liquidating Trust Estate to Beneficiaries;

(aa)     take or refrain from taking any and all actions the Liquidating Trustee reasonably deems necessary or convenient for the continuation, protection and maximization of the Liquidating Trust Estate or to carry out the purposes hereof;

(bb)    seek the examination of any Person pursuant to the provisions of Bankruptcy Rule 2004;

(cc)    make any tax election, settle or compromise any tax liability, consent to any claim or assessment relating to taxes or take any action consistent with the treatment of the Liquidating Trust as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d); and

(dd)    do any and all things which the Oversight Committee directs it to do or which are necessary or appropriate to accomplish the purposes of the Plan and this Trust Agreement.

4.3.    No Authority of Liquidating Trustee to Engage in Trade or Business; Limitations on Authority of Liquidating Trust.

(a)    Notwithstanding anything herein to the contrary, the Liquidating Trustee shall not be authorized to engage in any trade or business, and shall not take such actions inconsistent with the orderly liquidation of the Liquidating Trust Estate as are required or contemplated by applicable law, the Plan and this Trust Agreement.

(b)    The Liquidating Trust shall not hold any operating assets of a going business or 50% or more of the stock (in either vote or value) of any entity that is treated as a corporation for federal income tax purposes, nor be the sole member of a limited liability company, nor have any interest in an entity that is treated as a partnership for federal income tax purposes, unless such stock, membership interest, or partnership interest was obtained involuntarily or as a matter of practical economic necessity in order to preserve the value of the Liquidating Trust Estate and provided, that, in any case, such corporation, company or partnership does not hold operating assets of a going business.

4.4.    Books and Records.  The Liquidating Trustee shall maintain in respect of the Liquidating Trust and the holders of Beneficial Interests books and records relating to the Liquidating Trust Estate and income of the Liquidating Trust and the payment of expenses of, and liabilities of claims against or assumed by, the Liquidating Trust in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof.  Such books and records shall be maintained on a modified cash or other comprehensive basis of accounting necessary to facilitate compliance with the tax reporting requirements of the Liquidating Trust.  The members of the Oversight Committee shall have the right to examine all such books and records and all other books and records of the Liquidating Trust.  Except as otherwise may be expressly provided in this Trust Agreement, nothing in this Trust Agreement requires the Liquidating Trustee to file any accounting or seek approval of any court with respect to the administration of the Liquidating Trust, or as a condition for managing any payment or distribution out of the Liquidating Trust Estate.

4.5.    Reports to Oversight Committee.  Commencing thirty (30) days after the Effective Date, and continuing monthly thereafter until the Liquidating Trust is terminated, the Liquidating Trustee shall provide written reports to the members of the

Oversight Committee which shall contain, at least, the following: (i) the aggregate amount of Cash added to Collection Cash during the month; (ii) the amount of Collection Cash and an estimate of the value of the Liquidating Trust Estate and the Class B Subtrust held by the Liquidating Trust at the end of the month; (iii) the aggregate amount of Collection Expenses, Operating Expenses and Claims Reconciliation Expenses incurred during the month; (iv) the proposed terms of settlement of Avoidance Actions and Claims objections; (v) a description of all Avoidance Actions and all other Causes of Action, Disputed Claims and Contested Senior Creditor Claims which have been resolved whether by Bankruptcy Court order, settlement or dismissal; (vi) the status of the liquidation of the Non-Cash Assets; and (vii) a list of material disputes pending at the end of the month. The Liquidating Trustee also will provide such additional information to the Oversight Committee as may be requested.

4.6.    <u>Additional Powers</u>.  Except as otherwise set forth in this Trust Agreement (including Section 2.3), and subject to the Treasury Regulations governing liquidating trusts and the retained jurisdiction of the Bankruptcy Court as provided for in the Plan, but without prior or further authorization, the Liquidating Trustee may control and exercise authority over the Liquidating Trust Estate and over the protection, conservation and disposition thereof.  No Person dealing with the Liquidating Trust shall be obligated to inquire into the authority of the Liquidating Trustee in connection with the protection, conservation or disposition of the Liquidating Trust Estate.

4.7.    <u>Tax and Reporting Duties of the Liquidating Trustee</u>.  Subject to Section 4.2, the Liquidating Trustee shall be responsible for all tax and other matters as set forth in Article 5.

4.8.    <u>Compliance with Laws</u>.  Any and all distributions of the Liquidating Trust Estate and proceeds of borrowings, if any, shall be in compliance with applicable laws, including, without limitation, applicable federal and state securities laws.

4.9.    <u>Compensation of the Liquidating Trustee and Professionals</u>.

(a)    The Liquidating Trust shall pay compensation to AP Services, LLC in accordance with the terms of the AlixPartners Retention Agreement and shall assume the Debtors' obligations under the Estate Employee Retention Plan, in each case as provided in the Plan.  The Liquidating Trustee shall request that AP Services, LLC indicate in its monthly bills, the amount of time spent by its employees in connection with Disputed General Unsecured Claims, Senior Creditor Claims, and Disputed Cash Claims and Unpaid Administrative Expenses.

(b)    The Liquidating Trust shall pay reasonable compensation for the services provided by the Liquidating Trustee and any other professionals or other Persons retained by the Liquidating Trustee, the Liquidating Trust and the members of the Oversight Committee as permitted under this Trust Agreement.

4.10.    <u>Reliance by Liquidating Trustee</u>.  Except as otherwise provided in Article 8 hereof:

(a)    the Liquidating Trustee may rely, and shall be protected in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by him to be genuine and to have been signed or presented by the proper party or parties; and

(b)    Persons dealing with the Liquidating Trustee shall look only to the Liquidating Trust Estate to satisfy any liability incurred by the Liquidating Trustee to such person in carrying out the terms of this Trust Agreement, and neither the Liquidating Trustee nor any member of the Oversight Committee shall have any personal liability or other obligation to satisfy any such liability.

4.11.    <u>Investment and Safekeeping of Trust Assets</u>.  The right and power of the Liquidating Trustee to invest any portion of the Liquidating Trust Estate, the proceeds thereof or any income earned by the Liquidating Trust, shall be limited to the right and power that a liquidating trust, within the meaning of Treasury Regulations Section 301.7701-4(d), is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.  The Liquidating Trust will not receive or retain Cash (or cash equivalents) in excess of a reasonable amount to meet claims and contingent liabilities (including Disputed Claims) or to maintain the value of the assets during liquidation.  Subject to Section 2.3 and the other terms of this Trust Agreement, the Liquidating Trustee may expend the Cash of the Liquidating Trust (a) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Liquidating Trust during liquidation and (b) to pay the reasonable costs and expenses (including, without limitation, any taxes imposed on the Liquidating Trust).

ARTICLE 5

TAX MATTERS

5.1.    <u>Federal Income Tax Treatment of the Liquidating Trust</u>.  For all federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust (or the Class B Subtrust) for the benefit of the Beneficiaries holding Allowed Claims, whether Allowed on or after the Effective Date, as the (A) deemed transfer of the Liquidating Trust Assets directly to such Beneficiaries in satisfaction of such Claims (other than to the extent allocable to or retained on account of the Disputed General Unsecured Claims Reserve, the Cash Claims Reserve and the Senior Creditor Claims Reserve) followed by (B) the deemed transfer by such Beneficiaries to the Liquidating Trust (or the Class B Subtrust) of the Liquidating Trust Assets in exchange for Beneficial Interests (or the Class B Subtrust).  Accordingly, such Beneficiaries shall be treated for federal income tax purposes as the grantors and deemed owners of their respective share of the Liquidating Trust Estate.

5.2.    <u>Federal Income Tax Treatment of the Disputed General Unsecured Claims Reserve, the Cash Claims Reserve and the Senior Creditor Claims Reserve</u>.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary

(including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall (i) treat the Liquidating Trust Assets allocable to, or retained on account of, the Disputed General Unsecured Claims Reserve, the Cash Claims Reserve or the Senior Creditor Claims Reserve as held, in each case, by a discrete trust for federal income tax purposes, consisting of separate and independent shares to be established in respect of such respective reserve, in accordance with the trust provisions of the Internal Revenue Code (section 641 *et seq*), (ii) treat as taxable income or loss of the Disputed General Unsecured Claims Reserve, the Cash Claims Reserve or the Senior Creditor Claims Reserve, with respect to any given taxable year, the portion of the taxable income or loss of the Liquidating Trust allocable to the Liquidating Trust Assets held in such reserves, (iii) treat as a distribution from the Disputed General Unsecured Claims Reserve, the Cash Claims Reserve or the Senior Creditor Claims Reserve any increased amount distributed by the Liquidating Trust as a result of the resolution of any Disputed General Unsecured Claim, any Disputed Cash Claim or any Contested Senior Creditor Claim, as the case may be, earlier in the tax year, to the extent such distribution relates to taxable income or loss of the Disputed General Unsecured Claims Reserve, the Cash Claims Reserve or the Senior Creditor Claims Reserve, as the case may be, determined in accordance with the provisions hereof, and (iv) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All Beneficiaries report, for tax purposes, consistently with the foregoing.

     5.3.   <u>Tax Returns; Tax Matters</u>.

     (a)   The Liquidating Trustee shall file returns for the Liquidating Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) and comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority or similar governmental agency, including, without limitation, any requirements imposed by the Plan and this Article 5.  The Liquidating Trustee shall also annually send to each holder of Beneficial Interests a separate statement setting forth such holder's share of items of income, gain, loss, deduction or credit and shall instruct all such holders to report such items on their federal income tax returns.  The Liquidating Trust's taxable income, gain, loss, deduction or credit shall be allocated to such Beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust.

     (b)   As soon as possible after the Effective Date, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets, and such valuation shall be used consistently by all parties (including, without limitation, the Debtors, the Liquidating Trustee, and the Beneficiaries) for all federal income tax purposes.  The Liquidating Trustee shall also file (or cause to be filed) any other statements, returns or disclosures relating to the Liquidating Trust that are required by any governmental unit.

     (c)   The Liquidating Trustee is authorized to act as agent for the Liquidating Trust Estate in withholding or paying over any amounts required by law

-21-

(including tax law) to be withheld or paid by the Liquidating Trust Estate in connection with the transfer and assignment of the Liquidating Trust Assets to the Liquidating Trust pursuant to the Plan.  The Liquidating Trustee is further entitled to deduct any United State federal or applicable state withholding taxes from any payments made with respect to Allowed Claims, as appropriate.  The Liquidating Trustee shall be responsible for payments, out of the Liquidating Trust Estate, of any taxes imposed on the Liquidating Trust or its assets or net income.  In the event, and to the extent, any Cash retained on account of the Disputed General Unsecured Claims Reserve (or the Cash Claims Reserve or the Senior Creditor Claims Reserve) is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, the Disputed General Unsecured Claims Reserve (or the Cash Claims Reserve or the Senior Creditor Claims Reserve), such taxes paid by the Liquidating Trustee other than from the Disputed General Unsecured Claims Reserve (or the Cash Claims Reserve or the Senior Creditor Claims Reserve) shall be reimbursed from any subsequent Cash amounts retained on account of the Disputed General Unsecured Claims Reserve (or the Cash Claims Reserve or the Senior Creditor Claims Reserve).

     5.4.   <u>Expedited Determination of Taxes</u>.  The Liquidating Trustee may request an expedited determination of taxes of the Liquidating Trust, including the Class B Subtrust, the Disputed General Unsecured Claims Reserve, the Cash Claims Reserve and the Senior Creditor Claims Reserve under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Liquidating Trust for all taxable periods through the dissolution of the Liquidating Trust.

     5.5.   <u>Fiscal Year</u>.  The Liquidating Trust's fiscal year shall be the calendar year or such other period as may be fixed by the Liquidating Trustee with the prior written consent of the Oversight Committee or as otherwise required by the Internal Revenue Code and the Treasury Regulations.

ARTICLE 6

DISTRIBUTIONS

6.1.    Application of Cash.  The Liquidating Trust shall from time to time (subject to Section 3.11) upon the receipt of Cash (the "Collection Cash") from (i) the Cash Claims Reserve as a result of Disputed Cash Claims being Disallowed or becoming Allowed Claims in amounts less than their respective Maximum Amounts, (ii) the enforcement, prosecution, resolution, compromise or settlement of Causes of Action (including Avoidance Actions), (iii) the Cash Claims Reserve as a result of Unpaid Administrative Expenses aggregating less than the Cash reserved with respect thereto and no other Unpaid Administrative Expenses of the Debtors and their Estates accruing through the Effective Date with respect to which Cash has not been deposited in the Cash Claims Reserve and (iv) the sale, abandonment, liquidation and collection of all other Non-Cash Assets, apply all such Collection Cash net of taxes, if any, paid or payable by the Liquidating Trust with respect thereto:

FIRST, to replenish the Collection Expenses Reserve to the Collection Expenses Reserve Level then in effect and to the extent the Collection Expenses Reserve Level has been increased pursuant to Section 3.7 to fund the Collection Expenses Reserve Level as so increased;

SECOND, as set forth in the Plan, to the Class B Subtrust to the extent that the Class B Tranche Amount has not previously been paid in full;

THIRD, as set forth in the Plan, to the holders of the Class A Beneficial Interests to the extent the Bank Tranche Amount has not previously been paid in full; and thereafter

as set forth in the Plan, 68% to the holders of Class A Beneficial Interests and 32% to the Class B Subtrust.

6.2.    Annual Distribution Requirement.  Notwithstanding anything to the contrary contained herein, the Liquidating Trustee shall distribute at least annually to the Beneficiaries, the Liquidating Trust's net income and net proceeds from the sale of Non-Cash Assets, provided that the Liquidating Trust shall be permitted to retain amounts of net income and net proceeds reasonably necessary to maintain the value of its assets and to satisfy claims and contingent liabilities (including Disputed Claims).

6.3.    Delivery of Liquidating Trust Distributions.  All distributions under this Trust Agreement to any holder of an Allowed Claim shall be made at the address of such holder as set forth on the lists provided by the Debtors to the Liquidating Trust pursuant to Section 3.1 unless the Liquidating Trustee has been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or request for payment of administrative expenses by such holder that contains an address for such holder different from the address reflected on such lists for such holder.  In the event that any distribution to any holder is returned as undeliverable, the Liquidating Trustee shall

use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Liquidating Trustee has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; *provided, however*, that such undeliverable or unclaimed distributions shall be deemed unclaimed property and such holder shall forfeit all rights related thereto at the expiration of one year from the date of distribution.  Upon such forfeiture of any Beneficial Interest, such Beneficial Interest shall be deemed cancelled and of no further force or effect.  Upon such forfeiture of Cash or other property, such Cash or property shall be the property of the Liquidating Trust.

6.4.    Cash Distributions.  No Cash distributions shall be required to be made in an amount less than $50.00.  Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent distributions.  Notwithstanding the foregoing, all Cash shall be distributed in the final liquidating distribution of the Liquidating Trust.

6.5.    Distributions Upon Termination of Liquidating Trust.  Upon the termination of the Liquidating Trust, the Liquidating Trustee shall, as expeditiously as is consistent with the conservation and preservation of the Liquidating Trust Estate, distribute any undistributed Collection Cash in the Liquidating Trust in accordance with Section 6.1 and distribute to the holders of Class B Beneficial Interests their respective Pro Rata Share of any Cash in the Class B Subtrust, the Collection Expenses Reserve, the Operating Expenses Reserve and the Claims Reconciliation Expenses Reserve; *provided, however*, that any Cash in the Collection Expenses Reserve in excess of the Initial Collection Expenses Reserve shall be distributed 68% to the holders of Class A Beneficial Interests and 32% to the holders of the Class B Beneficial Interests.

ARTICLE 7

SUCCESSOR TRUSTEES

7.1.    Resignation of Liquidating Trustee.  The Liquidating Trustee may resign by giving not less than ninety (90) days' prior written notice thereof to the Oversight Committee and the Bankruptcy Court.  Such resignation shall become effective on the later to occur of:  (i) the day specified in such notice; or (ii) the appointment of a successor Liquidating Trustee and the acceptance by such successor Liquidating Trustee of such appointment.  If a successor Liquidating Trustee is not appointed or does not accept its appointment within sixty (60) days following delivery of notice of resignation, the Liquidating Trustee may petition the Bankruptcy Court for the appointment of a successor Liquidating Trustee.

7.2.    Removal of Liquidating Trustee.  The Liquidating Trustee (and its successors) may be removed at any time by the vote of a majority of the members of the Oversight Committee or upon order of the Bankruptcy Court, which may be sought by any member of the Oversight Committee, and such removal shall take effect on the date specified by the Oversight Committee or at the time specified by the Bankruptcy Court, as the case may be.  Upon such removal or resignation of the Liquidating Trustee pursuant to Section 7.1 or the death or disability of the Liquidating Trustee, members of

the Oversight Committee, within 30 days, shall petition the Bankruptcy Court to appoint a successor Liquidating Trustee.

7.3.    Acceptance of Appointment by Successor Trustee.  Any successor Liquidating Trustee appointed hereunder shall execute an instrument accepting such appointment hereunder and shall file such acceptance with the Liquidating Trust records. Thereupon, such successor Liquidating Trustee shall, without any further act, become vested with all the estates, properties, rights, powers, trusts and duties of its predecessor in the Liquidating Trust with like effect as if originally named herein; *provided, however*, that a removed, incapacitated, or resigning Liquidating Trustee shall, nevertheless, when requested in writing by the successor Liquidating Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Liquidating Trustee under the Liquidating Trust all the estates, properties, rights, powers, and trusts of such predecessor Liquidating Trustee.

ARTICLE 8

INDEMNIFICATION; LIMITATIONS OF LIABILITY

8.1.    Indemnification of Liquidating Trustee and Oversight Committee.  The Liquidating Trustee, and the Liquidating Trustee's agents, representatives, designees, and professionals, and their respective employees, shall not be liable for actions taken or omitted by the Liquidating Trustee, or any such agent, representative, designee, professional, or employee, and shall not be liable for any actions taken or omitted in its capacity as, or on behalf of, the Liquidating Trustee, except those acts or omissions arising out of its or their own willful misconduct, fraud, or gross negligence, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Liquidating Trustee, except for any actions or inactions involving willful misconduct, fraud, or gross negligence.  Any indemnification claim of the Liquidating Trustee (and the other parties entitled to indemnification under this Section 8.1) shall be satisfied from the Liquidating Trust Estate (but not from assets in the Disputed General Unsecured Claims Reserve or the Cash Claims Reserve).  The Liquidating Trustee shall be entitled to rely, in good faith, on the advice of its retained professionals.  The Liquidating Trust shall indemnify and hold harmless the Liquidating Trustee and the members of the Oversight Committee and their respective designees, agents, attorneys, professionals, and representatives (collectively "Indemnified Persons"), from and against and in respect of all liabilities, losses, damages, claims, costs, and expenses, including without limitation attorneys' fees and costs arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidating Trust or the implementation or administration of this Trust Agreement and the Plan ("Indemnifiable Expenses"); *provided, however*, that no such indemnification will be made for such actions or omissions as a result of willful misconduct, fraud, or gross negligence ("Carved-Out Expenses").  The Liquidating Trust shall advance to any Indemnified Person incurring any Indemnifiable Expenses such amounts, on a monthly basis; provided, however, that if the Indemnified Person is the Liquidating Trustee, then in order to receive such advancement the Liquidating Trustee shall provide the Liquidating Trust with an

undertaking reasonably satisfactory to the Oversight Committee that the Liquidating Trustee will repay any amounts finally determined to be Carved-Out Expenses.

8.2.    Limitation on Liability of Oversight Committee.  Subject to applicable law, no member of the Oversight Committee shall be liable for any act he or she may take or omit to take as a member of the Oversight Committee while acting in good faith and in the exercise of his or her reasonable judgment; nor will any member of the Oversight Committee be liable in any event except for his or her own gross negligence or fraud or willful misconduct.  The foregoing limitation on liability shall apply equally to the agents, professionals, representatives, and/or employees of a member of the Oversight Committee acting on behalf of such member in the fulfillment of a member's duties hereunder.

ARTICLE 9

REPORTS TO HOLDERS OF BENEFICIAL INTERESTS

9.1.    Securities Laws, Tax and Other Reports to Holders of Beneficial Interests.

(a)    Under Section 1145 of the Bankruptcy Code, the issuance of Beneficial Interests under the Plan shall be exempt from registration under the Securities Act of 1933, as amended, and applicable state and local laws requiring registration of securities.  If the Liquidating Trustee determines, with the advice of counsel, that the Liquidating Trust is required to comply with the registration and reporting requirements of the Securities Exchange Act of 1934, as amended, or the Investment Company Act of 1940, as amended, then the Liquidating Trustee shall take any and all actions to comply with such reporting requirements and file periodic reports with the Securities and Exchange Commission.

(b)    If the Liquidating Trustee is not required to file the periodic reports referred to in Section 9.1(a) above, as soon as practicable after [December 31] and [June 30] of each year, and as soon as practicable upon termination of the Liquidating Trust, the Liquidating Trustee shall submit to each holder of Beneficial Interests appearing on its records as of such date or the date of termination a written report including, without limitation, the following: (i) financial statements of the Liquidating Trust for such period prepared on a modified cash basis or other comprehensive basis of accounting, and, if the end of a calendar year, a report of an independent certified public accountant employed by the Liquidating Trustee, which report shall reflect the result of such procedures relating to the financial accounting administration of the Liquidating Trust as approved by the Liquidating Trustee; and (ii) a description of any action taken by the Liquidating Trustee in the performance of its duties that materially affects the Liquidating Trust and of which notice has not previously been given to the holders of Beneficial Interests.  The Liquidating Trustee shall promptly submit additional reports to the holders of Beneficial Interests whenever a material event or change occurs that affects either the Liquidating Trust or the rights of the holders of Beneficial Interests hereunder.  The semiannual reports furnished pursuant to this Section 9.1(b) shall include a description of the progress of converting the Liquidating Trust Estate to Cash and making distributions to

holders of Beneficial Interests and any other material information relating to the Liquidating Trust Estate and the administration of the Liquidating Trust.

(c)    By February 28 (or if such day is not a Business Day, the first Business Day thereafter) following the end of each calendar year, the Liquidating Trustee shall submit to each holder of Beneficial Interests appearing on its records during such year a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct all such holders to report such items on their federal income tax returns. The Liquidating Trust's taxable income, gain, loss, deduction, and credit will be allocated pro rata to the Beneficiaries in accordance with their relative beneficial interests in the Liquidating Trust. The Liquidating Trustee shall file (or cause to be filed) any other statements, returns, or disclosures relating to the Liquidating Trust that are required by any governmental authority.

(d)    Any report required to be distributed by the Liquidating Trustee under Section 9.1(b) hereof shall also be distributed to the Persons listed in Section 12.6 hereof within ten Business Days of its distribution to holders of Beneficial Interests under Section 9.1(b) hereof. The Liquidating Trustee may post any report required to be provided under this Section 9.1 on a web site maintained by the Liquidating Trustee in lieu of actual notice to holders of Beneficial Interests (unless otherwise required by law) subject to providing notice to the Persons listed in Section 12.6 herein.

ARTICLE 10

TERMINATION OF LIQUIDATING TRUST

10.1.    <u>Termination of Liquidating Trust</u>. The Liquidating Trust will terminate on the earlier of: (a) thirty (30) days after the final distribution of the Liquidating Trust Estate in accordance with the terms of this Trust Agreement and the Plan; or (b) the fifth (5th) anniversary of the Effective Date. Notwithstanding the foregoing, multiple fixed-term extensions of the term of the Liquidating Trust may be obtained so long as Bankruptcy Court approval upon motion and a showing that such extension is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Estate is obtained within six (6) months prior to the expiration of the original term and each extended term. The aggregate of all such extensions shall not exceed three (3) years, unless the Liquidating Trustee receives a favorable ruling from the IRS that any further extension would not adversely affect the status of the Liquidating Trust as a liquidating trust within the meaning of Treasury Regulations Section 301.7701-4(d) for federal income tax purposes. The Liquidating Trustee shall not unduly prolong the duration of the Liquidating Trust and shall at all times endeavor to resolve, settle or otherwise dispose of all claims that constitute the Liquidating Trust Estate and to effect the distribution of the Liquidating Trust Estate to the holders of the Beneficial Interests in accordance with the terms hereof and terminate the Liquidating Trust as soon as practicable.

ARTICLE 11

AMENDMENT AND WAIVER

11.1.    Amendment and Waiver.  Any substantive provision of this Trust Agreement may be amended or waived by the Oversight Committee; *provided, however*, that no change may be made to the provisions of Section 2.2 which require the vote or approval of specified members of the Oversight Committee without the consent of such members and any changes to this Trust Agreement which relate solely to Disputed General Unsecured Claims or the Claims Reconciliation Expenses Reserve may be made with the consent of only the Class B Representative; and, *provided, further*, that no change may be made to (a) the last sentence of Section 12.9 or (b) adversely affect the U.S. Federal income status of the Liquidating Trust as a "liquidating trust" (in accordance with Section 1.2 hereof).  Notwithstanding this Section 11.1, any amendments to this Trust Agreement shall not be inconsistent with the purpose and intention of the Liquidating Trust to liquidate in an expeditious but orderly manner the Liquidating Trust Estate in accordance with Treasury Regulations Section 301.7701-4(d) and Section 1.2 hereof.

ARTICLE 12

MISCELLANEOUS PROVISIONS

12.1.    Intention of Parties to Establish Liquidating Trust.  This Trust Agreement is intended to create a liquidating trust for federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such federal income tax laws, which amendments may apply retroactively.

12.2.    Preservation of Privilege and Defenses.  In connection with the rights, claims, and causes of action that constitute the Liquidating Trust Estate, any attorney-client privilege, work-product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Liquidating Trust shall vest in the Liquidating Trust and its representatives, and the Debtors are authorized to take all necessary actions to effectuate the transfer of such privileges and available defenses.

12.3.    Prevailing Party.  If the Liquidating Trustee or the Liquidating Trust, as the case may be, is the prevailing party in a dispute regarding the provisions of this Trust Agreement or the enforcement thereof, the Liquidating Trustee or the Liquidating Trust, as the case may be, shall be entitled to collect any and all costs, expenses and fees, including attorneys' fees, from the non-prevailing party incurred in connection with such dispute or enforcement action.

12.4.    Laws as to Construction.  This Trust Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to

rules governing the conflict of laws that otherwise would apply the law of another jurisdiction.

12.5.    <u>Severability</u>.  If any provision of this Trust Agreement or the application thereof to any Person or circumstance shall be finally determined by a court of competent jurisdiction to be invalid or unenforceable to any extent, the remainder of this Trust Agreement, or the application of such provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and such provision of this Trust Agreement shall be valid and enforced to the fullest extent permitted by law.

12.6.    <u>Notices</u>.  Any notice or other communication hereunder shall be in writing (including by facsimile transmission or by e-mail) and shall be deemed to have been sufficiently given, for all purposes, if deposited, postage prepaid, in a post office or letter box addressed to the person for whom such notice is intended (or, in the case of notice by facsimile transmission or email, when received and telephonically or electronically confirmed), addressed as follows (*provided, however*, that only one notice or other communication hereunder need be sent to holders sharing the same address):

> If to the Liquidating Trustee, to:
>
> Meade Monger
> c/o AlixPartners LLC
> 2100 McKinney Avenue
> Suite 800
> Dallas, Texas  75201
> (214) 647-7501 (facsimile)
> www.alixpartners.com
>
>
> With a copy to:
>
>
>
> If to the Oversight Committee, to:
>
>
>
> If to the Beneficiaries, to the addresses set forth on the lists
> provided by the Debtors to the Liquidating Trust pursuant
> to Section 3.1.

12.7.    <u>Headings</u>.  The section headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

12.8.  <u>Counterparts</u>.  This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original instrument, but all together shall constitute one agreement.

12.9.  <u>Relationship to the Plan</u>.  The principal purpose of this Trust Agreement is to aid in the implementation of the Plan and therefore this Trust Agreement incorporates the provisions of the Plan.  To that end, subject to the terms and conditions of this Trust Agreement, the Liquidating Trustee shall have full power and authority to take any action consistent with the purpose and provisions of the Plan, and to seek any orders from the Bankruptcy Court in furtherance of implementation of this Trust Agreement and the Plan. If any provisions of this Trust Agreement are found to be inconsistent with the provisions of the Plan, the provisions of this Trust Agreement shall control, except that the Plan shall control with respect to the matters set forth in Sections 7.3 and 7.4 thereof.

12.10.  <u>Bond</u>.  The Liquidating Trustee shall serve with reasonable bond.

12.11.  <u>Confidentiality</u>.  The Liquidating Trustee shall, during the period that it serves in such capacity under this Trust Agreement and following either the termination of this Trust Agreement or such Liquidating Trustee's removal, incapacity, or resignation hereunder, hold strictly confidential and not use for personal gain any material, non-public information of or pertaining to any entity to which any of the Liquidating Trust Estate relates or of which it has become aware in its capacity as Liquidating Trustee. Notwithstanding anything else in the Plan, this Trust Agreement or any other agreements implementing the Plan, each of the parties hereto (and each employee, representative, or other agent of such person) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated hereby and all materials of any kind (including opinions or other tax analyses) that are provided to such person  relating to such tax treatment and tax structure.

12.12.  <u>Effect of Death, Incapacity or Bankruptcy of Beneficiary</u>.  The death, incapacity or bankruptcy of a Beneficiary during the term of this Trust Agreement shall not operate to terminate the Liquidating Trust or this Trust Agreement, nor shall it entitle the representatives or creditors of the deceased Beneficiary to an accounting, or to take any action in the courts or elsewhere for the distribution of the property constituting the Liquidating Trust Estate or for a partition thereof, nor shall it otherwise affect the rights and obligations of any Beneficiary.

IN WITNESS WHEREOF, the parties hereto have either executed and acknowledged this Trust Agreement, or caused it to be executed and acknowledged on their behalf by their duly authorized officers all as of the date first above written.

GENUITY INC.
GENUITY SOLUTIONS INC.
GENUITY TELECOM INC.
BBN ADVANCED COMPUTERS INC.
BBN CERTIFICATE SERVICES INC.
BBN INSTRUMENTS CORPORATION
BBN TELECOM INC.
BOLT BERANEK AND NEWMAN
CORPORATION
GENUITY BUSINESS TRUST
GENUITY EMPLOYEE HOLDINGS LLC
GENUITY INTERNATIONAL, INC.
GENUITY INTERNATIONAL
NETWORKS LLC
GENUITY INTERNATIONAL
NETWORKS INC.
LIGHTSTREAM CORPORATION
Debtors and Debtors-in-Possession


By: _____
Name:      Ira H. Parker
Title:      President


NAP.NET, L.L.C.
Debtor and Debtor-in-Possession


_____
Name:      Ira H. Parker
Title:      Authorized Officer


LIQUIDATING TRUSTEE:


_____
Meade Monger

-31-

**EXHIBIT B**

<u>Exhibit B</u>

*In re Genuity Inc. et al., Bankr. S.D.N.Y. 02-43558 (PCB)*
Senior Creditor Claimants

| Senior Creditor Claimant | Agreement | Amount |
|---|---|---|
| JPMorgan Chase Bank, as Agent | Amended and Restated Credit Agreement dated September 21, 2001, as amended and in effect | $1,761,908,381.67 |
| 1300 Federal L.L.C. c/o Belvedere Capital 1775 Broadway, Suite 523 New York, New York 10019 | Real Estate Lease | $4,898,000.00 |
| InterXion Netherlands, B.V. Cessnalaan 1033, 1110 NJ Schiphol-Rijk The Netherlands | Real Estate Lease | $4,145,000.00 |
| Silicon Graphics, Inc. 1600 Amphitheatre Parkway Mountainview, CA 94043 | Equipment Lease 69-1 | $82,019.32 |
| Silicon Graphics, Inc. 1600 Amphitheatre Parkway Mountainview, CA 94043 | Equipment Lease 85-1 | $438,780.13 |
| Silicon Graphics, Inc. 1600 Amphitheatre Parkway Mountainview, CA 94043 | Equipment Lease 85-2 | $1,000,153.09 |
| Comdisco, Inc. 6111 North River Road Rosemount, IL 60018 | Equipment Lease Schedules | $296,571.92 |
| Fleet Business Credit One South Wacker Drive 38th Floor Chicago, IL 60606 | Equipment Lease Schedules | $2,224,222.12 |
| Wells Fargo 299 South Main Street Salt Lake City, UT 84111 | Equipment Lease Schedules | $2,231,236.06 |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| GENUITY INC., | ) | Nos.  02-43558 (PCB) |
| GENUITY SOLUTIONS INC., | ) | 02-43550 (PCB) |
| BBN ADVANCED COMPUTERS INC., | ) | 02-43551 (PCB) |
| BBN CERTIFICATE SERVICES INC., | ) | 02-43552 (PCB) |
| BBN INSTRUMENTS CORPORATION, | ) | 02-43553 (PCB) |
| BBN TELECOM INC., | ) | 02-43554 (PCB) |
| BOLT BERANEK AND NEWMAN CORPORATION, | ) | 02-43555 (PCB) |
| GENUITY BUSINESS TRUST, | ) | 02-43556 (PCB) |
| GENUITY EMPLOYEE HOLDINGS LLC, | ) | 02-43557 (PCB) |
| GENUITY INTERNATIONAL INC., | ) | 02-43559 (PCB) |
| GENUITY INTERNATIONAL NETWORKS LLC, | ) | 02-43560 (PCB) |
| GENUITY INTERNATIONAL NETWORKS INC., | ) | 02-43561 (PCB) |
| GENUITY TELECOM INC., | ) | 02-43562 (PCB) |
| LIGHTSTREAM CORPORATION, | ) | 02-43563 (PCB) |
| NAP.NET, L.L.C., | ) | 02-43564 (PCB) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER CONFIRMING**
**DEBTORS' JOINT CONSOLIDATED PLAN OF LIQUIDATION, AS MODIFIED**

Genuity Inc., together with certain of its subsidiaries who are debtors and debtors in

possession (collectively the "Debtors"), filed their Joint Consolidated Plan of Liquidation

(Docket No. 1563, the "Original Plan") and their Disclosure Statement with respect to the

Original Plan (Docket No. 1562, the "Original Disclosure Statement") pursuant to Section 1125

of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "Bankruptcy

Code") on August 26, 2003.  On September 29, 2003 the Debtors filed their Joint Consolidated

Plan of Liquidation, as Modified (Docket No. 1662) and an amended disclosure statement with

respect to that modified plan (Docket No. 1663).  The Court held a hearing on September 30,

2003 to consider the adequacy of this amended disclosure statement.  On or about October 1,

2003 the Debtors filed a further modified plan (Docket No. 1673, the "Solicitation Plan") and a

Second Amended Disclosure Statement with respect to the Solicitation Plan (Docket No. 1674,

the "Disclosure Statement").  By an order entered October 6, 2003 (Docket No. 1679, the

"Voting Procedures Order"), this Court approved the Disclosure Statement and approved the

form of notice and ballots, established the confirmation hearing date, voting procedures, and

notice procedures relating thereto, and established the deadline for filing objections to

confirmation of the Solicitation Plan.  The Solicitation Plan, the Disclosure Statement, the

Voting Procedures Order, the Ballots to vote on the Solicitation Plan and related materials (the

"Solicitation Package") were transmitted to all known holders of Claims entitled to vote on the

Solicitation Plan; Notice of Non-Voting Status was transmitted to holders of Claims or Interests

in the Debtors not entitled to vote on the Solicitation Plan; and the solicitation of acceptances

from holders of Claims was made within the time and manner required by the Voting Procedures

Order; and those certain affidavits of service (Docket Nos. 1796,1797,1798) were filed with

respect to the mailing of the Solicitation Package and related notices.  The Court set November

4, 2003 as the deadline for submitting ballots relating to the Solicitation Plan, and November 7,

2003 as the deadline for filing objections to confirmation of the Solicitation Plan, as set forth in

the Voting Procedures Order.  The Debtors filed a Plan Supplement on October 28, 2003.

Objections to the Solicitation Plan (collectively, the "Confirmation Objections") were filed by (i)

the United States Trustee, (ii) Qwest Corporation, Qwest Communications Corporation, and

Qwest !nterprise America, Inc. (collectively, "Qwest"), (iii) Level 3 Communications Inc., Level

3 Communications, LLC and Genuity Managed Services, LLC (collectively, "Level 3"), (iv)

Gamco Investors, Inc., Gabelli & Co. and Gabelli Funds, LLC (collectively, the "BBN

Bondholders"), (v) Communications Supply Corporation, (vi) Southwestern Bell Telephone,

L.P., Ameritech, Nevada Bell Telephone Company, Pacific Bell Telephone, The Southern New England Telephone Company, Ameritech Business Communications Services, Ameritech Advanced Data Services, SBC Advanced Solutions, Inc. and SBC Global Services (collectively, the "SBC Affiliates"), (vii) Deutsche Bank AG New York Branch ("Deutsche Bank"), (viii) the United States affiliates of Verizon Communications, Inc., (ix) Bellsouth Telecommunications, Inc., (x) Travis County, (xi) Palm Beach County, Florida, and (xii) various counties and cities in Texas.  On November 14, 2003 the Debtors filed a further modified plan (Docket No. 1807, such plan as may have been further modified or amended at or in connection with the hearing on confirmation thereof or by this Confirmation Order, the "Plan").  The Court has reviewed, among other things, the Plan, the Disclosure Statement, the Memorandum of Law in Support of Confirmation of the Plan which responds to the Confirmation Objections, the Declaration of Carole G. Donlin Certifying the Ballots Accepting and Rejecting the Debtors' Joint Consolidated Plan of Liquidation, as Modified (Docket No. 1788) (the "Voting Affidavit"), offers of proof of counsel and the evidence adduced at the Confirmation Hearing conducted on November 17, 2003.  All impaired classes of voting creditors accepted the Plan.  All terms not otherwise defined herein shall have the meanings set forth in the Plan.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Debtors and the subject matter of the Confirmation Hearing pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (L) and (O) and 1334(a).  The Confirmation Hearing is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (L) and (O).  Venue of the Chapter 11 Cases in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.       <u>Adequacy of Notice and Solicitation</u>.  In accordance with the Voting Procedures Order and the Debtors' voting and notice procedures, there has been sufficient and adequate notice of the Plan, the Confirmation Hearing and the deadlines for submitting votes on, and filing objections to the confirmation of, the Plan.

C.       <u>Judicial Notice</u>.  This Court takes judicial notice of the docket of the Chapter 11 Cases maintained by the Clerk of the Court or its duly appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and all evidence and arguments made, proffered or adduced at, the hearings held before this Court during the pendency of the Chapter 11 Cases, including, without limitation, (i) the hearing to consider approval of a settlement with Deutsche Bank, a settlement with Verizon Communications Inc., and a sale of substantially all of the Debtors' assets to Level 3, and (ii) the hearing to consider the adequacy of the Original Disclosure Statement.

D.       <u>Procedures for Voting</u>.  As evidenced by the Voting Affidavit, the procedures by which ballots for voting on the Solicitation Plan were received and tabulated were fair, properly conducted and in accordance with the Bankruptcy Code, the Bankruptcy Rules, the local rules of this Court and the Voting Procedures Order.

E.       <u>Satisfaction of Sections 1122 and 1123</u>.  Sections 1122 and 1123 of the Bankruptcy Code are satisfied under the Plan, as more specifically described below:

(1)      <u>Proper Classification of Claims and Interests</u>.  Sections 1122(a) and 1123(a)(1) of the Bankruptcy Code are satisfied because the Plan properly designates separate Classes of Claims and Interests, each of which contains only Claims or Interests that are substantially similar to the other Claims or Interests within that Class.

(2)    <u>Specification of Unimpaired Classes</u>.  Section 1123(a)(2) of the Bankruptcy Code
is satisfied because the Plan properly designates Classes of Claims and Interests
as impaired (Classes 3-7) or unimpaired (Classes 1 and 2).

(3)    <u>Specification of Treatment of Impaired Classes</u>.  Section 1123(a)(3) of the
Bankruptcy Code is satisfied because the Plan specifies the treatment of each
Class of Claims and Interests that is impaired under the Plan, to the extent that the
Claims or Interests within such Class are Allowed Claims or Allowed Interests,
respectively.

(4)    <u>Equal Treatment Within Classes</u>.  Section 1123(a)(4) of the Bankruptcy Code is
satisfied because the Plan provides the same treatment for each Allowed Claim or
Allowed Interest within a particular Class or the holder of a particular Allowed
Claim or Allowed Interest has agreed to a less favorable treatment of such Claim
or Interest.  Among other things, the Plan provides that distributions to all Holders
of Class 3 Claims shall be paid to the Bank Agent.  Deutsche Bank raised
objections (the "Deutsche Bank Objections") to its treatment in Class 3 in its
Initial Objection to Confirmation of the Plan (Docket No. 1744) and its
Memorandum in Support of that Objection (Docket No. 1803).  These objections
are overruled by and as set forth in this Court's Order on the Limited Response of
JPMorgan Chase Bank, as Administrative Agent, to Initial Objection of Deutsche
Bank AG to Confirmation of Debtors' Joint Consolidated Plan of Liquidation and
Motion of JPMorgan Chase Bank under 11 U.S.C. § 510 to Subordinate Certain
Claims of Deutsche Bank AG and Deutsche Bank AG's Motion for Stay Pending
Appeal (the "Deutsche Bank Objection Order"), entered this same date.

(5)    <u>Implementation of Plan</u>. Section 1123(a)(5) of the Bankruptcy Code is satisfied

because the Plan provides adequate means for its implementation. These means

include, <u>inter alia</u>, the creation of the Liquidating Trust, the vesting of property of

the Estates in the Liquidating Trust, the designation of the Liquidating Trustee

and the members of the Liquidating Trust Oversight Committee, procedures for

filling vacancies in the Liquidating Trust Oversight Committee and in the position

of the Liquidating Trustee, and the rejection of prepetition executory contracts

and unexpired leases. These means for the implementation of the Plan are

"adequate" within the meaning of Section 1123(a)(5) of the Bankruptcy Code.

(6)    <u>Charter Provisions</u>. Section 1123(a)(6) of the Bankruptcy Code is satisfied,

because the Debtors have agreed to take such actions as to comply in all respects

with Section 1123(a)(6) of the Bankruptcy Code.

(7)    <u>Selection of Liquidating Trustee and Members of the Liquidating Trust Oversight</u>

<u>Committee</u>. Section 1123(a)(7) of the Bankruptcy Code is satisfied, because the

Plan contains only provisions that are consistent with the interests of holders of

Claims and Interests in the Debtors and with public policy with respect to the

manner of selection of the Liquidating Trustee and the Liquidating Trust

Oversight Committee members, and any successors to such Persons.

(8)    <u>Rejection of Executory Contracts</u>. Section 1123(b)(2) of the Bankruptcy Code is

applicable and has been satisfied. The Plan provides for the rejection, as of the

Effective Date, of all executory contracts and unexpired leases, to which the

Debtors are party, that have not previously been assumed or rejected or deemed

rejected. Any contracts, service orders or service requests for telecommunications

circuits that have not been specifically identified by the Debtors prior to the Effective Date for assumption and assignment to Level 3 are deemed rejected as of the Effective Date.

(9)    <u>Settlement of Claims</u>.  Section 1123(b)(3) of the Bankruptcy Code states that a plan may provide for the settlement or adjustment of any claim or interest belonging to a debtor or to its estate.  Pursuant to Bankruptcy Rule 9019, and in consideration of the classification, distribution and other benefits provided under the Plan, the provisions of the Plan constitute a good faith compromise and settlement of all Claims and controversies resolved pursuant to the Plan.  This Confirmation Order constitutes the Court's approval of all such compromises and settlements, including the compromises and settlements relating to numerous complex intercreditor, debtor-creditor and inter-Debtor disputes as set forth in the Disclosure Statement, the releases contained in the Plan, and all other compromises and settlements proposed in the Plan (collectively, the "Plan Compromise").  The Plan Compromise is in its entirety fair and equitable, is in the best interest of the Debtors, the Estates, and their creditors, and represents a settlement and compromise within the range of reasonable negotiated outcomes of all such disputes.

(10)    <u>Bankruptcy Rule 3016(a)</u>.  Bankruptcy Rule 3016(a) is satisfied because the Plan is dated and identifies the entities submitting it.

F.    <u>Debtors' Compliance with the Applicable Provisions of the Bankruptcy Code</u>.

(1)    <u>Plan Complies with Title 11.</u>  Section 1129(a)(1) of the Bankruptcy Code is satisfied because the Plan complies with all applicable provisions of title 11.  The

Deutsche Bank Objections made certain objections with respect to Section

1129(a)(1) and distributions to Class 3 under the Plan. These objections are

overruled by and as set forth in the Deutsche Bank Objection Order.

Section 1129(a)(2) of the Bankruptcy Code is satisfied because the Debtors, as

debtors in possession, have complied with all applicable provisions of the

Bankruptcy Code, including Sections 1125 and 1126, and Bankruptcy Rules 3017

and 3018.

(2)     <u>Plan Proposed in Good Faith</u>.  Section 1129(a)(3) of the Bankruptcy Code is

satisfied because the Plan was proposed in good faith and not by any means

forbidden by law.  In determining that the Plan has been proposed in good faith,

the Court has examined the totality of the circumstances surrounding the filing of

the Chapter 11 Cases and the formulation of the Plan.  The Plan was proposed

with the legitimate purposes of liquidating the Debtors' assets and distributing

cash to the Debtors' creditors.  Further, the Plan Compromise and the provisions

of the Liquidating Trust Agreement are the product of extensive, arms' length

negotiations among the members of the Creditors' Committee, and the Plan is

otherwise the product of arms' length negotiations between the Debtors, the

Creditors' Committee and other interested parties.  All parties to such negotiations

have been advised by counsel.

(3)     <u>Payment for Services or Costs and Expenses</u>.  Section 1129(a)(4) of the

Bankruptcy Code is satisfied because, to the extent required by that section, any

payment made or to be made by the Debtors for services or for costs and expenses

in, or in connection with (including Substantial Contribution Claims), the Chapter

11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has

been approved by, or is subject to the approval of, the Bankruptcy Court as

reasonable.

(4)     Liquidating Trustee, Liquidating Trust Oversight Committee Members and

Insiders.  Section 1129(a)(5) of the Bankruptcy Code is satisfied because the

Debtors have disclosed the identities and affiliations of all Persons proposed to

serve as the Liquidating Trustee and the members of the Liquidating Trust

Oversight Committee; and the appointment of such Persons to, or the continuance

of such Persons in, such offices is consistent with the interests of the holders of

Claims and Interests in the Debtors and with public policy; and the Debtors have

disclosed the identity of any insider who will be employed or retained by the

Liquidating Trust and the nature of any compensation for such insider.

(5)     No Rate Changes.  The Debtors have not proposed any rate change under the

Plan.  Thus, the Debtors need not obtain the approval of any governmental

regulatory commission and the Plan complies with Section 1129(a)(6) of the

Bankruptcy Code.

(6)     Best Interests of Creditors Test.  Section 1129(a)(7) of the Bankruptcy Code is

satisfied.  The information contained in the Disclosure Statement, and the

evidence adduced at the Confirmation Hearing (i) was persuasive and credible,

(ii) was not controverted by other evidence, and (iii) established that each holder

of an impaired Claim or Interest in the Debtors either (a) accepted the Plan or

(b) will receive or retain under the Plan, on account of such Claim or Interest,

property of a value, as of the Effective Date, that is not less than the amount that

such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Specifically, the Plan Compromise has been approved, see supra, ¶ E(9),and therefore the value of any Estate litigation and Claims being compromised are within the range of reasonableness and are the appropriate values to use in the best-interests analysis of the Plan. Furthermore, the Plan, including the Plan Compromise, provides all Holders of Class 3 and Class 4 Claims with greater value than they would receive in a chapter 7 case were litigation to be decided against a chapter 7 trustee. The Plan Compromise is a resolution that could be agreed to by reasonable chapter 7 trustees of the Debtors' Estates.

(7) <u>Acceptance by Classes 1, 2 and 3</u>. Section 1129(a)(8)(A) of the Bankruptcy Code is satisfied with respect to Class 3, because that impaired Class is entitled to vote on the Plan and has accepted the Plan pursuant to Section 1126(c) of the Bankruptcy Code. Section 1129(a)(8)(B) of the Bankruptcy Code is satisfied with respect to Classes 1 and 2 because such Classes are not impaired by the Plan and are therefore conclusively deemed to have accepted the Plan under Section 1126(f) of the Bankruptcy Code.

(8) <u>Acceptance by Class 4</u>. Verizon originally voted to reject the Plan. On November 5, 2003, Verizon Filed a motion pursuant to Bankruptcy Rule 3018, seeking temporary allowance of certain claims for voting purposes. The Debtors have conceded that for purposes of calculating the vote of holders of claims in Class 4 only, Verizon has Claims in Class 4 in an amount equal to the sum of (a) one-third the aggregate amount of Claims voting in Class 4, including all Claims

hereby or subsequently allowed temporarily for voting purposes, plus (b) one dollar.   At the Confirmation Hearing, Verizon made an oral motion to change its vote to accept the Plan.  This Court deemed notice of the motion, with interested parties in the courtroom, good and sufficient notice and such motion was granted.  Section 1129(a)(8)(A) of the Bankruptcy Code is satisfied with respect to Class 4, because that impaired Class is entitled to vote on the Plan and has accepted the Plan pursuant to Section 1126(c) of the Bankruptcy Code.  Specifically, at least 93.5% in number, and 94.8% in amount, of Claims voted in Class 4 voted to accept the Plan.

(9)     Cramdown of Non-Accepting Classes.  Section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to Classes 5, 6 and 7 because these Classes are deemed not to have accepted the Plan pursuant to Section 1126(g) of the Bankruptcy Code.  In addition, no holder of an equity interest in, or Claim subject to Bankruptcy Code Section 510(b) against, the Debtors will receive or retain any property under the Plan on account of such Interest or Claim.  Nonetheless, the Plan satisfies the requirements of Section 1129(b) of the Bankruptcy Code and thus may be confirmed without compliance with Section 1129(a)(8) of the Bankruptcy Code with respect to Classes 5, 6 and 7.  That is, the Plan (i) does not discriminate unfairly against these Classes and (ii) is fair and equitable with respect to these Classes.  Specifically, with respect to Class 5, no junior class of Claims or Interests in the Debtors is receiving any distribution under the Plan, and the contractual and potential equitable subordination of Class 5 Claims provides a legitimate basis for the disparate

treatment of Class 5, as compared to Classes 3 and 4.  With respect to Class 6, no

junior class of Claims or Interests in the Debtors is receiving any distribution

under the Plan, and the subordination imposed by Bankruptcy Code Section

510(b) provides a legitimate basis for any disparate treatment.  With respect to

Class 7, no junior class of Interests is receiving any distribution under the Plan.

(10)    <u>Treatment of Administrative Expense Claims</u>.  Section 1129(a)(9)(A) of the

Bankruptcy Code is satisfied because the Plan provides that each Allowed

Administrative Claim shall either (i) be paid the full amount of such Allowed

Administrative Claim in Cash on or as soon as reasonably practicable after the

latest of (i) Effective Date, (ii) the date on which such Administrative Claim

becomes Allowed, and (iii) the dated fixed by the Bankruptcy Court, unless the

Holder of such Administrative Claim shall agree to a different treatment of such

Claim (including, without limitation, any different treatment that may be provided

in the documentation governing such Claim).

(11)    <u>Treatment of Other Priority Claims</u>.  Section 1129(a)(9)(B) of the Bankruptcy

Code is satisfied because the Plan provides that each Holder of an Allowed

Priority Claim will be paid in full in Cash the amount of such Allowed Priority

Claim on or as soon as reasonably practicable after the later of (i) the Effective

Date and (ii) the date such Priority Claim becomes Allowed, unless the Holder of

such Claim shall agree to a different treatment of such Claim.

(12)    <u>Treatment of Pre-Petition Priority Tax Claims</u>.  Section 1129(a)(9)(C) of the

Bankruptcy Code is satisfied because the Plan provides that the Holder of an

Allowed Priority Tax Claim will be paid in full in Cash the amount of such

Allowed Priority Tax Claim on or as soon as reasonably practicable after the later

of (i) the Effective Date and (ii) the date on which such Priority Tax Claim

becomes Allowed.

(13)    Acceptance of at Least One Impaired Class.  Section 1129(a)(10) of the

Bankruptcy Code is satisfied because at least one Class of Claims that is impaired

under the Plan has accepted the Plan, determined without including any

acceptance by an insider.  Specifically, Classes 3 and 4 have accepted the Plan.

(14)    Feasibility.  Section 1129(a)(11) of the Bankruptcy Code is satisfied because

liquidation of the Debtors, via the Liquidating Trust, is specifically contemplated

by the Plan.

(15)    Payment of Certain Fees.  Section 1129(a)(12) of the Bankruptcy Code is satisfied

because all fees payable under 28 U.S.C. § 1930 on or prior to the Effective Date

shall be paid by the Debtors on or before the Effective Date, and such fees

payable after the Effective Date shall be paid when due by the Liquidating Trust.

(16)    Continuation of Retirement Benefits.   The Debtors do not have any obligations

with respect to retiree benefits (as defined in the Bankruptcy Code).  Thus,

Section 1129(a)(13) of the Bankruptcy Code is deemed satisfied.

(17)    Only One Plan.  The Plan is the only plan of liquidation of the Debtors pending

before this Court or any other court, and no other party in interest has filed a

competing plan.

(18)    No Tax Avoidance.  The primary purpose of the Plan is neither the avoidance of

taxes nor the avoidance of Section 5 of the Securities Act of 1933, as amended,

and no governmental unit has objected to confirmation of the Plan on any such

grounds.  The Plan therefore satisfies the requirements of Bankruptcy Code

Section 1129(d).

G.      Releases and Injunctions.  The provisions of the Plan and the provisions in this

Confirmation Order dealing with waivers, releases, exculpation and injunctions, including

Sections 10.1, 10.2 (as modified below) and 10.3 of the Plan, are in the best interest of the

Debtors, and all their creditors, and the record of the Confirmation Hearing and the Chapter 11

Cases is sufficient to support the waivers, releases, exculpations and injunctions provided for in

Article 10 of the Plan.

H.      Good Faith Solicitation. Based upon the record before the Court, the Debtors, the

Creditors' Committee, and all of their respective officers, directors, employees, members, agents,

advisors, and all other professional persons employed by any of them have acted in good faith in

connection with and relating to the formulation, negotiation, solicitation, implementation,

confirmation and consummation of the Plan, the Disclosure Statement and the Liquidating Trust

and have acted in compliance with the applicable provisions of the Bankruptcy Code and are

entitled to the protections afforded by Section 1125(e) of the Bankruptcy Code.

I.       Substantive Consolidation.  Substantive consolidation of the Debtors' Estates,

solely for purposes of voting on, making distributions under and administering the Plan, is

appropriate under the circumstances.  Such limited substantive consolidation facilitates the Plan

and the Plan Compromise, thereby avoiding significant litigation costs that would reduce creditor

recoveries and significant delay in distributions to creditors.

J.       Retention of Jurisdiction.  The Court retains jurisdiction over the matters set forth

in Article XIII of the Plan.

K.      Modifications.  There has been adequate notice of and hearing on the

modifications to the Solicitation Plan accomplished by the Plan and this Confirmation Order.

Such modifications are not adverse to any creditor that voted in favor of the Solicitation Plan.

All such modifications comply with Bankruptcy Code Sections 1122 and 1123.

L.      Deutsche Bank Objection.  At the Confirmation Hearing, Deutsche Bank

withdrew with prejudice its objections to the Plan regarding treatment of Verizon and proposed

releases for the directors and officers of the Debtors.  Deutsche Bank pressed its other objections

(the "Remaining Deutsche Bank Objection") regarding the distribution to members of Class 3

under the Plan.  The Remaining Deutsche Bank Objection is overruled by and as set forth in the

Deutsche Bank Objection Order.

**FINDING THAT THE PLAN IS CONFIRMABLE BASED UPON, AMONG OTHER THINGS, ALL OF THE ABOVE-STATED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND FINDINGS AND CONCLUSIONS STATED ON THE RECORD AT THE CONFIRMATION HEARING, AND GOOD CAUSE APPEARING THEREFOR, THE COURT HEREBY ORDERS THAT:**

1.      Confirmation.  The Plan, a copy of which is attached hereto as Exhibit A and is

incorporated herein by reference, and each of its provisions are hereby confirmed pursuant to

Bankruptcy Code Section 1129.  To the extent that the provisions of this Confirmation Order

conflict with any provisions of the Plan, the provisions of this Confirmation Order shall control.

2.      Objections Overruled.  Except as to the Response of the Bank Agent, the

Response of the Creditors' Committee and as otherwise noted herein, each of the Confirmation

Objections and any other responses, statements and comments that contain objections, or purport

to object, to the Plan, other than those withdrawn with prejudice prior to, or on the record at, the

Confirmation Hearing, or resolved pursuant to this Confirmation Order, are hereby expressly

overruled.  After hearing, the Court overruled the Remaining Deutsche Bank Objection, ruling

that all Class 3 distributions should be paid to the Bank Agent, but the Court did not address whether and to what extent the Bank Agent is required to pay any initial or subsequent Class 3 distributions to Deutsche Bank or any other Bank Lender.  To the extent that there is any conflict between this Confirmation Order and the Deutsche Bank Objection Order, the terms of the Deutsche Bank Objection Order shall control.

       3.      <u>General Authorizations; Plan Modifications</u>.  Without need for further authorization or order of this Court, the Debtors and their respective directors, officers, agents and attorneys are hereby authorized, and empowered, (i) to make any and all modifications to any or all of the Plan Documents (as defined herein), provided that such modifications do not materially modify the terms of such documents subject to Section 14.3 of the Plan, and (ii) subject to the conditions set forth in the Plan, to carry out the provisions of the Plan, and to enter into, execute, deliver, file and/or perform the terms of the Plan, any technical modifications to the Plan stated on the record at the Confirmation Hearing and made part of the Plan, and (subject to Section 14.3 of the Plan) any other agreements, instruments and documents related thereto or contemplated therein (collectively, the "Plan Documents"), including, <u>inter</u> <u>alia</u>, the Liquidating Trust Agreement, and (subject to Section 14.3 of the Plan) any amendments, supplements or modifications to such Plan Documents as may be necessary or appropriate, and (subject to Section 14.3 of the Plan) to take such other steps and perform such other acts as may be necessary or appropriate to implement and effectuate the Plan, the Plan Documents or this Confirmation Order, and to satisfy all other conditions precedent to the implementation and effectiveness of the Plan and to consummate the Plan.

       4.      <u>Plan Documents Approved</u>.  The form, terms and provisions of the Plan Documents are hereby approved with such modifications made prior to the Effective Date as

contemplated by the Plan or this Confirmation Order. Each of the Plan Documents shall

constitute a legal, valid, binding and authorized obligation of the respective parties thereto,

enforceable in accordance with its terms (except as enforceability may be limited by any

bankruptcy or insolvency proceeding filed by any party thereto subsequent to the date of the

execution of such document).

5.      Binding Effect. The provisions of this Confirmation Order and, upon the

occurrence of the Effective Date, the Plan and the other Plan Documents shall be and hereby are

binding on, and enforceable by and against, the Debtors, the holders of BBN Bonds (including

beneficial holders), the BBN Bonds Trustee, the Creditors' Committee, the Liquidating Trust, the

Liquidating Trustee, the Liquidating Trust Oversight Committee, each holder of a Claim in the

Debtors, each holder of an Interest in the Debtors, and each other party in interest in the

Chapter 11 Cases, including their respective successors and assigns, whether or not they voted to

accept the Plan.

6.      Implementation of Plan. Pursuant to Section 1142(b) of the Bankruptcy Code, the

intended parties to the Plan Documents contemplated thereby or to be executed pursuant to the

Plan, subject to the satisfaction or due waiver of each of the conditions precedent to each of such

Plan Documents, are hereby directed to execute and deliver the Plan Documents on the Effective

Date and to take such other actions as shall be necessary to permit the Plan to take effect and be

consummated. The Debtors shall have the right, to the fullest extent permitted under Section 14.3

of the Plan and Bankruptcy Code Section 1142, to apply to this Court for an order (a) modifying

the effect of any otherwise applicable non-bankruptcy law or (b) directing any entity to execute

and deliver any instrument or to perform any other act necessary to effectuate the Plan; provided,

however, that (without the consent of the affected party or parties) no such order shall modify or

impair any right, title, interest, privilege or remedy expressly provided or reserved for under the Plan or this Confirmation Order.

7.    <u>Disbursing Agents</u>.  All distributions under the Plan shall be made by the Debtors and the Liquidating Trustee, as Disbursing Agents.  On the Effective Date, the Disbursing Agent shall make all distributions on account of the Bank Group Claims to the Bank Agent, as provided in Section 7.3 of the Plan, and the Disbursing Agent shall have no liability to any holder of a Class 3 Claim on account of any failure of the Bank Agent to make appropriate distributions to such holder.

8.    <u>Substantive Consolidation</u>.  As provided in Section 8.1.2 of the Plan, the Plan serves as a motion seeking the substantive consolidation of the Debtors, the Chapter 11 Cases and the Estates for purposes of voting on, making distributions under, and administering the Plan only.  No timely objections to such requested relief have been filed with the Court, and the applicable standards for the granting of such relief have been satisfied.  The Court finds that (a) limited substantive consolidation of the Debtors and the Estates in the Chapter 11 Cases as set forth in the Plan will facilitate prompt distributions to the Debtors' creditors and is consistent with the terms of the Plan Compromise, and (b) no creditor or other party-in-interest has objected to substantive consolidation, alleged that it would be prejudiced thereby, or asserted that it has relied on the separate credit of any of the Debtors.  Accordingly, the Court finds that limited substantive consolidation of the Debtors and the Estates as set forth in the Plan will benefit, and is in the best interests of, the Debtors' creditors.  As of the Effective Date:

(i)    all Intercompany Claims of each of the Debtors against any other Debtor shall be eliminated;

(ii)    all assets (including Causes of Action) and liabilities of the Subsidiary Debtors and their Estates shall be merged and treated as if they were merged with the assets and liabilities of Genuity Inc. and its Estate;

(iii)     any obligation of any of the Debtors and all (i) guarantees thereof by, and (ii) co-liability, joint liability or vicarious liability for such obligation of, any other Debtor shall be deemed to be one (1) obligation of Genuity Inc.;

(iv)     Interests in all of the Subsidiary Debtors shall be deemed cancelled for all purposes;

(v)     each Claim Filed or to be Filed against any Debtor shall be deemed Filed only against Genuity Inc. and shall be deemed a single claim against and a single obligation of Genuity Inc., and all duplicate proofs of claim for the same Claim Filed against more than one Debtor will be deemed to be expunged and the Claims asserted thereunder Disallowed;

(vi)     each of the officers and directors of each of the Debtors shall be deemed to have resigned;

(vii)     each of the Chapter 11 Cases of the Subsidiary Debtors shall be closed (*In re Genuity Solutions Inc.*, Case No. 02-43550 (PCB), *In re BBN Advanced Computers Inc.*, Case No. 02-43551 (PCB), *In re BBN Certificate Services  Inc.*, Case No. 02-43552 (PCB), *In re BBN Instruments Corporation*, Case No. 02-43553 (PCB), *In re BBN Telecom Inc.*, Case No. 02-43554 (PCB), *In re Bolt Baranek and Newman Corporation*, Case No. 02-43555 (PCB), *In re Genuity Business Trust*, Case No. 02-43556 (PCB), *In re Genuity Employee Holdings LLC*, Case No. 02-43557 (PCB), *In re Genuity International Inc.*, Case No. 02-43559 (PCB), *In re Genuity International Networks LLC*, Case No. 02-43560 (PCB), *In re Genuity International Networks Inc.*, Case No. 02-43561 (PCB), *In re Genuity Telecom Inc.*, Case No. 02-43562 (PCB), *In re Lightstream Corporation*, Case No. 02-43563 (PCB), *In re Nap.Net LLC*, Case No. 02-43564 (PCB)), following which any and all contested matters, proceedings, and other matters that could have been brought or otherwise commenced in any of such Chapter 11 Cases shall be brought or commenced in the Chapter 11 Case of Genuity Inc.; and

(viii)     all Claims based upon guarantees of collection, payment or performance made by any of the Debtors as to the obligations of another Debtor shall be released and of no further force or effect;

provided, however, that the substantive consolidation of assets and liabilities of the Debtors

effected by this Confirmation Order shall not otherwise affect the separate legal existence of

each Debtor for licensing, regulatory, tax or other purposes or result in any actual transfer or

merger of assets and liabilities for any purpose (including for tax purposes and state-law

purposes) other than the administration of the Chapter 11 Cases and the determination of the

rights of Holders of Claims and Interests under the Plan and the making of Plan distributions.

9.    <u>Disbursements</u>. Unless otherwise provided herein, and subject to the provisions of the Deutsche Bank Objection Order, any distributions and deliveries to be made hereunder shall be made as provided in the Plan.

10.    <u>Bar Date for Administrative Claims</u>.  Unless otherwise ordered by the Bankruptcy Court, requests for payment of Administrative Claims accruing on or after July 31, 2003, and all applications for final allowance of compensation and reimbursement of expenses of Professionals, and Substantial Contribution Claims, incurred through the Effective Date, must be Filed in accordance with Section 8.2.3 of the Plan.  Any Person that is required to File a request for payment of an Administrative Claim and fails to timely File such request, shall be forever barred, estopped and enjoined from asserting such Claim or participating in distributions under the Plan on account thereof.

11.    <u>Rejection of Executory Contracts and Unexpired Leases</u>.  All executory contracts and unexpired leases to which the Debtors are party that have not been specifically identified previously as being assumed and assigned, or rejected, shall be deemed rejected on the Effective Date.  Any contracts, service orders or service requests for telecommunications circuits that have not been specifically identified by the Debtors prior to the Effective Date for assumption and assignment to Level 3 are deemed rejected as of the Effective Date.

12.    <u>Bar Date for Filing of Rejection Claims</u>.  Unless otherwise ordered by the Bankruptcy Court, all proofs of claim with respect to Claims arising from the rejection of an executory contract or unexpired lease pursuant to the Plan must be Filed and served upon the Liquidating Trustee within thirty (30) days after the Effective Date.  Any Claim arising from the rejection of an executory contract or unexpired lease that is not Filed within such time frame shall be released, discharged and forever barred from assertion against the Debtors, their Estates

and the Liquidating Trust, and barred from receiving any distribution under the Plan in respect of such Claim.  Any Allowed Claim arising from the Debtors' rejection of an executory contract or unexpired lease shall be treated in the Plan as a General Unsecured Claim (Class 4).

13.    <u>Objections to Claims</u>.  Objections to Claims shall be Filed and served upon the Holders of such Claims no later than 120 days following the latest of the Effective Date, the date such Claims are Filed and such later date as may be established from time to time by the Bankruptcy Court as the last date for Filing objections to such Claims.  Nothing herein shall be construed to extend the Bar Date, deadlines for Filing of Cure Claims, the Interim Administrative Claims Bar Date, the Bar Date for Administrative Claims set forth in paragraph 10 hereof or the Bar Date for rejection damages set forth in paragraph 12 hereof.

14.    <u>Disputed Claims</u>.  Disputed Claims shall not be Allowed in excess of their Maximum Amount.

15.    <u>BBN Bonds</u>.  The BBN Bonds Trustee (on behalf of the Holders of BBN Bonds Claims) is hereby granted an Allowed Claim in Class 4 in the amount of $7,782,736.41.  Such claim shall be subject to the provisions of Section 8.8 of the Plan.  The BBN Bonds Trustee is hereby granted an Allowed Substantial Contribution Claim in the amount of $39,317.77.  The BBN Bonds Trustee may, on the Effective Date, deduct and retain such amount in full payment of its fees and expenses, from Cash held by it.  On the Effective Date, the BBN Bonds Trustee shall transfer, assign and deliver to the Liquidating Trust all other Cash held by the BBN Bonds Trustee, which shall be placed in the Senior Creditor Claims Reserve.  All other Claims of the BBN Bonds Trustee are hereby Disallowed.

16.    <u>Determination of Senior Creditor Claimants</u>.  A Person who is a Holder of a Claim under any agreement with Genuity Solutions not set forth in Exhibit B annexed to the Plan

or does not agree with the amount listed thereon may seek treatment as a Senior Creditor Claimant in respect of a Claim against Genuity Solutions by Filing a statement of such Claim, including the basis for qualification as a Senior Creditor Claimant, not later than the 30th day after the Effective Date.  The requirement to File such a Senior Creditor Claim shall not be construed as a new bar date for such Claims.  The Liquidating Trust, any Senior Creditor Claimant and any beneficial owner of BBN Bonds shall be the only Persons with standing to object to the Senior Creditor Claimant status of any Person Filing a Claim pursuant to Section 8.8.2 of the Plan or the Holder of an Allowed General Unsecured Claim under any agreement set forth on Exhibit B annexed to the Plan.  Such objections must be filed within 60 days after the Effective Date.

17.    No Waiver.  Neither the entry of this Confirmation Order, the execution of any of the documents required or contemplated hereunder or by the Plan, nor any other action or inaction by the Debtors, the Creditors' Committee, the Liquidating Trust or the Liquidating Trustee (including, without limitation, the failure of any such Person to object to any proof of claim) shall constitute a waiver, estoppel, res judicata, release, relinquishment, abandonment or any other abrogation of any objection, defense, offset or counterclaim by such Person.

18.    Causes of Action.  Pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code, but subject to Sections 8.3.4, 10.1 and 10.2 of the Plan, the Liquidating Trust shall retain all Causes of Action that the Debtors had or had power to assert immediately prior to the Effective Date, including Avoidance Actions.  The Liquidating Trust may commence or continue in any appropriate court or tribunal any suit or other proceeding for the enforcement of such retained Causes of Action.  Nothing contained in the Plan shall constitute a waiver of the rights, if any, of

the Liquidating Trust to a jury trial with respect to any Causes of Action or objection to any Claim or Interest.

19.    <u>Cancellation of Securities</u>.  Except as is necessary to allow any Disbursing Agent to fulfill its obligations under the Plan, on the Effective Date, the common stock of the Debtors, and any options, warrants, calls, subscriptions or other similar rights or other agreements or commitments, contractual or otherwise, entered into in connection with any of the foregoing, in each case, shall be cancelled and discharged.

20.    <u>Injunctions</u>.  All injunctions or stays provided for in the Chapter 11 Cases pursuant to Bankruptcy Code Section 105, 362 or otherwise and in effect on the Confirmation Date, shall remain in full force and effect until the closing of the Chapter 11 Cases pursuant to Bankruptcy Code Section 350(a).  Subject to the occurrence of the Effective Date, the entry of this Confirmation Order shall permanently enjoin all Persons that have held, currently hold or may hold a Claim or an Interest in the Debtors from taking any of the following actions in respect of such Claim or Interest: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind against any or all of the Debtors, the Liquidating Trust or their respective property or assets; (b) enforcing, levying, attaching, collecting or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree or order against any or all of the Debtors, the Liquidating Trust or their respective property or assets; (c) creating, perfecting or enforcing in any manner, directly or indirectly, any Lien against any or all of the Debtors, the Liquidating Trust or their respective property or assets; (d) asserting any setoff or right of subrogation of any kind, directly or indirectly, against any debt, liability or obligation due to the Debtors, the Liquidating Trust or their respective property; and (e) proceeding in any manner in any place

whatsoever that does not conform to or comply with or is inconsistent with the provisions of the

Plan.  Notwithstanding the foregoing, the Plan shall not enjoin a party from asserting rights of

setoff in connection with the resolution of claims to the extent such rights have been asserted or

preserved in a timely Filed proof of claim or other pleading Filed prior to the date hereof.  Upon

the occurrence of the Effective Date, the permanent injunctions set forth in the Plan and in this

Confirmation Order shall take effect.

       21.    <u>Exculpation</u>.  Section 10.2 of the Plan is hereby modified to read in its entirety as

follows:

> 10.2    <u>Exculpation</u>.  Subject to the occurrence of the Effective
> Date, the Debtors, the Creditors' Committee, each Person who
> served as a director or officer of the Debtors, or as a member of the
> Creditors' Committee, together with such Person's directors,
> officers, members, managers, partners, employees, attorneys,
> advisers, agents and representatives shall have no liability to any
> Person for any actions or omissions on or after the Petition Date
> that relate to the Debtors or their Estates, except in the case of
> gross negligence, willful misconduct, fraud, malpractice, misuse of
> confidential information that causes damages or *ultra vires* acts,
> <u>provided</u>, <u>however</u>, that this Section shall not release any Person
> from (i) any criminal liability or (ii) liability pursuant to ERISA §
> 502(a) with respect to any employee benefit plan sponsored by the
> Debtors; <u>and</u>, <u>provided</u>, <u>further</u>, that this Section shall not be
> deemed to release any attorney of liability to such attorney's client.

On the Effective Date, the exculpation provided by Section 10.2 (as modified hereby) shall have

full force and effect.

       22.    <u>Releases</u>.

       (a)    <u>Certain Directors and Officers</u>.  On the Effective Date, each of the Debtors

and their Estates, and any Person who, directly or indirectly, is receiving distributions under the

Plan, including Persons receiving a distribution via an attorney, agent, indenture trustee, or

securities intermediary, shall be deemed to have waived and released all claims and causes of

action, whether known or unknown, at law or in equity, against all Persons who served as

directors or officers of any of the Debtors and their Non-Debtor Subsidiaries, with respect to any

action or omission on or prior to the Effective Date that relates to the Debtors or their Estates,

provided, however, that this paragraph shall not release any Person from (i) any criminal

liability, (ii) liability to the United States federal government, (iii) liability pursuant to ERISA §

502(a) with respect to any employee benefit plan sponsored by the Debtors, or (iv) liability to

any beneficial holder of BBN Bonds that did not vote to accept the Plan.

(b)     Intercompany Matters.  On the Effective Date, each of the Debtors and

their Estates shall be deemed to have waived and released all claims and causes of action,

whether known or unknown, at law or in equity, against all other Debtors and their Estates.

(c)     Bank Lenders.  On the Effective Date, each of the Debtors and their

Estates, and any Person who, directly or indirectly, is receiving distributions under the Plan,

including Persons receiving a distribution via an attorney, agent, indenture trustee, or securities

intermediary, shall be deemed to have waived and released all claims, Causes of Action

(including, without limitation, Avoidance Actions and actions to subordinate claims) and other

causes of action, whether known or unknown, at law or in equity, against the Bank Agent and all

Bank Lenders, with respect to any action or omission on or prior to the Effective Date that relates

to the Debtors or their Estates, provided, however, that this paragraph shall not release any

Person from any criminal liability; and, provided, further, that neither this paragraph nor any

other provision of the Plan shall be deemed to constitute a waiver or release of any rights

(including Bank Agent fee and expense reimbursement and indemnification rights under the

Bank Credit Agreement), claims, or causes of action of the Bank Agent against the Bank Lenders

or of any Bank Lender against the Bank Agent or against any other Bank Lender or of Verizon pursuant to Verizon's participation in the Bank Credit Agreement.

23.    <u>Injunction of Claims Against Third Party Releases</u>.  Pursuant to Bankruptcy Code Section 105, as of the Effective Date this Confirmation Order shall act as a permanent injunction against the prosecution of any claim or cause of action released or exculpated by the Plan.

24.    <u>Revesting and Vesting</u>.  On and as of the Effective Date, pursuant to Sections 105, 363(b) and (f), 365, 1123(a)(5)(B) and (D) and (b)(4) and (6) and 1141 of the Bankruptcy Code, all of the Property of the Estates of the Debtors shall become vested in the Liquidating Trust, free and clear of all Claims, Interests, and Liens except as provided in the Plan.

25.    <u>Retention of Jurisdiction</u>.  Notwithstanding the entry of this Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases after the Effective Date to the extent that it is legally permissible, including, without limitation, for the following purposes:

(a)    <u>Claims and Interests</u>.    To determine the allowability, classification, or priority of Claims against and Interests in the Debtors, and to determine the rights of Senior Creditor Claimants to distributions in respect of the BBN Bonds;

(b)    <u>Injunction, etc.</u>  To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any Person, to construe and to take any other action to enforce and execute the Plan, including, but not limited to, the waiver, release, injunction and exculpation provisions thereof, this Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance and consummation of the Plan and all matters referred to therein, and to determine all matters

that may be pending before the Bankruptcy Court in each Chapter 11 Case with respect to any

Person;

    (c) <u>Fees.</u> To determine any and all applications for allowance of

compensation and expense reimbursement of Professionals for periods on or before the Effective

Date;

    (d) <u>Dispute Resolution</u>. To resolve any dispute arising under or related to the

implementation, execution, consummation or interpretation of the Plan and the Liquidating Trust

Agreement and the making of distributions thereunder;

    (e) <u>Leases and Executory Contracts</u>. To determine any and all motions for the

rejection, assumption, or assignment of executory contracts or unexpired leases and to determine

the allowance of any Claims resulting from the rejection of executory contracts and unexpired

leases;

    (f) <u>Actions</u>. To determine all applications, motions, adversary proceedings,

contested matters, actions, Causes of Action and any other litigated matters instituted in the

Chapter 11 Cases, including any remands;

    (g) <u>General Matters</u>. To determine such other matters, and for such other

purposes, as may be provided in this Confirmation Order or as may be authorized under

provisions of the Bankruptcy Code and the Bankruptcy Rules;

    (h) <u>Plan Modification</u>. To modify the Plan under Bankruptcy Code Section

1127, remedy any defect, cure any omission, or reconcile any inconsistency in the Plan or this

Confirmation Order so as to carry out the Plan's intent and purposes, in each case in accordance

with the Plan;

(i)     <u>Aid Consummation</u>.  To issue such orders in aid of consummation of the Plan and this Confirmation Order notwithstanding any otherwise applicable non-bankruptcy law, with respect to any Person, to the full extent authorized by the Bankruptcy Code;

(j)     <u>Avoidance Actions</u>.  To enable the prosecution of any and all proceedings that are not released pursuant to the Plan which have been or may be brought to set aside Liens and to recover any transfers, assets, properties or damages to which the Estates may be entitled under applicable provisions of the Bankruptcy Code or any other federal, state or local laws except as may be waived pursuant to the Plan;

(k)     <u>Implementation of Confirmation Order</u>.  To enter and implement such orders as may be appropriate in the event this Confirmation Order is for any reason stayed, revoked, modified or vacated;

(l)     <u>Resolve Disputes</u>.  To resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement hearing, or the Confirmation Hearing, for any purpose;

(m)     <u>Determine Tax Liability</u>.  To determine any tax liability pursuant to Bankruptcy Code Section 505;

(n)     <u>Orders</u>.  To resolve any dispute or matter arising under or in connection with any order of the Bankruptcy Court entered in the Chapter 11 Cases;

(o)     <u>Final Order</u>.  To enter a Final Order closing the Chapter 11 Cases; and

(p)     <u>Other</u>.  To determine such other matters as may be set forth in this Confirmation Order or as may arise in connection with the Plan, this Confirmation Order, the Liquidating Trust Agreement and/or any other agreement or transaction entered into pursuant to or in connection with the Plan.

26.    <u>New Securities</u>.  Pursuant to Bankruptcy Code Section 1145, the issuance of the Beneficial Interests (to the extent they are "securities") shall be exempt from the registration requirements of Section 5 of the Securities Act of 1933, as amended, and any state or local laws requiring registration of the offer or sale of a security, or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security.  Such securities, when issued or sold, shall be freely transferable by the recipient thereof, subject to the provisions of the Liquidating Trust Agreement and the provisions of Section 1145(b) relating to "underwriters," as defined therein.

27.    <u>Authorization</u>.  All actions contemplated by the Plan are hereby authorized and approved in all respects (subject to the provisions of the Plan).  All such actions, and any other actions described in the Plan or this Confirmation Order that would otherwise require the consent or approval of the directors, shareholders, members or trustee of the Debtors, shall be deemed to have been consented to or approved and shall be effective under applicable state law and the Bankruptcy Code, without any requirement of prior or further action by the directors, shareholders, members or trustee of the Debtors.  The Liquidating Trust is authorized to take all necessary or desirable steps and execute any documents and perform all necessary or desirable acts to consummate the terms and conditions of the Plan on and after the Effective Date.  On or after the Effective Date, the Liquidating Trust may File such agreements and other documents as may be necessary or desirable to effectuate or further evidence the terms and conditions of the Plan and the other agreements referred to therein.

28.    <u>Retention of Professionals by the Liquidating Trust, the Liquidating Trustee, and the Liquidating Trust Oversight Committee</u>.  From and after the Effective Date, subject to the terms and conditions set forth in the Liquidating Trust Agreement, the Liquidating Trust, the Liquidating Trustee and the Liquidating Trust Oversight Committee may retain such law firms,

accounting firms, experts, advisors, agents, consultants, investigators, appraisers, auctioneers or other professionals as they may deem necessary to aid them in the performance of their responsibilities pursuant to the terms of the Plan.  It shall not be a requirement that any such parties retained by the Liquidating Trust be a "disinterested person" (as such term is defined in Section 101(14) of the Bankruptcy Code), and such retained parties may include professionals or other Persons who had previously been active in the Chapter 11 Cases on behalf of any Debtor, creditor, Interest holder, or other party-in-interest.

29.    Termination of Committee.  The Creditors' Committee shall cease operating and dissolve on the Effective Date.  As of the Effective Date, all members of the Creditors' Committee shall have no further rights or duties arising from such membership.

30.    Exemption from Certain Taxes.  Pursuant to Section 1146(c) of the Bankruptcy Code, (i) the issuance, transfer or exchange of any securities, instruments or documents (including the Beneficial Interests); (ii) the creation of any Lien; (iii) the making or assignment of any lease or the making or delivery of any deed or other instrument of transfer; and (iv) the vesting, assignment, conveyance, transfer or sale of any real property of any of the Debtors (including to the Liquidating Trust and any subsequent transfers, assignments, sales or conveyances by the Liquidating Trust) under, pursuant to, in furtherance of or in connection with, the Plan, including any deeds, bills of sale, or assignments executed in connection with the Plan or this Confirmation Order shall not be subject to any stamp tax, transfer tax, mortgage tax, intangible tax, recording fee, conveyance fee, document recording tax or similar tax, charge or expense, whether imposed by state or local law or otherwise.  Each recorder of deeds or similar official for any county, city or governmental unit in which any instrument under the Plan is to be

recorded is hereby ordered and directed to accept such instrument without requiring the payment of any such tax, fee, charge or expense.

31.    <u>Release of Escrowed Funds</u>.  On the Effective Date, all amounts escrowed by each Estate in respect of stamp and similar taxes pursuant to the Level 3 Sale Order shall be released to the Liquidating Trust, as part of the Liquidating Trust Assets.

32.    <u>Certain Assets Abandoned</u>.  On the Effective Date, Genuity Inc. shall be deemed to have abandoned, pursuant to Section 554 of the Bankruptcy Code, all of the capital stock of Integra S.A. owned by Genuity Inc.

33.    <u>Ratification of Post-Petition Transactions</u>.  This Confirmation Order hereby ratifies all transactions effected by the Debtors during the period commencing on the Petition Date and ending on the Confirmation Date.

34.    <u>References to Plan Provisions</u>.  The failure to reference or discuss any particular provision of the Plan in this Confirmation Order shall have no effect on the validity, binding effect or enforceability of such provision and such provision shall have the same validity, binding effect and enforceability as every other provision of the Plan.

35.    <u>Reversal</u>.  If any or all of the provisions of this Confirmation Order are hereafter reversed, modified or vacated by subsequent order of this Court or any other court, such reversal, modification or vacatur shall not affect the validity of the acts or obligations incurred or undertaken under or in connection with the Plan prior to the Debtors' or the Liquidating Trust's receipt of written notice of any such order; nor shall such reversal, modification or vacatur of this Confirmation Order affect the validity or enforceability of such act or obligation. Notwithstanding any such reversal, modification or vacatur of this Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, this Confirmation Order

prior to the effective date of such reversal, modification or vacatur shall be governed in all respects by the provisions of this Confirmation Order and the Plan and all documents, instruments and agreements related thereto or any amendments or modifications thereto.

36.     Non-Occurrence of Conditions to the Effective Date.  This Confirmation Order shall be deemed annulled at such time as a condition to the Effective Date that has not been waived in a writing executed by the Debtors and the Creditors' Committee can no longer occur. If the Effective Date does not occur for any reason, then the Plan shall be null and void and, in such event, nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings (whether or not such proceedings involve the Debtors).  If this Confirmation Order is vacated, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or against, or any Interests in, the Debtors; (2) prejudice in any manner the rights of the Debtors; or (3) constitute an admission, acknowledgement, offer or undertaking by the Debtors in any respect.

37.     Enforceability.  Pursuant to Sections 1123(a) and 1142(a) of the Bankruptcy Code, the provisions of this Confirmation Order, the Plan and the other Plan Documents shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

38.     [Intentionally Omitted.]

39.     Findings of Fact and Conclusions of Law.  The findings of this Court set forth above and the conclusions of law stated herein shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding by Bankruptcy

Rule 9014.  To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and vice versa.

40.    <u>Notice of Entry of Confirmation Order</u>.  Within ten Business Days after the Effective Date, the Liquidating Trust shall, in accordance with Bankruptcy Rules 2002(f)(7), mail to all holders of Claims and Interests in the Debtors a notice of (a) the entry of this Confirmation Order, (b) the occurrence of the Effective Date, (c) the Administrative Claims Bar Date provided for herein; and (d) such other matters as the Debtors or the Liquidating Trust deems appropriate.  The foregoing notice shall constitute due and adequate notice of this Confirmation Order within the meaning of such Bankruptcy Rules.

41.    <u>Partial Stay of Confirmation Order</u>.  The provisions of Federal Rule of Civil Procedure 62(a) and Bankruptcy Rules 7062 and 3020(e) shall not apply to this Confirmation Order on or after 12:01 a.m. on November 25, 2003, and the Debtors are authorized to consummate the Plan at any time thereafter.

42.    <u>Comdisco Claims</u>.  This Confirmation Order and the Plan, including Exhibit B to the Plan, shall not have *res judicata*, law of the case or other preclusive effect with respect to the pending Motion of Comdisco for Payment of Administrative Expenses (Docket No. 1323), any contested matter or adversary proceeding to determine the allowable amount or priority of Comdisco's Proof of Claim (Claim No. 3751) or Comdisco's Administrative Proofs of Claim (Claim Nos. 3750 and 5862), and the characterization of the contracts between the Debtors and Comdisco as true leases or security agreements.  Comdisco shall comply with the procedures for filing any Senior Creditor Claim, but shall be allowed to assert such a claim in the alternative to Comdisco's assertion that contracts between the Debtors and Comdisco were true leases.

Persons who are permitted to object to Senior Creditor Claims may object to the amount proposed for Comdisco's Senior Creditor Claim on Exhibit B to the Plan.

43.    <u>Liens of Texas Ad Valorem Tax Claimants</u>.  Until the payment in full of their Allowed Priority Tax Claims, the County of Brazos et al. (as set forth in Docket No. 1720) and the Local Texas Tax Authorities (as defined in Docket No. 1782) (collectively, the "Texas Ad Valorem Tax Claimants") shall retain all Liens they presently hold in the proceeds of the sale of their collateral as provided by that stipulation and order of the Bankruptcy Court entered on January 24, 2003, as well as all Liens they presently hold as a matter of law for the 2003 tax year in the proceeds of the sale of their collateral to the extent of the liability of the Debtors for 2003 taxes.

44.    <u>Interest on Certain Oversecured Tax Claims</u>.  Travis County (as defined in Docket No. 1751) and the Texas Ad Valorem Tax Claimants will receive interim interest pursuant to applicable non-bankruptcy law on their Allowed Priority Tax Claims as provided in 11 USC 506(b), and to the extent such Allowed Claims are not paid on the Effective Date in Cash plus all applicable interest, the unpaid portion of such Allowed Priority Tax Claims shall accrue interest at the rate of 8% per annum from the Confirmation Date until the date such Allowed Claims are paid in full.

45.    <u>Claims of the Palm Beach Tax Collector</u>.  Nothing in this Confirmation Order or in the Plan shall be construed to have any *res judicata* effect, or to be a waiver by the Palm Beach County Tax Collector ("Palm Beach") or the Debtors of any rights or defenses, with respect to (i) the Debtors' objection (Docket No. 1358) to Palm Beach's proof of claim (the "Objection") and (ii) Palm Beach's response (Docket No. 1506) to the Objection.

46.    <u>Claims of Communications Supply Corporation</u>. The asserted mechanics lien of Communications Supply Corporation ("CSC") shall attach to the proceeds of the Level 3 Sale with the same validity, priority and extent and right of payment as existed on February 3, 2003. The Debtors shall continue to segregate the sum of $234,700.41 of such proceeds and shall not disburse such proceeds until allowance or disallowance of CSC's proof of claim, designated as No. 177.    Any objection to the CSC proof of claim must be filed by the Liquidating Trustee no later than 45 days after the Confirmation Date and in the absence of said objection, the sum of $234,700.41, shall be paid forthwith thereafter to CSC.

47.    <u>Rejection of Contracts of SBC Affiliates</u>.  Nothing in the Plan or in this Confirmation Order shall have any *res judicata* or preclusive effect or be deemed a waiver or admission regarding whether any contracts, service orders or service requests for telecommunications circuits are unitary contracts for the purposes of assumption or rejection.

48.    <u>Executory Contracts of Verizon</u>.  Notwithstanding Section 9.1 of the Plan, any contract, service orders or service requests for telecommunications circuits, lines, and/or services directly related to such circuits or lines, to which Verizon is party and for which the Debtors or Level 3 (as contract administrator for the Debtors) has not (i) given proper notice prior to May 16, 2003 that such Circuit Contract (as defined in the Settlement Agreement between the Debtors and Verizon dated November 16, 2003) was to be disconnected or terminated, or (ii) prior to November 14, 2003 filed and served a notice of rejection in the Chapter 11 Cases with respect to such Circuit Contract, shall be deemed assumed and assigned to Level 3 as of May 16, 2003.

49.    <u>Bond of Liquidating Trustee</u>.  A bond for the Liquidating Trustee in the amount of the lesser of (i) the amount of cash held by the Liquidating Trustee from time to time and (ii) $100,000,000.00 shall be reasonable bond for all purposes.

Dated:  November 21, 2003

<u>/s/ Prudence Carter Beatty</u>
The Honorable Prudence Carter Beatty
United States Bankruptcy Judge

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | ADMINISTRATIVE EXPENSE PROOF OF CLAIM |
|---|---|

| | THIS SPACE IS FOR COURT USE ONLY |
|---|---|

Complete list of Debtors with corresponding case numbers is listed on the back of this form

**NAME OF DEBTOR:** Genuity Solutions, Inc.

**CASE NUMBER:** 02-43550 (PCB)

NOTE: This form should be used to make a claim for an administrative expense arising after the commencement of the cases pursuant to 11 U.S.C §§ 503, 365(d)(3) and 365 (d)(10).

U.S.B.C. - S.D.N.Y.
GENUITY, INC.
CHAPTER 11    CASE NO: 02-43558 (PCB)
CLAIM NUMBER:    **05937**

**NAME AND ADDRESS OF ADMINISTRATIVE EXPENSE CREDITOR** (the person or entity to whom the debtor owes money or property).

CIT Communication Finance Corporation
f/k/a Newcourt Communication Finance Corporation
f/k/a AT&T Credit Corporation

1 CIT Drive,  Suite 4104A
Livingston, NJ 07039
Attn: Bankruptcy Department

Phone Number:  973-597-2079

☐ Check box if you are aware that anyone else has filed a proof of claim for an administrative expense relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the Bankruptcy Court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the Bankruptcy Court.

**ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:** E212580

Check here if this claim:  ☐ replaces
☐ amends a previously filed claim dated _____.

**1. BASIS FOR CLAIM:**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Wages, salaries, and compensation (Fill out below)
  Your social security number _____ .
  Unpaid compensation for services performed
  from _____ to _____
    (date)        (date)

☐ Personal injury/wrongful death
☐ Taxes
☐ Other (Describe briefly) _____

**2. DATE ADMINISTRATIVE DEBT WAS INCURRED:** Various

**3. IF COURT JUDGMENT, DATE OBTAINED:** N/A

**4. TOTAL AMOUNT OF ADMINISTRATIVE EXPENSE CLAIM THROUGH AND INCLUDING JULY 31, 2003.**
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

$ 759,476.68
(Total)

**5. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of administrative expense claim.

**6. SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**7. DATE-STAMPED COPY:** To receive an acknowledgement of the filing of your administrative expense proof of claim, enclose a stamped, self-addressed envelope and copy of this administrative expense proof of claim.
**THE ORIGINAL OF THIS ADMINISTRATIVE EXPENSE PROOF OF CLAIM MUST BE SENT SO THAT IT IS RECEIVED ON OR BEFORE 5:00 P.M. PREVAILING NEW YORK TIME, ON OCTOBER 15, 2003.**

THIS SPACE IS FOR COURT USE ONLY

IF ADMINISTRATIVE EXPENSE PROOF OF CLAIM IS SENT BY MAIL, SEND TO:

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
RE: GENUITY, INC., ET AL.
P.O. BOX 110, BOWLING GREEN STATION
NEW YORK, NY 10274

IF ADMINISTRATIVE EXPENSE PROOF OF CLAIM IS SENT BY HAND DELIVERY OR OVERNIGHT COURIER, DELIVER TO:

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
RE: GENUITY, INC., ET AL.
ONE BOWLING GREEN, ROOM 534
NEW YORK, NY 10004-1408

RECEIVED
OCT 1 4 2003
CLAIMS PROCESSING CENTER
USBC, SDNY

Date: 10/10/03

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

4141

117305937001

| | | | | | |
|---|---|---|---|---|---|
| **Genuity Solutions Inc. Petition filed:11/27/02 CIT Lease No. E212580** | | | | | |
| Schedule | Monthly Payment including taxes | PER DIEM including Taxes | Rejection Date | Equipment Returned or Picked Up * | Administrative Claim Amount as of 7/31/03 ** |
| 00170 | 8505.96 | 283.53 | | req. pick up on 10/01/03 | 47,349.31 |
| 00200 | 400.91 | 13.36 | 03/24/2003 | | 3,429.49 |
| 00260 | 343.39 | 11.45 | 03/24/2003 | Returned | 1,400.15 |
| 00320 | 10,997.83 | 366.59 | 03/24/2003 | Picked up | 50,222.31 |
| 00350 | 412.77 | 13.76 | 03/24/2003 | Returned | 1,682.51 |
| 00520 | 75,647.70 | 2,521.59 | | Picked up | 194,162.42 |
| 00550 | 862.60 | 28.75 | 03/24/2003 | | 7,380.13 |
| 00600 | 1,169.18 | 38.97 | | Returned | 10,034.74 |
| 00640 | 2,589.60 | 86.32 | | Returned | 22,184.21 |
| 00690 | 8,544.70 | 284.82 | 03/24/2003 | Picked up | 42,722.73 |
| 00710 | 7,723.42 | 257.45 | | Picked up | 19,824.09 |
| 00720 | 7,345.73 | 244.86 | 03/24/2003 | Picked up | 40,891.76 |
| 00750 | 2,282.81 | 76.09 | 03/24/2003 | Returned | 9,304.72 |
| 00800 | 1,831.25 | 61.04 | | Picked up | 6,512.69 |
| 00860 | 6,557.68 | 218.59 | 03/24/2003 | Picked up | 32,788.55 |
| 00870 | 4,030.06 | 134.33 | 03/24/2003 | Picked up | 22,432.63 |
| 00880 | 3,916.92 | 130.56 | 03/24/2003 | Returned | 15,965.64 |
| 00890 | 1,149.14 | 38.30 | | Picked up | 2,948.30 |
| 00910 | 1,593.61 | 53.12 | 03/24/2003 | Picked up | 8,946.85 |
| 00940 | 1,100.83 | 36.69 | | Returned | 9,429.37 |
| 00950 | 1,729.60 | 57.65 | 03/24/2003 | | 9,612.57 |
| 00980 | 3,778.50 | 125.95 | 03/24/2003 | Returned | 15,581.78 |
| 01010 | 2,533.58 | 84.45 | 03/24/2003 | Picked up | 8,405.12 |
| 01020 | 4,602.64 | 153.42 | 03/24/2003 | | 25,467.57 |
| 01030 | 1,779.35 | 59.31 | 03/24/2003 | | 9,899.03 |
| 01040 | 1,658.78 | 55.29 | | Picked up | 4,256.81 |
| 01050 | 947.53 | 31.58 | | Returned | 8,116.10 |
| 01060 | 6,854.94 | 228.50 | 03/24/2003 | Picked up | 38,159.62 |
| 01070 | 33,244.22 | 1,108.14 | | | 52,082.89 |
| 01080 | 2,273.62 | 75.79 | | Picked up | 8,083.39 |
| 01090 | 2,405.81 | 80.19 | 03/24/2003 | Picked up | 12,148.49 |
| 01100 | 1,522.88 | 50.76 | | | 2,385.13 |
| 01110 | 2,144.83 | 71.49 | 03/31/2003 | | 10,630.18 |
| 01120 | 3,234.19 | 107.81 | | Picked up | 5,035.40 |
| | | | | | |
| Total | 215,716.56 | 7,190.50 | | | 759,476.68 |

* This is not an admission that all equipment has been returned only a portion may have been returned.

** Amount does not include any charges or credits after July 31, 2003.

117305937002

Supporting document to Genuity Solutions, Inc. Administrative Expense Proof of Claim

This administrative expense claim is for post petition rent and other charges due under various lease agreements and schedules for telephone communications equipment and other ancillary items.

Due to voluminous nature of the leases and the schedules, copies may be obtained upon request to: Chris Pheney at CIT Communications Finance Corporation, 1 CIT Drive, Livingston, NJ 07039. Telephone number 973-597-2091.

117305937003

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | ADMINISTRATIVE EXPENSE PROOF OF CLAIM |
|---|---|

| In Re: Genuity, Inc., et al. | 02-43558(PCB) | THIS SPACE IS FOR COURT USE ONLY |
|---|---|---|

Complete list of Debtors with corresponding case numbers is listed on the back of this form

**Genuity Solutions, Inc.**
NAME OF DEBTOR:

**02-43550 (PCB)**
CASE NUMBER:

NOTE: This form should be used to make a claim for an administrative expense arising after the commencement of the cases pursuant to 11 U.S.C §§ 503, 365(d)(3) and 365 (d)(10).

**NAME AND ADDRESS OF ADMINISTRATIVE EXPENSE CREDITOR** (the person or entity to whom the debtor owes money or property).

CIT Communication Finance Corporation
f/k/a Newcourt Communication Finance Corporation
f/k/a AT&T Credit Corporation

1 CIT Drive,  Suite 4104A
Livingston, NJ 07039
Attn: Bankruptcy Department

Phone Number:  973-597-2079

☐ Check box if you are aware that anyone else has filed a proof of claim for an administrative expense relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the Bankruptcy Court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the Bankruptcy Court.

U.S.B.C. - S.D.N.Y.
GENUITY, INC.
CHAPTER 11  CASE NO: 02-43558 (PCB)
CLAIM NUMBER:

**06180**

ACCOUNT OR OTHER NUMBER BY WHICH CREDITOR IDENTIFIES DEBTOR:
E212580

Check here if this claim: ☐ replaces
☐ amends a previously filed claim dated _____ .

**1. BASIS FOR CLAIM:**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Wages, salaries, and compensation (Fill out below)
  Your social security number _____ .
  Unpaid compensation for services performed
  from _____ to _____
       (date)        (date)

☐ Personal injury/wrongful death
☐ Taxes
☐ Other (Describe briefly) _____

**2. DATE ADMINISTRATIVE DEBT WAS INCURRED:**
Various

**3. IF COURT JUDGMENT, DATE OBTAINED:**
N/A

**4.TOTAL AMOUNT OF ADMINISTRATIVE EXPENSE CLAIM** ARISING ON OR AFTER AUGUST 1, 2003 *
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

$ 200,610.77 *
(Total)

* CIT is entitled to an admin. statice Claim for the fair market

**5. CREDITS:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of administrative expense claim.
value of the equipment that has not been returned.

**6. SUPPORTING DOCUMENTS:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
DO NOT SEND ORIGINAL DOCUMENTS.  If the documents are not available, explain.  If the documents are voluminous, attach a summary.
Consequently, this AdministativeClaim is increased by $587,880 for a total of $788,450.77

**7. DATE-STAMPED COPY:** To receive an acknowledgement of the filing of your administrative expense proof of claim, enclose a stamped, self-addressed envelope and copy of this administrative expense proof of claim.
**THE ORIGINAL OF THIS ADMINISTRATIVE EXPENSE PROOF OF CLAIM MUST BE SENT SO THAT IT IS RECEIVED ON OR BEFORE 5:00 P.M. PREVAILING NEW YORK TIME, ON** January 2, 2004

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
JAN - 5 2004
CLAIMS PROCESSING CENTER
U.S.B.C. S.D.N.Y.

IF ADMINISTRATIVE EXPENSE PROOF OF CLAIM IS SENT BY MAIL, SEND TO:

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
RE: GENUITY, INC., ET AL.
P.O. BOX 110, BOWLING GREEN STATION
NEW YORK, NY 10274

IF ADMINISTRATIVE EXPENSE PROOF OF CLAIM IS SENT BY HAND DELIVERY OR OVERNIGHT COURIER, DELIVER TO:

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
RE: GENUITY, INC., ET AL.
ONE BOWLING GREEN, ROOM 534
NEW YORK, NY 10004-1408

Date:
12|31|03

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any).
Jeremy Dalton, Director Investment Recovery

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

4141

| Genuity Solutions Inc. Petition filed:11/27/02 CIT Lease No. E212580 | | | |
|---|---|---|---|
| Schedule | Administrative Claim from 8/1/03 to 1/2/04 | | |
| 00170 | (18,470.32) | | |
| 00200 | 2,112.97 | | |
| 00260 | - | | |
| 00320 | (24,038.35) | | |
| 00350 | - | | |
| 00520 | 213,974.92 | | |
| 00550 | 3,299.68 | | |
| 00600 | 4,481.54 | | |
| 00640 | (3,033.54) | | |
| 00690 | - | | |
| 00710 | 21,846.54 | | |
| 00720 | 12,347.93 | | |
| 00750 | - | | |
| 00800 | 1,511.89 | | |
| 00860 | (39,346.08) | | |
| 00870 | 6,778.97 | | |
| 00880 | - | | |
| 00890 | 3,249.90 | | |
| 00910 | 2,678.76 | | |
| 00940 | - | | |
| 00950 | 9,118.88 | | |
| 00980 | 9,500.22 | | |
| 01010 | - | | |
| 01020 | 24,316.98 | | |
| 01030 | 9,385.53 | | |
| 01040 | 4,691.66 | | |
| 01050 | (1,110.85) | | |
| 01060 | 11,522.92 | | |
| 01070 | (73,770.59) | | |
| 01080 | 8,697.28 | | |
| 01090 | - | | |
| 01100 | (3,307.14) | | |
| 01110 | 11,331.18 | | |
| 01120 | 2,670.91 | | |
| Total | 200,610.77 | | |

$ 587,880 - Equipment Value - Not returned

$ 788,490.77



Jessica L. Radloff
*Bankruptcy Specialist*
*CIT Communications Finance Corporation*

One CIT Drive
Livingston, New Jersey 07039
Telephone 973-597-2189
Facsimile 973-597-2679

December 30, 2003

United States Bankruptcy Court
Southern District of New York
Re: Genuity Inc., et al.
One Bowling Green, Room 534
New York, New York 10002-1408

Dear Sir or Madam:

Enclosed please find an original and one copy of an Administrative Claim to be filed in connection with the following:

       Genuity Inc., et al.             Case No. 02-43550

Please be kind enough to file the original and return a stamped copy in the self-addressed envelope, which is provided for your convenience.

Thank you for your attention to this request.

Very truly yours,

**CIT Communications Finance Corporation**

*Jessica J. Radloff*

**Jessica Radloff**
**Bankruptcy Specialist**

| UNITED STATES BANKRUPTCY COURT DISTRICT SOUTHERN DISTRICT OF NEW YORK | PROOF OF CLAIM |
|---|---|

| Name of Debtor<br>**GENUITY SOLUTIONS, INC** | Case Number<br>**02-43550-pcb** | |

NOTE: this form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| Name of Creditor (The person or other entity to whom the debtor owes money or property):<br>**CIT Communications Finance Corporation d\b\a AT&T Credit Corporation** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. | CASE NO: 02-43558 (PCB)<br>**02954** |
| Name and addresses where notices should be sent:<br>1 CIT Drive     Bankruptcy Department<br>Livingston, NJ 07039<br>*#71169*<br>Telephone Number:     (973) 597-2079 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br>☒ Check box if the address differs from the address on the envelope sent to you by the court. | THIS SPACE IS FOR COURT USE ONLY |

| Account or other number by which creditor identifies debtor: | Check here if this claim | ☐ replaces<br>☐ amends | a previously filed claim, dated:_____ |

**1.   Basis For Claim:**

| | | |
|---|---|---|
| ☐ | Goods sold | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) |
| ☐ | Services performed | ☐ Wages, salaries, and compensation (fill out below) |
| ☐ | Money loaned | Your SS#: _____-____-_____ |
| ☐ | Personal injury/wrongful death | Unpaid compensation for services performed |
| ☐ | Taxes | from ___/___/___ to ___/___/___ |
| ☒ | Other _____ | (date)         (date) |

**2.   Date debt was incurred:**        **3.   If court judgment, date obtained:**

**4.   Total Amount of Claim at Time Case Filed:**   $ 5,777,614.89– Contingent & Unliquidated – See Exhibit A

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5.   Secured Claim.**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:

☐ Real Estate     ☐ Motor Vehicle

☐ Other _____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any:
_____

**6.   Unsecured Priority Claim**

☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____
Specify the priority of the claim:

☐ Wages, salaries, or commissions (up to $4,300),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(3).
☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4).
☐ Up to $1,950* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(6).
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).
☐ Other -- Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

*Amounts are subject to adjustment on 4/1/98 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

**7.   Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8.   Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9.   Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

**R E C E I V E D**
**APR 1 1 2003**
U.S. BANKRUPTCY COURT
SO. DIST. OF NEW YORK

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Jeremy Galten, Director of Investment Recovery |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

117302954001

**Debtor : Genuity Solutions,Inc**
**Lease Number: E212580          Schedule: Various**
**Venue: U.S Bankruptcy Court Southern District of New York**
**Chapter: 11     Petition Date: 11/27/02**
**Case Number: 02-43550-PCB**

| Leases | SCHEDULES | TOTAL ESTIMATED CLAIM |
|--------|-----------|-----------------------|
| E212580 | 0005a | 6,840.42 |
| E212580 | 00011a | 9,429.31 |
| E212580 | 00020 | 176.00 |
| E212580 | 00120 | 176.00 |
| E212580 | 00170 | 132,135.11 |
| E212580 | 00200 | 0.00 |
| E212580 | 00260 | 535.74 |
| E212580 | 00320 | 245,438.01 |
| E212580 | 00350 | 608.42 |
| E212580 | 00500 | 14,334.96 |
| E212580 | 00520 | 1,624,626.28 |
| E212580 | 00550 | 218.26 |
| E212580 | 00570 | 7,301.37 |
| E212580 | 00590 | 16,138.26 |
| E212580 | 00600 | 176.00 |
| E212580 | 00610 | 21,849.39 |
| E212580 | 00640 | 47,591.39 |
| E212580 | 00690 | 223,120.51 |
| E212580 | 00710 | 189,856.48 |
| E212580 | 00720 | 191,812.68 |
| E212580 | 00750 | 2,567.51 |
| E212580 | 00800 | 65,665.37 |
| E212580 | 00860 | 173,211.23 |
| E212580 | 00870 | 106,447.77 |
| E212580 | 00880 | 70,457.01 |
| E212580 | 00890 | 31,772.61 |
| E212580 | 00910 | 35,270.38 |
| E212580 | 00940 | 25,988.17 |
| E212580 | 00950 | 61,953.74 |
| E212580 | 00980 | 73,467.20 |
| E212580 | 01010 | 105,137.76 |
| E212580 | 01020 | 192,668.60 |
| E212580 | 01030 | 75,511.91 |
| E212580 | 01040 | 42,258.17 |
| E212580 | 01050 | 17,899.63 |
| E212580 | 01060 | 151,716.78 |
| E212580 | 01070 | 1,346,732.47 |
| E212580 | 01080 | 87,983.61 |
| E212580 | 01090 | 100,089.99 |
| E212580 | 01100 | 60,600.97 |
| E212580 | 01110 | 89,006.83 |
| E212580 | 01120 | 128,832.69 |
| TOTAL | | 5,777,614.89 |

genuity solutions exhibit A form.xls

117302954002

## SUPPLEMENT TO PROOF OF CLAIM

In support of the within Proof of Claim, CIT Communications Finance Corporation ("CIT"), states as follows:

1.  CIT is the lessor of certain personal property to the Debtors.

2.  Pursuant to that certain lease agreements and equipment schedules related thereto, CIT leased certain communication equipment and other personal property to the Debtors. Due to a voluminous nature of the leases and the schedules, copies may be obtained upon request to CIT.

3.  On or before the Petition Date, the Debtors owed CIT past due payments and arrears through the Petition Date pursuant to the leases.

4.  From the Petition Date until the date hereof, the Debtors have continued to use and retain the personal property.  As such, pursuant to §§ 365(d)(10) and 503 of the Bankruptcy Code, CIT is owed administrative expense claims pursuant to the leases.

5.  The leases constitute true leases under applicable state law.  If the leases are rejected in Debtor's bankruptcy case, CIT is entitled to rejection damage claims under §§ 365(g) and 502(g) of the Bankruptcy Code. In the event that the leases are determined to be financing transactions, CIT holds a perfected first priority security interest in the personal property identified on the leases and is entitled to the amount remaining to be paid under the leases in accordance with the terms thereof as a secured claim under § 506 of the Bankruptcy Code.

6.  A true and correct itemization of the aggregate amounts due and owing from the Debtors to CIT as outlined in the foregoing paragraphs is attached hereto, and incorporated by reference, as Exhibit "A".

7.    Pursuant to the leases, CIT is entitled to charge a default rate of interest, late fees, and attorneys' fees as a result of amounts not paid when due.  As such, pursuant to the leases, CIT reserves the right to charge interest after the Petition Date (including the default rate), and collect late fees and attorney's fees to the extent permitted under the Bankruptcy Code.

8.    CIT reserves the right to supplement, amend or modify the within proof of claim.  Specifically, CIT reserves the right to file additional proofs of claim, or amend the within proof of claim, to include any amounts determined to be due and owing as a result of any rejection of the leases.

9.    CIT further reserves the right to file a separate application and/or motion for allowance of administrative expenses pursuant to the provisions of the leases and § 365(d)(10) of the Bankruptcy Code, including any administrative expenses that accrue after the date hereof.

117302954004



**Jeremy Galton**
*Director of Investment Recovery*
*CIT Communications Finance Corporation*
1 CIT Drive
Livingston, NJ 07039
Telephone 973-597-279
Facsimile 973-597-2679
E-mail: Jeremy.Galton@cit.com

April 9,2003

<u>VIA FEDERAL EXPRESS</u>
U.S. Bankruptcy Court
Southern District of New York
Re: Genuity Inc.,et al.
One Bowling Green, Room 534
New York, NY 10004-1408
(212)-669-2876

Dear Sir or Madam:

Enclosed please find an original and one copy of a Proof of Claim to be filed in connection with the following:

        Genuity Solutions, Inc        Case No. 02-43550-(PCB)

Please be kind enough to file the original and return a stamped copy in the self-addressed envelope, which is provided for your convenience.

Thank you for your attention to this request.

Very truly yours,

**CIT Communications Finance Corporation**

Jeremy Galton
Director of Investment Recovery

*poc cover letter-genuity solutions, inc.doc 4/9/03*

117302954005

—— DEFINITIONS ——

### Debtor

The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

### Creditor

A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

### Proof of Claim

A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

### Secured Claim

A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. (See also *Unsecured Claim*.)

### Unsecured Claim

If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

### Unsecured Priority Claim

Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims*.

## Items to be completed in Proof of Claim form (if not already filled in)

**Court, Name of Debtor, and Case Number:**

Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

**Information about Creditor:**

Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

1. **Basis for Claim:**
Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

2. **Date Debt Incurred:**
Fill in the date when the debt first was owed by the debtor.

3. **Court Judgments:**
If you have a court judgment for this debt, state the date the court entered the judgment.

4. **Total Amount of Claim at Time Case Filed:**
Fill in the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

5. **Secured Claim:**
Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above.)

6. **Unsecured Priority Claim:**
Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above.) A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

7. **Credits:**
By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

8. **Supporting Documents:**
You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

117302954006

| UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK | **PROOF OF CLAIM** |
|---|---|

| Name of Debtor<br>GENUITY SOLUTIONS, INC | Case Number<br>**02-43550-pcb** |
|---|---|

NOTE: this form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" of payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

| | |
|---|---|
| Name of Creditor  (The person or other entity to whom the debtor owes money or property):<br>**CIT Communications Finance Corporation d/b/a AT&T Credit Corporation** | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars. |
| Name and addresses where notices should be sent:<br>1 CIT Drive      Bankruptcy Department<br>Livingston, NJ 07039<br><br>Telephone Number:      (973) 597-2091 | ☐ Check box if you have never received any notices from the bankruptcy court in this case.<br><br>☒ Check box if the address differs from the address on the envelope sent to you by the court. |

U.S.B.C. - S.D.N.Y.
GENUITY, INC.
CHAPTER 11  CASE NO: 02-43558 (PCB)
CLAIM NUMBER:
**06176**

THIS SPACE IS FOR COURT USE ONLY

| Account or other number by which creditor identifies debtor:<br>E212580 | Check here if this claim | ☐ replaces<br>☒ amends | a previously filed claim, dated: _4/1/03_ |
|---|---|---|---|

**1.  Basis For Claim:**

- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other _____

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)

  Your SS#: _____-____-_____

  Unpaid compensation for services performed

  from ___/___/___ to ___/___/___
        (date)              (date)

**2.  Date debt was incurred:**

**3.  If court judgment, date obtained:**

**4.  Total Amount of Claim at Time Case Filed:**      $4,733,672.21– See Exhibit A

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 6 below.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5.  Secured Claim.**

☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:

- ☐ Real Estate    ☐ Motor Vehicle
- ☐ Other _____

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any:
_____

**6.  Unsecured Priority Claim**

☐ Check this box if you have an unsecured priority claim

Amount entitled to priority $_____
Specify the priority of the claim:

- ☐ Wages, salaries, or commissions (up to $4,300),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(4).
- ☐ Up to $1,950* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child – 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).
- ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).

*Amounts are subject to adjustment on 4/1/98 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7.  Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8.  Supporting Documents:** Attach copies of supporting documents, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9.  Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

RECEIVED
JAN 5 2004
U.S. BANKRUPTCY COURT
SO. DIST. OF NEW YORK

| Date<br>12/31/03 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):<br>Chris Pheney Bankruptcy Workout Manager | |
|---|---|---|

Penalty for presenting fraudulent claim:  Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## —— DEFINITIONS ——

### Debtor

The person, corporation, or other entity that has filed a bankruptcy case is called the debtor.

### Creditor

A creditor is any person, corporation, or other entity to whom the debtor owed a debt on the date that the bankruptcy case was filed.

### Proof of Claim

A form telling the bankruptcy court how much the debtor owed a creditor at the time the bankruptcy case was filed (the amount of the creditor's claim). This form must be filed with the clerk of the bankruptcy court where the bankruptcy case was filed.

### Secured Claim

A claim is a secured claim to the extent that the creditor has a lien on property of the debtor (collateral) that gives the creditor the right to be paid from that property before creditors who do not have liens on the property.

Examples of liens are a mortgage on real estate and a security interest in a car, truck, boat, television set, or other item of property. A lien may have been obtained through a court proceeding before the bankruptcy case began; in some states a court judgment is a lien. In addition, to the extent a creditor also owes money to the debtor (has a right of setoff), the creditor's claim may be a secured claim. (See also *Unsecured Claim*.)

### Unsecured Claim

If a claim is not a secured claim it is an unsecured claim. A claim may be partly secured and partly unsecured if the property on which a creditor has a lien is not worth enough to pay the creditor in full.

### Unsecured Priority Claim

Certain types of unsecured claims are given priority, so they are to be paid in bankruptcy cases before most other unsecured claims (if there is sufficient money or property available to pay these claims). The most common types of priority claims are listed on the proof of claim form. Unsecured claims that are not specifically given priority status by the bankruptcy laws are classified as *Unsecured Nonpriority Claims.*

## Items to be completed in Proof of Claim form (if not already filled in)

**Court, Name of Debtor, and Case Number:**

Fill in the name of the federal judicial district where the bankruptcy case was filed (for example, Central District of California), the name of the debtor in the bankruptcy case, and the bankruptcy case number. If you received a notice of the case from the court, all of this information is near the top of the notice.

**Information about Creditor:**

Complete the section giving the name, address, and telephone number of the creditor to whom the debtor owes money or property, and the debtor's account number, if any. If anyone else has already filed a proof of claim relating to this debt, if you never received notices from the bankruptcy court about this case, if your address differs from that to which the court sent notice, or if this proof of claim replaces or changes a proof of claim that was already filed, check the appropriate box on the form.

**1. Basis for Claim:**

Check the type of debt for which the proof of claim is being filed. If the type of debt is not listed, check "Other" and briefly describe the type of debt. If you were an employee of the debtor, fill in your social security number and the dates of work for which you were not paid.

**2. Date Debt Incurred:**

Fill in the date when the debt first was owed by the debtor.

**3. Court Judgments:**

If you have a court judgment for this debt, state the date the court entered the judgment.

**4. Total Amount of Claim at Time Case Filed:**

Fill in the total amount of the entire claim. If interest or other charges in addition to the principal amount of the claim are included, check the appropriate place on the form and attach an itemization of the interest and charges.

**5. Secured Claim:**

Check the appropriate place if the claim is a secured claim. You must state the type and value of property that is collateral for the claim, attach copies of the documentation of your lien, and state the amount past due on the claim as of the date the bankruptcy case was filed. A claim may be partly secured and partly unsecured. (See DEFINITIONS, above.)

**6. Unsecured Priority Claim:**

Check the appropriate place if you have an unsecured priority claim, and state the amount entitled to priority. (See DEFINITIONS, above.) A claim may be partly priority and partly nonpriority if, for example, the claim is for more than the amount given priority by the law. Check the appropriate place to specify the type of priority claim.

**7. Credits:**

By signing this proof of claim, you are stating under oath that in calculating the amount of your claim you have given the debtor credit for all payments received from the debtor.

**8. Supporting Documents:**

You must attach to this proof of claim form copies of documents that show the debtor owes the debt claimed or, if the documents are too lengthy, a summary of those documents. If documents are not available, you must attach an explanation of why they are not available.

Debtor : Genuity Solutions,Inc
Lease Number: E212580                Schedule: Various
Venue: U.S Bankruptcy Court Southern District of New York
Chapter: 11      Petition Date: 11/27/02
Case Number: 02-43550-PCB

| Leases | SCHEDULES | TOTAL ESTIMATED CLAIM |
|---|---|---|
| E212580 | 0005a | 1,967.96 |
| E212580 | 00011a | 5,619.74 |
| E212580 | 00020 | 176.00 |
| E212580 | 00120 | 176.00 |
| E212580 | 00170 | 55,581.47 |
| E212580 | 00200 | 0.00 |
| E212580 | 00260 | 535.74 |
| E212580 | 00320 | 190,448.86 |
| E212580 | 00350 | 608.42 |
| E212580 | 00500 | 6,340.61 |
| E212580 | 00520 | 1,322,035.48 |
| E212580 | 00550 | 218.26 |
| E212580 | 00570 | 4,186.32 |
| E212580 | 00590 | 7,704.09 |
| E212580 | 00600 | 176.00 |
| E212580 | 00610 | 14,704.87 |
| E212580 | 00640 | 26,874.59 |
| E212580 | 00690 | 214,575.81 |
| E212580 | 00710 | 158,962.80 |
| E212580 | 00720 | 184,466.95 |
| E212580 | 00750 | 2,567.51 |
| E212580 | 00800 | 54,677.87 |
| E212580 | 00860 | 127,307.47 |
| E212580 | 00870 | 102,417.71 |
| E212580 | 00880 | 70,457.01 |
| E212580 | 00890 | 27,176.05 |
| E212580 | 00910 | 33,676.77 |
| E212580 | 00940 | 25,998.17 |
| E212580 | 00950 | 61,953.74 |
| E212580 | 00980 | 73,467.20 |
| E212580 | 01010 | 105,137.76 |
| E212580 | 01020 | 178,830.58 |
| E212580 | 01030 | 75,511.91 |
| E212580 | 01040 | 35,623.05 |
| E212580 | 01050 | 10,318.99 |
| E212580 | 01060 | 144,861.84 |
| E212580 | 01070 | 1,000,042.82 |
| E212580 | 01080 | 83,436.37 |
| E212580 | 01090 | 92,872.46 |
| E212580 | 01100 | 45,372.17 |
| E212580 | 01110 | 80,411.43 |
| E212580 | 01120 | 106,193.36 |
| TOTAL | | 4,733,672.21 |

Presentment Date: November 10, 2004 at 2:30 p.m. Eastern Time
Responses Due: November 3, 2004 at 12 noon Eastern Time

KRAMER LEVIN NAFTALIS & FRANKEL LLP
919 Third Avenue
New York, New York 10022
(212) 715-9100
David M. Feldman (DF-8070)
P. Bradley O'Neill (PO-5832)
Julie K Horowitz (JH-9829)

Attorneys for GLT Liquidating Trust

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re: | ) |
| | ) |
| GENUITY INC., et al. | ) Chapter 11 |
| | ) |
| | ) Case No. 02-43558 (PCB) |
| Debtors. | ) |
| | ) Jointly Administered |
| | ) |

---

**NOTICE OF PRESENTMENT OF TENTH OMNIBUS OBJECTION OF GLT**
**LIQUIDATING TRUST TO PROOFS OF CLAIM**

---

**IF YOU ARE RECEIVING THIS NOTICE, YOUR CLAIM MAY BE**
**AFFECTED.  PLEASE REVIEW THE OBJECTION AND ITS**
**EXHIBITS CAREFULLY TO DETERMINE WHETHER THE**
**OBJECTION AFFECTS YOUR CLAIM**

---

PLEASE TAKE NOTICE that on September 22, 2004, GLT Liquidating Trust,

the successor-in-interest to the debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors") filed its Tenth Omnibus Objection to Proofs of Claim (the

"Objection").

KL2:2329941.1

PLEASE TAKE FURTHER NOTICE that unless a claim holder files and properly serves a timely response with respect to a claim subject to the Objection, there will not be a hearing on the Objection and the bankruptcy court may enter an order granting the relief requested in the Objection.  RESPONSES TO THE OBJECTION MUST BE FILED WITH THE COURT AND SERVED UPON THE NECESSARY PARTIES SO AS TO BE RECEIVED NO LATER THAN NOVEMBER 3, 2004 AT 12 NOON (PREVAILING NEW YORK TIME). Any and all Responses must be in writing, shall conform to the Federal Rules of Bankruptcy Procedure and Local Rules of the Bankruptcy Court, and shall be filed with the Bankruptcy Court electronically in accordance with General Order M-242 (General Order M-242 and the User's Manual for the Electronic Case Filing System can be found at www.nysb.uscourts.gov), by registered users of the Bankruptcy Court's case filing system and, by all other parties in interest, on a 3.5 inch disk, preferably in Portable Document Format (PDF), WordPerfect or any other Windows-based word processing format (with a hard-copy delivered directly to Chambers), and shall be served in accordance with the Bankruptcy Court's Order Under 11 U.S.C. §§ 102 and 105 and Fed. R. Bankr. P. 2002, 9006 and 9007 Establishing Certain Notice, Case Management and Administrative Procedures, dated December 2, 2002, upon: (i) GLT Liquidating Trust, 400 Unicorn Park, Woburn, MA  01801, Attn: Andrew P. Borggaard; (ii) Kramer Levin Naftalis & Frankel LLP, Attorneys for GLT Liquidating Trust, 919 Third Avenue, New York, New York, Attn: Julie K. Horowitz; (iii) the Office of the United States Trustee, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attn: Brian Masumoto, Esq.; (iv) Shearman & Sterling, counsel to JP Morgan Chase Bank, Administrative Agent under the Amended and Restated Credit Agreement dated September 24, 2001, 599 Lexington Avenue, New York, New York 10022, Attn: Douglas P. Bartner; and (v) Debevoise & Plimpton, counsel

KL2:2329941.1

to Verizon Communications Inc., 919 Third Avenue, New York, New York 10022, Attn: James

B. Roberts, Esq.  Any person filing a Response must also provide the Court with a proposed

order, on a hard disk and in hard copy, as soon as practicable after the Response Deadline.

PLEASE TAKE FURTHER NOTICE that **TIMELY FILED RESPONSES TO THE**

**OBJECTION SHALL BE HEARD ON NOVEMBER 10, 2004 AT 2:30 p.m.**

**(PREVAILING NEW YORK TIME)** before the **Honorable Prudence C. Beatty, United**

**States Bankruptcy Court, Southern District of New York, One Bowling Green, New York,**

**New York, 10004-1408; provided, however that GLT may adjourn the hearing, in whole or**

**in part, in its sole discretion.**.  Any adjourned hearing would take place on an omnibus hearing

date subsequent to November 10, 2004, with such omnibus hearing to take place before the

Honorable Prudence C. Beatty, United States Bankruptcy Court, in Room 701, Southern District

of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York,

10004-1408.

Dated:  New York, New York
      September 22, 2004

                     KRAMER LEVIN NAFTALIS & FRANKEL LLP

                     /s/ Julie K. Horowitz
                     David M. Feldman (DF-8070)
                     P. Bradley O'Neill (PO-5832)
                     Julie K. Horowitz (JH-9829)
                     919 Third Avenue
                     New York, New York 10022
                     (212) 715-9100

                     Attorneys for GLT Liquidating Trust

KL2:2329941.1

<div align="right">

Hearing Date:  November 10, 2004 at 2:30 p.m. Prevailing New York Time
Response Deadline:  November 3, 2004 at 12 noon Prevailing New York Time

</div>

KRAMER LEVIN NAFTALIS & FRANKEL LLP

919 Third Avenue
New York, New York 10022
(212) 715-9100
David M. Feldman (DF-8070)
P. Bradley O'Neill (PO-5832)
Julie K. Horowitz (JH-9829)

Attorneys for GLT Liquidating Trust

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------x
                                               :    Chapter 11
In re:                                         :
                                               :    Case No. 02-43558 (PCB)
GENUITY INC., et al.,                          :
                                               :    (Jointly Administered)
                          Debtors.             :
-----------------------------------------------x

## TENTH OMNIBUS OBJECTION OF GLT LIQUIDATING
## TRUST TO PROOFS OF CLAIM
### (No Basis Claims and Misclassified and/or Overstated Claims)

TO THE HONORABLE PRUDENCE C. BEATTY
UNITED STATES BANKRUPTCY JUDGE

GLT Liquidating Trust ("GLT"), successor in interest to the above-captioned debtors and

debtors-in-possession (collectively, the "Debtors"), hereby objects to certain proofs of claim

("Claims") filed in these cases.  In support of this Objection, GLT respectfully represents as

follows:

## **Background**

1.      On November 27, 2002, the Debtors each filed voluntary petitions in this Court

for reorganization relief under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

2.      No trustee or examiner has been appointed in these chapter 11 cases.  On

December 5, 2002, the United States Trustee for the Southern District of New York (the "U.S.

Trustee") appointed an official committee of the Debtors' unsecured creditors (the "Creditors'

Committee") in these chapter 11 cases.

3.      The Debtors filed their Schedules of Assets and Liabilities and Statements of

Financial Affairs (collectively, the "Schedules and Statements") on February 10, 2003.  Pursuant

to that certain Order Establishing Deadline for Filing Proofs of Claim and Approving the Form

and Manner of Notice Thereof (Docket No. 581) (the "Bar Date Order"), the deadline for filing

proofs of claims against the Debtors, other than claims of governmental units and administrative

claims, was April 18, 2003 at 5:00 p.m. (the "April 18th Bar Date") or, with respect to claims

filed by a person or entity holding a claim arising from the rejection of an executory contract or

unexpired lease, the later of (a) the April 18th Bar Date and (b) the date that is thirty days after

the effective date of rejection identified in the notice of rejection or order authorizing rejection

with respect to such executory contract or unexpired lease (the "Rejection Bar Date").  The

deadline for filing proofs of claims by governmental units (as defined in Section 101(27) of the

Bankruptcy Code), was May 26, 2003 at 5:00 p.m. (the "Governmental Bar Date").

4.      Pursuant to the Order Establishing Deadlines for Filing Administrative Claims

Accruing on or Before July 31, 2003 and Approving the Form and Manner of Notice Thereof

(Docket No. 1617) (the "Administrative Bar Date Order"), the deadline for filing administrative

claims accruing before July 31, 2003 was October 15, 2003 (the "Administrative Bar Date").

- 2 -

5.      On or about June 3, 2003, the Debtors filed a Motion for Approval of Procedures Related to Objection to Proofs of Claim, Notifying Claimants of Such Objections and Settling Such Objection on Limited Notice and Without Further Hearing (Docket No. 1213) (the "Claims Procedures Motion").  This Court entered an Order (Docket No. 1351) (the "Claims Procedures Order") approving the Claims Procedures Motion on or about June 26, 2003.

6.      On November 21, 2003, this Court entered an Order (Docket No. 1830) (the "Confirmation Order") confirming the Debtors' Joint Consolidated Plan of Liquidation, As Modified (the "Plan").  Pursuant to the Confirmation Order, the deadline for filing administrative claims accruing on or after July 31, 2003 was the 30th day after the Effective Date (the "Effective Date Bar Date" and collectively with the Governmental Bar Date, the April 18th Bar Date, the Rejection Bar Date and the Administrative Bar Date, the "Bar Dates").  The Plan became effective on December 2, 2003 (the "Effective Date").  On the Effective Date, the Creditors' Committee was dissolved.  Pursuant to the Plan, GLT is successor in interest to the Debtors.  Among the purposes of GLT is to manage the settlement of, and distribution on, all creditor claims.

## Jurisdiction

7.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. § 157(b)(2).

## Objection to Claims

8.      By this Objection, GLT objects to various Claims on two different grounds.  The exhibits to this Objection list each Claim objected to and the grounds for the objection by listing

- 3 -

at the top of each page a letter code and brief statement of the objection.  The basic objections are:

| Letter Code | Objection |
|---|---|
| A | No Basis Claims |
| B | Misclassified and/or Overstated Claims |

### Exhibit A - No Basis Claims

9.      GLT has examined the proofs of claim listed on Exhibit A hereto (collectively, the "No Basis Claims") and has determined that these claims are not properly allowable for one reason or another, as described in Exhibit A.  Such claims are not reflected as owing in the Debtors' books and records.  GLT believes that the holders of No Basis Claims are seeking recoveries for which they are not entitled, and therefore requests that the No Basis Claims be disallowed and expunged in their entirety.

10.      GLT's grounds for objecting to the No Basis Claims are set forth in Exhibit A hereto.

11.      GLT hereby reserves the right to object to the No Basis Claims on grounds other than those asserted herein at a later date.  Nothing contained herein shall be deemed to be or construed as a waiver of GLT's right to object to the No Basis Claims on other grounds.

### Exhibit B - Misclassified and/or Overstated Claims to be Reduced and/or Reclassified

12.      GLT objects to the proofs of claim listed on Exhibit B hereto (the "Misclassified/Overstated Claims") on the grounds that such claims are misclassified and/or overstated.  Some of the Misclassified/Overstated Claims have been filed as a secured or priority claim.  The Debtors' books and records, however, reflect that these classifications are inaccurate

with respect to some of the claims listed on Exhibit B hereto.  Further, GLT believes that some of the Misclassified/Overstated Claims were filed in an excessive amount.  Therefore, the Misclassified/Overstated Claims should be reclassified and reduced as set forth on Exhibit B.

13.    GLT's grounds for objecting to the Misclassified/Overstated Claims are set forth in Exhibit B hereto.

14.    GLT hereby reserves the right to object to the Misclassified/Overstated Claims on grounds other than those asserted herein at a later date.  Nothing contained herein shall be deemed to be or construed as a waiver of GLT's right to object to the Misclassified/Overstated Claims on other grounds.

**Reservation of Rights, Notice and Procedure**

15.    GLT expressly reserves the right to amend, modify or supplement this Objection and to file additional objections to proofs of claim, or any other claims (filed or not) on any grounds not stated herein that may be asserted against the Debtors or GLT.  Should one or more of the grounds of objection stated in this Objection be overruled, GLT reserves its right to object to the proofs of claim listed on Exhibits A through B attached hereto on any other ground that bankruptcy and non-bankruptcy law permits.

16.    In accordance with the Claims Procedures Order, notice of this Objection has been given via first class mail, facsimile, or by hand delivery, to (i) each Claimant, (ii) the U.S. Trustee, (iii) counsel to JPMorgan Chase Bank, Administrative Agent under the Amended and Restated Credit Agreement dated September 24, 2001, (iv) counsel to Verizon Communications Inc. and (v) any party from whom Ropes & Gray LLP or Kramer Levin Naftalis & Frankel LLP has, to date, received a written request for notice of all Objections.

17.     Such notice consists of (i) a copy of this Objection; (ii) a specific notice of the date by which any responses ("Responses") to the Objection must be filed (the "Response Deadline"); (iii) a statement that an order approving the relief requested in the Objection may be entered and a hearing will not be held on any of the proofs of claim that are the subject of the Objection if no Response to the Objection is filed on or before the Response Deadline; (iv) a statement that if a Response is timely filed, the Objection will be heard, if necessary, on the date of the next Omnibus Hearing that is at least seven (7) calendar days from the Response Deadline, unless further adjourned by agreement of the parties or by request of the Court; (v) a list of all of the Omnibus Hearing dates scheduled at the time this Objection is served; and (vi) the procedures which the Claimants must follow in filing and serving a Response, as well as the parties-in-interest upon whom the claimant must serve such Response. Further, in accordance with the Order Under 11 U.S.C. §§ 102 and 105 and Fed. R. Bankr. P. 2002, 9006 and 9007 Establishing Certain Notice, Case Management and Administrative Procedures (Docket No. 52), notice of this Objection has been provided to those parties included on the Master Service List maintained by GLT in these cases. GLT submits that given the nature of the relief requested, no other or further notice need be given.

18.     GLT submits that no new issue of law is presented with respect to the matters contained herein.  Because the relevant authorities in support of the requested relief are cited in this Objection, GLT requests that the requirement of the service and filing of a separate memorandum of law under Local Bankr. R. 9013-1(b) be deemed satisfied.

19.     Pursuant to Fed. R. Civ. P. 54(b) (made applicable hereto by Bankruptcy Rules 7054 and 9014), in seeking disallowance of each Claim objected to, GLT is also seeking

- 6 -

immediate entry of a final judgment with respect to such Claim, notwithstanding the continuation

of any other claims objections proceedings commenced by this Objection.

20.    Other than the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth and

Ninth Omnibus Objections, no previous request for the relief sought in this Objection has been

made to this Court or any other court.

WHEREFORE, GLT respectfully requests that this Court disallow and/or reduce and/or reclassify the Claims objected to herein, as set forth in Exhibits A through B attached hereto, and grant such other and further relief as is just and proper.

Dated:  New York, New York
        September 22, 2004

KRAMER LEVIN NAFTALIS & FRANKEL LLP

/s/ Julie K. Horowitz
David M. Feldman (DF-8070)
P. Bradley O'Neill (PO-5832)
Julie K. Horowitz (JH-9829)
919 Third Avenue
New York, New York 10022
(212) 715-9100

Attorneys for GLT Liquidating Trust

KL2:2329937.1

- 8 -

**Exhibit A**
**No Basis Claims**

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| Claim To Be Expunged | 6162 | Genuity Inc. | AMERITECH SERVICES, INC. ET.AL; SBC COMMUNICATIONS; C/O BANKRUPTCY COLLECTION ATTN: CHERYL BECKER, MRG-CREDIT & COLLECTIONS 722 N. BROADWAY, 11TH FLOOR MILWAUKEE, WI  53202 | $0.00 | $1,299,481.78 | $0.00 | $0.00 | $1,299,481.78 | INSUFFICIENT DOCUMENTATION PROVIDED; CLAIM NOT ENTITLED TO ADMINISTRATIVE EXPENSE STATUS |
| Claim To Be Expunged | 6166 | Genuity Inc. | AMERITECH SERVICES, INC. ET.AL; SBC COMMUNICATIONS; C/O BANKRUPTCY COLLECTION ATTN: CHERYL BECKER, MRG-CREDIT & COLLECTIONS 722 N. BROADWAY, 11TH FLOOR MILWAUKEE, WI  53202 | $0.00 | $846,485.81 | $0.00 | $0.00 | $846,485.81 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT CLAIM INCLUDES TERMINATION LIABILITIES, SUCH AMOUNTS ARE NOT ENTITLED TO ADMINISTRATIVE EXPENSE STATUS |
| Claim To Be Expunged | 3773 | Genuity Solutions Inc. | AMERITECH SERVICES, INC ; C/O SBC BANKRUPTCY DEPT; ATTN: CHERYL BECKER, MANAGER CRED & COLL 722 N. BROADWAY, 11 FL ASC & LSC ACCTS MILWAUKEE, WI  53202 | $317,546.44 | $0.00 | $0.00 | $0.00 | $317,546.44 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |

**Exhibit A**
**No Basis Claims**

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| Claim To Be Expunged | 5502 | Genuity Telecom Inc. | AMERITECH SERVICES, INC.; C/O SBC BANKRUPTCY DEPT; ATTN: CHERYL BECKER, MANAGER CRED & COLL<br>722 N. BROADWAY, 11 FL ASC & LSC ACCTS<br>MILWAUKEE, WI  53202 | $1,036,178.20 | $0.00 | $0.00 | $0.00 | $1,036,178.20 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |
| Claim To Be Expunged | 5963 | Genuity Solutions Inc. | ANDREW P BORGGAARD<br>3 MADISON RD<br>MARBLEHEAD, MA  01945 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | PROOF OF CLAIM DOES NOT SPECIFY AMOUNT OF DAMAGES OR BASIS OF CLAIM |
| Claim To Be Expunged | 5955 | Genuity Inc. | AVRUCH*STEVEN N<br>2 CLARENDON ST #701<br>BOSTON, MA  02116 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | PROOF OF CLAIM DOES NOT SPECIFY AMOUNT OF DAMAGES OR BASIS OF CLAIM |
| Claim To Be Expunged | 2017 | Genuity Inc. | BOSTON EDISON CO. DBA NSTAR ELECTRIC CO; ATTN: MICHAEL K. CALLAHAN; ATTORNEY IN FACT<br>800 BOYLSTON STREET 17TH FLOOR<br>BOSTON, MA  02199 | $0.00 | $93,108.12 | $0.00 | $0.00 | $93,108.12 | CLAIM DOES NOT MATCH BOOKS AND RECORDS |

**Exhibit A**
**No Basis Claims**

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| Claim To Be Expunged | 6180 | Genuity Solutions Inc. | CIT COMMUNICATION FINANCE CORPORATION F/K/A; NEWCOURT COMMUNICATION FINANCE CORPORATION; F/K/A AT&T CREDIT CORPORATION<br>ATTN: BANKRUPTCY DEPARTMENT 1 CTIT DRIVE, STE # 4104A<br>LIVINGSTON, NJ 07039 | $0.00 | $200,610.77 | $0.00 | $0.00 | $200,610.77 | CLAIM DOES NOT MATCH BOOKS AND RECORDS |
| Claim To Be Expunged | 5937 | Genuity Solutions Inc. | CIT COMMUNICATION FINANCE CORPORATION; F/K/A NEWCOURT COMMUNICATION FINANCE CORP.; F/K/A AT&T CREDIT CORPORATION<br>ATTN: BANKRUPTCY DEPARTMENT 1 CIT DRIVE, SUITE 4104A<br>LIVINGSTON, NJ 07039 | $0.00 | $759,476.68 | $0.00 | $0.00 | $759,476.68 | CLAIM DOES NOT MATCH BOOKS AND RECORDS |
| Claim To Be Expunged | 6176 | Genuity Solutions Inc. | CIT COMMUNICATIONS FINANCE CORPORATION; D/B/A AT&T CREDIT CORPORATION; ATTN:CHRIS PHENEY, BANKRUPTCY WORKOUT MANAGER<br>1 CIT DRIVE, BANKRUPTCY DEPARTMENT<br>LIVINGSTON, NJ 07039 | $0.00 | $0.00 | $0.00 | $4,733,672.21 | $4,733,672.21 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INVALID CLAIM FOR RESIDUAL VALUE; CLAIM DOES NOT REFLECT MITIGATION OF DAMAGES BY CLAIMANT |
| Claim To Be Expunged | 4027 | Genuity Inc. | COMPAQ COMPUTER CORPORATION; ATTN: KATHY HOFFMAN; 20555 STATE HWY 249<br>20555 STATE HIGHWAY 249<br>HOUSTON, TX 77070 | $0.00 | $0.00 | $0.00 | $144,662.49 | $144,662.49 | DISPUTED CUSTOMER ACCOUNTS RECEIVABLE BALANCE/SET-OFF RIGHTS AVAILABLE TO DEBTOR |

**Exhibit A**
**No Basis Claims**

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| Claim To Be Expunged | 667 | Genuity Solutions Inc. | ELYNX LTD.; ATTN: RONALD K. FOREMAN, CEO<br>TWO CROWNE POINT COURT SUITE 370<br>CINCINNATI, OH 45241 | $0.00 | $0.00 | $0.00 | $12,588.76 | $12,588.76 | CLAIM DOES NOT MATCH BOOKS AND RECORDS |
| Claim To Be Expunged | 6014 | Genuity Inc. | GUDONIS*PAUL R.<br>9 HICKORY HILL RD<br>MANCHESTER, MA 01944 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | PROOF OF CLAIM DOES NOT SPECIFY AMOUNT OF DAMAGES OR BASIS OF CLAIM |
| Claim To Be Expunged | 5954 | Genuity Inc. | HILEMAN*MARK P<br>298 WILLIS RD<br>SUDBURY, MA 01776 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | PROOF OF CLAIM DOES NOT SPECIFY AMOUNT OF DAMAGES OR BASIS OF CLAIM |
| Claim To Be Expunged | 3552 | Genuity Solutions Inc. | HINES INTEREST LIMITED PARTNERSHIP, AS AGENT; C/O BAKER BOTTS L.L.P.; ATTN: MARY MILLWOOD GREGORY<br>ONE SHELL PLAZA, 910 LOUISIANA<br>HOUSTON, TX 77002-4995 | $0.00 | $0.00 | $2,869.48 | $2,748.03 | $5,617.51 | AMENDED BY CLAIM #5732 FILED 9/29/03 |
| Claim To Be Expunged | 5839 | Genuity Solutions Inc. | HINES LOUISANA WALKER;TRANSFEROR: HINES INTEREST LIMITED PARTNERSHIP C/O BAKER BOTTS, ATTN: THOMAS R. TROWBRIDGE 30 ROCKEFELLER PLAZA<br>NEW YORK, NY 10112 | $0.00 | $616.08 | $0.00 | $0.00 | $616.08 | OBLIGATION PAID IN FULL - VERIFIED WITH MARY GREGORY |

**Exhibit A**
**No Basis Claims**

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| Claim To Be Expunged | 6250 | Genuity Inc. | IA - CASS COUNTY; C/O A.FRANK BARON 750 PIERCE STREET P.O. BOX 717 SIOUX CITY, IA  51102 | $0.00 | $0.00 | $52,868.00 | $0.00 | $52,868.00 | CLAIM FILED LATE AND DOES NOT MATCH BOOKS AND RECORDS |
| Claim To Be Expunged | 6251 | Genuity Inc. | IA - CASS COUNTY; C/O A.FRANK BARON 750 PIERCE STREET P.O. BOX 717 SIOUX CITY, IA  51102 | $0.00 | $0.00 | $26,550.00 | $0.00 | $26,550.00 | CLAIM FILED LATE AND DOES NOT MATCH BOOKS AND RECORDS |
| Claim To Be Expunged | 112 | Genuity Inc. | IRON MOUNTAIN INC.; C/O D&B/RMS BANKRUPTCY SERVICE; ATTN: KIMBERLY HARRIS, AGENT P.O. BOX 5126 TIMONIUM, MA  21094 | $0.00 | $0.00 | $0.00 | $780.20 | $780.20 | CONTRACT ASSUMED & ASSIGNED, DEFAULT CURED |
| Claim To Be Expunged | 399 | Genuity Inc. | IRON MOUNTAIN RECORDS MANAGEMENT, INC; C/O D&B/RMS BANKRUPTCY SERVICE; ATTN: KIMBERLY HARRIS, AGENT P.O. BOX 5126 TIMONIUM, MD  21094 | $0.00 | $0.00 | $0.00 | $21,867.48 | $21,867.48 | CONTRACT ASSUMED & ASSIGNED, DEFAULT CURED |
| Claim To Be Expunged | 5964 | Genuity Solutions Inc. | KUEBEL*ROGER A 22 MIDDLEBURY LANE BEVERLY, MA  01915 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | PROOF OF CLAIM DOES NOT SPECIFY AMOUNT OF DAMAGES OR BASIS OF CLAIM |
| Claim To Be Expunged | 5961 | Genuity Solutions Inc. | LARRY W SCHWARTZ 346 SUMMER ST MANCHESTER, MA  01944 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | PROOF OF CLAIM DOES NOT SPECIFY AMOUNT OF DAMAGES OR BASIS OF CLAIM |

10th Omnibus Claims Objection

Filed

**Exhibit A**
**No Basis Claims**

In re: Genuity, Inc., et al .
Case Nos. 02-43550-pcb through 02-43564-pcb

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| Claim To Be Expunged | 5241 | Genuity Inc. | MCLEODUSA; ATTN: BRYAN D COOK; SUPERVISOR OF WHOLESALE CREDIT P.O. BOX 3284 MILWAUKEE, WI 53201-3284 | $0.00 | $0.00 | $0.00 | $72,663.51 | $72,663.51 | CIRCUITS PREVIOUSLY DISCONNECTED; NO AMOUNTS DUE AND OWING |
| Claim To Be Expunged | 5244 | Genuity Inc. | MCLEODUSA; ATTN: BRYAN D COOK; SUPERVISOR OF WHOLESALE CREDIT PO BOX 3284 MILWAUKEE, WI 53201-3284 | $0.00 | $0.00 | $0.00 | $76,070.14 | $76,070.14 | CIRCUITS PREVIOUSLY DISCONNECTED; NO AMOUNTS DUE AND OWING |
| Claim To Be Expunged | 5766 | Genuity Solutions Inc. | NC- WAKE COUNTY REVENUE DEPARTMENT; ATTN: KEN HEPLER,APPRAISAL/COLLECTION MGR PO BOX 96084 CHARLOTTE, NC 28296-0084 | $0.00 | $4,650.79 | $0.00 | $0.00 | $4,650.79 | CLAIMANT ACKNOWLEDGES NO AMOUNT DUE AND OWING |
| Claim To Be Expunged | 780 | Genuity Inc. | NETG; ; ATTN: MARIA LUNA 1751 WEST DIEHL ROAD SUITE 200 NAPERVILLE, IL 60563 | $0.00 | $0.00 | $0.00 | $72,488.04 | $72,488.04 | CLAIM REPRESENTS PRE-PAID AMOUNT FOR USE BY GENUITY ESTATE |
| Claim To Be Expunged | 5918 | Genuity Inc. | OR- JACKSON COUNTY TAXATION DEPARTMENT; C/O SUSSMAN SHANK LLP; ATTN: SUSAN S. FORD-ATTORNEY 1000 SW BROADWAY-SUITE 1400 PORTLAND, OR 97205-3089 | $0.00 | $26,850.91 | $0.00 | $0.00 | $26,850.91 | CLAIM FOR 2003 TAXES PAID BY LEVEL 3 - CLAIMANT AGREES NO AMOUNT DUE |

**Exhibit A**

**No Basis Claims**

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| Claim To Be Expunged | 5919 | Genuity Inc. | OR- JOSEPHINE COUNTY TAXATION DEPARTMENT; C/O SUSSMAN SHANK LLP; ATTN: SUSAN S. FORD-ATTORNEY 1000 SW BROADWAY-SUITE 1400 PORTLAND, OR  97205-3089 | $0.00 | $974.21 | $0.00 | $0.00 | $974.21 | CLAIM FOR 2003 TAXES PAID BY LEVEL 3 - CLAIMANT AGREES NO AMOUNT DUE |
| Claim To Be Expunged | 5920 | Genuity Inc. | OR- MULTNOMAH COUNTY; DEPARTMENT OF ASSESSMENT & TAXATION; C/O SUSSMAN SHANK LLO ATTN: SUSAN S. FORD, ATTORNEY 1000 S.W. BROADWAY, SUITE 1400 PORTLAND, OR  97205-3089 | $0.00 | $10,092.20 | $0.00 | $0.00 | $10,092.20 | CLAIM FOR 2003 TAXES PAID BY LEVEL 3 - CLAIMANT AGREES NO AMOUNT DUE |
| Claim To Be Expunged | 6165 | Genuity Inc. | PACIFIC BELL TELEPHONE COMPANY; SBC COMMUNICATIONS; C/O BANKRUPTCY DEPARTMENT ATTN: CHERYL BECKER, MRG-CREDIT & COLLECTIONS 722 N. BROADWAY, 11TH FLOOR MILWAUKEE, WI  53202 | $0.00 | $870,427.85 | $0.00 | $0.00 | $870,427.85 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT CLAIM INCLUDES TERMINATION LIABILITIES, SUCH AMOUNTS ARE NOT ENTITLED TO ADMINISTRATIVE EXPENSE STATUS |
| Claim To Be Expunged | 3772 | Genuity Solutions Inc. | PACIFIC BELL TELEPHONE COMPANY; SBC COMMUNICATIONS; C/O BANKRUPTCY DEPT ATTN: CHERYL BECKER, MANAGER CREDIT & COLL. 722 N. BROADWAY, 11FL MILWAUKEE, WI  53202 | $869,369.64 | $0.00 | $0.00 | $0.00 | $869,369.64 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |

**Exhibit A**
**No Basis Claims**

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| Claim To Be Expunged | 3776 | Genuity Telecom Inc. | PACIFIC BELL TELEPHONE COMPANY; SBC COMMUNICATIONS; C/O BANKRUPTCY DEPT ATTN: CHERYL BECKER, MANAGER CREDIT & COLL. 722 N. BROADWAY, 11FL MILWAUKEE, WI  53202 | $368,849.25 | $0.00 | $0.00 | $0.00 | $368,849.25 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |
| Claim To Be Expunged | 5962 | Genuity Solutions Inc. | PARKER*IRA H 224 LOWELL RD WELLESLEY, MA  02481 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | PROOF OF CLAIM DOES NOT SPECIFY AMOUNT OF DAMAGES OR BASIS OF CLAIM |
| Claim To Be Expunged | 6248 | Genuity Inc. | PITNEY BOWES CREDIT CORPORATION; ATTN: RECOVERY DEPT. 27 WATERVIEW DR. SHELTON, CT  06484 | $0.00 | $0.00 | $0.00 | $27,601.77 | $27,601.77 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED |
| Claim To Be Expunged | 6019 | Genuity Telecom Inc. | SBC AFFILIATES, ET AL; C/O POTTER ANDERSON & CORROON LLP; ATTN: LAURIE SELBER SILVERSTEIN HERCULES PLAZA- 6TH FLOOR 1313 NORTH MARKET STREET- P.O. BOX 951 WILMINGTON, DE  19899 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | TO THE EXTENT CLAIM INCLUDES AMOUNTS INCURRED POST-PETITION, DOES NOT MATCH BOOKS AND RECORDS; PORTION OF CLAIM RELATING TO PRE-PETITION CURE HAS BEEN SATISFIED BY CURE PAYMENT (5/03) AND DEPOSIT APPLICATION; INSUFFICIENT DOCUMENTATION PROVIDED |

**Exhibit A**
**No Basis Claims**

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| **Claim To Be Expunged** | 6031 | Genuity Solutions Inc. | SBC AFFILIATES, ET AL; C/O POTTER ANDERSON & CORROON LLP; ATTN: LAURIE SELBER SILVERSTEIN HERCULES PLAZA- 6TH FLOOR 1313 NORTH MARKET STREET- P.O. BOX 951 WILMINGTON, DE  19899 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | DUPLICATIVE OF CLAIM #6019; SEE OBJECTION DESCRIPTION ABOVE |
| **Claim To Be Expunged** | 3454 | Genuity Telecom Inc. | SBC CALIFORNIA; C/O BANKRUPTCY RECOVERY CENTER; ATTN: R. THOMAS, BANKRUPTCY REP. P.O. BOX 981268 WEST SACRAMENTO, CA  95851 | $0.00 | $0.00 | $0.00 | $52,451.78 | $52,451.78 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |
| **Claim To Be Expunged** | 3455 | Genuity Inc. | SBC CALIFORNIA; C/O BANKRUPTCY RECOVERY CENTER; ATTN: R. THOMAS, BANKRUPTCY REP. P.O. BOX 981268 WEST SACRAMENTO, CA  95851 | $0.00 | $0.00 | $0.00 | $1,275,838.71 | $1,275,838.71 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |

**Exhibit A**
**No Basis Claims**

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| **Claim To Be Expunged** | 3456 | Genuity Solutions Inc. | SBC CALIFORNIA; C/O BANKRUPTCY RECOVERY CENTER; ATTN: R. THOMAS, BANKRUPTCY REP. P.O. BOX 981268 WEST SACRAMENTO, CA 95851 | $0.00 | $0.00 | $0.00 | $130,042.28 | $130,042.28 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |
| **Claim To Be Expunged** | 3815 | Genuity Inc. | SBC COMMUNICATIONS; ATTN: KATHY TOROK, CREDIT ADMIN ONE RAVINIA DRIVE, SUITE 700 ATLANTA, GA 30346 | $0.00 | $0.00 | $0.00 | $106,499.39 | $106,499.39 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |
| **Claim To Be Expunged** | 3469 | Genuity Inc. | SHERWOOD PARTNERS INC A CALIFORNIA CORP/BENEF; AS ASSIGNEE OF: BENEFIT OF CREDITORS OF NETIGY; C/O SULMEYER, KUPETZ, BAUMANN & ROTHMAN ATTN: DANIEL LEV, ESQ. 300 S. GRAND AVENUE, 14TH FLOOR LOS ANGELES, CA 90071 | $0.00 | $0.00 | $0.00 | $203,737.18 | $203,737.18 | DISPUTED CLAIM; CLAIMANT DID NOT PROVIDE ADEQUATE INVOICE SUPPORT |

10th Omnibus Claims Objection

**Exhibit A**

**No Basis Claims**

In re: Genuity, Inc., et al .

Case Nos. 02-43550-pcb through 02-43564-pcb

Filed

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| **Claim To Be Expunged** | 5500 | Genuity Telecom Inc. | SOUTHERN NEW ENGLAND TELEPHONE CO * THE; SBC COMMUNICATIONS; C/O BANKRUPTCY DEPT ATTN: CHERLY BECKER, MANAGER CRED & COLL 722 N. BROADWAY, 11 FL MILWAUKEE, WI 53202 | $249,832.77 | $0.00 | $0.00 | $0.00 | $249,832.77 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |
| **Claim To Be Expunged** | 6163 | Genuity Inc. | SOUTHERN NEW ENGLAND TELEPHONE COMPANY*THE; SBC COMMUNICATIONS; C/O BANKRUPTCY DEPARTMENT ATTN: CHERYL BECKER, MRG-CREDIT & COLLECTIONS 722 N. BROADWAY, 11 FLOOR MILWAUKEE, WI 53202 | $0.00 | $15,404.05 | $0.00 | $0.00 | $15,404.05 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT CLAIM INCLUDES TERMINATION LIABILITIES, SUCH AMOUNTS ARE NOT ENTITLED TO ADMINISTRATIVE EXPENSE STATUS |
| **Claim To Be Expunged** | 6167 | Genuity Inc. | SOUTHERN NEW ENGLAND TELEPHONE COMPANY*THE; SBC COMMUNICATIONS; C/O BANKRUPTCY DEPARTMENT ATTN: CHERYL BECKER, MRG-CREDIT & COLLECTIONS 722 N. BROADWAY, 11 FLOOR MILWAUKEE, WI 53202 | $0.00 | $7,088.52 | $0.00 | $0.00 | $7,088.52 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT CLAIM INCLUDES TERMINATION LIABILITIES, SUCH AMOUNTS ARE NOT ENTITLED TO ADMINISTRATIVE EXPENSE STATUS |

**Exhibit A**
**No Basis Claims**

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| Claim To Be Expunged | 1429 | Genuity Solutions Inc. | SOUTHWESTERN BELL TELEPHONE COMPANY; C/O BANKRUPTCY DEPT.; ATTN: J.S ARCENEAUX, BANKRUPTCY REP<br>555 MAIN ROOM 416<br>BEAUMONT, TX  77701 | $47,782.78 | $0.00 | $0.00 | $694,050.32 | $741,833.10 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |
| Claim To Be Expunged | 5752 | Genuity Solutions Inc. | SOUTHWESTERN BELL TELEPHONE COMPANY; C/O BANKRUPTCY DEPT.; ATTN: J.S ARCENEAUX, BANKRUPTCY REP<br>555 MAIN ROOM 416<br>BEAUMONT, TX  77701 | $0.00 | $0.00 | $0.00 | $66,514.87 | $66,514.87 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |
| Claim To Be Expunged | 6164 | Genuity Inc. | SOUTHWESTERN BELL TELEPHONE COMPANY; SBC COMMUNICATIONS; C/O BANKRUPTCY DEPARTMENT<br>ATTN: CHERYL BECKER, MRG-CREDIT & COLLECTIONS 722 N. BROADWAY, 11TH FLOOR<br>MILWAUKEE, WI  53202 | $0.00 | $451,392.90 | $0.00 | $0.00 | $451,392.90 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT CLAIM INCLUDES TERMINATION LIABILITIES, SUCH AMOUNTS ARE NOT ENTITLED TO ADMINISTRATIVE EXPENSE STATUS |

10th Omnibus Claims Objection

**Exhibit A**

In re: Genuity, Inc., _et al_ .

Filed

**No Basis Claims**

Case Nos. 02-43550-pcb through 02-43564-pcb

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| **Claim To Be Expunged** | **5499** | Genuity Telecom Inc. | SOUTHWESTERN BELL TELEPHONE COMPANY; SBC COMMUNICATIONS; C/O BANKRUPTCY DEPT ATTN: CHERYL BECKER, MANAGER CREDIT & COLL 722 N. BROADWAY, 11FL MILWAUKEE, WI  53202 | $588,730.04 | $0.00 | $0.00 | $0.00 | $588,730.04 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; INSUFFICIENT DOCUMENTATION PROVIDED; TO THE EXTENT ANY AMOUNTS ARE VALID, SUCH AMOUNTS ARE INCLUDED IN THE REDUCED CLAIM AMOUNT SET FORTH IN THE OBJECTION TO CLAIM #3381 ON EXHIBIT B |
| **Claim To Be Expunged** | **5501** | Genuity Solutions Inc. | SOUTHWESTERN BELL TELEPHONE COMPANY; SBC COMMUNICATIONS; C/O BANKRUPTCY DEPT ATTN: CHERYL BECKER, MANAGER CREDIT & COLL 722 N. BROADWAY, 11FL MILWAUKEE, WI  53202 | ($18,208.83) | $0.00 | $0.00 | $0.00 | ($18,208.83) | CLAIM DOES NOT MATCH BKS & REC.; INSUFF. DOC. PROVIDED; DEP. BY DEBTORS MAY NOT BE SET-OFF AGAINST NON-CURE CLAIMS; TO EXTENT ANY AMTS ARE VALID, SUCH AMTS ARE INCL. IN RED. CLAIM AMT SET FORTH IN OBJ. TO CLAIM #3381 ON EXH. B |
| **Claim To Be Expunged** | **5853** | Genuity Inc. | SPRINT COMMUNICATIONS COMPANY LP; ATTN: TINA MICHELLE HALL-BANKRUPTCY MANAGER; M/S: KSOPHT0101-Z2900 6391 SPRINT PARKWAY OVERLAND PARK, KS  66251-2900 | $0.00 | $0.00 | $171,795.90 | $0.00 | $171,795.90 | CLAIMANT HAS WITHDRAWN CLAIM AS EVIDENCED BY COPY OF LETTER MAILED TO COURT |
| **Claim To Be Expunged** | **5973** | Genuity Solutions Inc. | TEXAS ONE CALL SYSTEM; ONE CALL SYSTEMS INC.; ATTN: MARK SULLIVAN, ESQ. 115 EVERGREEN HEIGHTS DRIVE PITTSBURGH, PA  15229 | $0.00 | $363.25 | $0.00 | $0.00 | $363.25 | CLAIM PAID BY LEVEL 3 4/22/03 CHECK #3143766 |

**Exhibit A**
**No Basis Claims**

| | Claim # | Debtor | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|---|
| Claim To Be Expunged | 6211 | Genuity Inc. | TX- COUNTY OF DENTON, CITY OF JUSTIN ET AL; C/O MCCREARY VESELKA BRAGG & ALLEN, P.C.; ATTN: MICHAEL REED, ESQ. 5929 BALCONES DRIVE, SUITE 200 PO BOX 26990 AUSTIN, TX 78755 | $38,103.31 | $0.00 | $0.00 | $0.00 | $38,103.31 | DISPUTED CLAIM |
| Claim To Be Expunged | 1697 | Genuity Solutions Inc. | WA- BENTON COUNTY TREASURER; C/O BENTON COUNTY PROSECUTING ATTORNEY; ATTN: DUANE DAVIDSON, TREASURER 7320 WEST QUINAULT KENNEWICK, WA 99350 | $0.00 | $8,790.80 | $0.00 | $0.00 | $8,790.80 | CLAIMANT HAS WITHDRAWN CLAIM AS EVIDENCED BY COPY OF LETTER MAILED TO COURT |
| Claims To Be Expunged Totals | | | 53 | $3,498,183.60 | $4,595,814.72 | $254,083.38 | $7,694,277.16 | $16,042,358.86 | |

10th Omnibus Claims Objection

Filed

**Exhibit B**
**Reduce/Reclassify**

In re: Genuity, Inc., et al.

Case Nos. 02-43550-pcb through 02-43564-pcb

| | Claim # | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|
| **Filed Claim Amount** | 825 | BACK BAY SIGN CO; ATTN: ROBERT E SCHARJBE, OWNER | $0.00 | $0.00 | $0.00 | $1,499.77 | $1,499.77 | REDUCE CLAIM TO SCHEDULED AMOUNT |
| **Reclassified/Reduced To** | | 236 PEARL ST SOMERVILLE, MA  02145 | $0.00 | $0.00 | $1,400.00 | $0.00 | $1,400.00 | |
| **Filed Claim Amount** | 5336 | CENTURYTEL, INC.; ATTN: REX D. RAINACH; A PROFESSIONAL LAW CORPORATION | $0.00 | $0.00 | $0.00 | $510,016.71 | $510,016.71 | ORIGINALLY SOUGHT TO REDUCE FROM $510K TO $180K; ESTATE VERIFIED REDUCED AMOUNT AND OFFSET A/R BALANCE |
| **Reclassified/Reduced To** | | 3622 GOVERNMENT STREET BATON ROUGE, LA  70806-5720 | $0.00 | $0.00 | $0.00 | $433,398.27 | $433,398.27 | |
| **Filed Claim Amount** | 6042 | INTERSTATE FIBERNET, INC.; ATTN: DARVIN MORRIS, ESQ. | $0.00 | $172,968.69 | $0.00 | $0.00 | $172,968.69 | CLAIM DOES NOT MATCH BOOKS AND RECORDS; CLAIMANT HAS NOT PROVIDED ADEQUATE SUPPORT |
| **Reclassified/Reduced To** | | 4092 SOUTH MEMORIAL PARKWAY HUNTSVILLE, AL  35802 | $0.00 | $44,446.00 | $0.00 | $0.00 | $44,446.00 | |
| **Filed Claim Amount** | 4209 | MCLEOD COMMUNICATION; MCLEOD USA | $0.00 | $0.00 | $0.00 | $84,343.30 | $84,343.30 | DISPUTED CIRCUIT DISCONNECT/TRANSFER DATES |
| **Reclassified/Reduced To** | | PO BOX 3284 MILWAUKEE, WI  53201-3284 | $0.00 | $0.00 | $0.00 | $2,346.35 | $2,346.35 | |
| **Filed Claim Amount** | 261 | PSINET LIQUIDATING, LLC; C/O GAZES & ASSOCIATES; ATTN: IAN J. GAZES | $0.00 | $0.00 | $0.00 | $194,848.51 | $194,848.51 | CLAIM DOES NOT MATCH BOOKS AND RECORDS |
| **Reclassified/Reduced To** | | 1675 BROADWAY, 26TH FLOOR NEW YORK, NY  10019 | $0.00 | $0.00 | $0.00 | $15,677.34 | $15,677.34 | |
| **Filed Claim Amount** | 3381 | SBC AMERITECH CORPORATION; ATTN: PATRICIA A. BAER; BANKRUPTCY REPRESENTATIVE | $0.00 | $0.00 | $0.00 | $2,197,815.02 | $2,197,815.02 | REDUCED AMOUNT REFLECTS AGGREGATE PRE-PETITION SUM DUE TO SBC AND ALL OF ITS AFFILIATES AS SHOWN ON BOOKS AND RECORDS; INSUFFICIENT SUPPORT PROVIDED; REDUCED CLAIM AMOUNT REFLECTS APPLICATION OF DEPOSIT |
| **Reclassified/Reduced To** | | P.O. BOX 981268 WEST SACRAMENTO, CA  95798 | $0.00 | $0.00 | $0.00 | $2,069,899.00 | $2,069,899.00 | |
| **Filed Claim Amount** | 4031 | TELEFONICA DATA; ATTN: JUAN T. PENAGARICANO, GENERAL MANAGER | $0.00 | $0.00 | $217,279.77 | $0.00 | $217,279.77 | DISPUTED CIRCUIT DISCONNECT/TRANSFER DATES; A/R OFFSET APPLIED |
| **Reclassified/Reduced To** | | P.O.BOX 71389-8489 SAN JUAN, PR  00936-8489 | $0.00 | $0.00 | $0.00 | $12,992.67 | $12,992.67 | |

**Exhibit B**
**Reduce/Reclassify**

| | Claim # | Name and Address of Claimant | Secured | Administrative | Priority | Unsecured | Total | Objection Description |
|---|---|---|---|---|---|---|---|---|
| **Filed Claim Amount** | 4444 | WORLD ACCESS, INC. AND  WORLD ACCESS; TELECOMMUNICATIONS GROUP, INC.; C/O ALSTON & BIRD LLP | $0.00 | $0.00 | $0.00 | $26,736.00 | $26,736.00 | CLAIM DOES NOT MATCH BOOKS AND RECORDS |
| **Reclassified/Reduced To** | | ATTN: CHRISTOPHER S. STRICKLAND, ESQ. 1201 WEST PEACHTREE STREET ATLANTA, GA  30309-3424 | $0.00 | $0.00 | $0.00 | $12,699.60 | $12,699.60 | |
| **Filed Claim Totals** | 8 | | $0.00 | $172,968.69 | $217,279.77 | $3,015,259.31 | $3,405,507.77 | |
| **Reclassified/Reduced Totals** | | | $0.00 | $44,446.00 | $1,400.00 | $2,547,013.23 | $2,592,859.23 | |

Related Docket Item 2394
Hearing Date: February 9, 2005

Andrew C. Kassner (AK-9067)
DRINKER BIDDLE & REATH LLP
One Logan Square  18th & Cherry Streets
Philadelphia, PA 19103
Telephone:  (215) 988-2700
Facsimile: (215) 988-2757

Attorneys for CIT Communications Finance Corporation

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X
In re:                                                             :

GENUITY INC., et al.,                                              :        Chapter 11

                Debtors.                              :        Case No. 02-43558 (PCB)

                                              :

                                              :        (Jointly Administered)
-------------------------------------------------------------------- X

**RESPONSE OF CIT COMMUNICATIONS FINANCE CORPORATION TO**
**THE TENTH OMNIBUS OBJECTION TO CLAIMS**

      CIT Communications Finance Corporation ("CIT"), by and through their undersigned

counsel, respond to the Tenth Omnibus Objection to Claims (the "Objection") as follows:

**FACTUAL BACKGROUND**

      1.      On November 27, 2002 (the "Petition Date"), Genuity Inc. and its related

entities (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the

United States Bankruptcy Code, 11 U.S.C. 101, et. seq. (the "Bankruptcy Code").

      2.      CIT is the lessor of certain equipment (the "Equipment") to one or more of

the Debtors pursuant to Master Equipment Lease Agreement E212580 (the "Lease"), and various

Schedules relating thereto (the "Schedules"). The Equipment is located at various facilities in the

United States.

3.      On November 27, 2002, the Debtors filed the Motion for Order Under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 (I) (A) Approving Notice and Bidding Procedures, (B) Approving Bid Protections, Including Breakup Fee, Overbid Protections and Expense Reimbursement, in Connection with the Proposed Sale of Substantially All of the Debtors' Assets and (C) Scheduling Hearing and Setting Bidding and Objection Deadlines in Connection with Such Sale; and (II) Authorizing and Approving (A) Asset Purchase Agreement with Level 3 Communications, Inc. and Level 3 Communications, LLC, (B) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances, (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (D) Certain Related Relief (Docket No. 24) (the "Sale Motion").

4.      On January 15, 2003, CIT filed its Objection to the Sale Motion (Docket No. 337) (the "Sale Objection").

5.      On January 24, 2003, the United States Bankruptcy Court for the Southern District of New York granted certain relief requested in the Sale Motion by entering the Order Under 11 U.S.C. §§ 105(a), 363, 365 and 1146(c) and Fed. R. Bankr. P. 2002, 6004 and 6006 Authorizing and Approving (I) Asset Purchase Agreement with Level 3 Communications, Inc. and Level 3 Communications, LLC; (II) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances; (III) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Certain Related Relief (Docket No. 438) (the "Sale Order").  On January 27, 2003, this Court entered a Stipulation and Order regarding the objection of CIT Communications Finance Corporation to sale of debtors' assets, assumption and assignment of certain executory contracts and unexpired leases (Docket No. 459) (the "Consent Order").

6.    Subsequent to the entry of the Sale Order, the Debtors transferred possession of the Equipment to the purchaser. On March 11, 2003, the Debtors filed a notice with the Bankruptcy Court rejecting certain of the Schedules "effective March 24, 2003." (Docket No. 627).  The remainder of the Schedules were rejected pursuant to the Debtors Joint Consolidated Plan of Liquidation, As Modified (the "Plan") with an effective date of December 2, 2003.  To date, CIT has yet to receive possession of all of its Equipment.

7.    On or about September 22, 2004, the Debtors filed the instant Objection, objecting to multiple claims filed by CIT.[1]

Administrative Expense Claims

8.    As required by various bar date notices, CIT filed two separate administrative expense claims in these Chapter 11 cases.  These administrative expense claims reflected CIT's estimate of its administrative expense claim at the time of the filing of the claims. In its Objection, the Trustee set forth a general objection to the administrative expense claims that are the subject of the Objection.  Specifically, as to claims 6180 and 5937 (the "Administrative Claims"), the Trustee alleges that "Claim does not match books and records".

Prepetition Claim

9.    In accordance with the procedures approved by the Bankruptcy Court, CIT filed a proof of claim reflecting amounts due and owing CIT if the Debtors decided to reject the Lease.  With respect to CIT's prepetition claim (the "Prepetition Claim" and together with the Administrative Claims, the "CIT Claims"), claim 6176, the Trustee conclusorily states, "Claim

---

[1]  It appears that the Debtors failed to serve the Objection as required by Fed.R.Bankr.P. 7004(b)(3), as incorporated by Fed.R.Bankr.P. 9014.  Although a claim objection constitutes a contested matter, it does not appear that the Debtors served the Objection upon any particular officer, managing or general agent of CIT.

does not match books and records; Invalid Claim for Residual Value; Claim Does not Reflect

Mitigation of Damages by Claimant".

## THE DEBTORS' OBJECTION IS INSUFFICIENT TO OVERCOME THE PRIMA FACIE VALIDITY OF THE CIT CLAIMS

10.     The CIT Claims were filed with adequate information, listing each

account and the damages suffered.

11.     The CIT Claims were filed in accordance with the Bankruptcy Code and

the Federal Rules of Bankruptcy Procedure.  Pursuant to Fed.R.Bankr.P. 3001(f), the CIT Claims

are "prima facie evidence of the validity and amount" of each claim.

12.     In order to overcome the presumption of validity of the CIT Claims, the

party opposing the claim must present evidence equal in force to the prima facie case. See In re

Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992).  The evidence presented must be of

substance, as "the mere denial of the validity or amount is not sufficient." In re Glenn, 100 B.R.

763, 766 (Bankr. W.D. Pa. 1989).  Moreover, "the burden of going forward with the proof is on

the objecting [party], not the claimant.  That burden is not satisfied by the mere filing of an

objection." In re Lanza, 51 B.R. 125, 127 (Bankr. D. N.J. 1985) (citations omitted). An objection

alone is not sufficient to meet these standard since "the objection in and of itself is a mere

statement of invalidity and insufficient to contest-the prima facie case. A trustee must document

his objection with probative evidence to satisfy his burden of going forward." In re King

Resources Co., 20 B.R. 191, 197 (D. Colo. 1982).

13.     The specifics behind the Debtors' general basis for objecting to the CIT

Claims is unclear.  To the extent the Debtors' basis for objection is failure to mitigate, the

Debtors cite to no evidence that CIT did not in fact mitigate its damages, or that CIT was under a

duty to mitigate its damages.  Such a bald assertion, without supporting evidence, is akin to the

Debtors claiming that the CIT Claims do not agree with the Debtor's books and records, a claim insufficient to overcome the prima facie validity of the properly filed CIT Claims. See In re MichiganWisconsin Transp. Co., 161 B.R. 628, 637 (Bankr. W.D.Mich. 1993) (holding that in the absence of any evidence other than a books and records objection, the objection to claim must be overruled). See also In re Good Hope Industries, Inc., 16 B.R. 719, 721 (Bankr. D.Mass. 1982) (holding that basing an objection on the fact that Debtor's books and records did not reflect the amounts claimed was impertinent when the proof of claim was supported with adequate documentation); In re Systems Comm., Inc., 234 B.R. 143, 144 (Bankr. M.D.Fla. 1999) ("A debtor's book and record entries, presented alone, cannot be binding on a creditor. To hold otherwise would mean that if a debtor keeps no books and records it does not have any obligations, a proposition absurd on its face.").

14.    For the foregoing reasons, this Court should deny the Objection.

## CIT WAS UNDER NO DUTY TO MITIGATE DAMAGES AFTER REJECTION OF ITS UNEXPIRED LEASE WITH THE DEBTORS

15.    The Debtors provide no support for its assertion that CIT was under a duty to mitigate its damages after rejection of its unexpired lease with the Debtors.

16.    There is no requirement in the Bankruptcy Code that personal property lessors' mitigate their damages after rejection of their leases. There is, however, such a provision for real property lessors. See 11 U.S.C. § 502(b)(6).  Had Congress intended the same requirements apply to lessors of personal property, it would have explicitly provided for it, and without such, the Debtors should not be allowed to create requirements and write them into the Bankruptcy Code.[2]

---

[2] CIT recognizes that there exists case law in this District supporting the proposition that it has a duty to mitigate its damages. See In re 375 Park Avenue Assoc. Inc., 182 B.R. 690 (Bankr. S.D.N.Y. 1995).  To the extent such a duty

17.     Finally, as discussed above, not all of the Equipment has been returned to CIT.  With respect to Equipment that CIT has recovered, it has attempted to mitigate its damages and re-sell the recovered Equipment.  With respect to Equipment not returned to CIT, CIT has been precluded from mitigating its damages.  For these reasons, the Court should deny the Objection.

### CIT IS ENTITLED TO ITS LIQUIDATED DAMAGES CLAIM

18.     Under New Jersey law[3] (which governs the Lease), liquidated damages provisions in a commercial contract between sophisticated parties are presumptively reasonable, and the party challenging such provisions has the burden of proving their unreasonableness. MetLife Cap. Finan. Corp. v. Washington Ave. Assoc. LP, 732 A.2d 493, 502 (N.J. 1999). The test is whether the liquidated damages clause is reasonable "under the totality of the circumstances" or whether the size of enhanced default damages suggests a punitive intent.  Id. This test may be applied either at the time the contract is made or when it is breached.  Id. at 503.

19.     The liquidated damages clause in the Lease allows CIT to exercise "one or more of the following remedies" in the event of the Debtors' breach:

(1) accrued, unpaid rent at the time of default;

(2) plus the present value of all future payments under the Lease;

(3) plus the residual value of the Equipment at the end of the lease term discounted to present value;

(4) plus all other amounts due and owing CIT under each Schedule;

---

exists, CIT has attempted to mitigate its damages and is prepared to present evidence at a hearing on the Debtors' Objection.

[3] Debtors and CIT included a New Jersey choice of law provision in the Lease.  The Lease bore a reasonable relation to the State of New Jersey, where the lessor has its headquarters at the time the Lease was executed. Therefore, New Jersey law applies to the interpretation of the Lease.

(5) minus the net proceeds of any sale or re-lease of the Equipment.

In a case squarely on point, <u>In re Snelson</u>, 305 B.R. 255 (Bankr. N.D. Tex. 2003), the court analyzed a similar liquidated damages provision as the one involved in the instant case. Additionally, the lease was analyzed under New Jersey law, which happens to be the same law at issue in this case. In <u>Snelson</u>, the court upheld the validity of the liquidated damages provision determining that such clause did not constitute an impermissible penalty. In upholding the liquidated damages provision, the court cited with approval the <u>Coastal Leasing</u> and <u>Baldwin</u> cases discussed herein. In <u>Coastal Leasing Corp. v. T-Bar S Corp.</u>, 496 S.E.2d 795 (N.C. App. 1998), the court upheld a clause that "placed plaintiff in the position it would have occupied had the lease been fully performed by allowing it to accelerate the balance of the lease payments and repossess the equipment. In <u>Case Credit Corp. v. Baldwin Rental Centers, Inc.</u>, 228 B.R. 504 (Bankr. S.D. Ga. 1998), the court approved a clause providing that the lessor was entitled to (1) any accrued, unpaid rent at the time of breach, plus (2) the present value of the rent for the remainder of the lease, plus (3) the residual value of the equipment, minus (4) the present value of the net proceeds resulting from the disposition of the equipment. The <u>Baldwin</u> court concluded that a liquidated damages clause in a lease is likely to be reasonable if it contains two elements: (1) the balance of the lease payments reduced to present value, and (2) a credit to the lessee for the amount the lessor receives, or would receive, upon selling or re-leasing the property. <u>Baldwin</u>, 228 B.R. at 509. Such a clause is identical to the one contained in CIT's Lease. The <u>Baldwin</u> court, relying on evidence of the estimated value of the equipment at the end of the lease term, found that inclusion of the residual value would not make the formula unreasonable or result in greater payment to the lessor than the lessee would have paid in the absence of a breach. The <u>Baldwin</u> court also noted that this formula is presumptively reasonable

because the drafters of UCC 2A-504 contemplated "just such a provision" in the Official

Comment to section 2A-504.  <u>Id</u>. at 509-10.

20.    As for the other elements of damages CIT may seek pursuant to the Lease

(e.g., interest, late charges, costs of collection), they are the kinds of consequential damages that

are permissible under New Jersey law as reasonably calculated to compensate creditors for the

damages occasioned by delinquent payments.  N.J.S.A. 12A:2A-503(3) (consequential damages

may be liquidated in the lease as long as they are not unconscionable); <u>Metlife Cap. Fin. Corp. v.</u>

<u>Washington Ave. Assoc. LP</u>, 732 A.2d 493, 502-03 (N.J. 1999) (upholding fixed late charges

and elevated default interest rate).

21.    While there appears to be no cases construing N.J.S.A 12A:2A-504, New

Jersey's general approach to liquidated damages clauses in similar contexts will supply the

standard of decision.  <u>See</u> <u>e.g.</u>, <u>In re Montgomery Ward Holding Corp.</u>, 326 F.3d 383 (3d Cir.

2003) ("Although Illinois courts have not yet taken the occasion to look to…UCC 2A-504 to

decide on the validity of a claimed liquidated damages provision in the lease context, their

consistent approach to all damages issues is that the victim of a breach cannot be placed in a

better position than it would have occupied if the contract had been performed…").  <u>Metlife</u>,

<u>supra</u>, is the leading New Jersey case on the topic of liquidated damages clauses.  <u>Metlife</u>

dictates a significantly more permissive standard for creditors than <u>Montgomery Ward</u>, which

not only applies Illinois law but confronts a fundamentally different and blatantly punitive set of

facts.[4]  In sum, the Debtors have not carried their burden of overcoming the presumption that the

---

[4] In <u>Montgomery Ward</u>, the court analyzed a "leveraged lease" in which the lessor charged disproportionately low
rents for its equipment, essentially gambling on the lessee's willingness to renew the lease at the end of the initial
term.  The lease contained a liquidated damages provision that sought to compensate the lessor for its failed gamble
by forcing the lessee to pay inflated "casualty values" upon default.  As a result the court found that the 3.5 million
the lessor was awarded by the bankruptcy court under the liquidated damages clause was more than double the

liquidated damages clause in the Lease is reasonable.  For the foregoing reasons, this Court

should deny the Objection.

## CIT IS ENTITLED TO ITS ADMINISTRATIVE EXPENSE CLAIM

22.    Section 503(b)(1)(A) of the Bankruptcy Code allows a party to recover

"the actual, necessary costs and expenses of preserving the estate" as administrative expenses.

Pursuant to this provision, "That which is actually utilized . . . in the operation of a debtor's

business is a necessary cost and expense of preserving the estate and should be accorded the

priority of an administrative expense."  Broadcast Corp. of Georgia v. Broadfoot, II (In re

Subscription Television of Greater Atlanta), 789 F.2d 1530, 1532 (11th Cir. 1986); Philadelphia

Co. v. Dipple, 312 U.S. 168, 174-75 (1941).   Additionally, section 365(d)(10) of the Bankruptcy

Code mandates that the Debtors perform their obligations under the Lease, including payment of

all payments due thereunder.

23.    Accordingly, CIT is entitled to receive as an allowed administrative

expense under 11 U.S.C. §§ 503(b)(1)(A) and 365(d)(10) for payments due and owing under the

Lease or otherwise for the post-petition period commencing on the Petition Date through the date

of surrender of the Equipment to CIT.  See Farber v. Wards Co., 825 F.2d 684, 689-90 (2d Cir.

1987) (recognizing a presumption that contractual payment terms are a reasonable measure of

the administrative expenses to be allowed); In re Ames Dept. Stores, Inc., 306 B.R. 43 (Bankr.

S.D.N.Y. 2004) (noting that creditor may be entitled to post rejection rent at contract rate upon

traditional 503(b) analysis); Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant &

Russell, Inc.), 853 F.2d 700, 707 (9th Cir. 1988) (recognizing a presumption that contractual

payment terms are a reasonable measure of the administrative expenses to be allowed); Litho

---

amount the lessor would have collected if the lease had been fully performed.  This clause, which is clearly
distinguishable from the one in CIT's Lease, was held to be a penalty.

Specialties, Inc. v. Fleet Credit Corp. (In re Litho Specialties, Inc.), 154 B.R. 733, 736 (D. Minn. 1993) (finding that this presumption of reasonableness can only be rebutted by "substantial and convincing proof by the Debtor that the imposition of the [contractual] terms would be unwarranted"); In re Cardinal Indus., 151 B.R. 838, 842-43 (Bankr. S.D. Ohio 1992) (noting that the debtor is not entitled to a "bargain basement" rate of compensation); In re Beverage Canners Int'l Corp., 255 B.R. 89, 93 (Bankr. S.D. Fla. 2000) ("Presumptively, the value of consideration received under an executory contract is the amount set forth in the contract.").

**IF THE OBJECTION IS NOT OVERRULED WITH RESPECT TO THE CIT CLAIMS, THE ISSUES CONCERNING THOSE PROOFS OF CLAIM SHOULD BE SEVERED FROM THE OBJECTION AS THEY WERE IMPROPERLY JOINED WITH THE DEBTORS' OTHER CLAIMS OBJECTIONS**

24.    Federal Rule of Bankruptcy Procedure 7020 provides that "[a]ll persons may be joined in one action as defendants if there is asserted against them jointly, severally, or in the alternative, any right to relief in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all defendants will arise in the action." Fed.R.Bankr.P. 7020. Federal Rule of Bankruptcy Procedure 7021, as incorporated by Fed.R.Bankr.P. 9014, provides that "[p]arties may be dropped or added by order of the court" and "[a]ny claim against a party may be severed and proceeded with separately." Fed.R.Bankr.P. 7021.

25.    The Objection asserts many different bases for objecting to the numerous claims. There are no common facts, occurrences, transactions or series of occurrences or transactions concerning those claims. Certainly, each claimant should not have to sit through a hearing over many days concerning the basis for, and objections to, *all* of the other unrelated claims. Accordingly, if this Court does not deny the Objection with respect to CIT, this Court should sever the objection to the CIT Claims from the remaining objections.

WHEREFORE, CIT respectfully requests that this Court enter an order (i)

denying the Objection, or (ii) severing the issues concerning the CIT Claims from the other

claims objections, and (iii) granting such other relief as is just and appropriate.

Dated: January 21, 2005

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ Andrew C. Kassner
Andrew C. Kassner (AK9067)
One Logan Square
18th and Cherry Streets
Philadelphia, PA 19103-6996
Telephone:  (215) 988-2700
Facsimile:   (215) 988-2757

Attorneys for CIT Communications
Finance Corporation

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------------- X
In re:                                          :

GENUITY INC., et al.,                           :        Chapter 11

              Debtors.                          :        Case No. 02-43558 (PCB)

                                                :        (Jointly Administered)
-------------------------------------------------------------------- X
```

AND NOW, this ____ day of _____, 2005, upon consideration of the Debtors'

Tenth Omnibus Objection to Claims (the "Objection") and the response in opposition thereto

filed by CIT Communications Finance Corporation, and after notice and a hearing pursuant to 11

U.S.C. § 102(1), it is hereby ordered that:

     1.     The Objection is Denied with respect to the claims of CIT Communications

Finance Corporation.


BY THE COURT:


_____
United States Bankruptcy Judge

## <u>CERTIFICATE OF SERVICE</u>

I, Andrew C. Kassner, hereby certify that on this 21st day of January, 2005, I caused to be served by first class United States mail, postage pre-paid, a copy of the Response Of Cit Communications Finance Corporation To The Tenth Omnibus Objection To Claims upon the following:

Julie Horowitz, Esq.
Kramer Levin Naftalis & Frankel LLP
919 Third Avenue
New York, NY 10022

<div align="right">

/s/ Andrew C. Kassner
    Andrew C. Kassner

</div>

WM\3494\1

## CERTIFICATE OF SERVICE

I, Steven L. Caponi, hereby certify that on this 19th day of June, 2006, I caused true and correct copies of the foregoing *Memorandum of Law in Opposition to Plaintiff's Motion to Remand* to be served upon the following counsel of record in the manner indicated:

### Via Electronic Filing

Howard A. Cohen (DE I.D. No. 4082)
**Drinker Biddle & Reath**
1100 North Market Street
Suite 1000
Wilmington, DE 19801-1254
(302) 467-4200

Attorneys for Plaintiff

Steven L. Caponi (DE ID No. 3484)